MASSEY & GAIL LLP
Matthew M. Collette (California Bar No. 138771)
Chiseul "Kylie" Kim
Matthew E. Layden
1000 Maine Ave. SW., Suite 450
Washington, D.C. 20024
Tel:  (202) 652-4511
kkim@masseygail.com
mlayden@massygail.com

Leonard A. Gail
50 E. Washington St., Suite 400
Chicago, IL 60602
Tel: (312) 283-1590
lgail@masseygail.com

HIRSCHFELD KRAEMER LLP
Daniel H. Handman
1299 Ocean Avenue, Suite 750
Santa Monica, CA  90401
Telephone:  (310) 255-0705
dhandman@hkemploymentlaw.com

*Attorney for the National Association of* REALTORS®

*Local Counsel for the National Association of* REALTORS®

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| The PLS.com, LLC, a California limited company,<br><br>         Plaintiff,<br><br>   vs.<br><br>THE NATIONAL ASSOCIATION OF REALTORS,<br><br>        Defendant. | Case No. 2:25-cv-05971-JWH-E<br><br>**DISCOVERY MATTER**<br><br>**[PROPOSED] ORDER ESTABLISHING A PROTOCOL FOR ELECTRONIC DISCOVERY**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Hon. John W. Holcomb<br>Courtroom 9D, 9th Floor |

# [PROPOSED] ORDER ESTABLISHING PROTOCOL FOR ELECTRONIC DISCOVERY

## A.    DEFINITIONS

1.    "Extracted Text" means the text extracted from a Native Format file and includes all header, footer, and document body information.

2.    "Metadata" means structured information that describes, explains, locates, or otherwise makes it easier to retrieve, use, or manage an information resource.

3.    "Native Format" means the format of ESI in the application in which such ESI was originally created.

4.    "OCR" means the optical character recognition file, which is created by software used in conjunction with a scanner that is capable of reading text-based documents and making such documents searchable using appropriate software.

5.    "Producing Party" means a party in the above captioned matter that produces documents.

6.    "Receiving Party" means a party in the above captioned matter to whom documents are produced

7.    "Responsive Document" means any document that is responsive to any discovery requests served on the Producing Party in this litigation, which the

Producing Party has agreed to produce, or which the Producing Party has been ordered to produce by the Court.

8.      "Tagged Image File Format" or "TIFF" refers to the CCITT Group IV graphic file format for storing bit-mapped images, with multiple compression formats and resolutions.

**B.      <u>SCOPE</u>**

1.      This ESI Protocol Order will govern the production of ESI and paper documents. To the extent that a Party collected and processed documents prior to the entry of this ESI Protocol Order, and production of such documents cannot be made in accordance with the terms of this ESI Protocol Order, the Parties will meet and confer concerning the potential formats of the production of any such documents.

2.      Nothing in this ESI Protocol Order shall be construed to affect the admissibility of discoverable information. Pursuant to the terms of this ESI Protocol Order, information regarding search processes and ESI practices may be disclosed, but compliance with this ESI Protocol Order does not constitute a waiver, by any Party, of any objection to the production of particular ESI as irrelevant, undiscoverable, or otherwise inadmissible, unduly burdensome or not reasonably accessible, or privileged, nor does it constitute a waiver of any right to discovery by any Party. For the avoidance of doubt, a Party's compliance with

this ESI Protocol Order will not be interpreted to require disclosure of information potentially protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege.

3.    The Parties shall meet and confer in good faith in an effort to agree upon search methods and terms or other filtering or categorization to be applied and timeframes for collection and review of ESI.

4.    The Producing Party shall use commercially reasonable efforts to comply with the technical specifications herein, considering the capabilities of their eDiscovery tools and vendors. Parties shall meet and confer regarding any technical limitations that prevent strict compliance.

5.    Except as noted herein, the Parties agree that the following instructions("Instructions") apply to the production of all ESI, including "paper" documents and files stored in electronic format, note files (both paper notes and electronic notes created using electronic note applications such as Microsoft OneNote), Word documents, PowerPoint documents, Excel documents, and Access databases. Nothing in this ESI Protocol Order is intended to be an exhaustive list of discovery obligations or rights of a Producing Party or a Receiving Party, or any other Party or non-Party.

6.    The Parties and their attorneys do not intend by agreeing to this ESI Protocol Order to waive their rights to any protection or privilege, including the

attorney-client privilege and work product doctrine, or their rights to object to any discovery requests. This ESI Protocol Order does not address or resolve any objections to the scope of the Parties' respective discovery requests.

7.    Notwithstanding anything to the contrary herein, the following document types are not discoverable in the Litigation except upon a showing of good cause, which shall include a showing that the information sought is likely material, that it is unavailable from other sources, and that its production will not impose undue burden or expense on the Producing Party:

    i.    Back-up tapes or other long-term storage media that were created strictly for use as a data back-up, disaster recovery medium, or a means of information restoration;

    ii.    Deleted, erased, or overwritten computer files, whether fragmented or whole, which were deleted in the regular course of business;

    iii.    Deleted, shadowed, damaged, residual, slack, fragmented, and/or other data only accessible by forensics;

    iv.    Data in metadata fields that are frequently updated automatically, such as last-opened dates, except as specified in this ESI Protocol Order;

v.     Data stored in Random Access Memory ("RAM"), cache memory, or in temporary or cache files, including internet history, web browser cache, and cookie files, or other ephemeral data, wherever located;

vi.    Operating system files and executable files;

vii.   Data stored on photocopiers, scanners, and fax machines;

viii.  Email attachments that are less than 25 kilobytes;

ix.    Structural files not material to individual file contents that do not contain substantive content (e.g., .CSS, .XSL, .XML, .DTD, etc.).

x.     Voicemail data; and

xi.    Data stored as server, system, network and/or software application logs.

8.     Nothing in this ESI Protocol Order prevents any Party from asserting, in accordance with the Federal Rules of Civil Procedure, that other categories of ESI are not reasonably accessible within the meaning of Rule 26(b)(2)(B).

9.     The Parties shall meet and confer to resolve any disputes that arise under this ESI Protocol Order. In the event the Parties cannot reach agreement on a disputed matter, the Parties shall submit the matter to the Court.

10.    ESI shall include data collected from the following sources:

i.    Email

ii.    Locally stored files

iii.    Cloud/Internet stored documents (Google Drive, Dropbox, Box.com, iCloud, Asana C, etc.)

iv.    Chat communications (such as Slack, WhatsApp, Skype, Telegram or Discord)

v.    Mobile and Handheld devices documents and data (including but not limited to text messages or other chat messaging media)

vi.    Hard Copy Documents

vii.    When agreed to, collaboration tools and project management platforms (Google Analytics, etc.)

11.    Document Custodians: Each Party will disclose an initial list of proposed custodians reflecting those with information and/or documents responsive to the agreed-on scope of Rule 34 requests.

## C.    GENERAL PRODUCTION FORMAT

1.    **FORMAT:** Each ESI item will be produced in its native format, accompanies by TIFFs, Text Files, and a Load File as set out below.

2. **TIFFs**: Except for structured data, all production images will be provided as a black-and-white, single-page Group IV TIFF of at least 300 DPI resolution with corresponding multi-page text and necessary load files. Each image will have a file name that is the unique Bates number of that image. Original document orientation should be maintained to the extent reasonably practicable and technologically possible for a producing Party's vendor (i.e., portrait to portrait and landscape to landscape). Hidden content, tracked changes, edits, comments, notes, and other similar information viewable within the native file shall, to the extent reasonably practicable, also be imaged so that this information is captured on the produced image file. Documents that are difficult to render in TIFF because of technical issues, or any other documents that are impracticable to render in TIFF format, may be produced in their native format with a placeholder TIFF image stating "Document Produced Natively," unless such documents contain redactions, in which case the documents will be produced in TIFF format.

3. **Text Files:** Each ESI item produced under this ESI Protocol Order shall be accompanied by a text file as set out below. All text files shall be provided as a single document level text file for each item, not one text file per page. Each text file shall be named to use the Bates number of the first page of the corresponding production item.

i. OCR: A Producing Party may make paper documents available for inspection and copying/scanning in accordance with Fed. R. Civ. P. 34 or, additionally or alternatively, scan and OCR paper documents if it chooses. Where OCR is used, the Parties will endeavor to generate accurate OCR and will utilize quality OCR processes and technology. OCR text files should indicate page breaks where possible. Even if OCR is used by a Producing Party, however, the Parties acknowledge that, due to poor quality of the originals, not all documents lend themselves to the generation of accurate OCR. In such instances, or in the event that a Producing Party does not choose to use OCR at all, the Producing Party will make the paper documents available for inspection and copying in accordance with Fed. R. Civ. P. 34.

ii. ESI: Emails and other ESI will be accompanied by extracted text taken from the electronic file itself, where available.

4. **Load File:** All production items will be provided with a delimited datafile or "load file," which will include both an image cross-reference load file (such as an Opticon file) as well as a metadata (.dat) file with the metadata fields identified below on the document level to the extent available. See **Appendix A**

for a list of the Meta Data fields. The load file must reference each TIFF in the corresponding production. The total number of documents referenced in a production's data load file should match the total number of designated document breaks in the Image Load files in the production.

5. **Appearance:** Subject to any redactions, each document's TIFF image file shall contain the same information and same physical representation as the document did in its original format, whether paper or electronic, consistent with the processing specifications set forth in Section E. Documents that present imaging or formatting problems of which the Producing Party is aware at the time of production but has not been able to resolve shall be promptly identified by the Producing Party by e-mail to the Receiving Party within thirty (30) days after the production containing the problematic document(s), or the Producing Party may elect to produce those documents in native form consistent with Section C.9.

6. **Redactions:** If redaction takes place, it will be logged on a privilege log. Redaction of ESI will be performed on a TIFF imaged version of the document only, and native format files and extracted text will not be provided. Unredacted text in a redacted document must be made searchable using OCR. Any redactions must be clearly visible on the face of the produced document (e.g., the Parties should not use white boxes to make redactions on documents with a white background) and OCR searchable (e.g., labeled "Redacted").

7.     **Document Unitization:** For electronic documents, all unitization should be defined within the data load file; this includes the designation of parent/attachments both for e-mail and attachments and for compressed files (such as ZIP or RAR files) and their contents.

8.     **Color:** Documents containing color shall be produced in color unless the Producing Party makes a reasonable showing that the production of particular documents in color would be overly burdensome.

9.     **Document Branding:** Each TIFF shall be stamped with the following information:

i.     **Bates Number:** Each page of a document produced in TIFF file format shall have a legible, unique fixed-length numeric identifier ("Bates Number") containing eight (8) digits electronically "burned" onto the image in no less than 10-point font. Unless it would obscure, conceal or interfere with any information originally appearing on the document, the Bates Number shall be burned on the lower right-hand corner of the document. The Bates Number for each document shall be created so as to identify the Producing Party and the Bates Number (*e.g.*, "ABC00000001") and shall not contain spaces in the Document Number. Each Party shall have a unique

identifying name. Each document's confidentiality designation shall be included in the appropriate data field in the load file.

ii.    **Confidentiality:** If a particular paper document or ESI item qualifies for confidential treatment pursuant to the terms of a Protective Order entered by the Court in the Litigation, the designation shall be branded on the document's image at a location that does not obliterate or obscure any part of the underlying images. To the extent reasonably possible, this designation also should be included in the appropriate data field in the load file. Failure to comply with the procedures set forth in this ESI Protocol Order, any protective order or confidential order, or any confidential stipulation shall not waive any protection or confidential treatment.

10.    **Native File Exceptions:** To the extent a Producing Party produces Microsoft Excel or other spreadsheet files, video or audio files, or other information that is only readable and/or usable in its Native Format, such documents shall be produced in their Native Format. To the extent documents that fall under this exception contain privileged information, and cannot be redacted or produced in TIFF format, such documents will be logged on a privilege log.

The Metadata load file for files produced natively shall contain a link to the produced Native Files via data values called "Native Link." To the extent a response to discovery requires production of discoverable electronic information contained in a structured database format, such as Microsoft Access, the Parties shall discuss the production format prior to production. Each electronic file produced in Native Format shall be assigned a unique Document Number. The Producing Party shall include a single-page TIFF image branded with this unique Document Number and the phrase "PRODUCED IN NATIVE FORMAT" branded in the center of the page. To protect the confidentiality of files produced natively, any confidentiality designations pursuant to the Stipulated Protective Order must appear on the TIFF placeholder on the lower left-hand corner in no less than 10-point font. Native file names shall be identical to the Document number, followed by the file extension, *e.g.*, ABC00000001.xls. No Party may attach to any pleading or any correspondence to any adverse or third-Party, or submit as an exhibit at a deposition or any other judicial proceeding, a copy of any document in Native Format produced by any Party without ensuring that the corresponding Bates number and confidentiality legend, as designated by the Producing Party, appears in the Native File name.

11.    **Embedded Files:** If a document has another file embedded in it, (*e.g.*, a Word document that has a spreadsheet embedded in it), the embedded file

shall be produced as a standalone file. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved. Embedded files without substantive content, such as logos, icons, emoticons, and footers may be culled from a document family and need not be produced as separate documents by a producing document.  Email attachments shall be extracted and processed as separate documents with family linking preserved; however, non-attachment embedded links (e.g., hyperlinks to external files) are not automatically extracted and may be provided separately if required for production.

12.    **Production Media:** The Producing Party shall produce document images, native files, load files and metadata via secure file transfer protocol ("FTP").

13.    **De-duplication:** The Parties shall use MD5 hash values to identify duplicate ESI and globally de-duplicate ESI. Family groups (e.g., an email and its attachments) shall be de-duplicated only against other family groups as entities, and no document that is not part of a family group shall be de-duplicated against a member of a family group. The Parties will not de-duplicate loose electronic documents or hard copy information against email attachments. The Parties will not treat a document containing handwritten notes, highlighting, or any other markings as a duplicate of a non-marked or annotated version of the same

document. A Party may de-duplicate ESI across its custodians or sources, but if that option is exercised, the Party shall identify each custodian who had a copy of the produced document in the ALL CUSTODIANS field in the Metadata load file. A Party may only de-duplicate "exact duplicate" documents and may not de-duplicate "near duplicate" documents, both of the quoted terms in this sentence being given their ordinary meaning in the e-discovery field. Common system files defined by the NIST library (http://www.nsrl.nist.gov/) need not be produced.

14.    **Original Documents:** Nothing in this Stipulated Order shall eliminate or alter any Party's obligation to retain Native Format copies, including associated metadata, of all ESI preserved for and produced in the Litigation and/or original versions of all hard copy documents preserved for and produced in the Litigation.

15.    **Third-Party Software and Legacy Systems:** To the extent that documents produced pursuant to this Stipulated Order cannot be rendered or viewed without the use of proprietary third-party software or legacy systems, the Parties shall meet and confer to minimize any expense or burden associated with the production of such documents in an acceptable format.

D.    **PAPER DOCUMENT PRODUCTION PROTOCOLS**

1.    **Scanning:** Where relevant documents are in hard copy format, the Producing Party shall scan and provide OCR copies of the documents.

2.    **Coding Fields:** The Parties shall employ the coding and metadata fields reflected in the attached **Appendix A**.

3.    **Unitization of Paper Documents:** Paper documents should be logically unitized for production to the extent reasonably practicable. Therefore, when scanning paper documents for production, distinct documents shall not be merged into a single record and single documents shall not be split into multiple records.

4.    **File/Binder Structures**: Where the documents were organized into groups, such as folders, clipped bundles, and binders, this structure shall be maintained and provided in the load file to the extent reasonably practicable. The relationship among the documents in a folder or other grouping should be reflected in proper coding of the beginning and ending document and attachment fields to the extent reasonably practicable. The Parties will make their best efforts to unitize documents correctly. Where a document, or a document group—such as folder, clipped bundle, or binder—has an identification spine or other label, the information on the label shall be scanned and produced as the first page of the document or grouping.

5.    **Custodian Identification**: The Parties will utilize best efforts to ensure that paper records for a particular Document Custodian are produced in consecutive Bates stamp order.

### E.     <u>PROCESSING SPECIFICATIONS</u>

1.     The Producing Party shall collect and process documents using forensically sound methods that avoid spoliation of data. The Producing Party will generate and preserve the MD5 hash values at the time of ESI processing. The Producing Party shall use the following specifications when converting ESI from its Native Format into TIFF image files prior to its production:

i.     All ESI shall be processed with a single consistent time zone date and time setting.

ii.     All tracked changes shall be maintained, to the extent reasonably feasible upon collection, so that all changes to a document are evident.

iii.     Author comments shall remain or be made visible, to the extent reasonably feasible upon collection and processing.

iv.     Hidden columns, rows, comments, and worksheets shall be made visible prior to processing, to the extent reasonably feasible upon collection and processing.

v.     PowerPoint documents should be processed with hidden slides and speaker's notes, and comments unhidden prior to processing, and should display both the slide, speaker's notes, and comments on the TIFF image, to the extent such elements

are made visible during collection. Auto-populated fields, with the exception of auto-populating "page-number" fields, shall be replaced with text indicating the field name. For example, auto-populating "date" fields shall be replaced with the text "DATE" (or other similar text) and auto-populating "file path" fields shall be replaced with the text "PATH" (or other similar text).

vi.  For archive files (zip, jar, rar, gzip, etc.), extract from the archive and maintain family relationships; do not include the source/container file itself in the production.

2.  **Email Collection and Processing:**

i.  **Email Threading:**  The Parties may use email thread suppression to avoid review and production of information contained within an existing email thread in another document being reviewed and produced, but under no circumstances will email thread suppression eliminate (a) the ability of a Receiving Party to identify every custodian who had a copy of a produced document or email, or (b) remove from a production any unique branches and/or attachments contained within an email thread.

      ii.    **Email Domains:** Excluded from any ESI search process shall be uniquely identifiable categories of documents, such as emails from domains typically associated with junk email, such as fantasy football-related emails, retailer advertising, and newsletters or alerts that do not concern relevant topics. The Parties agree to disclose domain names excluded under this section at the time of production.

**F.**    <u>**USE OF TECHNOLOGY ASSISTED REVIEW**</u>

1.    **Use of TAR:** The Parties may use Technology Assisted Review ("TAR") to sort documents for linear review without disclosure of that use. The Parties shall not utilize TAR in combination with search terms to cull or narrow the review set. If a Party elects to use TAR to cull or otherwise limit the volume of ESI subject to linear review, the requirements set forth in Section F.2 shall apply.

2.    **Use of TAR:**

      i.    **Paper Documents**: The Parties agree to meet and confer to determine whether paper documents may be included in a TAR process.

      ii.    **Excluded Documents**: Any document excluded from TAR must undergo separate analysis.

iii.   **Notice**: Before using TAR to cull or otherwise limit the volume of ESI subject to linear review, a Producing Party must provide to the Receiving Party a written description of the TAR tool and method(s) for identifying or eliminating documents for review, including (1) the name of any TAR software (name and version); (2) the vendor used; (3) the manner in which TAR will be employed for the review (e.g., Simple Active Learning, Continuous Active Learning); and (4) fields on which TAR will be applied.

iv.   **Validation Report**: Prior to the deadline for substantial completion of document productions, a Party utilizing TAR must provide to the Receiving Party a Validation Report containing the volume of documents included to TAR, the volume excluded and the reasons for exclusion (e.g., filetype, size, lack of extracted text), and the information required by Section F.2.v below.

v.   **Validation Standards**:

1.   The determination to stop review pending validation shall be determined by the type of TAR applied:

a.   For a party using TAR 1.0 (Simple Active Learning, Predictive Coding) a Control Set will be used to calculate statistical metrics like recall, precision, richness/prevalence, and depth for recall. Once the predictive coding model has been sufficiently trained, documents scored on or above the identified cutoff score, along with their families, will be eligible for production. Parties will report the recall, precision, richness/prevalence, and depth for recall of this population based on a 95 percent confidence level and 5 percent margin of error and will target a recall rate of 80%. In addition to the Control Set measurements, parties using a TAR 1.0 methodology will identify a Validation Set to confirm the overall performance of the model. This set will be randomly selected from the predicted non-responsive documents (excluding predicted responsive family members) and represent a 95 percent confidence level and 5

percent margin of error. The metrics of the Validation Set and Control Set will be reported in the Validation Report.

b.    For a party using TAR 2.0 (Continuous Active Learning) statistical sampling will be used to validate the appropriateness of terminating the TAR process and estimating recall. Parties will target an estimated recall of 80%. Once the parties determine that it is likely that a high percentage of responsive documents have been reviewed based on regular metrics tracking, an Elusion Sample will be drawn from the documents excluded from review by the TAR process. The sample will be sufficiently sized to provide a 95 percent confidence level and 5 percent margin of error. The richness of this sample (the Elusion Rate) will be used to estimate the number of responsive documents remaining in the unreviewed population. The total number of responsive documents in the

TAR population will be estimated by the sum of the estimated number of responsive documents in the unreviewed population and the total number of documents identified as responsive by the TAR process. Recall will be estimated by dividing the total number of documents identified as responsive by the TAR process by the estimated total number of responsive documents. If the sampling indicates that 80% recall has not been achieved, then the review process will continue unless the party demonstrates that the burden of continuing the review process is outweighed by the benefit. If the sampling indicates that 80% recall has been achieved, then TAR and review process will be terminated.

2.     Any responsive documents found in the elusion sample will be produced and identified as such and the Parties may request additional searches or training.

vi.     Aside from the Elusion Set, a Producing Party need not conduct any additional review of information subjected to, but

not retrieved by, a TAR tool as part of the identification of the

subset of information that will be subject to review and

production.

### G.    **PRIVILEGE MATERIALS**

1.    **Privilege Log:** Any document or e-mail or redacted portion of

document/e-mail that is identified as privileged for any reason and logged on a

privilege log is subject to the following:

    i.    Within thirty (30) days after the completion of a Party's

document production, the Producing Party shall serve on the

Receiving Party a privilege log containing any documents

withheld on the basis of any claim of privilege or other legal

protection ("Privileged Material"). The Parties shall promptly

provide a privilege log for any subsequently withheld

documents. To the extent the Producing Party makes multiple

document productions, the Producing Party shall supplement

and add to its original privilege log so that only one log is used

throughout the Litigation.

    ii.    The privilege log shall include sufficient information to allow

the Receiving Party to reasonably assess the claim of privilege,

including but not limited to the following information: (i) the

date of the document (i.e., the date of the last email in the email chain); (ii) the author(s)/sender(s); (iii) recipients (including recipients copied and/or blind copied); (iv) a description of the contents of the document that, without revealing information itself privileged or protected, is sufficient to understand the basis of the claim of privilege; and (v) the type or nature of the privilege asserted (e.g., attorney-client privilege, work-product doctrine).

iii.    The Parties are only required to provide a single privilege log entry for multiple email messages in the same email thread to the extent such messages are included within one individual email thread. The email that will be logged will be the most inclusive thread with any associated attachments.

iv.    Documents that contain both privileged and non-privileged/work product protected information will be produced with the privileged/protected information redacted and the non-privileged/protected information visible. Documents or portions thereof that contain redactions for information withheld on privilege/work product grounds will be identified in a privilege log in accordance with Rule

26(b)(5) and this ESI Protocol Order—with the exception that redacted documents need not be logged provided the basis for the redaction is made plain on the face of the redacted document (e.g., the email to/from is between counsel and is visible in the produced version of the document).

2.    **Non-Waiver:** Pursuant to Federal Rule of Evidence 502(d), the production of any material or information shall not be deemed to waive any privilege or work product protection in the Litigation or in any other federal or state proceeding. Nothing in this Paragraph is intended to or shall serve to limit a Party's right to conduct a review of any material or information for relevance, responsiveness, and/or segregation of privileged and/or protected information before production, subject to the below.

3.    **Clawback:** Any Party or non-Party may request the return of any produced material or information on the grounds of privilege or work product protection by identifying it, stating the basis for withholding such material or information from production, and providing any other information that would be listed on a supplemental privilege log. Federal Rule of Civil Procedure 26(b)(5)(B) shall govern the claw back of produced documents or information on the grounds of privilege or work product protection. If a Party or non-Party

requests the return of such produced material or information then in the custody

of one or more Parties, the possessing Parties shall within fifteen (15) days:

    i.    Destroy or return to the Producing Party or non-Party the produced material or information and all copies thereof, and expunge from any other document or material, information derived solely from the produced material or information; or

    ii.    Notify the Producing Party or non-Party that it wishes to challenge the claim of privilege or work product protection and has sequestered the material until the issue can be resolved. The Parties agree to meet and confer regarding the claim of privilege. If, at the conclusion of the meet-and-confer process, the Parties are still not in agreement, they may bring the issue to the Court. A Party challenging a claw-back request under this Section may not use the content of the clawed-back document for the purpose of filing a motion with the Court under seal that challenges whether or not the document is privileged or work product only. A Party challenging a claw-back request under this Section may not use the content of the clawed-back documents for any other purpose unless and until the Court has addressed the challenge.

## H.   THIRD-PARTY DISCOVERY

1.      A Party that issues a non-party subpoena (the "Issuing Party") shall include a copy of the Protective Order concerning confidentiality entered in this litigation with the subpoena.

2.      The Issuing Party shall provide to all other Parties within 10 business days of receipt a copy of any documents and ESI (including any metadata) obtained under subpoena.

3.      If the non-party production is not Bates-stamped, the Issuing Party will endorse the non-party production with unique Bates prefixes and numbering scheme prior to reproducing them to all other Parties.

**IT IS SO ORDERED.**

DATED:   10-23-25

Hon. Charles F. Eick
United States Magistrate Judge

# APPENDIX A.
## <u>METADATA FIELDS[1]</u>

Note: Cloud-specific metadata fields (e.g., titles, types, owners, dates) shall be provided if available and collected via load file from the source repository; otherwise standard document metadata fields shall suffice.

1. **BegBates** –Beginning Bates number.

2. **EndBates** – Ending Bates number.

3. **BegAttach** – Bates number of the first page of a Family range.

4. **EndAttach** – Bates number of the last page of a Family range.

5. **ParentID** – Parent Bates number, populated only for child records.

6. **PageCount** – Number of pages in a document.

7. **FileExtension** – Original file extension as the document was maintained in the ordinary course.

8. **FileSize** – File size in bytes.

9. **DocTitle** – Document title as extracted from a Native File

10. **DocSubject** – Any value populated in the Subject field of the document properties.

11. **Custodian** – Primary custodian full name.

12. **All Custodians** – All custodians from which the document was collected prior to deduplication.

---

[1] To be provided to the extent reasonably available.

13. **Author --** Document author information for non-email ESI.

14. **LastSavedBy** – User who last saved ESI.

15. **From** – Sender of an email or Chat Communication.

16. **To** – Recipient of an email or all recipients of a Chat Communication.

17. **CC** – Additional Recipients.

18. **BCC -** Blind Additional Recipients.

19. **Email Subject** – Subject line of e-mail.

20. **Attachments** – Name of attached file(s) as maintained in the ordinary course of business.

21. **Number of Attachments** – Number of attachments to an e-mail.

22. **DateCreated** – File date and time created as extracted from the Native File.

23. **DateModified** – File date and time modified as extracted from the Native File.

24. **DateSent** – Date and time sent.

25. **DateReceived** – Date and time received.

26. **FileName** – Name of the file as maintained in the ordinary course of business with extension.

27. **File/Folder Path** – Original file/path of the location where the item was located at the time of collection. If an email extracted from a container, e.g., from a .pst file, it should contain the name and location of the email

container, and the folder within the container from which the email was collected.

28.  **Hash** – The hash value generated at processing.

29.  **Collaboration Channel/Chat Name** – Name of the channel or chat where the Chat Communication occurred, if provided via load file during ingestion of chat data.

30.  **Chat Conversation ID** – Unique ID to identify all messages and attachments within a Chat Communication channel/thread (i.e., messages involving the same participants or occurring within the same thread), if provided via load file during ingestion of chat data.

31.  **Time Zone Processed** – Time zone data was processed (e.g, UTC).

32.  **TextPath** – The path to the text file for each record in the production volume, including filename.

33.  **NativePath** – The path to the Native Format file on the delivery media, including the file name.

34.  **Confidentiality** – Confidentiality level if assigned pursuant to any applicable Protective Order or stipulation.[2]

35.  **Redacted** – Descriptor for documents that have been redacted. "Yes" for redacted documents; "No" for un-redacted documents.

---

[2] To the extent there is a discrepancy between the metadata field and the face of the document, the highest designation controls.