# Exhibit 1

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### CIVIL MINUTES—
### GENERAL

| | | | |
|---|---|---|---|
| Case No. | 2:25-cv-05971-JWH-Ex | Date | October 15, 2025 |
| Title | *The PLS.com, LLC v. The National Association of Realtors* | | |

Present: The Honorable   JOHN W. HOLCOMB, UNITED STATES DISTRICT JUDGE

| Clarissa Lara | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:   SCHEDULING ORDER**

This case is set for trial before the Honorable John W. Holcomb in Courtroom 9D, Ronald Reagan Federal Building and U.S. Courthouse, 411 W. 4th Street, Santa Ana, California.

## I.  PRE-TRIAL AND TRIAL DEADLINES

| EVENT | DATE/DEADLINE |
|---|---|
| **Jury Trial** (Monday at 9:00 a.m.) | **Monday, September 27, 2027**<br>8 days |
| **Final Pretrial Conference** [L.R. 16] (Friday at 1:00 p.m.) | **Friday, September 10, 2027** |
| **Hearing on Motions *In Limine*** (Friday at 9:00 a.m.) | **Friday, September 3, 2027** |
| **Last Date to Hear Dispositive Motions** (Friday at 9:00 a.m.) | **Friday, June 25, 2027** |

CIVIL MINUTES—
                                GENERAL            Initials of Deputy Clerk cla

| EVENT | DATE/DEADLINE |
|---|---|
| **Last Date to Conduct Settlement Conference** | **Friday, May 21, 2027** |
| **Expert Discovery Cut-Off** (including hearing all expert-related discovery motions | **Friday, April 30, 2027** |
| **Expert Disclosure** (Rebuttal)[1] | **Friday, March 5, 2027** |
| **Expert Disclosure** (Initial) | **Friday, January 8, 2027** |
| **Fact Discovery Cut-Off** (including hearing of discovery motions) | **Friday, October 23, 2026** |
| **Substantial Completion Deadline for Document Discovery** | **Friday, February 6, 2026** |
| **Written Discovery Deadline** (discovery must be served so that responses are due on or before this date) | **Friday, December 19, 2025** |

## II.  AMENDING PLEADINGS AND ADDING PARTIES

There is no separate deadline for the parties to amend their pleadings or to add parties.  Parties who wish to amend pleadings or to add parties shall comply with Rule 15(a)(1) or (2) and, if applicable, Rule 16(b)(4) of the Federal Rules of Civil Procedure, as well as L.R. 15-1 through L.R. 15-3 and L.R. 16-14.

---

[1]     In accordance with Rule 26(a)(2)(D)(ii) of the Federal Rules of Civil Procedure, the Court construes a "rebuttal expert" as one offered by a party "solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)." If a party seeks to present expert testimony other than "solely to contradict or rebut evidence on the same subject matter identified by another party," then that party should make its disclosure as an Initial Disclosure no later than January 8, 2027.

### III.  MOTIONS

**A.      Schedule and Procedures**

Judge Holcomb hears motions in civil cases, through in-person appearances, on Fridays at 9:00 a.m.  The cut-off date for hearing motions is the last day on which motions will be heard; *i.e.*, the motion must be filed at least 28 days before the deadline in accordance with the requirements of L.R. 6-1.  ***A copy of every motion-related document filed (including documents pertaining to claim construction hearings in patent cases) must be delivered to the chambers drop box outside Courtroom 9D or transmitted to chambers via FedEx, UPS, or other overnight delivery service (the "Mandatory Chambers Copy").***  The cut-off date applies to all non-discovery motions except motions directly related to the conduct of trial (*e.g.*, motions *in limine* and motions to sever parties or to bifurcate issues for trial).

The parties are also reminded about their obligation to comply with L.R. 7-3, which requires a Conference of Counsel at least seven days before a party files most types of motions.  The Court may deny a motion *sua sponte* if the moving party fails to comply strictly with L.R. 7-3.

**B.      Motions for Summary Judgment**

The Court employs special procedures for summary judgment motions, including the parties' preparation of a mandatory ***Joint Exhibit*** and ***Joint Statement of Undisputed Facts and Genuine Disputes***.  The parties and their counsel are directed to the Standing Order for a full explanation.

The Court reminds the parties that the cut-off date for hearing dispositive motions (*i.e.*, summary judgment motions) is the last day on which motions will be ***heard***, not ***filed***.  The Court encourages parties to confer early and often regarding anticipated summary judgment motions and, when appropriate, to file a stipulation and proposed order to set a briefing schedule that provides the parties with more time between filing and opposition, and between opposition and reply, than the one week that is provided under L.R. 6-1, 7-9, and 7-10.

**CIVIL MINUTES—
GENERAL**        Initials of Deputy Clerk <u>cla</u>

## C.   Motions *in Limine*

All motions *in limine* (including *Daubert* motions) and other trial-related motions must be filed at least 21 days before the hearing on such motion. Oppositions to motions *in limine* are due 14 days before the hearing on motions *in limine*.  Replies will not be accepted.

Counsel shall meet and confer thoroughly, in accordance with L.R. 7-3, in an effort to limit or eliminate the need for such trial-related motions.  Memoranda of Points and Authorities in support of or in opposition to motions *in limine* shall not exceed 10 pages.  Motions shall not be compound; *i.e.*, each motion shall address only one item of evidence or witness.  If common grounds for exclusion or admission apply to multiple items of evidence or witnesses, each motion shall address only one category of evidence or witnesses.  Motions *in limine* should not be disguised motions for summary judgment or summary adjudication.

## D.   Withdrawal and Non-Opposition of Motions

All parties and counsel must comply with L.R. 7-16, which provides as follows:

> Any moving party who intends to withdraw the motion before the hearing date shall file and serve a withdrawal of the motion, not later than seven (7) days preceding the hearing.  Any opposing party who no longer intends to oppose the motion, shall file and serve a withdrawal of the opposition, not later than seven (7) days preceding the hearing.

Failure to comply with this notification requirement may result in the imposition of sanctions on the offending counsel or party.

If a defendant files a motion to dismiss a complaint and the plaintiff subsequently amends that complaint, then the defendant shall file a Notice of Withdrawal of its motion to dismiss in accordance with L.R. 7-16, without waiting for the plaintiff or the Court to take action on the motion.

## IV.  DISCOVERY

Counsel shall initiate all discovery other than depositions at least *45 days* before the cut-off date.  The Court will not approve stipulations between counsel

that permit responses to be served after the cut-off date except in unusual circumstances and for good cause shown.

All depositions must be completed by the discovery cut-off deadline. Counsel shall lodge all original depositions that will be used in trial with the Courtroom Deputy Clerk on the first day of trial.

Counsel are expected to resolve discovery problems without the assistance of the Court.  Discovery disputes have been referred to the Magistrate Judge assigned to this case.  The discovery cut-off is the last date to *complete* discovery, including expert discovery.  It is also the last day for hearing any discovery motion.

## V.  SETTLEMENT PROCEDURES

Counsel must complete a settlement conference under the Court-Directed ADR Program (L.R. 16-15.4) no later than the date set by the Court above.  If the parties desire to participate in an ADR procedure other than that elected in the Rule 26(f) Scheduling Report and Order, they shall file a stipulation with the Court.  This request will not necessarily be granted.

Counsel shall include in the proposed Pretrial Conference Order a status report detailing what procedure has been followed and the status of settlement efforts.  The case may not proceed to trial unless all parties, including the principals of all corporate parties, have appeared personally at a settlement conference and have complied with L.R. 16-15.5.

If a settlement is reached, it shall be reported immediately to this Court as required by L.R. 16-15.7.  ***In all cases set for jury trial, the parties must notify the Court, no later than the Wednesday preceding the Monday trial date, of any settlement, so that the necessary arrangements can be made to bring in a different case for trial or to notify the members of the public who would otherwise be reporting for jury duty that their services are not needed that date.  Failure to comply with this notification requirement may result in the imposition of sanctions on counsel for one or more parties, or their clients, or both.***

---

| **CIVIL MINUTES— GENERAL** | Initials of Deputy Clerk <u>cla</u>

## VI.  FINAL PRETRIAL CONFERENCE

The Court will conduct a Final Pretrial Conference pursuant to Rule 16 of the Federal Rules of Civil Procedure and L.R. 16-1 on the date and time listed above.  Each party appearing in this action shall be represented at the Final Pretrial Conference and at all pretrial meetings by its lead trial counsel.  Counsel should be prepared to discuss streamlining the trial, including the presentation of testimony by deposition excerpts, time limits, stipulations regarding undisputed facts, and the qualification of experts by admitted resumes.  In rare cases where the Pretrial Conference is waived by the Court, counsel must follow L.R. 16-11.  This Court does not exempt *pro per* parties from the requirements of L.R. 16.

## VII.  MATTERS TO BE DISCUSSED AT THE FINAL PRETRIAL CONFERENCE

Counsel shall be prepared to discuss the following matters with the Court at the Pretrial Conference:

- the witnesses all parties intend to call during their respective cases, and the amount of time necessary for direct and cross examination of each witness;

- any anticipated problems in scheduling witnesses;

- any evidentiary issues, including anticipated objections under Rule 403 of the Federal Rules of Evidence, and objections to exhibits;

- jury selection procedures;

- all pretrial motions, including motions *in limine* and motions to bifurcate and to sever (which, as noted above, must be set for hearing at least one week before the Pretrial Conference);

- any disputed jury instructions, and the form of the instructions that will be given to the jury at the outset of the case, i.e., before opening statements and presentation of evidence;

- whether any counsel intends to use any evidence or demonstrative aid in opening statement; and

---

**CIVIL MINUTES— GENERAL**   Initials of Deputy Clerk <u>cla</u>

- motions to exclude witnesses from the courtroom during trial testimony.

If counsel for any party needs to arrange for the installation of their own equipment, such as video monitors, notebooks, or projection equipment, counsel shall notify the Courtroom Deputy Clerk no later than 4:00 p.m. on the Wednesday before trial so that the necessary arrangements can be made.

## VIII.  PRETRIAL FILINGS

Counsel shall submit carefully prepared Memoranda of Contentions of Fact and Law (which may also serve as the trial briefs) and proposed Pretrial Conference Orders in accordance with the provisions of L.R. 16-4 through 16-7.  The form of the proposed Pretrial Conference Order shall be in conformity with the form set forth in Appendix A to the Local Rules.

The filing schedule for pretrial documents is as follows:

**A.     At Least 21 Days before Final Pretrial Conference**

- Memorandum of contentions of fact and law

- Witness lists

- Joint exhibit list

- Oppositions to motions *in limine* (which, as noted above, must be set for hearing at least one week before the Pretrial Conference)

**B.     At Least 14 Days before Final Pretrial Conference**

- Proposed Final Pretrial Conference Order

- Proposed jury instructions and any objections thereto

- Proposed verdict forms

- Statement of the case

- Proposed *voir dire* questions, if desired

| **CIVIL MINUTES— GENERAL** | Initials of Deputy Clerk <u>cla</u>

**C.     At Least 7 Days before Trial:**

- Trial briefs, if desired.

In drafting the Proposed Final Pretrial Conference Order, counsel shall make a good faith effort to agree on, and to set forth, as many uncontested facts as possible.  The Court may read the uncontested facts to the jury at the start of the trial.

In drafting the factual issues in dispute for the Proposed Final Pretrial Conference Order, the issues of fact should track the elements of a claim or defense upon which the jury would be required to make findings.  Counsel should attempt to state issues in ultimate fact form, not in the form of evidentiary fact issues (*i.e.*, "was the defendant negligent?"; "was such negligence the proximate cause of injury to the plaintiff?"; "was the plaintiff negligent?"; *not*, "was the plaintiff standing on the corner of 5th Street and Spring Avenue at 10:00 a.m. on May 3?"). Counsel may list sub-issues under the headings of ultimate fact issues, but shall not use this as a device to list disputes over evidentiary matters.

Issues of law should state legal issues upon which the Court will be required to rule after the Pretrial Conference, including during the trial, and should not list ultimate fact issues to be submitted to the trier of fact.

Each party shall list and identify its respective expert witnesses, if any. Failure of a party to list and identify an expert witness in the Proposed Final Pretrial Conference Order shall preclude a party from calling that expert witness at trial.

**D.     Exhibit and Witness Lists**

Counsel are directed to prepare their exhibits by placing them in three-ring binders that are tabbed down the right side with exhibit numbers.  The spine portion of the binder shall indicate the volume number and shall contain an index of each exhibit included in the volume.  The binders are to be prepared with an original for the Courtroom Deputy Clerk, which shall be tagged with the appropriate exhibit tags in the upper right-hand corner of the first page of each exhibit, and two copies for the Court (the "Judge's binders").  Each binder shall contain an index of the included exhibits.  The exhibits are to be numbered in accordance with L.R. 26-3.

The Court requires the following to be submitted to the Courtroom Deputy Clerk on the first day of trial:

- The original exhibits with the Court's exhibit tags. The parties shall use yellow tags for Plaintiff and blue tags for Defendant, which shall be stapled to the front of the exhibit on the upper right corner with the case number, case name, and exhibit number placed on each tag. Counsel can obtain exhibit tags at the Clerk's Office. Exhibit Tags (Plaintiff & Defendant, form G-014) are also available on the Court's website, under "Court Procedures," "Forms."

- Two Judge's binders with a copy of each exhibit for use by the Court, tabbed with numbers as described above. (Court's exhibit tags not necessary.)

- Four copies of the exhibit index.

The exhibit index shall be in the following form:

| Case No.     | Case Name:                         |               |               |
|--------------|------------------------------------|---------------|---------------|
| Exhibit No.  | Description                        | Date Identified | Date Admitted |
| 3            | 1/30/2005 Letter from Doe to Roe   |               |               |

- Four copies of witness lists in the order in which the witnesses may be called to testify.

The witness lists shall be in the following form:

| Case No.      | Case Name:              |
|---------------|-------------------------|
| Witness Name  | Date Called to Testify  |
| 1. John Doe   |                         |
| 2. Jane Roe   |                         |

All counsel shall meet no later than *10 calendar days* before trial and shall stipulate to the extent possible regarding foundation, waiver of the best evidence

---

**CIVIL MINUTES— GENERAL**    Initials of Deputy Clerk <u>cla</u>

rule, and admission into evidence of exhibits at the start of trial.  The exhibits to be received will be noted on the extra copies of the exhibit lists.

## IX.  COURT REPORTER

At least seven days before the commencement of trial, counsel for the parties shall provide the court reporter with a list of unusual words, phrases, and spellings that may come up during trial.  This information should be emailed to Court Reporter Services at ReportersCACD@cacd.uscourts.gov.

## X.  JURY INSTRUCTIONS

*Fourteen calendar days* prior to the L.R. 16-2 Meeting of Counsel, counsel shall exchange proposed jury instructions and special verdict forms (if applicable).  *Seven calendar days* prior to the L.R. 16-2 meeting, counsel shall exchange any objections to the instructions and special verdict forms.  Prior to or at the time of the L.R. 16-2 meeting, counsel shall meet and confer with the goal of reaching agreement regarding one set of joint, undisputed jury instructions and one special verdict form.

The parties shall file proposed jury instructions *fourteen calendar days* before the Final Pretrial Conference.  As always, the parties must submit Mandatory Chambers Copies to the Court.  In addition, the parties must submit electronic versions (in Word format) to the Court at the following e-mail address: JWH_Chambers@cacd.uscourts.gov.

As noted above, the parties must act jointly to submit proposed jury instructions.  The parties must submit one set of agreed upon jury instructions.  At the same time, the parties must submit another set of jury instructions containing the instructions upon which the parties disagree and the objections to those instructions.  Where the parties disagree on an instruction, the party opposing the instruction must attach a short (*i.e.*, one to two paragraphs) statement supporting the objection and the party submitting the instruction must attach a short statement supporting the instruction.  Each statement should be on a separate page and should follow directly after the disputed instruction.

Accordingly, the parties ultimately will submit one document or, if the parties disagree over any proposed jury instructions, two documents.  If the parties submit two documents, those documents should consist of:  (1) a set of agreed upon jury instructions; and (2) a set of disputed jury instructions along with reasons supporting and opposing each disputed instruction.

Where the ***Manual of Model Civil Jury Instructions for the Ninth Circuit*** provides a version of a requested instruction, the parties should submit the Model instruction.  Where California law applies, the Court prefers counsel to use JUDICIAL COUNCIL OF CALIFORNIA, CIVIL INSTRUCTIONS—("CACI").  If neither of the above sources has an instruction on the subject, counsel are directed to consult the current edition of O'Malley, et al., FEDERAL JURY PRACTICE AND INSTRUCTIONS.  Each requested instruction (a) shall cite the authority or source of the instruction; (b) shall be set forth in full; (c) shall be on a separate page; (d) shall be numbered; (e) shall cover only one subject or principle of law; and (f) shall not repeat principles of law contained in any other requested instruction.

The Court will send a copy of the jury instructions into the jury room for use by the jury during deliberations.  Accordingly, in addition to the file copies described above, the parties shall file with the Courtroom Deputy Clerk and shall email to chambers on the first day of the trial a "clean set" of joint and/or proposed jury instructions that contain only the text of each instruction set forth in full on each page, with the caption "Court's Instruction Number __" (eliminating titles, supporting authority, indication of party proposing, etc.).  This version will be referred to as the "Jury Copy" of the jury instructions.

An index page shall accompany all jury instructions submitted.  The index page shall indicate the following:

- The number of the instruction;

- A brief title of the instruction;

- The source of the instruction and any relevant case citations; and

- The page number of the instruction.

---

**CIVIL MINUTES— GENERAL**

Initials of Deputy Clerk cla

EXAMPLE:

| Number | Title | Source | Page |
|--------|-------|--------|------|
| 1 | Burden of Proof | 9th Cir. 12.02 | 7 |

## XI.  JOINT STATEMENT OF THE CASE

Counsel shall prepare a joint statement of the case which will be read by the Court to the prospective panel of jurors prior to the commencement of *voir dire*. The statement should not be longer than three paragraphs.  The statement shall be filed with the Court fourteen calendar days before the Final Pretrial Conference.

## XII.  TRIAL

The Court sets firm trial dates.  Counsel shall arrive at the Courtroom ***not later than 8:30 a.m.*** each day of trial.  The Court reserves the time from ***8:30 to 9:00 a.m.*** to handle legal and administrative matters outside the presence of the jury.  The trial will commence promptly at 9:00 a.m.  Counsel shall anticipate matters that may need discussion or hearing outside the presence of the jury and to raise them during this period.

The Court is in session with the jury on ***Mondays through Thursdays, 9:00 a.m. to 5:00 p.m., with a morning and an afternoon break and a lunch recess from approximately 12:00 noon to 1:00 p.m.***  In most instances, jury selection is completed on the first morning of trial, and counsel should be prepared to give opening statements and to begin their presentation of evidence immediately thereafter.

All counsel shall observe the following practices during trial:

- All counsel and parties shall rise when the jury enters and leaves the courtroom.

- Counsel shall stand when addressing the Court, including when objecting to opposing counsel's questions.

- When objecting, counsel shall state only "objection" and the legal ground for the objection (*e.g.*, hearsay, irrelevant, etc.).  Counsel shall refrain from

arguing the legal basis for the objection unless and until permission is granted to do so. Counsel shall instruct their witnesses to refrain from answering a question while an objection is pending.

- Counsel must seek leave to approach the Courtroom Deputy Clerk or the witness and shall question witnesses while standing at the lectern.

- Counsel shall not address or refer to witnesses or parties by first names alone, with the exception of witnesses under 14 years old.

- Counsel shall not discuss the law or argue the case in opening statements.

- Counsel shall address all remarks to the Court and shall not directly address the Courtroom Deputy Clerk, the Court Reporter, opposing counsel, or the jury (except in opening statement and closing argument and during *voir dire*). Counsel must ask the Court for permission to talk off the record in order to speak with opposing counsel.

- Counsel shall not make an offer of stipulation unless he or she has conferred with opposing counsel and believes that the stipulation will be accepted.

- While Court is in session, counsel may not leave the counsel table to confer with witnesses, colleagues, or assistants elsewhere in the courtroom unless the Court grants permission to do so in advance.

- Where a party has more than one lawyer, only one may conduct the direct or cross-examination of a particular witness or make objections with respect to that witness.

- If a witness was on the stand before a recess or adjournment, counsel shall have the witness back on the stand and ready to proceed when Court resumes.

- If there is more than a brief delay between witnesses, the Court may deem that the party has rested.

- The Court attempts to cooperate with witnesses and will, except in extraordinary circumstances, accommodate them by permitting them to be examined out of sequence. Counsel should discuss any scheduling issues

with opposing counsel.  If there is an objection, counsel shall confer with the
Court in advance.

## XIII.  WEBSITE

Counsel are encouraged to review the Central District's website for
additional information:  www.cacd.uscourts.gov.

**IT IS SO ORDERED.**

**CIVIL MINUTES—
GENERAL**

Initials of Deputy Clerk <u>cla</u>

# Exhibit 2

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
Central District of California

| | |
|---|---|
| The PLS.com, LLC, a California limited company | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 2:25-CV-05971 |
| The National Association of Realtors, et al., | ) |
| | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:            UMRO Realty Corp., d/b/a the Agency
            331 Foothill Road, Suite 100, Beverly Hills, CA 90210
*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attached Schedule A

| Place: HIRSCHFELD KRAEMER LLP<br>1299 Ocean Avenue, Suite 750<br>Santa Monica, CA 90401 | Date and Time:<br><br>12/03/2025 5:00 pm |
|---|---|

❑ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    11/12/2025

| *CLERK OF COURT* | |
|---|---|
| | OR |
| _____ | /s/ Leonard A. Gail<br>_____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Defendant
National Association of Realtors                              , who issues or requests this subpoena, are:
Leonard A. Gail, MASSEY & GAIL LLP, 50 E. Washington St., Suite 400, Chicago, IL 60602; lgail@masseygail.com; (312) 283-1590

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 2:25-CV-05971

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

   **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

## DEFINITIONS

1.      "You," or "Your" means "You," "Your," and "the Agency" refer to UMRO Realty Corp., d/b/a the Agency, including, without limitation, all of its locations, predecessors, predecessors-in-interest, subsidiaries, parents, affiliates, past or present directors, officers, members, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, franchisees, licensees, owners, shareholders, and partnership relationships.

2.      "The PLS.com, LLC," or "PLS" means the entity and its employees, agents, founders, or other persons acting on its behalf.

3.      "Action" means all existing and future actions consolidated in *The PLS.com, LLC v. The National Association of Realtors, et al.*, 2:25-cv-05971-JWH-E (C.D. Cal.).

4.      "Prior Action" means all existing and future actions consolidated in *The PLS.com, LLC v. The National Association of Realtors, et al.*, 2:20-cv-04790-JWH (C.D. Cal.).

5.      Complaint" means the operative amended complaint filed in this Action (ECF No. 1), attached as Exhibit A.

6.      "Clear Cooperation Policy" has the same meaning as used in the Complaint.

7.      "Communication" or "communications" means any oral, written, or other contact between two or more persons or entities by which any information or knowledge of any nature is transmitted.

8.      "Document" or "Documents" shall have the same meaning as used in Rule 34 of the Federal Rules of Civil Procedure, and shall be construed in its broadest sense to include, without limitation, the final form and all drafts and

1

revisions of any paper or other substance or thing, original or reproduced, and all copies thereof that are different in any way from the original, on which any words, letters, numbers, symbols, pictures, graphics, or any other form of information is written, typed, printed, inscribed, or otherwise visibly shown, and also every other form of stored or recorded information, whether on film, tape, disks, cards, computer memories, or any other medium and/or device whereby stored information can, by any means whatsoever, be printed or otherwise recovered, generated or displayed in the form of visible, audible, or otherwise perceptible words, letters, numbers, symbols, pictures, or graphics. To illustrate (and not to limit) the breadth of this definition, Document in this sense includes papers or objects bearing handwritten notes, material written in Braille, contracts, letters, bills, telegrams, notes, e-mail, voice mail, social media communications, texts, instant messages, books, desk calendars, memoranda, envelopes, drafts or partial copies of anything, signs, photographic negatives and prints, video and audio recordings of all kinds and data. Each and every draft of a document is a separate Document for purposes of these Document requests.

9.　"Pocket Listing" means a property that is listed for sale but is not publicly listed on the Multiple Listing Service.

10.　"Office Exclusive" means a residential real estate property marketed by a Licensed Real Estate Professional pursuant to Policy Statement 7.63 of NAR's Handbook on Multiple Listing Policy ("If a seller withholds consent for a listing to be published in an MLS compilation of current listings, such listings shall be filed with the MLS but not disseminated to other participants. As a matter of local discretion, certification may be required from the seller or from the listing broker that the listing is being withheld from the MLS at the direction of the seller.") or similar policy.

11.    "Listing Network" means any database or other facility for the marketing of real property among and between Licensed Real Estate Professionals, including but not limited to PLS, California Regional Multiple Listing Service, Inc., Bright MLS, Inc., Midwest Real Estate Data, LLC, or any MLS.

12.    "Listing Network Services" means the marketing of real property among and between Licensed Real Estate Professionals on Listing Networks, as defined above.

13.    "MLS" shall mean multiple listing service as defined in Section 1 of NAR's 2022 Handbook on Multiple Listing Policy, whether or not affiliated with NAR, including MLS predecessors, wholly-owned or controlled subsidiaries or affiliates, successors, parents, other subsidiaries, departments, divisions, joint ventures, other affiliates, and any organization or entity that it manages or controls, including those merged with or acquired, together with all present and former directors, officers, employees, agents, attorneys, representatives, or any persons acting or purporting to act on their behalf, whether located in the United States or abroad.

14.    "Umansky Fraud Litigations" refer to the following cases, individually and collectively: Western World Insurance Co. v. UMRO Realty Corp., (C.D. Ca. filed June 25, 2018); Sweetwater Malibu CA, LLC v. Umansky, 2:19-cv-1848, (C.D. Ca. filed Mar. 13, 2019); Hakim v. Umansky, 19SMCV01619 (Cal. Super. Ct. filed Sept. 13, 2019); Segal vs. Umansky, 19SMCV01720 (Cal.Super. Ct. filed Sept. 27, 2019); Sweetwater Malibu CA, LLC v. Hakim, 2:20-cv-08945-GW-KS, (C.D. Ca. filed Sept. 29, 2020).

15.    "Each" and "every" shall be construed to mean "each and every."

16.    "Including" shall mean "including without limitation" and "including but not limited to."

3

17.   "Relating to," "related to," or "relate to," when referring to any given subject matter, means without limitation any information, document, or thing that in whole or in part and directly or indirectly relates to, concerns, regards, discusses, describes, depicts, demonstrates, shows, evidences, supports, refutes, contradicts, summarizes, analyzes, bears upon, comments upon, pertains to, constitutes, comprises, involves, contains, embodies, reflects, alludes to, identifies, states, mentions, refers to, deals with, or is in any way relevant to the particular subject matter identified.

18.   "ESI" shall mean any "electronically stored information."

19.   All other words are given their plain and ordinary meaning.

## INSTRUCTIONS

1.   Unless otherwise stated in a specific request, these requests seek responsive Documents for the period January 1, 2017 to the Present.

2.   In complying with these Requests, You are to produce all responsive Documents within Your possession, custody, or control, along with every family document (such as any appendices, attachments, cover letters, enclosures, exhibits, and schedules), that is in Your possession, custody, or control, including the custody or control of Your agents and employees. If any portion of a Document or Communication is responsive to and Request, the entire   Document or Communication should be produced.

3.   In answering these Requests, provide information that is available to You, not just information within Your knowledge. If no Document in Your possession, custody, or control is responsive to a particular request for production, provide a written response stating so.

4.   If You claim privilege as grounds for not fully answering a Request, You should provide a privilege log in accordance with Rule 26 of the Federal Rules

4

of Civil Procedure, pages 18-21 of the ESI Order (ECF No. 53), attached as Exhibit C, and any other applicable order or agreement regarding privilege logs. You may also designate confidential materials in accordance with the Stipulated Protective Order (ECF No. 47), attached as Exhibit B. In the absence of any applicable order or agreement, produce each responsive Document as it is kept in the ordinary course of business, with all metadata intact, and with Bates numbering.

5.    These Requests must be construed in the broadest possible manner consistent with the Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the Central District of California. The words "all," "any," "each," "every," "and," and "or" must be construed conjunctively and disjunctively as necessary to make the Requests inclusive rather than exclusive. The singular includes the plural and vice versa. A masculine, feminine, or neuter pronoun includes all other genders. Any verb used in any tense includes the verb in all its tenses.

6.    These requests for production are continuing. If, after responding, You obtain or become aware of any additional responsive Document, then produce that Document promptly, as required by Federal Rule of Civil Procedure 26(e).

7.    Enclosed as Exhibits B and C are the Stipulated Protective Order (ECF No. 47) in this matter and the Order Establishing a Protocol for Electronic Discovery ("ESI Order") (ECF No. 53), respectively. Section H of the ESI Order states that a Party that issues a non-party subpoena (the "Issuing Party") shall include a copy of both orders along with the subpoena.

## REQUESTS FOR PRODUCTION

1. All documents relating to PLS.

2. All Documents relating to the Action, the Prior Action, or the allegations in the Complaint.

3. All documents relating to Your participation in any listing service.

4. All documents or communications including the term "clear cooperation policy" from June 1, 2019 or later.

5. Documents or data sufficient to show all payments, individually and in total, that You have made for Listing Network Services, including but not limited to subscriptions to or memberships in Listing Networks.

6. All Documents referring to the act of withholding, concealing, or misrepresenting any information about a residential real estate property and relating to any Plan to sell or market such a property.

7. All Documents and communications relating to the Umansky Fraud Litigations.

8. Documents or data sufficient to show all third-party marketing services You have used to facilitate the sale of residential real estate properties and sufficient to identify: (a) each service used; (b) the identity of and contact information for each provider of such services; and (c) the dates and the amounts of any payments You made to any such provider for any such service.

9. All Documents relating to any allegation that You violated any law, applicable rule of professional responsibility, or applicable professional code of ethics, or breached any fiduciary duty relating to the sale, purchase, or marketing of a residential real estate property, including but not limited to allegations of fraud, breach of contract, breach of fiduciary duty, torts, violations of The Fair Housing Act, 42 U.S.C. 3601 et seq., violations of California's Fair Employment

and Housing Act, CA Govt Code §§ 12900–12951, 12927–12928, 12955–12956.1, 12960–12976, violations of any rule imposed by the California Bureau of Real Estate or any similar entity in any other state, or violations of any Code of Ethics promulgated by NAR, by the California Association of Realtors, or by any other any association of Licensed Real Estate Professionals.

10. All documents and communications relating to any and all Pocket Listings marketed or sold by Christopher Dyson from June 1, 2018 or later.

11. All documents and communications relating to any and all Office Exclusive Listings marketed or sold by Christopher Dyson from June 1, 2018 or later.

12. All documents and communications relating to any and all Pocket Listings marketed or sold by Mauricio Umansky from June 1, 2018 or later.

13. All documents and communications relating to any and all Office Exclusive Listings marketed or sold by Mauricio Umansky from June 1, 2018 or later.

14. All documents and communications relating to any and all Pocket Listings marketed or sold by David Parnes from June 1, 2018 or later.

15. All documents and communications relating to any and all Office Exclusive Listings marketed or sold by David Parnes from June 1, 2018 or later.

16. All documents and communications relating to any and all Pocket Listings marketed or sold by James Harris from June 1, 2018 or later.

17. All documents and communications relating to any and all Office Exclusive Listings marketed or sold by James Harris from June 1, 2018 or later.



Christopher G. Renner (D.C. Bar No. 1025699)*
cgrenner@dhillonlaw.com
(571) 430-2240 (voice and fax)
Dhillon Law Group Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
*Additional Counsel on Signature Page*
    *   *pro hac vice* forthcoming

Brandon Q. Tran (CA Bar No. 223435)
btran@dhillonlaw.com
(949) 340-1968 (voice and fax)
4675 MacArthur Court, Suite 1410
Newport Beach, CA 92660

***Attorneys for Plaintiff*** **The PLS.com, LLC**

## IN THE UNITED STATES DISTRICT COURT
## FOR CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| **The PLS.com, LLC**, a California limited liability company, | Case No. 2:25-cv-05971 |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| **The National Association of Realtors**, | |
| Defendant. | |

Plaintiff The PLS.com, LLC, ("PLS"), by and through its undersigned attorneys, brings this action for trebled compensatory damages under the antitrust laws of the United States against the above-named Defendant, demanding a trial by jury. For its Complaint against Defendant National Association of Realtors ("NAR"), PLS alleges the following:

## NATURE OF THE CASE

1. For over 50 years, residential real estate in the United States has been primarily marketed through the multiple listing services ("MLSs") owned by members of the NAR.

2. NAR, by itself and through its affiliates, controls competition in the residential real estate brokerage industry through its members' ownership of most of the nation's MLSs.

3. NAR has frequently used its control over MLSs to exclude new and disruptive market entrants to the benefit of NAR members, and the detriment of consumers. NAR and its members have abused the market power conferred upon them by control over the MLS system time and time again.

4. NAR's ability to control competition in the residential real estate brokerage industry rests on the market power of the MLSs operated by its members.

5. In recent years, the edifice on which NAR's ability to control competition was built had begun to crumble. For the first time in the life of most Americans, an alternative to the NAR-affiliated MLS system had emerged, promising a wave of innovation, competition, and new entry.

6. Home sellers have for years sought to retain the services of licensed real estate professionals to market their homes outside of the NAR-affiliated MLS system. Sellers sought these services for a number of reasons. Many sellers desired for reasons of privacy or security to market their home without the wide exposure that comes from listing a property in NAR-affiliated MLSs. Many sellers desired to test the market for their home without the stigma that comes from listing and then delisting the property on a NAR-affiliated MLS.

7. Listings marketed by licensed real estate professionals outside the NAR-affiliated MLS system are sometimes called "pocket listings." Demand for pocket listing services has skyrocketed in recent years, particularly in large and competitive real estate markets such as Los Angeles, Orange County, San Francisco, Miami, and

Washington D.C. In some of these markets, 20 percent or more of residential real estate was being sold outside the NAR-affiliated MLS system, primarily as pocket listings. NAR recognized in 2018 that NAR members were competing with one another to meet consumer demand for pocket listing services.

8. As consumer demand for pocket listing service grew, so did the need for a centralized, searchable repository of pocket listings. PLS was formed as the "Pocket Listing Service" to meet this need. Pocket listings had historically been marketed bilaterally by licensed real estate professionals, face to face, through phone calls, or by email. By joining PLS, licensed real estate professionals could privately share pocket listings with other licensed real estate professionals while avoiding the exposure of those listings through the NAR-affiliated MLSs. For home sellers and the licensed real estate professionals serving those home sellers, the PLS offered all of the benefits of the NAR-affiliated MLSs while retaining the privacy and discretion that would be lost by listing with NAR-affiliated MLSs. For home buyers and the licensed real estate professionals serving those home buyers, the PLS offered an opportunity to learn about properties that were not widely marketed.

9. The surge in consumer demand for pocket listings, and the rise of a listing network to market pocket listings effectively, was a competitive threat to the viability of the NAR-affiliated MLS system. These market changes also threatened NAR's ability to control competition in the residential real estate brokerage industry.

10. NAR-affiliated MLSs were aware of this competitive threat. Competing MLS systems met together privately and through NAR to discuss this threat and formulated a common plan to eliminate that competitive threat.

11. In September 2019, the largest NAR-affiliated MLSs, including California Regional Multiple Listing Service, Bright MLS, as well as Midwest Real Estate Data, jointly authored and published a white paper on pocket listings and the future of the NAR-affiliated MLS system. The white paper provided that "The multiple listing service as we know it is in jeopardy and this call-to-action serves as

an impassioned plea to brokers and MLSs to take immediate action." The white paper identified the declining share of properties listed in NAR-affiliated MLSs due to the "persistent, and increasing, presence of off-MLS home marketing" as among the "largest challenges MLSs face[.]" The white paper further noted the risk that one or more private listing networks would obtain a critical mass of pocket listings that "could fuel the trend to power private listing databases in general" which "will soon exceed, or circumvent, the service MLSs offer."

12. PLS was the listing network that NAR-affiliated MLSs feared. Having amassed nearly 20,000 members, PLS had or would have soon attracted a critical mass of members and listings to create a powerful network effect that was likely to quickly lead to substantial market share as new members joined, bringing new listings, attracting in turn more new members and more new listings in a virtuous and self-sustaining cycle. The more competitive future that the NAR-affiliated MLSs feared had arrived.

13. Acting through NAR, the NAR-affiliated MLSs moved swiftly to eliminate the competitive threat from listing networks aggregating pocket listings. In November 2019, NAR promulgated a mandatory rule governing all NAR-affiliated MLSs. The rule, called the Clear Cooperation Policy, requires NAR members participating in NAR-affiliated MLSs to submit their listings to the MLS within one business day of marketing the property to the public. For purposes of the Clear Cooperation Policy, NAR defines marketing a property to the public to include listing on private "multi-brokerage listing sharing networks" such as PLS. NAR members that violate the Clear Cooperation Policy face discipline and punishment by other NAR members.

14. The Clear Cooperation Policy eliminates the viability of the private network of pocket listings that the MLS conspirators and other NAR-affiliated MLSs had identified as a competitive threat. By eliminating the threat to NAR-affiliated

4

MLSs, NAR cements its ability to control competition in the market for residential real estate brokerage services.

15. Through the Clear Cooperation Policy, NAR and the MLS conspirators eliminated the possibility of a more competitive future in the market for residential real estate listing network services. A once-in-a-lifetime opportunity for competition in a monopolized market has been lost. NAR's conduct has harmed competition and consumers, and is illegal.

**PLAINTIFF**

16. Plaintiff PLS is a California Limited Liability Company headquartered in Los Angeles, California. At the time the Clear Cooperation Policy was adopted, PLS operated the largest network of licensed real estate professionals marketing pocket listings in the United States.

**DEFENDANT**

17. Defendant NAR is a trade association headquartered in Chicago, Illinois, that establishes and enforces policies and professional standards for its over 1.4 million members. NAR is incorporated under the laws of Illinois. Its 54 state and territorial associations and over 1,200 local associations are members of, and are overseen by, NAR. NAR promulgates rules governing the operation of the approximately 600 MLSs that are affiliated with NAR through their ownership or operation by NAR's state, local and territorial associations. NAR is registered to do business as a non-profit in the state of California and advertises and solicits members in the state. It has more than 185,000 members in California, derives revenue from California, and holds meetings in California. NAR also directs its California-based members to follow rules it promulgates.

**NON-PARTY CO-CONSPIRATORS**

18. California Regional Multiple Listing Service, Inc. ("CRMLS") is the largest MLS in the United States with over 100,000 members who have access to more than 70 percent of listings for sale in California. CRMLS is owned and

5

controlled by NAR members operating through 39 local associations of NAR throughout the State of California. CRMLS is headquartered in Chino Hills, California, and is incorporated under the laws of California. CRMLS is a NAR-affiliated MLS governed and controlled by NAR rules.

19. Bright MLS, Inc. ("Bright MLS") is a MLS serving the Mid-Atlantic region of the United States with over 88,000 members. Bright MLS is owned and controlled by NAR members operating through 43 local associations of NAR members operating through local associations of NAR throughout the States of New Jersey, Delaware, Maryland, Pennsylvania, West Virginia, the Commonwealth of Virginia, and the District of Columbia. Bright MLS is headquartered in Rockville, Maryland, and is incorporated under the laws of Delaware. In a typical year, Bright MLS will facilitate approximately $70 billion in residential real estate transactions. Bright MLS is a NAR-affiliated MLS governed and controlled by NAR rules.

20. Midwest Real Estate Data, LLC ("MRED") is a MLS serving northern Illinois, southern Wisconsin, and northwest Indiana with over 45,000 members. MRED is indirectly owned and controlled by NAR members operating through 15 local associations of NAR throughout the States of Illinois, Wisconsin, and Indiana. MRED is headquartered in Lisle, Illinois, and organized under the laws of Illinois.

## JURISDICTION, STANDING, AND VENUE

21. Plaintiff brings this action to recover damages, including treble damages, cost of suit, and reasonable attorney's fees, arising from NAR's violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

22. This Court has subject matter jurisdiction of Plaintiff's claim pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation).

23. Plaintiff has standing to bring this action under Section 4 of the Clayton Act, 15 U.S.C. § 15.

6

24. This Court has personal jurisdiction over Defendant and venue is proper in the Central District of California and this division under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 28 U.S.C. § 1391, because NAR and CRMLS regularly transact business within the Central District of California, and because Bright MLS and MRED formulated, led and joined a conspiracy among NAR members and NAR-affiliated MLSs that expressly aimed their intentional and anticompetitive conduct at California. NAR and its co-conspirators knew and specifically intended that their conspiracy would be formulated, negotiated, and implemented in California, would exclude competition in California (where they knew PLS was based), and would harm consumers in California. NAR and its co-conspirators worked in concert to effect NAR's adoption of the Clear Cooperation Policy at a 2019 NAR Convention in California, and NAR and its co-conspirators committed overt acts in furtherance of the conspiracy in California. CRMLS, Bright MLS, and MRED (together, the "MLS Conspirators") were among the MLSs that caused the September 2019 white paper, setting forth the competitive threat from pocket listings and the need for collective action among NAR-affiliated MLSs, to be published from San Juan Capistrano, California.

25. NAR and the MLS Conspirators are engaged in, and their activities substantially affect, interstate trade and commerce. Billions of dollars flow across state lines in the mortgage market to finance the sales of residential real estate facilitated by NAR and the MLS Conspirators.

<div align="center"><b>RESIDENTIAL REAL ESTATE BROKERAGE</b></div>

26. State law regulates entry into the residential real estate brokerage services industry. There are two licensee categories: (i) the real estate broker; and (ii) the individual real estate licensee or agent. Brokers supervise agents who work directly with consumers. Agents solicit listings, work with homeowners to sell their homes, and show buyers homes that are likely to match their preferences. Brokers

<div align="center">7</div>

often provide agents with branding, advertising, and other services that help the agents complete transactions.

27. Although there is no legal impediment to consumers buying and selling homes on their own, the large majority of consumers choose to work with a real estate broker. The substantial majority of residential real estate transactions involve the services of licensed real estate professionals. According to NAR, in 2017, 92 percent of sellers sold their home and 87 percent of buyers purchased their home with the assistance of a real estate broker.

28. The vast majority of licensed real estate professionals active in the residential real estate brokerage services industry are NAR members.

29. NAR promulgates rules and codes of conduct for its members and for its state, territorial and local associations. These associations, in turn, are required to adopt NAR's rules and bylaws and to enforce NAR-promulgated rules upon the licensed real estate professionals comprising the associations.

30. Until recently, with the surge in consumer demand for pocket listings, NAR-affiliated MLSs facilitated the vast majority of residential real estate transactions.

31. MLSs are joint ventures among virtually all licensed real estate professionals operating in local or regional areas. Licensed real estate professionals regard participation in their local MLS as critical to their ability to compete with other licensed real estate professionals for home sellers and buyers. The MLS combines its members' home listings information into a database, usually in electronic form. The MLS then makes these data available to all licensed real estate professionals who are members of the MLS. By listing in the MLS, a licensed real estate professional can market properties to a large set of potential buyers. By searching the MLS, a licensed real estate professional representing a buyer can provide that buyer with information about all the listed homes in the area that match the buyer's housing needs. An MLS is thus a market-wide joint venture of competitors that possesses substantial market

8

power: to compete successfully, a licensed real estate professional must be a member; and to be a member, a licensed real estate professional must adhere to any restrictions that the MLS imposes.

32. The state, territorial and local associations of NAR (sometimes referred to as "Realtor® associations") own NAR-affiliated MLSs. NAR requires each of these associations to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy.

33. NAR does not require that licensed real estate professionals be NAR members to participate in NAR-affiliated MLSs. In Alabama, California, Florida, and Georgia, NAR-affiliated MLSs are prohibited by law from promulgating any such requirement. As a result, many licensed real estate professionals that are not NAR members participate in NAR-affiliated MLSs.

34. NAR-affiliated MLSs must adopt new or amended NAR policies. NAR's Handbook on Multiple Listing Policy states that NAR-affiliated MLSs "must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program."

35. One of the many benefits that NAR provides to its state, territorial and local associations and the MLSs owned by those associations is professional liability insurance. To be eligible for this insurance, associations and their MLSs must comply with the mandatory provisions in the Handbook on Multiple Listing Policy. NAR threatens to withhold these valuable insurance benefits from associations and MLSs that fail to comply with these mandatory provisions. NAR's Handbook states that "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."

9

36. NAR reviews the governing documents of its state, territorial and local associations to ensure compliance with its rules. NAR requires its state, territorial and local associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

**THE NAR-AFFILIATED MLS SYSTEM**

37. For decades, the NAR-affiliated MLSs have often been regarded as a permanent, unavoidable, and inevitable feature of the residential real estate brokerage industry. NAR-affiliated MLSs have for decades enjoyed durably high market shares in markets across the country.

38. The majority of NAR-affiliated MLSs, including Bright MLS, are managed as for-profit enterprises. Regardless of their corporate form, the majority of NAR-affiliated MLSs, and MRED, serve directly or indirectly as the primary revenue stream for their owners, the state, territorial and local associations of NAR, whose shareholders use the funds for other purposes.

39. All NAR-affiliated MLSs are actual or potential competitors with other NAR-affiliated MLSs. NAR-affiliated MLSs frequently have overlapping service areas and licensed real estate professionals may choose to pay for access to only one of several available NAR-affiliated MLSs.

40. NAR-affiliated MLSs charge licensed real estate professionals for access to each MLS. The prices charged by NAR-affiliated MLSs to licensed real estate professionals for access to the MLS are excessive, above competitive levels, and unrelated to the MLSs' cost of service.

41. NAR-affiliated MLSs have been slow to innovate and unresponsive to consumer demand. According to NAR-affiliated MLSs writing in 2019, "the software used in most MLSs has become obsolete."

42. According to a white paper commissioned by NAR-affiliated MLSs in 2017, "Almost everyone interviewed for this study feels that the MLS industry has meandered aimlessly for over a decade. There are of course various reasons, but the

10

dominant contributing factor is the fact that most MLS organizations are owned and governed by Realtor® associations. And Realtor® associations, and their fragmentally managed committee structure, are simply not geared to compete in today's new, bold, fast-paced technology arena."

43. A Chief Executive Officer of one NAR-affiliated MLS stated in 2017, "As an industry, we have outdated technology that is the result of the community we represent resisting change. There are perhaps 30 to 40 MLSs across the country that have it right or are moving toward the right direction, but there are also 650 MLS organizations that are continuing to rest on how they have done it for decades. They are ignoring the fact that the marketplace and the needs of the user have changed, and their failure to respond is spiraling the MLS industry to the bottom."

44. Another Chief Executive Officer of a NAR-affiliated MLS stated in 2017, "The MLS has a business model problem. The industry has forgotten who their customers are. The industry's longstanding 'product in a box' solution is no longer valid and the platform it is delivered on is antiquated. In essence, the MLS is still trying to operate as a gatekeeper and continues to block real estate professionals from having access to the best-in-class products they need to help them do their job."

45. The regionally-fragmented system of NAR-affiliated MLSs is inefficient and imposes unnecessary and redundant costs on licensed real estate professionals. According to an executive of a large real estate brokerage in 2017, "Mid-sized and large brokerages that operate across states and regions face unique challenges in having to belong to multiple MLSs, and that can be costly, redundant and inefficient." According to a 2015 study commissioned by NAR, "An estimated $250-$500 million in MLS fees are attributable to duplication, redundancy, and excess among MLSs every year. If economies of scale were implemented nationwide, MLS fees would be significantly less."

46. There is consumer demand for a listing network aggregating listings nationwide. According to a 2015 study commissioned by NAR, "A national MLS has

been talked about for decades, but never before has the likelihood of it actually becoming a reality been so high."

47. One driver of consumer demand for a national listing network service is attributable to large brokerages, which purchase listing network services nationwide. These brokerages can belong to dozens of MLSs across the country with often different rules, policies, technology and underlying systems. In 2013, dozens of large brokerages threatened to pull out of NAR-affiliated MLSs and create their own multi-brokerage listing network, voicing concerns about MLSs overcharging for MLS services.

48. Another driver of consumer demand for a national listing network service is attributable to brokerages that specialize in serving clients interested in listing properties that may be of interest to buyers nationwide, clients interested in considering the purchase of properties nationwide, or both. These properties are sometimes relatively unique and have high listing prices.

**POCKET LISTINGS CREATE THE OPPORTUNITY FOR COMPETITION**

49. MLSs, like other networks, exhibit what economists call "network externalities," meaning the value of the network services is a function of the number of trading partners connected by the network.

50. The dominance of NAR-affiliated MLSs is a function of the percentage share of listings submitted to NAR-affiliated MLSs by licensed real estate professionals. When all or almost all listings are submitted to the NAR-affiliated MLSs, the possibility of effective competition to those MLSs is nil. Conversely, when listings are not submitted to the MLS and are marketed by licensed real estate professionals in other ways, the possibility of competition to the MLSs emerges. And when a critical mass of listings becomes available for a competing listing network, the possibility of head-to-head, network-to-network competition becomes real.

51. The dominance of NAR-affiliated MLSs is neither inevitable nor efficient. The surge in consumer demand for pocket listings created, for the first time

in living memory, the possibility of competition for the NAR-affiliated MLSs. Pocket listings presented the opportunity for a competing listing network to aggregate a critical mass of listings that could support a listing network competing with the NAR-affiliated MLSs.

52. According to a 2015 study commissioned by NAR, "Off-MLS listings may contribute to the unraveling of the MLS as we know it, and its replacement by a private network that serves to benefit a certain group of participants."

53. There is substantial and unmet demand among licensed real estate professionals, and among the customers they serve, for an alternative to the NAR-affiliated MLSs.

54. According to a 2015 study commissioned by NAR, "A number of industry initiatives suggest that the current MLS-centric era might be coming to an end. After half a century of operating as the only gateway, there is a strong likelihood that the MLS may lose its exclusive positioning as the principal source of real estate listings."

55. According to the President and Chief Executive Officer of a network of large real estate brokerage firms in 2017, "MLS has been of great value to agents, but their loyalty to the MLS is waning … For the first time, the industry has entered a world where there are realistic and legitimate attempts to create alternatives to the MLS that exists today."

56. As one licensed real estate professional wrote after the NAR Clear Cooperation Policy was adopted, "I long for the day when a private company decides to create an MLS platform that competes with association-owned MLSs freeing us from the clutches of NAR."

**PLS WAS A COMPETITIVE THREAT TO NAR'S MLS SYSTEM**

57. PLS was formed in 2017 to address the demand of licensed real estate professionals, and for the consumers they serve, for an alternative to the NAR-affiliated MLS system.

58. Like the NAR-affiliated MLSs, PLS is a private network limited to licensed real estate professionals. All licensed real estate professionals were eligible to be members in the PLS.

59. The PLS, like the NAR-affiliated MLSs, is a means for licensed real estate professionals to cooperate in the sale of residential real estate. Like the NAR-affiliated MLSs, PLS operates an electronic database of listings submitted by PLS members with an offer of compensation to other PLS members that can find a buyer. Like the NAR-affiliated MLSs, PLS then makes these data available to all licensed real estate professionals who are members of the PLS.

60. Unlike the NAR-affiliated MLSs, licensed real estate professionals listing on PLS could share as much or as little information about the listing as their client desired. In this way, the PLS combined the powerful network efficiencies of the MLS with the privacy and discretion of the pocket listing.

61. Before PLS was launched, there was no place for licensed real estate professionals operating in separate brokerage firms to privately list, search, organize and share information about pocket listings.

62. PLS's fees to licensed real estate professionals would have been substantially lower than the fees charged for similar services to licensed real estate professionals by the NAR-affiliated MLSs.

63. PLS was designed and marketed as a national platform, unlike the fragmented NAR-affiliated MLS system that imposes duplicative and burdensome fees on brokerages operating in multiple geographic markets.

64. PLS was an actual or potential competitor to every single NAR-affiliated MLS, and each MLS Conspirator. At the time the Clear Cooperation Policy was adopted, PLS had members across the country, including in the service areas of the MLS Conspirators.

14

65. PLS launched successfully and grew quickly. At the time the Clear Cooperation Policy was adopted, nearly 20,000 licensed real estate professionals were cooperating to sell billions of dollars of residential real estate listings nationwide.

66. PLS was a serious competitive threat to the NAR-affiliated MLS system, and to the MLS Conspirators.

67. NAR and the NAR-affiliated MLSs, and the MLS Conspirators, were aware of this competitive threat and acted through the Clear Cooperation Policy and otherwise to eliminate this threat.

## NAR AND ITS AFFILIATES EXCLUDE COMPETITION

68. For the NAR-affiliated MLSs, pocket listings are a form of lost market share. The NAR-affiliated MLSs were concerned that a critical mass of pocket listings could be aggregated in a competing listing network, making possible for the first time network-to-network competition to the MLS system.

69. NAR-affiliated MLSs, and MRED, recognized that they could not unilaterally eliminate the competitive threat that pocket listings posed, in part because pocket listings are a national phenomenon and could create the possibility of a nationwide competitor to the MLS system. NAR-affiliated MLSs, and MRED, recognized the need for collective action among NAR-affiliated MLSs, in the form of a change to the mandatory provisions in NAR's Handbook on Multiple Listing Policy that would require all NAR-affiliated MLSs to take action to stamp out the possibility of competitive entry presented by the rise of pocket listings.

70. In August 2019, NAR's MLS Technology and Emerging Issues Advisory Board voted to recommend the adoption of what would become the Clear Cooperation Policy at the upcoming NAR Convention in San Francisco, California. The members present for this vote included executives of NAR-affiliated MLSs, and Defendant MRED. On information and belief, MRED's representative participated in this NAR Advisory Board meeting as a representative of the Council of Multiple

Listing Services ("CMLS"), an association of approximately 200 MLSs, including NAR-affiliated MLSs and the MLS Conspirators.

71. NAR admits that the Clear Cooperation Policy was formulated and advanced by the NAR-affiliated MLSs, and by MRED. According to NAR, "The association's MLS Technology and Emerging Issues Advisory Board, a group made up of brokers and MLS executives, developed the proposal in consultation with brokerage and MLS leaders across the industry."

72. NAR-affiliated MLSs around the country communicate frequently and privately among themselves regarding pocket listings, using internet forums and social media, and through CMLS.

73. MRED's Chief Executive Officer admits that these private interfirm communications among NAR-affiliated MLSs, MRED, and the other MLS Conspirators, were the means by which the Clear Cooperation Policy was formulated and advanced.

74. In September 2019, Bright MLS, MRED, and CRMLS were among the signatories of the white paper issued by the largest NAR-affiliated MLSs that called for collective action to address the threat to the MLS system presented by the rise of pocket listings and the prospect of a competing listing network that would aggregate such listings.

75. On October 16, 2019, Bright MLS adopted a version of what would become the Clear Cooperation Policy, before having any obligation under NAR rules or otherwise to do so.

76. On or around the same day, MRED published a statement supporting adoption by NAR of the Clear Cooperation Policy at the upcoming NAR Convention.

77. On October 17 and 18, 2019, NAR-affiliated MLSs, MRED, and the other MLS Conspirators, met at a CMLS conference in Salt Lake City, Utah to discuss the competitive threat presented by pocket listings and the need for NAR to take

action at the upcoming NAR Convention to eliminate that threat through adoption of the Clear Cooperation Policy.

78. On October 17, 2019, the Chief Executive Office of MRED addressed the assembled representatives of the NAR-affiliated MLSs at the CMLS conference. MRED's Chief Executive Officer, who had attended the August NAR meeting where the Clear Cooperation Policy was first proposed and recommended, explained that the Clear Cooperation Policy was motivated by concerns that pocket listings were "making the MLS less valuable." At this October 2019 CMLS conference, representatives of the assembled NAR-affiliated MLSs were provided with copies of MRED's published statement in support of the Clear Cooperation Policy and urged to review it.

79. On October 17, 2019, the Chairman of Bright MLS addressed representatives of the NAR-affiliated MLSs at the CMLS conference, recited the fact that Bright MLS the day before had adopted a policy banning pocket listings, and urged the assembled NAR-affiliated MLSs to adopt similar policies. The Chairman of Bright MLS also urged the representatives of the NAR-affiliated MLSs to attend the upcoming NAR Convention, and to work as a group at that meeting to ensure NAR's adoption of the Clear Cooperation Policy.

80. Among other things, the Chairman of Bright MLS stated "Now, the people who want to do pocket listings? They're a little pissed. They'll get over it. We need to not worry about it. Because that's bad for our industry, right? All right, let me tell you what we all need to do. We have an opportunity in front of us to make, put this policy into effect in November. And Bright adopted it yesterday, MRED's already adopted it, other people are already doing it, but we really need to get it through."

81. The Chairman of Bright MLS continued on: "So what do we need to do? We need to go back and talk to your Boards of Directors, talk to your big brokers, and make sure that they understand we're talking pocket listings and not everything else

and make sure that they understand. And then you need to make a policy statement. What are you guys going to do? And then you need to come to that MLS forum, and you need to line up at the microphone and say 'Bright MLS, we're all in. 8.0. Go.'" What would become the Clear Cooperation Policy was referred to at this time as MLS Statement 8.0.

82. The Chairman of Bright MLS explained to the representatives of the assembled NAR-affiliated MLSs that he anticipated a degree of resistance to passage of the Clear Cooperation Policy at the upcoming NAR Convention, in part from NAR members who wished to continue to offer pocket listings.

83. The Chairman of Bright MLS urged the representatives of the assembled MLSs to contact members of their MLS who were on NAR's Board of Directors to advocate for the adoption of the Clear Cooperation Policy at the upcoming NAR Convention.

84. The Chairman of Bright MLS urged the representatives of the assembled NAR-affiliated MLSs to take collective action in the State of California to effect the adoption of the Clear Cooperation Policy. Specifically, the Chairman of Bright MLS said "I look forward to seeing you in San Francisco. I look forward to us, in this room, getting this through."

85. In November 2019, NAR's and the MLS Conspirators gathered in San Francisco to take action on the Clear Cooperation Policy. On November 9, 2019, NAR's Multiple Listing Issues and Policies Committee approved the Clear Cooperation Policy by a voice vote, sending the Policy to NAR's Board of Directors. Executives of the NAR-affiliated MLSs, including Bright MLS, and MRED, attended this meeting and spoke in support of the Clear Cooperation Policy. As had been discussed and planned at the October CMLS conference, other NAR-affiliated MLSs did the same. At this meeting, elimination of competition to NAR-affiliated MLSs from networks aggregating pocket listings was cited as a reason for passage of the Clear Cooperation Policy.

86. NAR's Executive Committee reviewed and discussed the Clear Cooperation Policy at the San Francisco meeting on November 10, 2019. NAR's Board of Directors approved the Clear Cooperation Policy at the San Francisco meeting on November 11, 2019.

87. NAR adopted the Clear Cooperation Policy over the complaints of some NAR members, who informed NAR that the policy was anticompetitive and likely illegal.

88. The text of the Clear Cooperation Policy provides:

> Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public. (Adopted 11/19).

89. The Clear Cooperation Policy was effective January 1, 2020, and was included as a mandatory rule in the 2020 version of the NAR Handbook on Multiple Listing Policy. NAR required that all NAR-affiliated MLSs, including Bright MLS and CRMLS, modify their rules to conform to the Clear Cooperation Policy by May 1, 2020. NAR admits that all NAR-affiliated MLSs, including Bright MLS and CRMLS, must adopt and enforce the Clear Cooperation Policy. According to NAR, "By establishing a national policy, it is mandatory that all REALTOR® Association MLSs adopt the policy and have the same consistent standard."

90. NAR admits that there are no exceptions for properties that are "publicly marketed." According to NAR, "The new policy does not include an 'opt out.' Any listing that is 'publicly marketed' must be filed with the service and provided to other MLS Participants for cooperation within (1) one business day."

91. Previously, NAR-affiliated MLSs had generally allowed members to withhold listings from the MLS if the seller of the property so desired. The Clear

19

Cooperation Policy eliminates this possibility, and in that way renders the provision of residential real estate brokerage services unresponsive to consumer demand.

92. The Clear Cooperation Policy does, however, have an exception that allows brokerages to maintain so-called "office listings," or listings marketed entirely within a brokerage firm, without submission of those listing to the MLS.

93. NAR-affiliated MLSs, including Bright MLS and CRMLS, enforce the Clear Cooperation Policy by monitoring adherence to the policy, encouraging MLS members to report their colleagues using pocket listings, and through fines for non-compliance. For example, one MLS in South Florida, a market where consumer demand for pocket listings is high, describes the penalties it levies for violations of the Clear Cooperation Policy as "severe," including maximum fines of up to $15,000 and possible suspension or termination of access to the MLS. The penalties imposed by the NAR-affiliated MLSs for violations of the Clear Cooperation Policy are intended to, and in fact do, make violations of the Clear Cooperation Policy cost-prohibitive for NAR members, and are a constructive refusal to offer MLS services to NAR members that violate the Clear Cooperation Policy.

94. Since the adoption of the Clear Cooperation Policy, NAR-affiliated MLSs have operated, or planned to operate, their own private listing networks, effectively allowing their members to market off-MLS listings under the auspices of the NAR-affiliated MLSs without violation of the Clear Cooperation Rule. MRED has also operated a private listing network.

95. NAR-affiliated MLSs and CMLS have admitted that the purpose of the Clear Cooperation Policy was to maintain the market dominance of the NAR-affiliated MLS system, and specifically to exclude PLS.

**RELEVANT MARKET**

96. PLS and the NAR-affiliated MLSs, including Bright MLS and CRMLS, and MRED, compete to offer listing networks that facilitate the sale of residential real estate listings among licensed residential real estate professionals in the United States.

20

97. The provision of listing network services to licensed real estate professionals for the sale of residential real estate listings is a relevant antitrust market. Consumers of listing network services for the sale of residential real estate listings view these networks, including the NAR-affiliated MLSs, MRED and PLS, as substitutes for each other. A hypothetical monopolist of listing network services for the sale of residential real estate listings could profitably impose a small but significant, non-transitory increase in price above competitive levels.

98. Listing network services are not a two-sided transaction market because listing networks do not involve a simultaneous sale between buyers and sellers of real estate. No transaction between buyers and sellers occurs on these networks. The networks simply list available residential real estate for sale and charges brokerages monthly fees to access the network, regardless of whether their agents represent buyers, sellers, or both. Access to the listing network gives real estate agents the ability to list properties for sale or view available properties for sale.

99. One relevant geographic market is nationwide. Licensed real estate professionals and their customers seek listing network services that aggregate listings nationwide, from across the United States. In the alternative, each and every service area of a NAR-affiliated MLS, as well as the service areas of each MLS Conspirator, is a relevant geographic market. On information and belief, each of the MLS Conspirators has enjoyed a durably high share of over 65 percent of residential real estate listings marketed by licensed real estate professionals in their respective service areas.

100. NAR and the MLS Conspirators collectively have substantial market power in the relevant market or markets, however defined. Substantial barriers to entry exist to protect that market power, as shown by the durably high market shares enjoyed by the NAR-affiliated MLSs and NAR's ability to exclude competition. One substantial barrier to entry are the network effects that accrue to the NAR-affiliated MLSs as a result of their large market shares. The value of an MLS to licensed real

21

estate professionals is a function of its market share. The greater the market share, the larger the network effects that accrue to the MLS, and the more important access to the MLS is to licensed real estate professionals. NAR and NAR-affiliated MLSs, including the MLS Conspirators, have the power to profitably elevate the prices paid by licensed real estate professionals for access to listing network services above the competitive level, and to impose onerous conditions of access on licensed real estate professionals, including the Clear Cooperation Policy.

## NAR'S UNLAWFUL CONDUCT

101. NAR and the MLS Conspirators agreed with one another to exclude PLS. NAR and the MLS Conspirators had a conscious commitment to a common scheme to prevent the emergence of a viable competitor to NAR-affiliated MLSs, to exclude PLS from the relevant market, and to eliminate PLS as an effective competitor. NAR and the MLS Conspirators took overt acts in furtherance of this conspiracy.

102. NAR is a combination or conspiracy among its members, who are licensed real estate professionals who compete with one another. The members of NAR, as a group and through the Board they elect and the staff they indirectly employ, have agreed to, adopted, maintained, and enforced rules, including the Clear Cooperation Policy, affecting how members compete to provide brokerage services, participate in NAR-affiliated MLSs, and access MLS services. NAR's members agree (and adhere) to NAR's code of ethics, bylaws, and rules as a condition of membership. NAR's rules, including the Clear Cooperation Policy, are therefore the product of agreements and concerted action among its members, including the owners of the NAR-affiliated MLSs. that operate and control the MLS Conspirators.

103. The adoption and enforcement of the Clear Cooperation Policy by the NAR-affiliated MLSs is also the product of agreements and concerted action (i) among the MLS Conspirators and (ii) between and among each NAR-affiliated MLS and their members. Each NAR-affiliated MLS is owned and controlled by associations of competing real estate brokers, who collectively have the power to

22

admit new members, propose bylaws, and enact rules for members. The NAR-affiliated MLSs' rules are an agreement among competitors that define the way in which they will compete with one another.

104. The Clear Cooperation Policy and the overt acts taken by NAR and NAR-affiliated MLSs in formulating, adopting, implementing, and enforcing that Policy, are unreasonable restraints of trade. Each of the MLS Conspirators joined the conspiracy to formulate and adopt the Clear Cooperation Policy for their own financial benefit and to eliminate the threat posed by upstart networks such as the PLS, and took overt acts in furtherance of that conspiracy.

105. The Clear Cooperation Policy imposes an "all or nothing" term on licensed real estate professionals that seek to use listing networks: the licensed real estate professional must either submit all such listings to the NAR-affiliated MLSs, or risk losing access to the NAR-affiliated MLSs.

106. The "all or nothing" term imposed on licensed real estate professionals by the Clear Cooperation Policy is exclusionary.

107. Because licensed real estate professionals generally believe that they must submit at least a portion of their listings to NAR-affiliated MLSs to serve their customers, the Clear Cooperation Policy predictably ensures that all listings are submitted to NAR-affiliated MLSs.

108. By ensuring that all listings are submitted to NAR-affiliated MLSs, the Clear Cooperation Policy eliminates the ability of listing networks that compete with the NAR-affiliated MLSs to feature listings that are not on the NAR-affiliated MLSs, and ensures that the NAR-affiliated MLSs will always offer a superset of the listings available on any listing network.

109. By ensuring that the NAR-affiliated MLSs will always offer a superset of the listings available on any listing network, the Clear Cooperation Policy degrades the quality of competing listing networks, reduces the incentives of licensed real estate

professionals to use those competing listing networks, and makes those competing listing networks less effective competitors to the NAR-affiliated MLSs.

110. By ensuring that the NAR-affiliated MLSs will always offer a superset of the listings available on any listing network, the Clear Cooperation Policy imposes a penalty on the use of competing listing networks and creates strong economic incentives for licensed real estate professionals to purchase listing network services exclusively from NAR-affiliated MLSs. By ensuring that licensed real estate professionals accessing listings through a competing listing network pay twice for access to the same listings, the Clear Cooperation Policy creates strong economic incentives for licensed real estate professionals to exclusively use NAR-affiliated MLSs to avoid the surcharge imposed by the Clear Cooperation Policy on the use of competing listing networks.

111. The Clear Cooperation Policy has had actual and substantial anticompetitive effects by eliminating the ability and incentive of licensed real estate professionals to market pocket listings through PLS, or any other listing network, thereby harming competition in the market for the provision of listing network services to licensed real estate professionals.

112. By eliminating the ability and incentive of licensed real estate professionals to market pocket listings through PLS or any other listing network, the Clear Cooperation Policy forecloses competing listing networks from access to a critical mass of listings necessary to obtain significant network effects and compete with the NAR-affiliated MLSs in the relevant market(s). All or nearly all active licensed real estate professionals depend upon access to NAR-affiliated MLSs.

113. Through the Clear Cooperation Policy, NAR and the NAR-affiliated MLSs maintained the cost of listing network services for residential real estate listings above a competitive level, and otherwise stifled competition in the market for listing network services for residential real estate listings. In that way, the conduct of NAR and the MLS Conspirators harmed (i) real estate professionals serving both buyers

and sellers of residential real estate services that desired to use listing networks other than those operated by the NAR-affiliated MLSs, and also (ii) those buyers and sellers of residential real estate.

114. The Clear Cooperation Policy also harmed consumers and competition by eliminating from the market a form of real estate brokerage services desired by consumers, and which lowered barriers to entry for listing networks competing with the NAR-affiliated MLSs and MRED. There was substantial consumer demand for pocket listings. Before the Clear Cooperation Policy, licensed real estate professionals, including but not limited to NAR members, competed to offer pocket listings, and listing networks that competed with the NAR-affiliated MLSs and MRED were formed. Through the Clear Cooperation Policy, NAR restrained the ability of licensed real estate professionals to offer those services. Because NAR and its members collectively have market power, NAR's restraint on the ability of licensed real estate professionals to offer pocket listings has excluded competition in the relevant market(s), restricted output of residential real estate brokerage services and rendered the provision of those services unresponsive to consumer demand.

115. There is no cognizable or plausible procompetitive justification for the unlawful conduct of NAR and the MLS Conspirators, or one that outweighs its anticompetitive effects. NAR's tolerance of off-MLS listings when privately marketed by NAR members that do not compete with the NAR-affiliated MLSs as listing networks (the "office listing" exclusion) or under the auspices of NAR-affiliated MLSs shows that NAR's asserted justifications for the Clear Cooperation Policy are pretext, and illuminate the purpose and effect of the Clear Cooperation Policy as the elimination of competition to the NAR-affiliated MLSs in the relevant market(s) from PLS and other listing networks not affiliated with NAR.

116. For nearly 60 years, NAR's Bylaws have recognized that forcing NAR members to list properties in the MLS in the routine provision of real estate brokerage services is improper and not reasonably related to any legitimate business

25

justification. Since 1960, Interpretation No. 1 of Article 1, Section 2 of NAR's Bylaws has provided that "A requirement to participate in a Multiple Listing Service in order to gain and maintain REALTOR® membership is an inequitable limitation on its membership. When a Multiple Listing Service is available, is well operated and properly organized, it is the duty of the REALTOR® to consider thoroughly whether he can serve the best interests of his clients by participating in it. The decision, however, must be his own. As a REALTOR®, it is possible for him to conduct business in an ethical and efficient manner without participating in a Multiple Listing Service. Therefore, his participation must not be a requirement of REALTOR® membership."

117. According to NAR's Handbook on Multiple Listing Policy, "Any multiple listing activity in which it is compulsory that all members of an association of REALTORS® participate and submit information on all designated types of listings would be in direct conflict with the National Association's bylaws, Article I, Section 2, which bans the adoption by associations of REALTORS® of inequitable limitations on membership."

118. The Clear Cooperation Policy does not eliminate or prevent any free-riding at the expense of NAR, NAR members, or the NAR-affiliated MLSs. NAR does not itself provide MLS services. NAR can and does charge membership fees, and can and does recoup the costs of providing its services in those fees. The NAR-affiliated MLSs charge a membership fee for access to their listing networks, and can and do recoup the costs of providing listing network services in those fees. The membership fees charged by the NAR-affiliated MLS do not generally vary depending on the number of listings submitted by NAR members to the MLS. PLS members that sought to list properties on the PLS while also accessing a NAR-affiliated MLS were not free-riding on NAR members that only submit listings to NAR-affiliated MLS because PLS members that continued to also access the NAR-affiliated MLS continued to pay fees to the NAR-affiliated MLSs. There were no

26

uncompensated services being provided by NAR, NAR members or NAR-affiliated MLSs to members of the PLS. Instead, NAR and the MLS Conspirators advocated for and/or adopted the Clear Cooperation Policy as a means of preventing the continued exponential growth of a competitor that was providing a lower cost and nationwide listing service.

119. The Clear Cooperation Policy is also overbroad and restrains competition unnecessarily. The Clear Cooperation Policy was passed by NAR members but limits the ability of licensed real estate professionals who are not NAR members to compete using alternative listing network services because even non-NAR members generally depend upon access to the NAR-affiliated MLSs for at least some of their business. NAR has no legitimate business justification for using NAR rules to restrain the ability of non-NAR members to deal with PLS and other listing networks that compete with the NAR-affiliated MLSs. The overbreadth of the Clear Cooperation Policy illuminates its anticompetitive purpose and effect.

120. PLS suffered injury and damages as a result of the unlawful conduct of NAR and the MLS Conspirators. Adoption and implementation of the Clear Cooperation Policy had the natural and intended effect on PLS's business operations. Listings were removed from PLS and submitted instead to NAR-affiliated MLSs. Agent participation in PLS declined. PLS's access to capital was constrained. PLS was foreclosed from the commercial opportunities necessary to innovate and grow.

121. Injury to PLS was the direct, foreseeable and intended result of NAR and MLS Conspirators' conduct. The conduct of NAR and the MLS Conspirators simultaneously harmed PLS and consumers in the relevant market by excluding PLS and thereby artificially maintaining or increasing the prices paid by licensed real estate professionals for listing network services for the sale of residential real estate. Although the mechanism of injury to PLS and to licensed real estate professionals (and thereby to consumers) is the same, the damages caused by conduct of NAR and the MLS Conspirators in the form of higher prices is distinct from, and not duplicative

27

of, the damages caused to PLS, which take the form of lost profits and damaged equity and goodwill.

## UPDATED FACTUAL ALLEGATIONS

122. PLS filed a Complaint in this Court in May 2020 naming as defendants NAR and the MLS Conspirators. *See The PLS.com, LLC v. The National Association of Realtors et al*, Case No. 2:20-cv-04790 ("*PLS I*"), ECF 1. PLS filed an Amended Complaint in July 2020. *Id.*, ECF 46. The Amended Complaint was dismissed with prejudice for failure to state a claim upon which relief could be granted in February 2021. *Id.*, ECF 97. The Ninth Circuit reversed, holding that PLS's Amended Complaint stated a claim for relief under Section 1 of the Sherman Act. *PLS.Com, LLC v. National Ass'n of Realtors*, 32 F.4th 824 (9th Cir. 2022).

123. On January 25, 2024, NAR and PLS entered into a Tolling Agreement and Stipulation. The Tolling Agreement and Stipulation, among other things, tolled any applicable statutes of limitations for PLS's claims against NAR from May 28, 2020, through the termination of the Tolling Agreement and Stipulation. The Tolling Agreement and Stipulation had an expiration date of December 31, 2024. A true and correct copy of the Tolling Agreement and Stipulation is attached hereto as Exhibit A.

124. On January 26, 2024, PLS dismissed its claims against NAR without prejudice. *See PLS I*, ECF 179.

125. On February 2, 2024, PLS dismissed its claims against the MLS Conspirators with prejudice. *See PLS I*, ECF 180.

126. On March 14, 2025, but effective as of December 31, 2024, NAR and PLS entered into an Amendment to the Tolling Agreement and Stipulation. The Amendment to the Tolling Agreement and Stipulation, among other things, tolled any applicable statutes of limitations for PLS's claims against NAR from May 28, 2020 until June 30, 2025, unless earlier terminated by the parties. A true and correct copy

of the Amendment to the Tolling Agreement and Stipulation is attached hereto as Exhibit B.

127.   Paragraphs 1-121 of this Complaint are substantively identical to the Amended Complaint filed by PLS in July 2020 (*PLS I*, ECF 46), with the omission of the MLS Conspirators as defendants and non-substantive changes to reflect that omission.

128.   NAR's Clear Cooperation Policy remains in effect as alleged herein and continues to have anticompetitive effects as alleged herein.

129.   NAR's Clear Cooperation Policy continued to have its natural and intended effect on PLS's business operations through August 2024, when PLS discontinued the provision of listing network services and exited the relevant market. At all relevant times, the Clear Cooperation Policy materially impaired PLS's business operations by preventing it from attracting a critical mass of listings sufficient to compete effectively in the relevant market for listing network services for the sale of residential real estate listings.  The Clear Cooperation Policy had a direct, material and adverse effect on PLS's business operations through August 2024 including diminished profits and diminished enterprise value and was throughout that time a material cause of injury to PLS's business and property.  PLS exited the relevant market as a direct result of the anticompetitive effects of the Clear Cooperation Policy.

<div align="center">

**PLS'S CLAIM FOR RELIEF**

**COUNT ONE**

**(Violation of the Sherman Act)**

</div>

130.   PLS hereby restates Paragraphs 1 through 129 of this Complaint.  NAR's conduct as alleged herein is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

131.   NAR's conduct has caused injury and damage to PLS in the form of lost profits.

132. NAR's conduct has caused injury and damage to PLS in the form of lost enterprise value, equity and goodwill, diminishing the value of PLS as a going concern.

## PRAYER FOR RELIEF

WHEREFORE, PLS respectfully prays for relief and judgment against NAR as follows:

1. Award compensatory and trebled damages in favor of PLS and against NAR, including all interest thereon;

2. Award PLS reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

3. Any other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: July 1, 2025

By:___/s/ *Christopher G. Renner*_____
Christopher G. Renner*
cgrenner@dhillonlaw.com
D.C. Bar No. 1025699
(571) 430-2240 (voice and fax)
Jonathan M. Shaw*
jshaw@dhillonlaw.com
Virginia Bar No. 98497
(703) 748-2266 (voice and fax)
Andrew K. Mann*
akmann@dhillonlaw.com
Virginia Bar No. 77021
(571) 695-2677 (voice and fax)
Domenic P. Aulisi*
daulisi@dhillonlaw.com
Virginia Bar No. 101045
(703) 574-1093 (voice and fax)
Dhillon Law Group Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

\* *pro hac vice* forthcoming

30

By:___/s/ *Brandon Q. Tran*_____
Brandon Q. Tran
CA Bar No. 223435
btran@dhillonlaw.com
(949) 340-1968 (voice and fax)
4675 MacArthur Court, Suite 1410
Newport Beach, CA 92660

***Attorneys for Plaintiff* The PLS.com, LLC**

# EXHIBIT A

DocuSign Envelope ID: 85667090-1550-4654-B666-9A0937SD7DB2

# TOLLING AGREEMENT and STIPULATION

This **TOLLING AGREEMENT AND STIPULATION** (the " **Agreement**") is effective as of this 25th day of January, 2024, by and between The PLS.com, LLC ("**PLS**"), and The National Association of Realtors ("**NAR**"). PLS and NAR may be referred to herein singularly as "**Party**" or collectively as the "**Parties**".

**WHEREAS,** on May 28, 2020, PLS filed a Complaint against NAR and three multiple listing service defendants, in the United States District Court for the Central District of California – Western Division, Case No. 2:20-CV-04790 (the "**Lawsuit**"); and

**WHEREAS,** the PLS has reached a settlement agreement with the three multiple listing service defendants in the Lawsuit, which will result in a dismissal of the Lawsuit against those defendants; and

**WHEREAS,** PLS is prepared to dismiss without prejudice the Lawsuit against NAR so that the parties may explore the potential for a resolution of the claims alleged in the Lawsuit, based upon NAR's willingness to provide an agreement tolling of any applicable statutes of limitations; and

**WHEREAS,** the Parties have decided and agreed to execute this Agreement setting forth the terms of their agreement for dismissal of the Lawsuit without prejudice, and for the tolling of any limitations periods under state or federal law.

**NOW, THEREFORE, IT IS FURTHER AGREED** as follows:

1.    **Tolling Agreement.**

    1.1    The parties agree that the running of any limitations periods under any applicable state or federal statute of limitations or administrative filing deadline, or other

4888-7297-5006v.1 0115833-000001

time-related defense, under common law or by statute, with respect to the claims asserted by PLS against NAR in the Lawsuit, are tolled from May 28, 2020 until the termination of this Agreement.

     1.2    The tolling of limitations periods under this Agreement shall remain in effect commencing on May 28, 2020 and continue until the date on which PLS initiates a future lawsuit against NAR over the matters alleged in the Lawsuit, or the date upon which PLS and NAR execute a settlement resolving the claims alleged in the Lawsuit. Provided, however, that this Agreement terminates on its own terms on December 31, 2024.

     1.3    Upon termination of this Tolling Agreement, all applicable time periods, other time-related defenses or equitable doctrines otherwise tolled by this Tolling Agreement shall again commence running.

     1.4    PLS agrees that NAR is not waiving any defense otherwise available to it, including, without limitation, lack of jurisdiction, exhaustion of remedies, and statutes of limitations with respect to any limitations period that existed as of May 28, 2020, or that may expire after the termination of this Agreement.

     1.5    Nothing in this Agreement shall revive or be asserted to revive any claim, action, suit, demand, cross-demand, or defense that is or would be barred due to the passage of time prior to May 28, 2020 and/or after the termination of this Agreement.

     1.6    The parties agreement to toll the limitations periods under this Agreement shall not be construed or deemed an admission adverse to any Party hereto: (i) of liability to any person and/or entity; (ii) of the commission of any act or wrong which was or could have been alleged in any action; (iii) of violation of any law or regulation; or (iv) that either

Party had a timely claim which is not time-barred or that it/he has complied with administrative requirements or any applicable statute of limitations or repose, or any similar rule of law including rules of eligibility. No Party has waived, or has intended to waive, any of its rights or defenses with respect to any actions, except as expressly provided in this Agreement. The Parties agree that they will not argue or contend that this Agreement is an admission or concession of any kind by the other Party.

**2. Dismissal of Lawsuit.**

The Parties agree that within 2 days of execution of this Agreement that their counsel will file a request for dismissal, without prejudice and without costs and disbursements to any party, of the claims against NAR. The Parties agree that their counsel are authorized to execute all documents necessary to achieve this dismissal without prejudice.

**3. Miscellaneous.**

3.1 This Agreement shall be binding upon, and inure to the benefit of, the Parties and their successors, predecessors, assigns, agents, representatives, heirs, and executors.

3.2 This Agreement shall be interpreted in accordance with the substantive law of the State of California, without application of choice of law rules. Each Party agrees that it will not assert or argue that any aspect of this Agreement is relevant to or otherwise affects which state's law does or does not apply to any claim, defense, or counterclaim.

3.3 This Agreement is non-transferable and can be modified only in a subsequent written agreement duly executed by each of the Parties to this Agreement. This Agreement shall constitute the entire understanding between the Parties concerning

3

4888-7297-5006v.1 0115833-000001

the subject matter of this Agreement and supersedes and replaces all prior negotiations, proposed agreements, and agreements, written or oral, relating to this subject.

3.4    This Agreement may be executed in one or more counterparts, each of which, when so executed, shall be deemed to be an original. Such counterparts shall together constitute, and be, one and the same instrument. Signatures transmitted by electronic mail or facsimile shall be acceptable for all purposes with respect to this Tolling Agreement.

3.5    All of the signatories represent and warrant that they have full approval to execute this agreement on behalf of the party they purport to sign for below.

**The PLS.com, LLC**

By: _____
    Chris Dyson
    Founder and CEO
    6300 Wilshire Blvd., Suite 2030
    Los Angeles, CA  90048
    chris@thenls.com
Date: 1/25/2024

**The National Association of Realtors**

By _____
    Ethan Glass
    Cooley LLP
    1299 Pennsylvania Ave, NW
    Suite 700
    Washington, DC  20004
    Attorney for NAR
Date: 1/25/2024

4888-7297-5006v.1 0115833-000001

**B**

Christopher G. Renner (*Pro Hac Vice*)
cgrenner@dhillonlaw.com
Jonathan M. Shaw (*Pro Hac Vice*)
jshaw@dhillonlaw.com
Andrew K. Mann (*Pro Hac Vice*)
akmann@dhillonlaw.com
Domenic P. Aulisi (*Pro Hac Vice*)
daulisi@dhillonlaw.com
**DHILLON LAW GROUP INC.**
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
(571) 430-2240 (voice and fax)

Brandon Q. Tran (CA Bar No. 223435)
btran@dhillonlaw.com
**DHILLON LAW GROUP INC.**
4675 MacArthur Court, Suite 1410
Newport Beach, CA 92660
(949) 340-1968 (voice and fax)

Attorneys for Plaintiff
The PLS.com LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION – ORANGE COUNTY

| | |
|---|---|
| The PLS.com, LLC, a California limited liability company,<br><br>            Plaintiff,<br><br>vs.<br><br>The National Association of Realtors,<br><br>            Defendant. | Case No. 2:25-cv-05971-JWH-E<br><br>**STIPULATED PROTECTIVE ORDER**<br><br>Assigned to the Hon. John W. Holcomb Courtroom 2<br><br>Action Filed:    July 1, 2025 |

1



## 1. INTRODUCTION

### 1.1.  Purposes and Limitations.

As the parties have represented that discovery in this action is likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted, this Court enters the following Protective Order.[1] This Order does not confer blanket protections on all disclosures or responses to discovery.  The protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles.  Further, as set forth in Section 12.3, below, this Protective Order does not entitle the parties to file confidential information under seal.  Rather, when the parties seek permission from the court to file material under seal, the parties must comply with Civil Local Rule 79-5 and with any pertinent orders of the assigned District Judge and Magistrate Judge.

### 1.2.  Good Cause Statement.

In light of the nature of the claims and allegations in this case and the parties' representations that discovery in this case will involve the production of trade secrets and other valuable research, development, commercial, financial, technical and/or proprietary information for which special protection from public disclosure and from use for any purpose other than prosecution of this action is warranted. Such confidential and proprietary materials and information consist of, among other things, confidential business or financial information, information regarding confidential business practices, or other confidential research, development, or commercial

---

[1] This Stipulated Protective Order is substantially similar to the Stipulated Protected Order in the Prior Action (as defined herein); which was substantially based on the model protective order provided under Magistrate Judge Rozella A. Oliver's Procedures.

2

STIPULATED PROTECTIVE ORDER                    Case No. 2:25-cv-05971-JWH-E

information (including information implicating privacy rights of third parties), information otherwise generally unavailable to the public, or which may be privileged or otherwise protected from disclosure under state or federal statutes, court rules, case decisions, or common law.  To expedite the flow of information, to facilitate the prompt resolution of disputes over confidentiality of discovery materials, to adequately protect information the parties are entitled to keep confidential, to ensure that the parties are permitted reasonable necessary uses of such material in connection with this action, to address their handling of such material at the end of the litigation, and to serve the ends of justice, a protective order for such information is justified in this matter.  The parties shall not designate any information/documents as confidential without a good faith belief that such information/documents have been maintained in a confidential, non-public manner, and that there is good cause or a compelling reason why it should not be part of the public record of this case.

> 1.3.    Acknowledgment of Procedure for Filing Under Seal.

The parties further acknowledge, as set forth in Section 12.3, below, that this Stipulated Protective Order does not entitle them to file confidential information under seal; Local Civil Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal.  There is a strong presumption that the public has a right of access to judicial proceedings and records in civil cases.  In connection with non-dispositive motions, good cause must be shown to support a filing under seal. *See Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1176 (9th Cir. 2006); *Phillips v. Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002); *Makar-Welbon v. Sony Electrics, Inc.*, 187 F.R.D. 576, 577 (E.D. Wis. 1999) (even stipulated protective orders require good cause showing), and a specific showing of good cause or compelling reasons with proper evidentiary support and legal justification, must be made with respect to Protected Material that a party seeks to file under seal.  The

3

STIPULATED PROTECTIVE ORDER                                    Case No. 2:25-cv-05971-JWH-E

parties' mere designation of Disclosure or Discovery Material as CONFIDENTIAL or HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY does not—without the submission of competent evidence by declaration, establishing that the material sought to be filed under seal qualifies as confidential, privileged, or otherwise protectable—constitute good cause.

Further, if a party requests sealing related to a dispositive motion or trial, then compelling reasons, not only good cause, for the sealing must be shown, and the relief sought shall be narrowly tailored to serve the specific interest to be protected. *See Pintos v. Pacific Creditors Ass'n*, 605 F.3d 665, 677-79 (9th Cir. 2010). For each item or type of information, document, or thing sought to be filed or introduced under seal in connection with a dispositive motion or trial, the party seeking protection must articulate compelling reasons, supported by specific facts and legal justification, for the requested sealing order. Again, competent evidence supporting the application to file documents under seal must be provided by declaration. Any document that is not confidential, privileged, or otherwise protectable in its entirety will not be filed under seal if the confidential portions can be redacted. If documents can be redacted, then a redacted version for public viewing, omitting only the confidential, privileged, or otherwise protectable portions of the document shall be filed. Any application that seeks to file documents under seal in their entirety should include an explanation of why redaction is not feasible.

2.      DEFINITIONS

2.1     Prior Action: the previously dismissed action captioned *The PLS.com, LLC v. The National Association of Realtors, et al.*, Case No. 2:20-cv-04790-JWH-RAO.

2.2     Action: *The PLS.com, LLC v. The National Association of Realtors*, Case No. 2:25-cv-05971-JWH-E.

4

STIPULATED PROTECTIVE ORDER                                    Case No. 2:25-cv-05971-JWH-E

2.3.    Challenging Party: a Party or Non-Party that challenges the designation of information or items under this Order.

2.4.    "CONFIDENTIAL" Information or Items: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c), and as specified above in the Good Cause Statement.

2.5.    "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY" Information or Items:  extremely sensitive "CONFIDENTIAL" Information or Items, the disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.6.    Counsel: Outside Counsel of Record and House Counsel (as well as their support staff).

2.7.    Designating Party: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY."

2.8.    Disclosure or Discovery Material: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things) that are produced or generated in disclosures or responses to discovery in this matter or in the Prior Action.

2.9.    Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this Action.

2.10.    House Counsel: attorneys who are employees of a party to this Action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

5

2.11.  Non-Party: any natural person, partnership, corporation, association or other legal entity not named as a Party to this action.

2.12.  Outside Counsel of Record: attorneys who are not employees of a party to this Action but are retained to represent or advise a party to this Action and have appeared in this Action on behalf of that party or are affiliated with a law firm that has appeared on behalf of that party, and includes support staff.

2.13.  Party: any party to this Action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staff).

2.14.  Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this Action.

2.15.  Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.16.  Protected Material: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY."

2.17.  Receiving Party: a Party that receives Disclosure or Discovery Material from a Producing Party.

3.    SCOPE

The protections conferred by this Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any deposition testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material, other than during a court hearing or at trial. Any use of Protected Material during a court hearing or at trial shall be governed

STIPULATED PROTECTIVE ORDER                    Case No. 2:25-cv-05971-JWH-E

by the orders of the presiding judge.  This Order does not govern the use of Protected Material during a court hearing or at trial.

Materials produced in the Prior Action may be used by the Parties in this Action as if produced and designated hereunder and shall be subject to the protections and obligations of this Order.

4.    DURATION

Once a case proceeds to trial, information that was designated as CONFIDENTIAL or HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY or maintained pursuant to this protective order used or introduced as an exhibit at trial becomes public and will be presumptively available to all members of the public, including the press, unless compelling reasons supported by specific factual findings to proceed otherwise are made to the trial judge in advance of the trial. *See Kamakana*, 447 F.3d at 1180-81 (distinguishing "good cause" showing for sealing documents produced in discovery from "compelling reasons" standard when merits related documents are part of court record).  Accordingly, the terms of this protective order do not extend beyond the commencement of the trial.

5.    DESIGNATING PROTECTED MATERIAL

5.1.    Exercise of Restraint and Care in Designating Material for Protection.

Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards.  The Designating Party must designate for protection only those parts of material, documents, items or oral or written communications that qualify so that other portions of the material, documents, items or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order.  Mass, indiscriminate or routinized designations are prohibited.  Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber the case development

STIPULATED PROTECTIVE ORDER                           Case No. 2:25-cv-05971-JWH-E

process or to impose unnecessary expenses and burdens on other parties) may expose the Designating Party to sanctions. If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, that Designating Party must promptly notify all other Parties that it is withdrawing the inapplicable designation.

5.2. <u>Manner and Timing of Designations</u>.

Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a)    For information in documentary form (e.g., paper or electronic documents, but excluding transcripts of depositions), that the Producing Party affix at a minimum, the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY" to each page that contains protected material.  If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).  A Party or Non-Party that makes original documents available for inspection need not designate them for protection until after the inspecting Party has indicated which documents it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "CONFIDENTIAL."  After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order.  Then, before producing the specified documents, the Producing Party must affix the "CONFIDENTIAL", or "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY" legend to each page that contains Protected Material.  If only a portion

8

STIPULATED PROTECTIVE ORDER                                    Case No. 2:25-cv-05971-JWH-E

of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins).

(b)     For testimony given in depositions, the entire transcript shall be deemed "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY" for a period of thirty days following receipt of the final transcript by the Designating Party, to allow time for the Designating Party to specifically identify, by page and line number, any testimony that qualifies for protection under this Order.

(c)     for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information is stored the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY." If only a portion or portions of the information warrants protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

5.3.    Inadvertent Failures to Designate.

If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

6.      CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1.    Timing of Challenges.

Any Party or Non-Party may challenge a designation of confidentiality at any time that is consistent with the Court's Scheduling Order.

6.2.    Meet and Confer.

The Challenging Party shall initiate the dispute resolution process under Local Rule 37-1.

STIPULATED PROTECTIVE ORDER                    Case No. 2:25-cv-05971-JWH-E

6.3.    Burden.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party.  Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions.  Unless the Designating Party has waived or withdrawn the confidentiality designation, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the Court rules on the challenge.

7.    ACCESS TO AND USE OF PROTECTED MATERIAL

7.1.    Basic Principles.

A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this Action only for prosecuting, defending or attempting to settle this Action.  Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order.  When the Action has been terminated, a Receiving Party must comply with the provisions of section 13 below (FINAL DISPOSITION). Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2.    Disclosure of "CONFIDENTIAL" Information or Items.

Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this Action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this Action;

(b) the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this Action;

10

STIPULATED PROTECTIVE ORDER                    Case No. 2:25-cv-05971-JWH-E

(c) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d) the court and its personnel;

(e) court reporters and their staff;

(f) professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information;

(h) during their depositions, witnesses, and attorneys for witnesses, in the Action to whom disclosure is reasonably necessary provided: (1) the deposing party requests that the witness sign the "Acknowledgment and Agreement to Be Bound" (Exhibit A); and (2) they will not be permitted to keep any confidential information unless they sign the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court.  Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material may be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order; and

(i) any mediator or settlement officer, and their supporting personnel, mutually agreed upon by any of the parties engaged in settlement discussions.

7.3.    Disclosure of "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY" Information or Items.

Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" only to:

11

STIPULATED PROTECTIVE ORDER                              Case No. 2:25-cv-05971-JWH-E

(a) the Receiving Party's Outside Counsel of Record in this Action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this Action;

(b) Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c) the court and its personnel;

(d) private court reporters and their staff to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(e) professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this Action and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information; and

(g) any mediator or settlement officer, and their supporting personnel, mutually agreed upon by any of the parties engaged in settlement discussions

8.    PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this Action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY," that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena

12

STIPULATED PROTECTIVE ORDER                                    Case No. 2:25-cv-05971-JWH-E

or order is subject to this Protective Order.  Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected. If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission, or unless otherwise required by the law or court order.  The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this Action to disobey a lawful directive from another court.

9.    A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION

(a)    The terms of this Order are applicable to information produced by a NonParty in this Action and designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY."  Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order.  Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b) In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

<hr>

13

STIPULATED PROTECTIVE ORDER                    Case No. 2:25-cv-05971-JWH-E

(1) promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

(2) promptly provide the Non-Party with a copy of the Stipulated Protective Order in this Action, the relevant discovery request(s), and a reasonably specific description of the information requested; and

(3) make the information requested available for inspection by the Non-Party, if requested.

(c) If a Non-Party represented by counsel fails to commence the process called for by Local Rules 45-1 and 37-1 within 14 days of receiving the notice and accompanying information or fails contemporaneously to notify the Receiving Party that it has done so, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If an unrepresented Non-Party fails to seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court unless otherwise required by the law or court order. Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

10.    UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or

14

persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

11.    INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL

Pursuant to Federal Rule of Evidence 502, the Parties agree that, if a Producing Party inadvertently produces a document, a tangible item, or electronically stored information that it later discovers or in good faith asserts to be privileged, protected by the work product doctrine, or subject to some other immunity from disclosure ("Privileged Material"), the production of that Privileged Material shall not be deemed to constitute a waiver of any applicable privilege, work product protection, or immunity from disclosure. Upon discovery of any inadvertent disclosure of Privileged Material, the Producing Party shall immediately notify each Receiving Party of the inadvertent production, and request either the return or confirmation of destruction of the Privileged Material. Upon receiving such a notice, the obligations of the Receiving Party or Parties are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). In addition, within five (5) business days of receiving such a notice, each Receiving Party shall either (i) return or confirm destruction of all such Privileged Material or (ii) confirm that all such Privileged Material has been sequestered, notify the Producing Party that it intends to challenge the claim of privilege, work product protection, or immunity from disclosure, and initiate the dispute resolution process provided for by Local Rule 37-1 et seq. This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review.

//

//

15

## 12.    MISCELLANEOUS

### 12.1.  Right to Further Relief.

Nothing in this Order abridges the right of any person to seek its modification by the Court in the future.

### 12.2.  Right to Assert Other Objections.

By stipulating to the entry of this Protective Order, no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order.  Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

### 12.3.  Filing Protected Material.

A Party that seeks to file under seal any Protected Material must comply with Local Civil Rule 79-5 and with any pertinent orders of the assigned District Judge and Magistrate Judge.  Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material at issue.  If a Party's request to file Protected Material under seal is denied by the court, then the Receiving Party may file the information in the public record unless otherwise instructed by the court.

## 13.    FINAL DISPOSITION

After the final disposition of this Action, as defined in paragraph 4, within 60 days of a written request by the Designating Party, each Receiving Party must return all Protected Material to the Producing Party or destroy such material.  As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material.  Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60 day deadline that (1) identifies

16

STIPULATED PROTECTIVE ORDER                          Case No. 2:25-cv-05971-JWH-E

(by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material.  Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

14.    <u>VIOLATION</u>

Any violation of this Order may be punished by appropriate measures including, without limitation, contempt proceedings and/or monetary sanctions.

**IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.**

DATED: September 11, 2025          DHILLON LAW GROUP INC.

By: /s/ Christopher G. Renner

Christopher G. Renner
Attorneys for Plaintiff
The PLS.com, LLC

DATED: September 11, 2025          MASSEY GAIL LLP

By: /s/ Matthew M. Collette

Matthew M. Collette
Attorneys for Defendant
The National Association of Realtors

<div align="center">17</div>

STIPULATED PROTECTIVE ORDER                    Case No. 2:25-cv-05971-JWH-E

**FOR GOOD CAUSE SHOWN, IT IS SO ORDERED.**

DATED: September 11, 2025     _____

Hon. Charles F. Eick

United States Magistrate Judge

18

## SIGNATURE ATTESTATION

I hereby attest that all signatories listed above, on whose behalf this stipulation is submitted, concur in the filing's content and have authorized the filing.

DATED: September 11, 2025                    DHILLON LAW GROUP INC.

By: /s/ Christopher G. Renner

Christopher G. Renner
Attorneys for Plaintiff
The PLS.com, LLC

19

STIPULATED PROTECTIVE ORDER                    Case No. 2:25-cv-05971-JWH-E

## EXHIBIT A

## ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of _____ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Central District of California on _____[date] in the case of *The PLS.com, LLC v. The National Association of Realtors*, Case No. 2:25-cv-05971-JWH-E.  I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt.  I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Central District of California for enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.  I hereby appoint _____ [print or type full name] of _____ [print or type full address and telephone number] as my California agent for service of process in connection with this action or any proceedings related to enforcement of this Stipulated Protective Order.

Date: _____

City and State where sworn and signed: _____

Printed name: _____

Signature: _____

STIPULATED PROTECTIVE ORDER                                    Case No. 2:25-cv-05971-JWH-E

C

MASSEY & GAIL LLP
Matthew M. Collette (California Bar No. 138771)
Chiseul "Kylie" Kim
Matthew E. Layden
1000 Maine Ave. SW., Suite 450
Washington, D.C. 20024
Tel:  (202) 652-4511
kkim@masseygail.com
mlayden@massygail.com

Leonard A. Gail
50 E. Washington St., Suite 400
Chicago, IL 60602
Tel: (312) 283-1590
lgail@masseygail.com

**HIRSCHFELD KRAEMER LLP**
Daniel H. Handman
1299 Ocean Avenue, Suite 750
Santa Monica, CA  90401
Telephone:  (310) 255-0705
dhandman@hkemploymentlaw.com

***Attorney for the National Association of* REALTORS®**

***Local Counsel for the National Association of* REALTORS®**

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

The PLS.com, LLC, a California limited company,

      Plaintiff,

  vs.

THE NATIONAL ASSOCIATION OF REALTORS,

      Defendant.

Case No. 2:25-cv-05971-JWH-E

**DISCOVERY MATTER**

**[PROPOSED] ORDER ESTABLISHING A PROTOCOL FOR ELECTRONIC DISCOVERY**

**DEMAND FOR JURY TRIAL**

Hon. John W. Holcomb
Courtroom 9D, 9th Floor

CASE NO. 2:25-CV-05971
ORDER ESTABLISHING A PROTOCOL FOR ELECTRIC DISCOVERY
1

# [PROPOSED] ORDER ESTABLISHING PROTOCOL FOR ELECTRONIC DISCOVERY

## A.    DEFINITIONS

1.    "Extracted Text" means the text extracted from a Native Format file and includes all header, footer, and document body information.

2.    "Metadata" means structured information that describes, explains, locates, or otherwise makes it easier to retrieve, use, or manage an information resource.

3.    "Native Format" means the format of ESI in the application in which such ESI was originally created.

4.    "OCR" means the optical character recognition file, which is created by software used in conjunction with a scanner that is capable of reading text-based documents and making such documents searchable using appropriate software.

5.    "Producing Party" means a party in the above captioned matter that produces documents.

6.    "Receiving Party" means a party in the above captioned matter to whom documents are produced

7.    "Responsive Document" means any document that is responsive to any discovery requests served on the Producing Party in this litigation, which the

Producing Party has agreed to produce, or which the Producing Party has been ordered to produce by the Court.

8.    "Tagged Image File Format" or "TIFF" refers to the CCITT Group IV graphic file format for storing bit-mapped images, with multiple compression formats and resolutions.

**B.    SCOPE**

1.    This ESI Protocol Order will govern the production of ESI and paper documents. To the extent that a Party collected and processed documents prior to the entry of this ESI Protocol Order, and production of such documents cannot be made in accordance with the terms of this ESI Protocol Order, the Parties will meet and confer concerning the potential formats of the production of any such documents.

2.    Nothing in this ESI Protocol Order shall be construed to affect the admissibility of discoverable information. Pursuant to the terms of this ESI Protocol Order, information regarding search processes and ESI practices may be disclosed, but compliance with this ESI Protocol Order does not constitute a waiver, by any Party, of any objection to the production of particular ESI as irrelevant, undiscoverable, or otherwise inadmissible, unduly burdensome or not reasonably accessible, or privileged, nor does it constitute a waiver of any right to discovery by any Party. For the avoidance of doubt, a Party's compliance with

this ESI Protocol Order will not be interpreted to require disclosure of information potentially protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege.

3.    The Parties shall meet and confer in good faith in an effort to agree upon search methods and terms or other filtering or categorization to be applied and timeframes for collection and review of ESI.

4.    The Producing Party shall use commercially reasonable efforts to comply with the technical specifications herein, considering the capabilities of their eDiscovery tools and vendors. Parties shall meet and confer regarding any technical limitations that prevent strict compliance.

5.    Except as noted herein, the Parties agree that the following instructions("Instructions") apply to the production of all ESI, including "paper" documents and files stored in electronic format, note files (both paper notes and electronic notes created using electronic note applications such as Microsoft OneNote), Word documents, PowerPoint documents, Excel documents, and Access databases. Nothing in this ESI Protocol Order is intended to be an exhaustive list of discovery obligations or rights of a Producing Party or a Receiving Party, or any other Party or non-Party.

6.    The Parties and their attorneys do not intend by agreeing to this ESI Protocol Order to waive their rights to any protection or privilege, including the

attorney-client privilege and work product doctrine, or their rights to object to any discovery requests. This ESI Protocol Order does not address or resolve any objections to the scope of the Parties' respective discovery requests.

7.      Notwithstanding anything to the contrary herein, the following document types are not discoverable in the Litigation except upon a showing of good cause, which shall include a showing that the information sought is likely material, that it is unavailable from other sources, and that its production will not impose undue burden or expense on the Producing Party:

     i.      Back-up tapes or other long-term storage media that were created strictly for use as a data back-up, disaster recovery medium, or a means of information restoration;

     ii.      Deleted, erased, or overwritten computer files, whether fragmented or whole, which were deleted in the regular course of business;

     iii.      Deleted, shadowed, damaged, residual, slack, fragmented, and/or other data only accessible by forensics;

     iv.      Data in metadata fields that are frequently updated automatically, such as last-opened dates, except as specified in this ESI Protocol Order;

v. Data stored in Random Access Memory ("RAM"), cache memory, or in temporary or cache files, including internet history, web browser cache, and cookie files, or other ephemeral data, wherever located;

vi. Operating system files and executable files;

vii. Data stored on photocopiers, scanners, and fax machines;

viii. Email attachments that are less than 25 kilobytes;

ix. Structural files not material to individual file contents that do not contain substantive content (e.g., .CSS, .XSL, .XML, .DTD, etc.).

x. Voicemail data; and

xi. Data stored as server, system, network and/or software application logs.

8. Nothing in this ESI Protocol Order prevents any Party from asserting, in accordance with the Federal Rules of Civil Procedure, that other categories of ESI are not reasonably accessible within the meaning of Rule 26(b)(2)(B).

9. The Parties shall meet and confer to resolve any disputes that arise under this ESI Protocol Order. In the event the Parties cannot reach agreement on a disputed matter, the Parties shall submit the matter to the Court.

10. ESI shall include data collected from the following sources:

    i.     Email

    ii.    Locally stored files

    iii.   Cloud/Internet stored documents (Google Drive, Dropbox, Box.com, iCloud, Asana C, etc.)

    iv.   Chat communications (such as Slack, WhatsApp, Skype, Telegram or Discord)

    v.    Mobile and Handheld devices documents and data (including but not limited to text messages or other chat messaging media)

    vi.   Hard Copy Documents

    vii.  When agreed to, collaboration tools and project management platforms (Google Analytics, etc.)

11. Document Custodians: Each Party will disclose an initial list of proposed custodians reflecting those with information and/or documents responsive to the agreed-on scope of Rule 34 requests.

**C.**    **GENERAL PRODUCTION FORMAT**

1. **FORMAT:** Each ESI item will be produced in its native format, accompanies by TIFFs, Text Files, and a Load File as set out below.

2.      **TIFFs**: Except for structured data, all production images will be provided as a black-and-white, single-page Group IV TIFF of at least 300 DPI resolution with corresponding multi-page text and necessary load files. Each image will have a file name that is the unique Bates number of that image. Original document orientation should be maintained to the extent reasonably practicable and technologically possible for a producing Party's vendor (i.e., portrait to portrait and landscape to landscape). Hidden content, tracked changes, edits, comments, notes, and other similar information viewable within the native file shall, to the extent reasonably practicable, also be imaged so that this information is captured on the produced image file. Documents that are difficult to render in TIFF because of technical issues, or any other documents that are impracticable to render in TIFF format, may be produced in their native format with a placeholder TIFF image stating "Document Produced Natively," unless such documents contain redactions, in which case the documents will be produced in TIFF format.

3.      **Text Files:** Each ESI item produced under this ESI Protocol Order shall be accompanied by a text file as set out below. All text files shall be provided as a single document level text file for each item, not one text file per page. Each text file shall be named to use the Bates number of the first page of the corresponding production item.

i.  OCR: A Producing Party may make paper documents available for inspection and copying/scanning in accordance with Fed. R. Civ. P. 34 or, additionally or alternatively, scan and OCR paper documents if it chooses. Where OCR is used, the Parties will endeavor to generate accurate OCR and will utilize quality OCR processes and technology. OCR text files should indicate page breaks where possible. Even if OCR is used by a Producing Party, however, the Parties acknowledge that, due to poor quality of the originals, not all documents lend themselves to the generation of accurate OCR. In such instances, or in the event that a Producing Party does not choose to use OCR at all, the Producing Party will make the paper documents available for inspection and copying in accordance with Fed. R. Civ. P. 34.

ii.  ESI: Emails and other ESI will be accompanied by extracted text taken from the electronic file itself, where available.

4.  **Load File:** All production items will be provided with a delimited datafile or "load file," which will include both an image cross-reference load file (such as an Opticon file) as well as a metadata (.dat) file with the metadata fields identified below on the document level to the extent available. See **Appendix A**

for a list of the Meta Data fields.  The load file must reference each TIFF in the corresponding production. The total number of documents referenced in a production's data load file should match the total number of designated document breaks in the Image Load files in the production.

5.    **Appearance:** Subject to any redactions, each document's TIFF image file shall contain the same information and same physical representation as the document did in its original format, whether paper or electronic, consistent with the processing specifications set forth in Section E. Documents that present imaging or formatting problems of which the Producing Party is aware at the time of production but has not been able to resolve shall be promptly identified by the Producing Party by e-mail to the Receiving Party within thirty (30) days after the production containing the problematic document(s), or the Producing Party may elect to produce those documents in native form consistent with Section C.9.

6.    **Redactions:** If redaction takes place, it will be logged on a privilege log. Redaction of ESI will be performed on a TIFF imaged version of the document only, and native format files and extracted text will not be provided. Unredacted text in a redacted document must be made searchable using OCR. Any redactions must be clearly visible on the face of the produced document (e.g., the Parties should not use white boxes to make redactions on documents with a white background) and OCR searchable (e.g., labeled "Redacted").

7.    **Document Unitization:** For electronic documents, all unitization should be defined within the data load file; this includes the designation of parent/attachments both for e-mail and attachments and for compressed files (such as ZIP or RAR files) and their contents.

8.    **Color:** Documents containing color shall be produced in color unless the Producing Party makes a reasonable showing that the production of particular documents in color would be overly burdensome.

9.    **Document Branding:** Each TIFF shall be stamped with the following information:

    i.    **Bates Number:** Each page of a document produced in TIFF file format shall have a legible, unique fixed-length numeric identifier ("Bates Number") containing eight (8) digits electronically "burned" onto the image in no less than 10-point font. Unless it would obscure, conceal or interfere with any information originally appearing on the document, the Bates Number shall be burned on the lower right-hand corner of the document. The Bates Number for each document shall be created so as to identify the Producing Party and the Bates Number (*e.g.*, "ABC00000001") and shall not contain spaces in the Document Number. Each Party shall have a unique

identifying name. Each document's confidentiality designation shall be included in the appropriate data field in the load file.

ii.   **Confidentiality:** If a particular paper document or ESI item qualifies for confidential treatment pursuant to the terms of a Protective Order entered by the Court in the Litigation, the designation shall be branded on the document's image at a location that does not obliterate or obscure any part of the underlying images. To the extent reasonably possible, this designation also should be included in the appropriate data field in the load file. Failure to comply with the procedures set forth in this ESI Protocol Order, any protective order or confidential order, or any confidential stipulation shall not waive any protection or confidential treatment.

10.   **Native File Exceptions:** To the extent a Producing Party produces Microsoft Excel or other spreadsheet files, video or audio files, or other information that is only readable and/or usable in its Native Format, such documents shall be produced in their Native Format. To the extent documents that fall under this exception contain privileged information, and cannot be redacted or produced in TIFF format, such documents will be logged on a privilege log.

The Metadata load file for files produced natively shall contain a link to the produced Native Files via data values called "Native Link." To the extent a response to discovery requires production of discoverable electronic information contained in a structured database format, such as Microsoft Access, the Parties shall discuss the production format prior to production. Each electronic file produced in Native Format shall be assigned a unique Document Number. The Producing Party shall include a single-page TIFF image branded with this unique Document Number and the phrase "PRODUCED IN NATIVE FORMAT" branded in the center of the page. To protect the confidentiality of files produced natively, any confidentiality designations pursuant to the Stipulated Protective Order must appear on the TIFF placeholder on the lower left-hand corner in no less than 10-point font. Native file names shall be identical to the Document number, followed by the file extension, *e.g.*, ABC00000001.xls. No Party may attach to any pleading or any correspondence to any adverse or third-Party, or submit as an exhibit at a deposition or any other judicial proceeding, a copy of any document in Native Format produced by any Party without ensuring that the corresponding Bates number and confidentiality legend, as designated by the Producing Party, appears in the Native File name.

11. **Embedded Files:** If a document has another file embedded in it, (*e.g.*, a Word document that has a spreadsheet embedded in it), the embedded file

shall be produced as a standalone file. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved. Embedded files without substantive content, such as logos, icons, emoticons, and footers may be culled from a document family and need not be produced as separate documents by a producing document. Email attachments shall be extracted and processed as separate documents with family linking preserved; however, non-attachment embedded links (e.g., hyperlinks to external files) are not automatically extracted and may be provided separately if required for production.

12.     **Production Media:** The Producing Party shall produce document images, native files, load files and metadata via secure file transfer protocol ("FTP").

13.     **De-duplication:** The Parties shall use MD5 hash values to identify duplicate ESI and globally de-duplicate ESI. Family groups (e.g., an email and its attachments) shall be de-duplicated only against other family groups as entities, and no document that is not part of a family group shall be de-duplicated against a member of a family group. The Parties will not de-duplicate loose electronic documents or hard copy information against email attachments. The Parties will not treat a document containing handwritten notes, highlighting, or any other markings as a duplicate of a non-marked or annotated version of the same

document. A Party may de-duplicate ESI across its custodians or sources, but if that option is exercised, the Party shall identify each custodian who had a copy of the produced document in the ALL CUSTODIANS field in the Metadata load file. A Party may only de-duplicate "exact duplicate" documents and may not de-duplicate "near duplicate" documents, both of the quoted terms in this sentence being given their ordinary meaning in the e-discovery field. Common system files defined by the NIST library (http://www.nsrl.nist.gov/) need not be produced.

14. **Original Documents:** Nothing in this Stipulated Order shall eliminate or alter any Party's obligation to retain Native Format copies, including associated metadata, of all ESI preserved for and produced in the Litigation and/or original versions of all hard copy documents preserved for and produced in the Litigation.

15. **Third-Party Software and Legacy Systems:** To the extent that documents produced pursuant to this Stipulated Order cannot be rendered or viewed without the use of proprietary third-party software or legacy systems, the Parties shall meet and confer to minimize any expense or burden associated with the production of such documents in an acceptable format.

**D. PAPER DOCUMENT PRODUCTION PROTOCOLS**

1. **Scanning:** Where relevant documents are in hard copy format, the Producing Party shall scan and provide OCR copies of the documents.

2.      **Coding Fields:** The Parties shall employ the coding and metadata fields reflected in the attached **Appendix A**.

3.      **Unitization of Paper Documents:** Paper documents should be logically unitized for production to the extent reasonably practicable. Therefore, when scanning paper documents for production, distinct documents shall not be merged into a single record and single documents shall not be split into multiple records.

4.      **File/Binder Structures**: Where the documents were organized into groups, such as folders, clipped bundles, and binders, this structure shall be maintained and provided in the load file to the extent reasonably practicable. The relationship among the documents in a folder or other grouping should be reflected in proper coding of the beginning and ending document and attachment fields to the extent reasonably practicable. The Parties will make their best efforts to unitize documents correctly. Where a document, or a document group—such as folder, clipped bundle, or binder—has an identification spine or other label, the information on the label shall be scanned and produced as the first page of the document or grouping.

5.      **Custodian Identification**: The Parties will utilize best efforts to ensure that paper records for a particular Document Custodian are produced in consecutive Bates stamp order.

## E.    PROCESSING SPECIFICATIONS

1.    The Producing Party shall collect and process documents using forensically sound methods that avoid spoliation of data. The Producing Party will generate and preserve the MD5 hash values at the time of ESI processing. The Producing Party shall use the following specifications when converting ESI from its Native Format into TIFF image files prior to its production:

i.    All ESI shall be processed with a single consistent time zone date and time setting.

ii.    All tracked changes shall be maintained, to the extent reasonably feasible upon collection, so that all changes to a document are evident.

iii.    Author comments shall remain or be made visible, to the extent reasonably feasible upon collection and processing.

iv.    Hidden columns, rows, comments, and worksheets shall be made visible prior to processing, to the extent reasonably feasible upon collection and processing.

v.    PowerPoint documents should be processed with hidden slides and speaker's notes, and comments unhidden prior to processing, and should display both the slide, speaker's notes, and comments on the TIFF image, to the extent such elements

are made visible during collection. Auto-populated fields, with the exception of auto-populating "page-number" fields, shall be replaced with text indicating the field name. For example, auto-populating "date" fields shall be replaced with the text "DATE" (or other similar text) and auto-populating "file path" fields shall be replaced with the text "PATH" (or other similar text).

vi. For archive files (zip, jar, rar, gzip, etc.), extract from the archive and maintain family relationships; do not include the source/container file itself in the production.

2. **Email Collection and Processing:**

i. **Email Threading:** The Parties may use email thread suppression to avoid review and production of information contained within an existing email thread in another document being reviewed and produced, but under no circumstances will email thread suppression eliminate (a) the ability of a Receiving Party to identify every custodian who had a copy of a produced document or email, or (b) remove from a production any unique branches and/or attachments contained within an email thread.

ii.   **Email Domains:** Excluded from any ESI search process shall be uniquely identifiable categories of documents, such as emails from domains typically associated with junk email, such as fantasy football-related emails, retailer advertising, and newsletters or alerts that do not concern relevant topics. The Parties agree to disclose domain names excluded under this section at the time of production.

## F.    USE OF TECHNOLOGY ASSISTED REVIEW

1.    **Use of TAR:** The Parties may use Technology Assisted Review ("TAR") to sort documents for linear review without disclosure of that use. The Parties shall not utilize TAR in combination with search terms to cull or narrow the review set. If a Party elects to use TAR to cull or otherwise limit the volume of ESI subject to linear review, the requirements set forth in Section F.2 shall apply.

2.    **Use of TAR:**

i.   **Paper Documents**: The Parties agree to meet and confer to determine whether paper documents may be included in a TAR process.

ii.   **Excluded Documents**: Any document excluded from TAR must undergo separate analysis.

CASE NO. 2:25-CV-05971

ORDER ESTABLISHING A PROTOCOL FOR ELECTRIC DISCOVERY

19

iii. **Notice**: Before using TAR to cull or otherwise limit the volume of ESI subject to linear review, a Producing Party must provide to the Receiving Party a written description of the TAR tool and method(s) for identifying or eliminating documents for review, including (1) the name of any TAR software (name and version); (2) the vendor used; (3) the manner in which TAR will be employed for the review (e.g., Simple Active Learning, Continuous Active Learning); and (4) fields on which TAR will be applied.

iv. **Validation Report**: Prior to the deadline for substantial completion of document productions, a Party utilizing TAR must provide to the Receiving Party a Validation Report containing the volume of documents included to TAR, the volume excluded and the reasons for exclusion (e.g., filetype, size, lack of extracted text), and the information required by Section F.2.v below.

v. **Validation Standards**:

1. The determination to stop review pending validation shall be determined by the type of TAR applied:

a. For a party using TAR 1.0 (Simple Active Learning, Predictive Coding) a Control Set will be used to calculate statistical metrics like recall, precision, richness/prevalence, and depth for recall. Once the predictive coding model has been sufficiently trained, documents scored on or above the identified cutoff score, along with their families, will be eligible for production. Parties will report the recall, precision, richness/prevalence, and depth for recall of this population based on a 95 percent confidence level and 5 percent margin of error and will target a recall rate of 80%. In addition to the Control Set measurements, parties using a TAR 1.0 methodology will identify a Validation Set to confirm the overall performance of the model. This set will be randomly selected from the predicted non-responsive documents (excluding predicted responsive family members) and represent a 95 percent confidence level and 5

percent margin of error. The metrics of the Validation Set and Control Set will be reported in the Validation Report.

b. For a party using TAR 2.0 (Continuous Active Learning) statistical sampling will be used to validate the appropriateness of terminating the TAR process and estimating recall. Parties will target an estimated recall of 80%. Once the parties determine that it is likely that a high percentage of responsive documents have been reviewed based on regular metrics tracking, an Elusion Sample will be drawn from the documents excluded from review by the TAR process. The sample will be sufficiently sized to provide a 95 percent confidence level and 5 percent margin of error. The richness of this sample (the Elusion Rate) will be used to estimate the number of responsive documents remaining in the unreviewed population. The total number of responsive documents in the

TAR population will be estimated by the sum of the estimated number of responsive documents in the unreviewed population and the total number of documents identified as responsive by the TAR process. Recall will be estimated by dividing the total number of documents identified as responsive by the TAR process by the estimated total number of responsive documents. If the sampling indicates that 80% recall has not been achieved, then the review process will continue unless the party demonstrates that the burden of continuing the review process is outweighed by the benefit. If the sampling indicates that 80% recall has been achieved, then TAR and review process will be terminated.

2. Any responsive documents found in the elusion sample will be produced and identified as such and the Parties may request additional searches or training.

vi. Aside from the Elusion Set, a Producing Party need not conduct any additional review of information subjected to, but

not retrieved by, a TAR tool as part of the identification of the subset of information that will be subject to review and production.

## G.     PRIVILEGED MATERIALS

1.     **Privilege Log:** Any document or e-mail or redacted portion of document/e-mail that is identified as privileged for any reason and logged on a privilege log is subject to the following:

i.     Within thirty (30) days after the completion of a Party's document production, the Producing Party shall serve on the Receiving Party a privilege log containing any documents withheld on the basis of any claim of privilege or other legal protection ("Privileged Material"). The Parties shall promptly provide a privilege log for any subsequently withheld documents. To the extent the Producing Party makes multiple document productions, the Producing Party shall supplement and add to its original privilege log so that only one log is used throughout the Litigation.

ii.     The privilege log shall include sufficient information to allow the Receiving Party to reasonably assess the claim of privilege, including but not limited to the following information: (i) the

date of the document (i.e., the date of the last email in the email chain); (ii) the author(s)/sender(s); (iii) recipients (including recipients copied and/or blind copied); (iv) a description of the contents of the document that, without revealing information itself privileged or protected, is sufficient to understand the basis of the claim of privilege; and (v) the type or nature of the privilege asserted (e.g., attorney-client privilege, work-product doctrine).

iii. The Parties are only required to provide a single privilege log entry for multiple email messages in the same email thread to the extent such messages are included within one individual email thread. The email that will be logged will be the most inclusive thread with any associated attachments.

iv. Documents that contain both privileged and non-privileged/work product protected information will be produced with the privileged/protected information redacted and the non-privileged/protected information visible. Documents or portions thereof that contain redactions for information withheld on privilege/work product grounds will be identified in a privilege log in accordance with Rule

CASE NO. 2:25-CV-05971

ORDER ESTABLISHING A PROTOCOL FOR ELECTRIC DISCOVERY

25

26(b)(5) and this ESI Protocol Order—with the exception that redacted documents need not be logged provided the basis for the redaction is made plain on the face of the redacted document (e.g., the email to/from is between counsel and is visible in the produced version of the document).

2.    **Non-Waiver:** Pursuant to Federal Rule of Evidence 502(d), the production of any material or information shall not be deemed to waive any privilege or work product protection in the Litigation or in any other federal or state proceeding. Nothing in this Paragraph is intended to or shall serve to limit a Party's right to conduct a review of any material or information for relevance, responsiveness, and/or segregation of privileged and/or protected information before production, subject to the below.

3.    **Clawback:** Any Party or non-Party may request the return of any produced material or information on the grounds of privilege or work product protection by identifying it, stating the basis for withholding such material or information from production, and providing any other information that would be listed on a supplemental privilege log. Federal Rule of Civil Procedure 26(b)(5)(B) shall govern the claw back of produced documents or information on the grounds of privilege or work product protection. If a Party or non-Party

requests the return of such produced material or information then in the custody of one or more Parties, the possessing Parties shall within fifteen (15) days:

    i.    Destroy or return to the Producing Party or non-Party the produced material or information and all copies thereof, and expunge from any other document or material, information derived solely from the produced material or information; or

    ii.    Notify the Producing Party or non-Party that it wishes to challenge the claim of privilege or work product protection and has sequestered the material until the issue can be resolved. The Parties agree to meet and confer regarding the claim of privilege. If, at the conclusion of the meet-and-confer process, the Parties are still not in agreement, they may bring the issue to the Court. A Party challenging a claw-back request under this Section may not use the content of the clawed-back document for the purpose of filing a motion with the Court under seal that challenges whether or not the document is privileged or work product only. A Party challenging a claw-back request under this Section may not use the content of the clawed-back documents for any other purpose unless and until the Court has addressed the challenge.

## H.    THIRD-PARTY DISCOVERY

1.     A Party that issues a non-party subpoena (the "Issuing Party") shall include a copy of the Protective Order concerning confidentiality entered in this litigation with the subpoena.

2.     The Issuing Party shall provide to all other Parties within 10 business days of receipt a copy of any documents and ESI (including any metadata) obtained under subpoena.

3.     If the non-party production is not Bates-stamped, the Issuing Party will endorse the non-party production with unique Bates prefixes and numbering scheme prior to reproducing them to all other Parties.

**IT IS SO ORDERED.**

DATED:    10-23-25

Hon. Charles F. Eick
United States Magistrate Judge

# APPENDIX A.
## METADATA FIELDS[1]

Note: Cloud-specific metadata fields (e.g., titles, types, owners, dates) shall be provided if available and collected via load file from the source repository; otherwise standard document metadata fields shall suffice.

1.    **BegBates** –Beginning Bates number.

2.    **EndBates** – Ending Bates number.

3.    **BegAttach** – Bates number of the first page of a Family range.

4.    **EndAttach** – Bates number of the last page of a Family range.

5.    **ParentID** – Parent Bates number, populated only for child records.

6.    **PageCount** – Number of pages in a document.

7.    **FileExtension** – Original file extension as the document was maintained in the ordinary course.

8.    **FileSize** – File size in bytes.

9.    **DocTitle** – Document title as extracted from a Native File

10.    **DocSubject** – Any value populated in the Subject field of the document properties.

11.    **Custodian** – Primary custodian full name.

12.    **All Custodians** – All custodians from which the document was collected prior to deduplication.

---

[1] To be provided to the extent reasonably available.

CASE NO. 2:25-CV-05971

APPENDIX A.

29

13.    **Author --** Document author information for non-email ESI.

14.    **LastSavedBy** – User who last saved ESI.

15.    **From** – Sender of an email or Chat Communication.

16.    **To** – Recipient of an email or all recipients of a Chat Communication.

17.    **CC** – Additional Recipients.

18.    **BCC -** Blind Additional Recipients.

19.    **Email Subject** – Subject line of e-mail.

20.    **Attachments** – Name of attached file(s) as maintained in the ordinary course of business.

21.    **Number of Attachments** – Number of attachments to an e-mail.

22.    **DateCreated** – File date and time created as extracted from the Native File.

23.    **DateModified** – File date and time modified as extracted from the Native File.

24.    **DateSent** – Date and time sent.

25.    **DateReceived** – Date and time received.

26.    **FileName** – Name of the file as maintained in the ordinary course of business with extension.

27.    **File/Folder Path** – Original file/path of the location where the item was located at the time of collection. If an email extracted from a container, e.g., from a .pst file, it should contain the name and location of the email

CASE NO. 2:25-CV-05971

APPENDIX A.

30

container, and the folder within the container from which the email was collected.

28.  **Hash** – The hash value generated at processing.

29.  **Collaboration Channel/Chat Name** – Name of the channel or chat where the Chat Communication occurred, if provided via load file during ingestion of chat data.

30.  **Chat Conversation ID** – Unique ID to identify all messages and attachments within a Chat Communication channel/thread (i.e., messages involving the same participants or occurring within the same thread), if provided via load file during ingestion of chat data.

31.  **Time Zone Processed** – Time zone data was processed (e.g, UTC).

32.  **TextPath** – The path to the text file for each record in the production volume, including filename.

33.  **NativePath** – The path to the Native Format file on the delivery media, including the file name.

34.  **Confidentiality** – Confidentiality level if assigned pursuant to any applicable Protective Order or stipulation.[2]

35.  **Redacted** – Descriptor for documents that have been redacted. "Yes" for redacted documents; "No" for un-redacted documents.

---

[2] To the extent there is a discrepancy between the metadata field and the face of the document, the highest designation controls.

CASE NO. 2:25-CV-05971

APPENDIX A.

31

# Exhibit 3

Brandon K. Braga (State Bar No. 253233)
Kristin A. Regan (State Bar No. 156680)
THE AGENCY
331 Foothill Road, Suite 100
Beverly Hills, California 90210
Telephone: (213) 624-6900
Facsimile: (213) 624-6999
brandon.braga@theagencyre.com
kregan@theagencyre.com

Attorneys for Defendants UMRO REALTY
CORP. dba THE AGENCY

# UNITED STATES DISTRICT COURT FOR

# CENTRAL DISTRICT OF CALIFORNIA SOUTHERN DIVISION

| | |
|---|---|
| The PLS.com, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>The National Association of Realtors,<br><br>Defendants. | Case No. 2:25-cv-05971<br><br>**NON-PARTY UMRO REALTY CORP.'S OBJECTIONS TO DEFENDANT'S DEPOSITION SUBPOENA FOR PRODUCTION OF DOCUMENTS**<br><br>Action Filed:<br>Trial Date: |

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that pursuant to the Federal Rules of Civil Procedure, Non-Party UMRO REALTY CORP. dba THE AGENCY ("UMRO"), by and through its undersigned counsel, hereby objects to Defendant The National Association of Realtors' ("Defendant") Deposition Subpoena for Production of Documents, dated November 12, 2025 (the "Subpoena"), in the above-captioned action

## PRELIMINARY STATEMENT

These Objections are timely pursuant to the extension to December 24, 2025, for Objections and Production, agreed upon by counsel on December 4, 2025, between Kristin Regan, Associate General Counsel, The Agency and Matthey E. Layden, Esq., Massey & Gail LLP. All

1

NON-PARTY UMRO REALTY CORP.'S OBJECTIONS TO DEFENDANT'S
DEPOSITION SUBPOENA FOR PRODUCTION OF DOCUMENTS

rights under Rule 45(d)(2)(B) are preserved.

Pursuant to Rules 26, 34 and 45, UMRO objects to the Subpoena and the documents requested therein because it imposes an undue burden on a non-party, is overly broad, seeks documents that are neither relevant to any party's claim or defense nor proportional to the needs of the case, and seeks disclosure of confidential and privileged information.

UMRO objects to the Subpoena and the documents requested therein on the grounds that it constitutes an improper attempt to use UMRO as a proxy to obtain discovery from a non-party by circumventing the limits of permissible discovery. UMRO is a separate and distinct legal entity from PLS. Aside from a partial ownership interest held by Mauricio Umansky in each entity, UMRO and PLS operate independently. Neither entity exercises managerial control, oversight, governance, or operational authority over the other. UMRO does not direct, supervise, or participate in the business operations of PLS, nor does PLS do so with respect to UMRO. Because UMRO does not possess, custody, or control documents relating to PLS's business operations, the Subpoena improperly seeks materials beyond the scope of Rule 45 and imposes an undue and unnecessary burden on a non-party. Rules 45(d)(1) & (3)(A)(iv).

UMRO makes its objections to the Subpoena without waiving, or intending to waive, but on the contrary, preserving and intending to preserve: (i) the right to object on any and all grounds, at any time, to other requests or discovery procedures involving or related to the subject matter of the Subpoena; and ii) the right at any time to revise, correct, supplement, or clarify any responses to the record requests (the "Requests") set forth in the Subpoena.

Nothing contained herein is intended as, or shall in any way be deemed, a waiver of any privilege, protection, or immunity, including without limitation, the attorney-client privilege, the attorney-work product doctrine, the joint defense privilege, the common interest privilege, or any other applicable privilege, protection, or immunity afforded by law. UMRO's objections and any production of documents are conditioned specifically on the understanding that inadvertent disclosure of privileged or otherwise protected information is not intended to be, and may not be construed as, a waiver of any privilege, protection, immunity or any other ground for objecting to discovery with respect to such request, or the subject matter thereof, or the response thereto. Any

2

**NON-PARTY UMRO REALTY CORP.'S OBJECTIONS TO DEFENDANT'S DEPOSITION SUBPOENA FOR PRODUCTION OF DOCUMENTS**

privileged or otherwise protected information that is produced inadvertently must be returned to UMRO upon demand.

UMRO's objections hereto are not an admission or representation that responsive documents or information otherwise exist and would be produced in the absence of such objections.

The failure of UMRO to make a Specific Objection to a particular individual Request is not, and shall not be construed as, a waiver of any objection to that particular Request.

## **GENERAL OBJECTIONS**

Each of UMRO's objections herein, in addition to any specifically stated objections, is subject to and incorporates the following General Objections:

UMRO objects to the Subpoena, as well as the Definitions and Instructions, to the extent they seek to impose obligations on UMRO that are inconsistent with and/or beyond the scope of those imposed or authorized by the Federal Rules of Civil Procedure.

UMRO objects to the Subpoena to the extent that it seeks information unknown to UMRO, that refers to persons, entities or events not known to UMRO, or that relates to information or documents not within UMRO's possession, custody, or control.

UMRO objects to the Subpoena on the grounds that it seeks information and documents that are not relevant to the subject matter of the action and are not either admissible in evidence or reasonably calculated to lead to the discovery of admissible evidence. Rule 26(a)(1).

UMRO objects to the Subpoena to the extent it seeks "all" documents and/or information on the grounds that such requests are unduly burdensome and not consistent with the duties and responsibilities imposed under Rule 45(d)(1).

UMRO objects to the Subpoena to the extent that Defendant has failed to "take reasonable steps to avoid imposing undue burden or expense on UMRO. Rule 45(d)(1).

UMRO objects to the Subpoena on the grounds that it seeks information and documents already in Plaintiffs' possession or available to Plaintiffs from the actual parties to the action or from public sources. At a minimum, such documents should be sought from the parties before

3

**NON-PARTY UMRO REALTY CORP.'S OBJECTIONS TO DEFENDANT'S DEPOSITION SUBPOENA FOR PRODUCTION OF DOCUMENTS**

burdening non-party UMRO with the expense and effort of searching for materials readily obtainable from the parties. See *Calcor Space Facility, Inc. v. Super. Ct.*, 53 Cal. App. 4th 216, 225 (1997).

UMRO objects to the Subpoena to the extent that it seeks documents which are not within Responding Party's possession, custody or control.

UMRO objects to the Subpoena on the grounds that the likely burden or expense of the proposed discovery outweighs the likely benefit, taking into account the amount in controversy, the resources of the parties, the importance of the issues in the action, and the importance of the requested discovery in resolving the issues.

UMRO objects to the Subpoena to the extent that it fails to specify a relevant time period, or to the extent any specified time period is irrelevant to any claim or defense at issue in the action, on the grounds that the Subpoena is overly broad and unduly burdensome. Rule 34(b)(1)

UMRO objects to the Subpoena to the extent that it seeks documents that are not related to the specific claim or claims at issue in this litigation and consequently seeks documents and information that are neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Rule 26(a)(1).

UMRO objects to the Subpoena to the extent that it seeks information which, if furnished, would violate any domestic or foreign judicial order, protective order, stipulation of confidentiality, or confidentiality agreement or restriction that exists with respect to such information.

UMRO objects to the Subpoena to the extent that it seeks information or documents that constitute or contain trade secrets or other confidential, research, development, proprietary, or sensitive commercial or private information. Rule 45(3).

UMRO objects to the Subpoena on privacy grounds to the extent that it requests the production of consumer personal information which is protected by the CCPA and CPRA.

UMRO objects to the Subpoena to the extent that it contains vague, ambiguous, conclusory, undefined or ill-defined terms. Rule 34(b)(1).

UMRO objects to the Subpoena to the extent it calls for electronic documents that are

<div align="center">4</div>

**NON-PARTY UMRO REALTY CORP.'S OBJECTIONS TO DEFENDANT'S DEPOSITION SUBPOENA FOR PRODUCTION OF DOCUMENTS**

inaccessible because retrieval would involve undue cost and expense. Rule 45(e)(1)(D).

UMRO objects to the Subpoena to the extent that it seeks Documents that are so old, they no longer exist.

UMRO objects to the Subpoena to the extent that it seeks a legal conclusion and/or expert testimony.

UMRO objects to the Subpoena to the extent that it seeks information that is protected from disclosure by the attorney-client privilege, the work product doctrine, the common interest privilege and/or any other applicable privilege or protection. UMRO does not waive, and intends to preserve, any applicable privilege or protection. Rule 45(3).

UMRO objects to the Subpoena to the extent that it seeks documents that are inconsistent with and/or seek to impose obligations beyond those imposed under the Federal Rules of Civil Procedure 26, 34 and 45, California Code of Civil Procedure or other applicable law regarding the discovery of information through written Subpoenas for documents.

UMRO objects to the defined term "YOU" as vague, ambiguous and unintelligible. UMRO interprets "YOU" to mean UMRO Co. only.

UMRO objects to Definition No. 1, which provides: "'YOU,' 'YOUR' or 'THE AGENCY'" includes, but is not limited to, all of its locations, predecessors, predecessors-in-interest, subsidiaries, parents, affiliates, past or present directors, officers, members, agents, representatives, employees, consultants, attorneys, entities acting in joint venture, franchisees, licensees, owners, shareholders, and partnership relationships. UMRO can only respond for UMRO. UMRO cannot and will not respond on behalf of third parties. As such, UMRO will interpret the terms "YOU," "YOUR" and "The" to mean UMRO, only.

UMRO reserves the right to seek appropriate compensation, including the costs and fees (including, without limitation, attorneys' fees and costs, and vendor costs) associated with or attendant to any production of documents or the doing of any other matter in response to the Subpoena.

The inadvertent identification and/or production of any documents or other information protected from discovery by the attorney-client privilege, the attorney work product

5

**NON-PARTY UMRO REALTY CORP.'S OBJECTIONS TO DEFENDANT'S DEPOSITION SUBPOENA FOR PRODUCTION OF DOCUMENTS**

privilege, and/or other privileges or immunities applicable under law is not intended and shall not be construed as a waiver of any applicable privilege. UMRO reserves the right to demand and seek the return of any such documents or other information so produced, and no affirmative use shall be made by any party of any such document or information inadvertently identified, disclosed or produced.

Nothing contained herein shall obligate or commit UMRO to supplement or amend this Objection to the Subpoena, or any of the various responses contained herein. However, if desired, UMRO reserves the right to supplement, modify or add to its Objections to the Subpoena.

**SPECIFIC OBJECTIONS TO REQUESTS FOR PRODUCTION**

Subject to the foregoing General Objections, which are incorporated by reference in each of the following Specific Objections, UMRO objects as follows:

**REQUEST FOR PRODUCTION NO. 1:**

All documents relating to PLS.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

UMRO incorporates by reference its General Objections as though fully set forth herein.

This Request is so vague, ambiguous, and overly broad that UMRO cannot reasonably ascertain the scope of documents sought. As drafted, the Request could be construed to encompass virtually any article, industry commentary, email, text message, or other communication sent to or from UMRO or its agents, who are independent contractors. Further, the Request fails to identify any reasonable temporal scope. The absence of a defined time period renders the Request facially overbroad.

For these reasons, UMRO objects to this request on the grounds that it: (1) fails to "describe with reasonable particularity each item or category of items to be inspected." Rule 34(b)(1)(A); (2) fails to take "reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Rule 45(d)(1) and 45(d)(3)(iv); (3) seeks the discovery of documents that do not "appear reasonably calculated to lead to the discovery of admissible evidence" Rule 26(b)(1); and (4) it appears to be interposed for an "improper purpose, such as to harass" UMRO which is related to this litigation only to the extent that is partially owned by a

6

**NON-PARTY UMRO REALTY CORP.'S OBJECTIONS TO DEFENDANT'S DEPOSITION SUBPOENA FOR PRODUCTION OF DOCUMENTS**

partial owner of PLS. Rule 26(g)(1)(B).

Because UMRO cannot determine with reasonable certainty what documents are being requested, UMRO is unable to identify or produce documents responsive to this Request as written. UMRO therefore objects to the Request and requests Defendant to clarify and narrowly tailor the specific categories of documents sought, including appropriate subject-matter and time limitations, consistent with the requirements of Rules 26(b)(1), 34(b)(1)(A), and 45(d).

**REQUEST FOR PRODUCTION NO. 2:**

All Documents relating to the Action, the Prior Action, or the allegations in the Complaint.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

UMRO incorporates by reference its General Objections as though fully set forth herein.

This Request is so vague, ambiguous, and overly broad that UMRO cannot reasonably ascertain the scope of documents sought. UMRO, as a non-party, cannot determine what Defendant considers to "relate" to its own allegations.

For these reasons, UMRO objects to this request on the grounds that it: (1) fails to "describe with reasonable particularity each item or category of items to be inspected." Rule 34(b)(1)(A); and (2) it appears to be interposed for an "improper purpose, such as to harass" UMRO which is related to this litigation only to the extent that is partially owned by a partial owner of PLS. Rule 26(g)(1)(B).

Because UMRO cannot determine with reasonable certainty what documents are being requested, UMRO is unable to identify or produce documents responsive to this Request as written. UMRO therefore objects to the Request and requests Defendant to clarify and narrowly tailor the specific categories of documents sought, including appropriate subject-matter and time limitations, consistent with the requirements of Rule 34(b)(1)(A).

**REQUEST FOR PRODUCTION NO. 3:**

All documents relating to Your participation in any listing service.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

UMRO incorporates by reference its General Objections as though fully set forth herein.

This Request is so vague, ambiguous, and overly broad that UMRO cannot reasonably

**NON-PARTY UMRO REALTY CORP.'S OBJECTIONS TO DEFENDANT'S DEPOSITION SUBPOENA FOR PRODUCTION OF DOCUMENTS**

ascertain the scope of documents sought. As drafted, the Request could be construed to encompass virtually any (1) internal reference, posting or communication of company-owned offices and over a hundred franchise offices; as well as (2) emails, text messages, or other communications sent to or from any MLS and UMRO agents, who are independent contractors. Further, the Request fails to identify any reasonable temporal scope. The absence of a defined time period renders the Request facially overbroad. In addition, any contracts or agreements with listing services are private.

For these reasons, UMRO objects to this request on the grounds that it: (1) fails to "describe with reasonable particularity each item or category of items to be inspected." Rule 34(b)(1)(A); (2) fails to take "reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Rule 45(d)(1) and 45(d)(3)(iv); (3) seeks the discovery of documents that do not "appear reasonably calculated to lead to the discovery of admissible evidence" Rule 26(b)(1); (4) requests documents that are privileged or protected, Rule 45(d)(3)(A)(iii); and (5) it appears to be interposed for an "improper purpose, such as to harass" UMRO which is related to this litigation only to the extent that is partially owned by a partial owner of PLS. Rule 26(g)(1)(B).

Because UMRO cannot determine with reasonable certainty what documents are being requested, UMRO is unable to identify or produce documents responsive to this Request as written. UMRO therefore objects to the Request and requests Defendant to clarify and narrowly tailor the specific categories of documents sought, including appropriate subject-matter and time limitations, consistent with the requirements of Rules 26(b)(1), 34(b)(1)(A), and 45(d).

**REQUEST FOR PRODUCTION NO. 4:**

All documents or communications including the term "clear cooperation policy" from June 1, 2019 or later.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

UMRO incorporates by reference its General Objections as though fully set forth herein.

This Request is so vague, ambiguous, and overly broad that UMRO cannot reasonably ascertain the scope of documents sought. As stated, the Request is not limited to the subject matter

8

**NON-PARTY UMRO REALTY CORP.'S OBJECTIONS TO DEFENDANT'S DEPOSITION SUBPOENA FOR PRODUCTION OF DOCUMENTS**

of the case and covers internal compliance deliberations concerning the Clear Cooperation Policy that are protected as work product and trade secrets.

For these reasons, UMRO objects to this Request on the grounds that it: (1) requests documents that constitute "trade secrets or other confidential research, development or commercial information," Rule 45(d)(3)(B)(i); (2) requests documents that are privileged or protected, Rule 45(d)(3)(A)(iii); (3) fails to "describe with reasonable particularity each item or category of items to be inspected" Rule 34(b)(1)(A); (4) fails to take "reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Rule 45(d)(1) and 45(d)(3)(iv); (5) seeks the discovery of documents that do not "appear reasonably calculated to lead to the discovery of admissible evidence" Rule 26(b)(1); and (6) it appears to be interposed for an "improper purpose, such as to harass" UMRO which is related to this litigation only to the extent that is partially owned by a partial owner of PLS. Rule 26(g)(1)(B).

Because UMRO cannot determine with reasonable certainty what documents are being requested, UMRO is unable to identify or produce documents responsive to this Request as written. UMRO therefore objects to the Request and requests Defendant to clarify and narrowly tailor the specific categories of documents sought, including appropriate subject-matter and time limitations, consistent with the requirements of Rules 26(b)(1), 34(b)(1)(A), and 45(d).

**REQUEST FOR PRODUCTION NO. 5:**

Documents or data sufficient to show all payments, individually and in total, that You have made for Listing Network Services, including but not limited to subscriptions to or memberships in Listing Networks.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

UMRO incorporates by reference its General Objections as though fully set forth herein. UMRO objects to this Request because it seeks the consumer personal information of UMRO agents, who are independent contractors, and clients, who are entitled to protection under the CCPA and CPRA. In addition, it: (1) requests information that constitutes "trade secrets or other confidential research, development or commercial information," Rule 45(d)(3)(B)(i); (2) requests documents that are privileged or protected, Rule 45(d)(3)(A)(iii); (3) fails to "describe with

9

**NON-PARTY UMRO REALTY CORP.'S OBJECTIONS TO DEFENDANT'S DEPOSITION SUBPOENA FOR PRODUCTION OF DOCUMENTS**

reasonable particularity each item or category of items to be inspected" Rule 34(b)(1)(A); (4) fails to take "reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Rule 45(d)(1) and 45(d)(3)(iv); (5) seeks the discovery of documents that do not "appear reasonably calculated to lead to the discovery of admissible evidence" Rule 26(b)(1); and (6) it appears to be interposed for an "improper purpose, such as to harass" UMRO which is related to this litigation only to the extent that is partially owned by a partial owner of PLS. Rule 26(g)(1)(B).

UMRO therefore objects to the Request and requests Defendant to clarify and narrowly tailor the specific categories of documents sought, including appropriate subject-matter and time limitations, consistent with the requirements of Rules 26(b)(1), 34(b)(1)(A), and 45(d).

**REQUEST FOR PRODUCTION NO. 6:**

All Documents referring to the act of withholding, concealing, or misrepresenting any information about a residential real estate property and relating to any Plan to sell or market such a property.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

UMRO incorporates by reference its General Objections as though fully set forth herein.

UMRO objects to this Request on the grounds that it is argumentative on its face by assuming misconduct by using the terms "withholding," "concealing," and "misrepresenting." For these reasons it appears to be interposed for an "improper purpose, such as to harass" UMRO. Rule 26(g)(1)(B). The Request is also vague and fails to "describe with reasonable particularity each item or category of items to be inspected" Rule 34(b)(1)(A). Thus, the documents sought do not "appear reasonably calculated to lead to the discovery of admissible evidence" Rule 26(b).

As stated, the Request is not limited to the subject matter of the case and could potentially encompass information of UMRO clients and agents, such as marketing plans and seller disclosures, which are protected under the CCPA and CPRA, and possibly privilege or protection under Rule 45(d)(3)(A).

In addition, this Request contains built-in legal conclusions and seeks categories of documents UMRO does not maintain in any centralized form. UMRO does not maintain

10

**NON-PARTY UMRO REALTY CORP.'S OBJECTIONS TO DEFENDANT'S DEPOSITION SUBPOENA FOR PRODUCTION OF DOCUMENTS**

centralized logs, reports, or files of the type demanded and therefore has no responsive documents in the manner requested.

Therefore, UMRO is unable to identify or produce documents responsive to this Request as written. UMRO requests Defendant to clarify and narrowly tailor the specific categories of documents sought, including appropriate subject-matter and time limitations, consistent with the requirements of Rules 26(b)(1), 34(b)(1)(A), and 45(d).

**REQUEST FOR PRODUCTION NO. 7:**

All Documents and communications relating to the Umansky Fraud Litigations.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

UMRO incorporates by reference its General Objections as though fully set forth herein.

UMRO objects to this Request on the grounds that it is argumentative on its face by alleging "Fraud". For these reasons it appears to be interposed for an "improper purpose, such as to harass" UMRO. Rule 26(g)(1)(B). This Request is also improper because any discovery concerning the topic requested should be directed to the parties of that litigation, and not to UMRO. Thus, the Request places a clear undue burden on UMRO. Rule 45(d)(1) and 45(d)(3)(iv).

This Request is not limited to the subject matter of the case and therefore does not "appear reasonably calculated to lead to the discovery of admissible evidence" Rule 26(b). It also requests documents that are privileged or protected and may be work product, Rule 45(d)(3)(A)(iii).

In addition, this Request contains built-in legal conclusions and seeks categories of documents UMRO does not maintain in any centralized form. UMRO does not maintain centralized logs, reports, or files of the type demanded and therefore has no responsive documents in the manner requested.

Therefore, UMRO will not produce any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 8:**

Documents or data sufficient to show all third-party marketing services You have used to facilitate the sale of residential real estate properties and sufficient to identify: (a) each service used; (b) the identity of and contact information for each provider of such services; and (c) the dates and the amounts of any payments You made to any such provider for any such service.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

UMRO incorporates by reference its General Objections as though fully set forth herein.

11

**NON-PARTY UMRO REALTY CORP.'S OBJECTIONS TO DEFENDANT'S DEPOSITION SUBPOENA FOR PRODUCTION OF DOCUMENTS**

UMRO objects to this Subpoena on the grounds that: (1) it seeks documents that are available to Defendants from the actual parties to the action or from third-party sources; (2) it fails to take "reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena" Rule 45(d)(1) and 45(d)(3)(iv); (3) it appears to be interposed for an "improper purpose, such as to harass" UMRO which is related to this litigation only to the extent that is partially owned by a partial owner of PLS. Rule 26(g)(1)(B); and (3) seeks the discovery of documents that do not "appear reasonably calculated to lead to the discovery of admissible evidence" Rule 26(b)(1) because it is not clear what this has to do with the litigation.

While the Request for "all documents" is disproportionate, UMRO may be able to produce a single document summarizing vendors.

**REQUEST FOR PRODUCTION NO. 9:**

All Documents relating to any allegation that You violated any law, applicable rule of professional responsibility, or applicable professional code of ethics, or breached any fiduciary duty relating to the sale, purchase, or marketing of a residential real estate property, including but not limited to allegations of fraud, breach of contract, breach of fiduciary duty, torts, violations of The Fair Housing Act, 42 U.S.C. 3601 et seq., violations of California's Fair Employment and Housing Act, CA Govt Code §§ 12900-12951, 12927-12928, 12955-12956.1, 12960-12976, violations of any rule imposed by the California Bureau of Real Estate or any similar entity in any other state, or violations of any Code of Ethics promulgated by NAR, by the California Association of Realtors, or by any other any association of Licensed Real Estate Professionals.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

UMRO incorporates by reference its General Objections as though fully set forth herein.

UMRO objects to this Request on the grounds that it is a fishing expedition and not limited to the subject matter of the case and therefore does not "appear reasonably calculated to lead to the discovery of admissible evidence" Rule 26(b). It is also argumentative on its face by alleging "violations", "breached any fiduciary duty", "fraud, breach of contract, breach of fiduciary duty, torts, violations . . ." For these reasons it appears to be interposed for an "improper purpose, such as to harass" UMRO. Rule 26(g)(1)(B).

In addition, this Request contains built-in legal conclusions and seeks categories of

12

**NON-PARTY UMRO REALTY CORP.'S OBJECTIONS TO DEFENDANT'S DEPOSITION SUBPOENA FOR PRODUCTION OF DOCUMENTS**

documents UMRO does not maintain in any centralized form. UMRO does not maintain centralized logs, reports, or files of the type demanded and therefore has no responsive documents in the manner requested.

Therefore, UMRO will not produce any documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 10:**

All documents and communications relating to any and all Pocket Listings marketed or sold by Christopher Dyson from June 1, 2018 or later.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

UMRO incorporates by reference its General Objections as though fully set forth herein. UMRO objects to this Subpoena on the grounds any discovery concerning the topic requested should be directed to the parties of that litigation, or the agents listed, and not to UMRO. This request places a clear undue burden on UMRO. Rule 45(d)(1) and 45(d)(3)(iv).

In addition, this Request seeks categories of documents UMRO does not maintain in any centralized form. UMRO does not maintain centralized logs, reports, or files of the type demanded and therefore has no responsive documents in the manner requested.

Therefore, UMRO will not produce any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 11:**

Al documents and communications relating to any and all Office Exclusive Listings marketed or sold by Christopher Dyson from June 1, 2018 or later.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

UMRO incorporates by reference its General Objections as though fully set forth herein. UMRO objects to this Subpoena on the grounds any discovery concerning the topic requested should be directed to the parties of that litigation, or the agents listed, and not to UMRO. This request places a clear undue burden on UMRO. Rule 45(d)(1) and 45(d)(3)(iv).

In addition, this Request seeks categories of documents UMRO does not maintain in any centralized form. UMRO does not maintain centralized logs, reports, or files of the type demanded and therefore has no responsive documents in the manner requested.

Therefore, UMRO will not produce any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 12:**

All documents and communications relating to any and all Pocket Listings marketed or

13

NON-PARTY UMRO REALTY CORP.'S OBJECTIONS TO DEFENDANT'S DEPOSITION SUBPOENA FOR PRODUCTION OF DOCUMENTS

sold by Mauricio Umansky from June 1, 2018 or later.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

UMRO incorporates by reference its General Objections as though fully set forth herein. UMRO objects to this Subpoena on the grounds any discovery concerning the topic requested should be directed to the parties of that litigation, or the agents listed, and not to UMRO. This Request places a clear undue burden on UMRO. Rule 45(d)(1) and 45(d)(3)(iv).

In addition, this Request seeks categories of documents UMRO does not maintain in any centralized form. UMRO does not maintain centralized logs, reports, or files of the type demanded and therefore has no responsive documents in the manner requested.

Therefore, UMRO will not produce any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 13:**

All documents and communications relating to any and all Office Exclusive Listings marketed or sold by Mauricio Umansky from June 1, 2018 or later.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

UMRO incorporates by reference its General Objections as though fully set forth herein. UMRO objects to this Subpoena on the grounds any discovery concerning the topic requested should be directed to the parties of that litigation, or the agents listed, and not to UMRO. This Request places a clear undue burden on UMRO. Rule 45(d)(1) and 45(d)(3)(iv).

In addition, this Request seeks categories of documents UMRO does not maintain in any centralized form. UMRO does not maintain centralized logs, reports, or files of the type demanded and therefore has no responsive documents in the manner requested.

Therefore, UMRO will not produce any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 14:**

All documents and communications relating to any and all Pocket Listings marketed or sold by David Parnes from June 1, 2018 or later.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

UMRO incorporates by reference its General Objections as though fully set forth herein. UMRO objects to this Subpoena on the grounds any discovery concerning the topic requested should be directed to the parties of that litigation, or the agents listed, and not to UMRO. This

14

**NON-PARTY UMRO REALTY CORP.'S OBJECTIONS TO DEFENDANT'S DEPOSITION SUBPOENA FOR PRODUCTION OF DOCUMENTS**

Request places a clear undue burden on UMRO. Rule 45(d)(1) and 45(d)(3)(iv).

In addition, this Request seeks categories of documents UMRO does not maintain in any centralized form. UMRO does not maintain centralized logs, reports, or files of the type demanded and therefore has no responsive documents in the manner requested.

Therefore, UMRO will not produce any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 15:**

All documents and communications relating to any and all Office Exclusive Listings marketed or sold by David Parnes from June 1, 2018 or later.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

UMRO incorporates by reference its General Objections as though fully set forth herein. UMRO objects to this Subpoena on the grounds any discovery concerning the topic requested should be directed to the parties of that litigation, or the agents listed, and not to UMRO. This Request places a clear undue burden on UMRO. Rule 45(d)(1) and 45(d)(3)(iv).

In addition, this Request seeks categories of documents UMRO does not maintain in any centralized form. UMRO does not maintain centralized logs, reports, or files of the type demanded and therefore has no responsive documents in the manner requested.

Therefore, UMRO will not produce any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 16:**

All documents and communications relating to any and all Pocket Listings marketed or sold by James Harris from June 1, 2018 or later.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

UMRO incorporates by reference its General Objections as though fully set forth herein. UMRO objects to this Subpoena on the grounds any discovery concerning the topic requested should be directed to the parties of that litigation, or the agents listed, and not to UMRO. This Request places a clear undue burden on UMRO. Rule 45(d)(1) and 45(d)(3)(iv).

In addition, this Request seeks categories of documents UMRO does not maintain in any centralized form. UMRO does not maintain centralized logs, reports, or files of the type demanded and therefore has no responsive documents in the manner requested.

Therefore, UMRO will not produce any documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 17:**

15

All documents and communications relating to any and all Office Exclusive Listings marketed or sold by James Harris from June 1, 2018 or later.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

UMRO incorporates by reference its General Objections as though fully set forth herein. UMRO objects to this Subpoena on the grounds any discovery concerning the topic requested should be directed to the parties of that litigation, or the agents listed, and not to UMRO. This Request places a clear undue burden on UMRO. Rule 45(d)(1) and 45(d)(3)(iv).

In addition, this Request seeks categories of documents UMRO does not maintain in any centralized form. UMRO does not maintain centralized logs, reports, or files of the type demanded and therefore has no responsive documents in the manner requested.

Therefore, UMRO will not produce any documents responsive to this Request.

DATED:  December 23, 2025          **UMRO REALTY CORP. dba THE AGENCY**


By:   *Kristin A. Regan*
      _____
      Brandon K. Braga
      Kristin A. Regan
      Attorneys for Defendants UMRO REALTY
      CORP. dba THE AGENCY

16

**NON-PARTY UMRO REALTY CORP.'S OBJECTIONS TO DEFENDANT'S DEPOSITION SUBPOENA FOR PRODUCTION OF DOCUMENTS**

# Exhibit 4

50 E. Washington Street
Suite 400
Chicago, IL 60602



Constance Grieves
cgrieves@masseygail.com
(312) 809-0183

April 9, 2026

**VIA ELECTRONIC MAIL**

Kristin A. Regan
UMRO Realty Corp. dba The Agency
331 Foothill Road, Suite 100
Beverly Hills, California 90210

Re:    *PLS.com v. The National Association of REALTORS®* – Case No. 2:25-cv-05971

Dear Counsel:

Pursuant to CDCA Local Rules 45-1 and 37-1, Defendant National Association of REALTORS® ("NAR") requests a meet-and-confer with UMRO Realty Corp. d/b/a The Agency ("UMRO") in connection with UMRO's responses and objections, dated December 23, 2025 ("Responses and Objections"), to NAR's subpoena, dated November 12, 2025 (the "Subpoena").

Before addressing specific Subpoena requests, NAR responds to certain of UMRO's objections that appear repeatedly in the Reponses and Objections:

- UMRO objects that the Subpoena requests confidential material such as trade secrets and consumer information that is purportedly subject to protection under California law. This objection is not a valid reason for UMRO to withhold responsive documents. *See Nguyen v. Lotus By Johnny Dung Inc.*, 2019 WL 4570032, at *4 (C.D. Cal. Apr. 12, 2019) (denying third-party motion to quash and rejecting "conclusory allegations that Defendant's subpoenas seek private, confidential, and trade secrets information" (internal citation omitted)); *see also Barracuda Networks, Inc. v. J2 Glob., Inc.*, No. MC 19-146 PSG (PJWX), 2019 WL 7865179, at *1 (C.D. Cal. Oct. 9, 2019) (protective order "mitigates concerns about disclosure of sensitive information" (internal citation and quotation omitted)). If UMRO takes the position that responsive documents are entitled to confidential treatment, it may indicate as such pursuant to the Protective Order the Court entered in this case, Dkt. No. 47, attached as Exhibit B to the Subpoena.

- UMRO objects that the Subpoena requests privileged material. This objection is not a valid reason for UMRO to withhold responsive documents. *See Barracuda Networks, Inc.*, 2019 WL 7865179, at *1 n.1 (affirming order compelling third-party subpoena recipient to comply and noting that privileged materials could be withheld "subject to a privilege log"); *see also Solis v. Best Miracle Corp.*, 2011 WL 13187251, at *2 (C.D. Cal. Mar. 15, 2011) (denying motion to quash third-party subpoena in part because "any fear of disclosing communications covered by the attorney-client privilege can be ameliorated by redacting any privileged material from the documents"). If UMRO takes the position that responsive documents are entirely privileged, it may indicate as such in a privilege log. If responsive documents contain privileged information, that information can be redacted.

April 9, 2026
Page | 2

- UMRO objects that the Subpoena is intended to harass UMRO. NAR disputes this characterization; the Subpoena requests are relevant and proportionate to the needs of the case. UMRO admits that Maurice Umansky holds or held a partial ownership interest in both UMRO and The PLS.com, LLC ("PLS"). Other individuals involved with PLS also work with or at UMRO or did so in the past. For example, NAR has learned that James Harris and David Parnes, both PLS co-founders as well as former UMRO employees, no longer have access to their UMRO email accounts and thus do not have many documents responsive to NAR's subpoenas to them. This Subpoena is the only way NAR can obtain these documents. **REDACTED** UMRO, in short, is a highly relevant party in this dispute.

Incorporating these points, NAR describes below its understanding of UMRO's position, with NAR's response, for each Subpoena request.

- **Request for Production No. 1:** "All documents related to PLS."
  - o UMRO objects and requests that NAR "clarify and narrowly tailor the specific categories of documents sought, including appropriate subject-matter and time limitations."
  - o NAR states as follows:
    - NAR seeks documents relating to or describing:
      - The formation of PLS;
      - The operation of PLS;
      - Organizational charts of PLS;
      - Agent and brokerage usage of PLS;
      - UMRO assisting or working with PLS;
      - Contracts or other agreements between UMRO and PLS;
      - Developments in PLS's business plan; and
      - PLS's economic performance, including but not limited to profit and loss statements.
    - The time limitation from Paragraph 1 of the Subpoena instructions, "January 1, 2017 to the Present," is both clear and reasonable.
- **Request for Production No. 2:** "All Documents relating to the Action, the Prior Action, or the allegations in the Complaint."
  - o UMRO objects and requests that NAR "clarify and narrowly tailor the specific categories of documents sought, including appropriate subject-matter and time limitations."
  - o NAR states as follows:

April 9, 2026
Page | 3

- NAR seeks documents relating to or describing:
    - The prior lawsuit or the current lawsuit between PLS and NAR;
    - The enactment and enforcement of the Clear Cooperation Policy;
    - Allegations that the Clear Cooperation Policy or any of NAR's rules violate antitrust law; and
    - Allegations that the Clear Cooperation Policy, NAR, or NAR-affiliated MLSs have damaged or harmed PLS or UMRO.
- The time limitation from Paragraph 1 of the Subpoena instructions, "January 1, 2017 to the Present," is both clear and reasonable.

- **Request for Production No. 3:** "All documents relating to Your participation in any listing service."
    - UMRO objects and requests that NAR "clarify and narrowly tailor the specific categories of documents sought, including appropriate subject-matter and time limitations."
    - NAR states as follows:
        - NAR seeks documents relating to or describing UMRO, its agents or employees, or other individuals associated with UMRO, including Mauricio Umansky, Christopher Dyson, David Parnes, and James Harris:
            - Signing up for use of any Listing Network or Listing Network Services;
            - Renewing an agreement for use of any Listing Network or Listing Network Services;
            - Terminating or declining to renew an agreement for use of any Listing Network or Listing Network Services; and
            - Discussing the benefits or detriments of using any Listing Network or Listing Network Services.
        - The time limitation from Paragraph 1 of the Subpoena instructions, "January 1, 2017 to the Present," is both clear and reasonable.

- **Request for Production No. 4:** "All documents or communications including the term 'clear cooperation policy' from June 1, 2019 or later."
    - UMRO objects and requests that NAR "clarify and narrowly tailor the specific categories of documents sought, including appropriate subject-matter and time limitations."
    - NAR states as follows:
        - The Request is both clear and reasonable. UMRO provides no justifiable reason why it cannot or need not identify documents responsive to this Request.

April 9, 2026
Page | 4

- To the extent the search term "clear cooperation policy" is not sufficiently tailored, NAR is willing to discuss search terms that would help narrow the universe of responsive documents.

- The timeline from the Request, "from June 1, 2019 or later," is both clear and reasonable.

- **Request for Production No. 5:** "Documents or data sufficient to show all payments, individually and in total, that You have made for Listing Network Services, including but not limited to subscriptions to or memberships in Listing Networks."

  - UMRO objects and requests that NAR "clarify and narrowly tailor the specific categories of documents sought, including appropriate subject-matter and time limitations."

  - NAR states as follows:

    - The Request is both clear and reasonable. UMRO provides no justifiable reason why it cannot or need not identify documents responsive to this Request.

    - To the extent necessary, NAR is willing to discuss search terms that would help identify responsive documents.

    - The time limitation from Paragraph 1 of the Subpoena instructions, "January 1, 2017 to the Present," is both clear and reasonable.

- **Request for Production No. 6:** "All Documents referring to the act of withholding, concealing, or misrepresenting any information about a residential real estate property and relating to any Plan to sell or market such a property."

  - UMRO objects and requests that NAR "clarify and narrowly tailor the specific categories of documents sought, including appropriate subject-matter and time limitations."

  - NAR states as follows:

    - The Request is both clear and reasonable. UMRO provides no justifiable reason why it cannot or need not identify documents responsive to the Request.

    - The use of the words "withholding," "concealing," and "misrepresenting" in the Request does not assume misconduct; rather, it describes relevant conduct. The Request does not assume responsive documents exist, but NAR has a good faith basis to believe that responsive documents, if they do exist, are in UMRO's possession, custody, or control.

    - To the extent UMRO does not maintain responsive documents in "any centralized form," NAR is willing to discuss search terms that would help identify responsive documents.

    - The time limitation from Paragraph 1 of the Subpoena instructions, "January 1, 2017 to the Present," is both clear and reasonable.

April 9, 2026
Page | 5

- **Request for Production No. 7:** "All Documents and communications relating to the Umansky Fraud Litigations."
    - UMRO objects and states that it "will not produce any documents responsive to this Request."
    - NAR states as follows:
        - The Request is both clear and reasonable. UMRO provides no justifiable reason why it need not produce documents responsive to this Request.
        - The use of the term "Fraud" in defining the "Umansky Fraud Litigations," from Paragraph 14 of the Subpoena definitions, is not argumentative. It is a direct reference to the subject matter of the allegations from the cases in question.
        - NAR has reason to believe UMRO is closely tied to the Umansky Fraud Litigations: UMRO is the defendant in one of the cases. Mauricio Umansky, the CEO and Founder of UMRO, is the defendant in three of the cases. And the plaintiff in the final case, *Sweetwater Malibu CA, LLC v. Hakim*, 2:20-cv-08945-GW-KS, (C.D. Ca. filed Sept. 29, 2020), is Umansky's former client. NAR's understanding is that all five litigations relate to the same sequence of events, in which UMRO was a key player.
        - At a minimum, the requested documents speak directly to the credibility and potential motives of key witnesses in this case and are therefore discoverable. *See, e.g.*, *Davis v. Kelly Servs., Inc.*, No. CV 17-1699-GW (PLAX), 2017 WL 11633478, at *7 (C.D. Cal. Oct. 23, 2017) (denying motion to quash third-party subpoena in part because "documents that tend to implicate credibility, such as disciplinary records and performance evaluations, are discoverable" (citation omitted)).
        - To the extent UMRO does not maintain responsive documents in "any centralized form," NAR is willing to discuss search terms that would help identify responsive documents.
- **Request for Production No. 8:** "Documents or data sufficient to show all third-party marketing services You have used to facilitate the sale of residential real estate properties and sufficient to identify: (a) each service used; (b) the identity of and contact information for each provider of such services; and (c) the dates and the amounts of any payments You made to any such provider for any such service."
    - UMRO objects and states that it "may be able to produce a single document summarizing vendors."
    - NAR states as follows:
        - At this time, NAR is willing to agree to UMRO's proposed production of a single document summarizing UMRO's vendors.
        - NAR reserves its rights to request additional documents responsive to this Request.

April 9, 2026
Page | 6

- **Request for Production No. 9:** "All Documents relating to any allegation that You violated any law, applicable rule of professional responsibility, or applicable professional code of ethics, or breached any fiduciary duty relating to the sale, purchase, or marketing of a residential real estate property, including but not limited to allegations of fraud, breach of contract, breach of fiduciary duty, torts, violations of The Fair Housing Act, 42 U.S.C. 3601 et seq., violations of California's Fair Employment and Housing Act, CA Govt Code §§ 12900–12951, 12927–12928, 12955–12956.1, 12960–76, violations of any rule imposed by the California Bureau of Real Estate or any similar entity in any other state, or violations of any Code of Ethics promulgated by NAR, the California Association of Realtors, or by any other any association of Licensed Real Estate Professionals."
    - o   UMRO objects and states that it "will not produce any documents responsive to this Request."
    - o   NAR states as follows:
        - ▪   The Request is both clear and reasonable. UMRO provides no justifiable reason why it need not produce documents responsive to this Request.
        - ▪   At minimum, the requested documents speak directly to the credibility and potential motives of key witnesses in this case and are therefore discoverable. *Kelly Servs., Inc.*, 2017 WL 11633478, at *7 (denying motion to quash third-party subpoena in part because "documents that tend to implicate credibility, such as disciplinary records and performance evaluations, are discoverable." (citation omitted)).
        - ▪   The Request's reference to "any allegation that You violated any law," and the related categories of allegations, is not argumentative on its face. It is directly related to the allegations at issue in the Umansky Fraud Litigation. The Request does not assume responsive documents exist, but NAR has a good faith basis to believe that responsive documents, if they do exist, are in UMRO's possession, custody, or control.
        - ▪   To the extent UMRO does not maintain responsive documents in "any centralized form," NAR is willing to discuss search terms that would help identify responsive documents.
- **Request for Production No. 10:** "All documents or communications relating to any and all Pocket Listings marketed or sold by Christopher Dyson from June 1, 2018 or later."
    - o   UMRO objects and states that it "will not produce any documents responsive to this Request."
    - o   NAR states as follows:
        - ▪   The Request is both clear and reasonable. UMRO provides no justifiable reason why it need not produce documents responsive to this Request.
        - ▪   NAR has reason to believe that Christopher Dyson marketed or sold Pocket Listings in his capacity as an agent or employee of UMRO and that responsive documents are in UMRO's possession, custody, or control. It is not unreasonable to ask UMRO to produce such documents.

April 9, 2026
Page | 7

- To the extent UMRO does not maintain responsive documents in "any centralized form," NAR is willing to discuss search terms that would help identify responsive documents.

- **Request for Production No. 11:** "All documents or communications relating to any and all Office Exclusive Listings marketed or sold by Christopher Dyson from June 1, 2018 or later."

    o UMRO objects and states that it "will not produce any documents responsive to this Request."

    o NAR states as follows:

        - The Request is both clear and reasonable. UMRO provides no justifiable reason why it need not produce documents responsive to this Request.

        - NAR has reason to believe that Christopher Dyson marketed or sold Office Exclusive Listings in his capacity as an agent or employee of UMRO and that responsive documents are in UMRO's possession, custody, or control. It is not unreasonable to ask UMRO to produce such documents.

        - To the extent UMRO does not maintain responsive documents in "any centralized form," NAR is willing to discuss search terms that would help identify responsive documents.

- **Request for Production No. 12:** "All documents and communications relating to any and all Pocket Listings marketed or sold by Mauricio Umansky from June 1, 2018 or later."

    o UMRO objects and states that it "will not produce any documents responsive to this Request."

    o NAR states as follows:

        - The Request is both clear and reasonable. UMRO provides no justifiable reason why it need not produce documents responsive to this Request.

        - NAR has reason to believe that Mauricio Umansky marketed or sold Pocket Listings in his capacity as the CEO and Founder of UMRO and that responsive documents are in UMRO's possession, custody, or control. It is not unreasonable to ask UMRO to produce such documents.

        - To the extent UMRO does not maintain responsive documents in "any centralized form," NAR is willing to discuss search terms that would help identify responsive documents.

- **Request for Production No. 13:** "All documents and communications relating to any and all Office Exclusive Listings marketed or sold by Mauricio Umansky from June 1, 2018 or later."

    o UMRO objects and states that it "will not produce any documents responsive to this Request."

    o NAR states as follows:

April 9, 2026
Page | 8

- - The Request is both clear and reasonable. UMRO provides no justifiable reason why it need not produce documents responsive to this Request.

    - NAR has reason to believe that Mauricio Umansky marketed or sold Office Exclusive Listings in his capacity as the CEO and Founder of UMRO and that responsive documents are in UMRO's possession, custody, or control. It is not unreasonable to ask UMRO to produce such documents.

    - To the extent UMRO does not maintain responsive documents in "any centralized form," NAR is willing to discuss search terms that would help identify responsive documents.

- **Request for Production No. 14:** "All documents and communications relating to any and all Pocket Listings marketed or sold by David Parnes from June 1, 2018 or later."
  - o UMRO objects and states that it "will not produce any documents responsive to this Request."
  - o NAR states as follows:
    - The Request is both clear and reasonable. UMRO provides no justifiable reason why it need not produce documents responsive to this Request.

    - NAR has reason to believe that David Parnes marketed or sold Pocket Listings in his capacity as an agent or employee of UMRO and that responsive documents are in UMRO's possession, custody, or control. It is not unreasonable to ask UMRO to produce such documents.

    - To the extent UMRO does not maintain responsive documents in "any centralized form," NAR is willing to discuss search terms that would help identify responsive documents.

- **Request for Production No. 15:** "All documents and communications relating to any and all Office Exclusive Listings marketed or sold by David Parnes from June 1, 2018 or later."
  - o UMRO objects and states that it "will not produce any documents responsive to this Request."
  - o NAR states as follows:
    - The Request is both clear and reasonable. UMRO provides no justifiable reason why it need not produce documents responsive to this Request.

    - NAR has reason to believe that David Parnes marketed or sold Office Exclusive Listings in his capacity as an agent or employee of UMRO and that responsive documents are in UMRO's possession, custody, or control. It is not unreasonable to ask UMRO to produce such documents.

    - To the extent UMRO does not maintain responsive documents in "any centralized form," NAR is willing to discuss search terms that would help identify responsive documents.

- **Request for Production No. 16:** "All documents and communications relating to any and all Pocket Listings marketed or sold by James Harris from June 1, 2018 or later."

April 9, 2026
Page | 9

- o UMRO objects and states that it "will not produce any documents responsive to this Request."
- o NAR states as follows:
    - The Request is both clear and reasonable. UMRO provides no justifiable reason why it need not produce documents responsive to this Request.
    - NAR has reason to believe that James Harris marketed or sold Pocket Listings in his capacity as an agent or employee of UMRO and that responsive documents are in UMRO's possession, custody, or control. It is not unreasonable to ask UMRO to produce such documents.
    - To the extent UMRO does not maintain responsive documents in "any centralized form," NAR is willing to discuss search terms that would help identify responsive documents.

- **Request for Production No. 17:** "All documents and communications relating to any and all Office Exclusive Listings marketed or sold by James Harris from June 1, 2018 or later."
    - o UMRO objects and states that it "will not produce any documents responsive to this Request."
    - o NAR states as follows:
        - The Request is both clear and reasonable. UMRO provides no justifiable reason why it need not produce documents responsive to this Request.
        - NAR has reason to believe that James Harris marketed or sold Office Exclusive Listings in his capacity as an agent or employee of UMRO and that responsive documents are in UMRO's possession, custody, or control. It is not unreasonable to ask UMRO to produce such documents.
        - To the extent UMRO does not maintain responsive documents in "any centralized form," NAR is willing to discuss search terms that would help identify responsive documents.

Nothing in this letter should be read to concede the validity of any of UMRO's objections. NAR reserves the right to request documents from UMRO that are responsive to the Subpoena as drafted.

Please let me know when you are able to meet and confer about UMRO's response to the Subpoena in the next ten days, pursuant to LR 37-1.

Sincerely yours,

Constance Grieves

cc:    Peter Stasiewicz
       Will French
       Morgan Meyer
       Bill Balachowski

# Exhibit 5

Leonard A. Gail
lgail@masseygail.com
Suyash Agrawal
sagrawal@masseygail.com
Peter M. Stasiewicz
pstasiewicz@masseygail.com
William K. French
wfrench@masseygail.com
MASSEY & GAIL LLP
50 East Washington Street, Suite 400
Chicago, IL  60602
Tel: (312) 283-1590

*Motion Hearing: August 7, 2026, 9:30 A.M.*
*Fact Discovery Cut-Off: October 23, 2026*
*Pretrial Conference: September 10, 2027*
*Trial date: September 27, 2027*

Matthew M. Collette
mcollette@masseygail.com
Kylie C. Kim
kkim@masseygail.com
MASSEY & GAIL LLP
1000 Main Avenue SW, Suite 450
Washington, D.C. 20024
Tel: (202) 652-4511

Brandon K. Braga
brandon.braga@theagencyre.com
Kristin A. Regan
kregan@theagencyre.com
UMRO Realty Corp. d/b/a The Agency
331 Foothill Road, Suite 100
Beverly Hills, California 90210

Daniel H. Handman
dhandman@hkemploymentlaw.com
HIRSCHFELD KRAEMER LLP
1299 Ocean Avenue, Suite 750
Santa Monica, CA  90401
Tel: (310) 255-0705

*Attorneys for Defendant National Association of REALTORS®*

*Attorneys for Third Party UMRO Realty Corp. d/b/a The Agency*

**IN THE UNITED STATES DISTRICT COURT**
**FOR CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION—LOS ANGELES**

LOCAL RULE 37 JOINT STIPULATION FOR SUBPOENA FROM DEFENDANT THE NATIONAL ASSOCIATION OF REALTORS TO THIRD PARTY UMRO REALTY CORP. D/B/A THE AGENCY

| | |
|---|---|
| The PLS.com, LLC, a California limited liability company,<br><br>      Plaintiff,<br><br>vs.<br><br>The National Association of Realtors,<br><br>      Defendant. | Case No.: 2:25-cv-05971-JWH-E<br><br>**LOCAL RULE 37 JOINT STIPULATION FOR SUBPOENA FROM DEFENDANT THE NATIONAL ASSOCIATION OF REALTORS TO THIRD PARTY UMRO REALTY CORP. D/B/A THE AGENCY**<br><br>**HEARING DATE: AUGUST 7, 2026, 9:30 A.M.** |

# TABLE OF CONTENTS

INTRODUCTORY STATEMENTS ........................................................................ 2

I.      NAR's INTRODUCTORY STATEMENT ............................................... 2

II.     UMRO's INTRODUCTORY STATEMENT ............................................ 5

ISSUES IN DISPUTE ............................................................................................ 5

I.      REQUESTS FOR WHICH UMRO ASKED FOR CLARITY AND NAR THEN PROPOSED SEARCH TERMS ............................................................... 5

        A.      NAR's Requests Nos. 1, 2, and 4 and UMRO's Responses and Objections ............................................................................... 5

        B.      NAR's and UMRO's Positions Concerning Requests Nos. 1, 2, and 4 ................................................................................... 10

                1.      NAR's Position ............................................................ 10

                2.      UMRO's Position ......................................................... 12

II.     REQUEST FOR WHICH UMRO INDICATED IT WOULD NOT PRODUCE DOCUMENTS AND NAR THEN PROPOSED SEARCH TERMS ........................ 12

        A.      NAR's Request No. 7 and UMRO's Responses and Objections ... 13

        B.      NAR's and UMRO's Positions Concerning Request No. 7 .......... 14

                1.      NAR's Position ............................................................ 14

                2.      UMRO's Position ......................................................... 17

CONCLUSION .................................................................................................... 17

Pursuant to Local Rule 37 of the Local Civil Rules for the Central District of California, Defendant National Association of REALTORS® ("NAR") and third party UMRO Realty Corp. d/b/a/ The Agency ("UMRO") submit this Joint Stipulation in connection with the document subpoena that NAR issued to UMRO on November 12, 2025 ("Subpoena"). On December 23, 2025, UMRO objected to nearly all of NAR's document requests ("Requests"). For some Requests, UMRO asked that NAR "clarify and narrowly tailor" the documents it seeks; for other Requests, UMRO refused to produce documents. Following extensive written communications, counsel for the parties met and conferred on May 27, 2026. During that call, NAR offered to send to UMRO proposed search terms for its Requests, including Requests for which UMRO had previously indicated it would be unwilling to produce documents. UMRO agreed to consider the search terms. NAR accordingly sent proposed search terms for certain of its Requests (reserving its right to send more terms in the future) on June 3, 2026. UMRO never responded to these terms and, to date, has not produced any documents. NAR sent a draft of this Joint Stipulation to UMRO on July 2, 2026.

NAR and UMRO request a motion-hearing date of Friday, August 7, 2026, at 9:30 A.M., before the Honorable Charles F. Eick. The fact discovery cut-off date is October 23, 2026; the final pretrial conference date is September 10, 2027; and the trial date is September 27, 2027. Scheduling Order, Dkt. 51, at 1–2.

1

Attached as exhibits to the French Declaration filed with this Joint Stipulation are: the scheduling order, Dkt. 51 (Exhibit 1); NAR's Subpoena to UMRO (Exhibit 2 ("Subpoena")); UMRO's response to NAR's Subpoena (Exhibit 3 ("R&Os")); the meet-and-confer letter NAR sent UMRO (Exhibit 4 ("Meet-and-Confer Letter")); the first amended complaint from *Western World Insurance Co. v. UMRO Realty Corp.*, No. 18-cv-05594 (C.D. Ca. Sept. 17, 2018), Dkt. 33, one of the cases relevant to NAR's Request No. 7 (Exhibit 5 ("Western World Complaint")); email correspondence between the parties concerning the Subpoena (Exhibit 6 ("Email Thread One") and Exhibit 7 ("Email Thread Two")); and a copy of a page from UMRO's website announcing the launch of Plaintiff, The PLS.com, LLC ("PLS"), The Agency Team, *ThePLS.com Launches First Private, National, Off-Market Listing Platform*, THE AGENCY JOURNAL (Aug. 5, 2017), https://blog.theagencyre.com/2017-08-theplscom-launches-first-private-national-off-market-listing-platform/ (Exhibit 8 ("PLS Article")).

## INTRODUCTORY STATEMENTS

### I.    NAR'S INTRODUCTORY STATEMENT

UMRO is a highly relevant party to this dispute as it has close ties to PLS and likely possesses crucial documents that NAR has no other way of obtaining. UMRO admits that Mauricio Umansky holds or held a partial ownership interest in both UMRO and PLS. Indeed, Umansky is the founder and CEO of UMRO

2

and is one of four co-founders of PLS. Other individuals involved with PLS also work with or at UMRO or did so in the past. Chris Dyson, another of the PLS co-founders, still maintains a role with UMRO. And NAR has learned that James Harris and David Parnes, who are both PLS co-founders as well as former UMRO employees, no longer have access to their UMRO email accounts. Harris and Parnes thus do not have many documents responsive to NAR's subpoenas to them; the Subpoena to UMRO is the only way NAR can obtain these documents. Further, NAR has reason to believe that UMRO worked with the co-founders to help launch PLS. For example, after PLS launched, UMRO posted an article promoting PLS, with quotes from Dyson and a link to join PLS. PLS Article at 1–3.[1] Simply put, given UMRO's close connections with PLS and UMRO's possession of relevant information, NAR's Requests to UMRO are appropriate.

What is more, NAR has engaged in good faith with UMRO in an effort to reach a mutually agreeable solution regarding UMRO's response to the Subpoena. Yet UMRO has not reciprocated these good-faith efforts. On April 9, 2026, NAR sent to UMRO a letter requesting a meet-and-confer pursuant to Local Rule 37-1.

---

[1] NAR has refrained from relying upon documents from other parties' productions that are marked Confidential or Highly Confidential because NAR maintains that even publicly available information amply demonstrates UMRO's close connections to this case. To the extent the Court believes that more information is required, NAR can work with the interested parties to submit materials under seal as appropriate.

LOCAL RULE 37 JOINT STIPULATION FOR SUBPOENA FROM DEFENDANT THE NATIONAL ASSOCIATION OF REALTORS TO THIRD PARTY UMRO REALTY CORP. D/B/A THE AGENCY

Meet-and-Confer Letter at 1; Email Thread One at 16. UMRO did not acknowledge receipt of the letter until April 27. Email Thread One at 14–15. It was not until May 18—and only following more communication efforts from NAR—that UMRO offered a date for the meet-and-confer. *Id.* at 11–12. The parties held their meet-and-confer on May 27, *id.* at 7–8, and on June 3, NAR sent UMRO proposed search terms as the parties had agreed, *id.* at 6–7. UMRO did not acknowledge receipt of the terms, so NAR sent multiple follow-up emails and left multiple follow-up voicemails. *Id.* at 3–5. On June 15, a Monday, UMRO said that it would send an update by the end of the week. *Id.* at 2–3. The next day, NAR asked whether UMRO anticipated objecting to any of the Requests so that the parties could prepare a joint stipulation pursuant to Local Rule 37 if necessary and asked UMRO to schedule a call. *Id.* at 2. UMRO did not respond to these requests. Instead, on Friday, June 19, UMRO wrote only that it would send a written response the following week. *Id.* at 1. The same day, NAR again asked whether the parties should begin preparing a joint stipulation and asked for a call. Email Thread Two at 1. UMRO again did not respond. On Friday, June 26, NAR asked UMRO whether it would provide a written statement as UMRO had represented the week prior. Email Thread One at 1. UMRO did not respond.

UMRO's failure to engage in good faith, coupled with impending depositions, has required the parties to seek this Court's intervention. NAR

4

requests that the Court order UMRO to produce documents for the at-issue Requests pursuant to the search terms that NAR proposed pursuant to the parties' agreement during their meet-and-confer.

## II.    UMRO's Introductory Statement

[].

## ISSUES IN DISPUTE

For the sake of efficiency, NAR and UMRO have broken the at-issue Requests into two categories: those for which UMRO in its responses and objections sought clarity, and those for which UMRO in its responses and objections indicated it would not produce documents. The parties discuss the two categories in turn.

## I.    Requests For Which UMRO Asked for Clarity and NAR Then Proposed Search Terms

These three Requests (Nos. 1, 2, and 4) overlap in terms of substance and issues raised. NAR and UMRO therefore treat them together. First, the parties list the three Requests, along with UMRO's responses and objections. Then, each party describes its position for the three Requests collectively.

### A.    NAR's Requests Nos. 1, 2, and 4 and UMRO's Responses and Objections

REQUEST FOR PRODUCTION NO. 1 (Subpoena at 6)

All documents relating to PLS.

5

UMRO's RESPONSES AND OBJECTIONS TO REQUEST NO. 1 (R&Os at 6–7)

UMRO incorporates by reference its General Objections as though fully set forth herein.

This Request is so vague, ambiguous, and overly broad that UMRO cannot reasonably ascertain the scope of documents sought. As drafted, the Request could be construed to encompass virtually any article, industry commentary, email, text message, or other communication sent to or from UMRO or its agents, who are independent contractors. Further, the Request fails to identify any reasonable temporal scope. The absence of a defined time period renders the Request facially overbroad.

For these reasons, UMRO objects to this request on the grounds that it: (1) fails to "describe with reasonable particularity each item or category of items to be inspected." Rule 34(b)(1)(A); (2) fails to take "reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Rule 45(d)(1) and 45(d)(3)(iv); (3) seeks the discovery of documents that do not "appear reasonably calculated to lead to the discovery of admissible evidence" Rule 26(b)(1); and (4) it appears to be interposed for an "improper purpose, such as to harass" UMRO which is related to this litigation only to the extent that is partially owned by a partial owner of PLS. Rule 26(g)(1)(B).

LOCAL RULE 37 JOINT STIPULATION FOR SUBPOENA FROM DEFENDANT THE NATIONAL ASSOCIATION OF REALTORS TO THIRD PARTY UMRO REALTY CORP. D/B/A THE AGENCY

Because UMRO cannot determine with reasonable certainty what documents are being requested, UMRO is unable to identify or produce documents responsive to this Request as written. UMRO therefore objects to the Request and requests Defendant to clarify and narrowly tailor the specific categories of documents sought, including appropriate subject-matter and time limitations, consistent with the requirements of Rules 26(b)(1), 34(b)(1)(A), and 45(d).

REQUEST FOR PRODUCTION NO. 2 (Subpoena at 6)

All Documents relating to the Action, the Prior Action, or the allegations in the Complaint.

UMRO' RESPONSES AND OBJECTIONS TO REQUEST NO. 2 (R&Os at 7)

UMRO incorporates by reference its General Objections as though fully set forth herein.

This Request is so vague, ambiguous, and overly broad that UMRO cannot reasonably ascertain the scope of documents sought. UMRO, as a non-party, cannot determine what Defendant considers to "relate" to its own allegations. For these reasons, UMRO objects to this request on the grounds that it: (1) fails to "describe with reasonable particularity each item or category of items to be inspected." Rule 34(b)(1)(A); and (2) it appears to be interposed for an "improper

LOCAL RULE 37 JOINT STIPULATION FOR SUBPOENA FROM DEFENDANT THE NATIONAL ASSOCIATION OF REALTORS TO THIRD PARTY UMRO REALTY CORP. D/B/A THE AGENCY

purpose, such as to harass" UMRO which is related to this litigation only to the extent that is partially owned by a partial owner of PLS. Rule 26(g)(1)(B).

Because UMRO cannot determine with reasonable certainty what documents are being requested, UMRO is unable to identify or produce documents responsive to this Request as written. UMRO therefore objects to the Request and requests Defendant to clarify and narrowly tailor the specific categories of documents sought, including appropriate subject-matter and time limitations, consistent with the requirements of Rule 34(b)(1)(A).

REQUEST FOR PRODUCTION NO. 4 (Subpoena at 6)

All documents or communications including the term "clear cooperation policy" from June 1, 2019 or later.

UMRO's RESPONSES AND OBJECTIONS TO REQUEST NO. 4 (R&Os at 8–9)

UMRO incorporates by reference its General Objections as though fully set forth herein.

This Request is so vague, ambiguous, and overly broad that UMRO cannot reasonably ascertain the scope of documents sought. As stated, the Request is not limited to the subject matter. of the case and covers internal compliance deliberations concerning the Clear Cooperation Policy that are protected as work product and trade secrets.

LOCAL RULE 37 JOINT STIPULATION FOR SUBPOENA FROM DEFENDANT THE NATIONAL ASSOCIATION OF REALTORS TO THIRD PARTY UMRO REALTY CORP. D/B/A THE AGENCY

For these reasons, UMRO objects to this Request on the grounds that it: (1) requests documents that constitute "trade secrets or other confidential research, development or commercial information," Rule 45(d)(3)(B)(i); (2) requests documents that are privileged or protected, Rule 45(d)(3)(A)(iii); (3) fails to "describe with reasonable particularity each item or category of items to be inspected" Rule 34(b)(1)(A); (4) fails to take "reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Rule 45(d)(1) and 45(d)(3)(iv); (5) seeks the discovery of documents that do not "appear reasonably calculated to lead to the discovery of admissible evidence" Rule 26(b)(1); and (6) it appears to be interposed for an "improper purpose, such as to harass" UMRO which is related to this litigation only to the extent that is partially owned by a partial owner of PLS. Rule 26(g)(1)(B).

Because UMRO cannot determine with reasonable certainty what documents are being requested, UMRO is unable to identify or produce documents responsive to this Request as written. UMRO therefore objects to the Request and requests Defendant to clarify and narrowly tailor the specific categories of documents sought, including appropriate subject-matter and time limitations, consistent with the requirements of Rules 26(b)(1), 34(b)(1)(A), and 45(d).

**B.**    **NAR's and UMRO's Positions Concerning Requests Nos. 1, 2, and 4**

   *1.    NAR's Position*

During the meet and confer on May 27, 2026, NAR proposed that it send search terms for these Requests to UMRO to clarify the documents NAR is seeking, as UMRO had asked in its responses and objections. UMRO agreed to consider the search terms. NAR then sent the following search terms (with a date range of January 1, 2017, to the present) corresponding to Requests Nos. 1, 2, and 4: (1) "PLS" or "pocket listing service"; (2) "pocket" w/2 "listing"; (3) PLS OR "PLS.com" OR "ThePLS.com" OR "pocket listing service*" OR "Private Listing service*"; (4) "Clear Cooperation" OR "cooperation policy" OR CCP; (5) (MLS* OR "multiple listing") AND ("private listing network" OR "private network" OR PLN OR (private* w/4 network)); (6) (benefit* OR advantag* OR value*) w/10 ((non-member* OR nonmember* OR "without membership" OR member*) w/10 (MLS* OR "multiple listing")); (7) nation* w/10 database w/10 listing*. Email Thread One at 6–7.

These search terms are reasonable, and UMRO has proffered no justification for its failure to respond, nor proposed alternative limitations. "Non-parties and third parties 'are subject to the same discovery obligations under Rule 45, including the obligation to respond to subpoenas for documents and testimony.'" *Ronduen v. Geo Grp., Inc.*, No. 5:23-CV-00481-JGB-SHK, 2024

10

WL 4800690, at *8 (C.D. Cal. Oct. 4, 2024) (alterations omitted) (quoting *United States v. Acad. Mortg. Corp.*, 968 F.3d 996, 1006 (9th Cir. 2020)). Granted, "courts may consider non-party status when determining whether discovery restrictions are necessary." *Id.* But NAR's good-faith proposal of search terms targeting undoubtedly relevant documents obviated any need for further restrictions here. UMRO cannot object that the requested documents are unclear, and it has not. Further, its assertion that the Requests are intended to harass—which, to be clear, was always without merit—rings especially hollow now; NAR has engaged in good faith exactly as UMRO asked.

UMRO's other objections also fail to justify its lack of a response. To the extent UMRO contends that the requested documents are privileged, it may log them on a privilege log. *See Barracuda Networks, Inc.*, 2019 WL 7865179, at *1 n.1 (affirming an order compelling a third-party subpoena recipient to comply and noting that privileged materials could be withheld "subject to a privilege log"); *see also Solis v. Best Miracle Corp.*, 2011 WL 13187251, at *2 (C.D. Cal. Mar. 15, 2011) (denying a motion to quash a third-party subpoena in part because "any fear of disclosing communications covered by the attorney-client privilege can be ameliorated by redacting any privileged material from the documents"). Likewise, if UMRO takes the position that responsive documents are entitled to confidential treatment, it may indicate as such pursuant to the Protective Order the Court

11

entered in this case, Dkt. No. 47, attached as Exhibit B to the Subpoena, Subpoena at 48–68. *See Nguyen v. Lotus By Johnny Dung Inc.*, 2019 WL 4570032, at *4 (C.D. Cal. Apr. 12, 2019) (denying a third-party motion to quash and rejecting "conclusory allegations that [the d]efendant's subpoenas seek private, confidential, and trade secrets information" (internal citation omitted)); *see also Barracuda Networks, Inc.*, 2019 WL 7865179, at *1 (explaining that a protective order "mitigates concerns about disclosure of sensitive information" (internal citation and quotation omitted)). These objections do not alleviate UMRO of its obligation to respond to NAR's Requests.

Simply put, NAR has done exactly as UMRO asked by narrowing Requests Nos. 1, 2, and 4. Since then, UMRO has failed to engage whatsoever. NAR therefore requests that the Court order UMRO to comply with the search terms that NAR proposed. In the alternative, although NAR maintains that its proposed search terms are reasonable, it remains willing to work with UMRO to reach a mutually agreeable solution.

### 2. *UMRO's Position*

[].

## II. REQUEST FOR WHICH UMRO INDICATED IT WOULD NOT PRODUCE DOCUMENTS AND NAR THEN PROPOSED SEARCH TERMS

The second category of documents at issue concerns just one Request, Request No. 7, which involves other lawsuits alleging fraudulent conduct on the

part of UMRO and its CEO and founder—and one of the PLS co-founders—Mauricio Umansky.

**A.     NAR's Request No. 7 and UMRO's Responses and Objections**

REQUEST FOR PRODUCTION NO. 7 (Subpoena at 6)[2]

All Documents and communications relating to the Umansky Fraud Litigations.

UMRO's RESPONSES AND OBJECTIONS TO REQUEST NO. 7 (R&Os at 11)

UMRO incorporates by reference its General Objections as though fully set forth herein.

UMRO objects to this Request on the grounds that it is argumentative on its face by alleging "Fraud". For these reasons it appears to be interposed for an "improper purpose, such as to harass" UMRO. Rule 26(g)(1)(B). This Request is also improper because any discovery concerning the topic requested should be

---

[2] Relevant to this Request, Paragraph 14 of NAR's Subpoena definitions provides: "'Umansky Fraud Litigations' refer to the following cases, individually and collectively: Western World Insurance Co. v. UMRO Realty Corp., (C.D. Ca. filed June 25, 2018); Sweetwater Malibu CA, LLC v. Umansky, 2:19-cv-1848, (C.D. Ca. filed Mar. 13, 2019); Hakim v. Umansky, 19SMCV01619 (Cal. Super. Ct. filed Sept. 13, 2019); Segal vs. Umansky, 19SMCV01720 (Cal.Super. Ct. filed Sept. 27, 2019); Sweetwater Malibu CA, LLC v. Hakim, 2:20- cv-08945-GW-KS, (C.D. Ca. filed Sept. 29, 2020)." Subpoena at 3.

LOCAL RULE 37 JOINT STIPULATION FOR SUBPOENA FROM DEFENDANT THE NATIONAL ASSOCIATION OF REALTORS TO THIRD PARTY UMRO REALTY CORP. D/B/A THE AGENCY

directed to the parties of that litigation, and not to UMRO. Thus, the Request places a clear undue burden on UMRO. Rule 45(d)(1) and 45(d)(3)(iv).

This Request is not limited to the subject matter of the case and therefore does not "appear reasonably calculated to lead to the discovery of admissible evidence" Rule 26(b). It also requests documents that are privileged or protected and may be work product, Rule 45(d)(3)(A)(iii).

In addition, this Request contains built-in legal conclusions and seeks categories of documents UMRO does not maintain in any centralized form. UMRO does not maintain centralized logs, reports, or files of the type demanded and therefore has no responsive documents in the manner requested.

Therefore, UMRO will not produce any documents responsive to this Request.

**B.    NAR's and UMRO's Positions Concerning Request No. 7**

   *1.    NAR's Position*

During the meet and confer on May 27, 2026, NAR proposed that it send search terms for this Request to UMRO so that UMRO could determine whether it would produce documents or stand on its objection. UMRO agreed to consider the proposed search terms. NAR then sent the following search terms (with a date range of January 1, 2017, to the present) corresponding to Request No. 7: (1) 3620

14

OR Sweetwater, (2) Nguema OR Oberfeld OR Hakim, (3) "Western World." Email Thread One at 6–7.

These search terms relate to the litigations alleging fraud against UMRO and Mauricio Umansky. NAR's understanding—unrefuted by UMRO—is that Umansky, in his role as a realtor with UMRO, was accused of committing fraud in a real estate transaction that bears on the issues in this case. The following draws from the amended complaint in *Western World Insurance Co. v. UMRO Realty Corp.*, No. 18-cv-05594 (C.D. Ca. Sept. 17, 2018), Dkt. 33, with NAR's proposed search terms bolded: The property at issue in the underlying litigations was located at **3620 Sweetwater** Mesa, Malibu, California (Western World Complaint ¶ 29); Teodoro **Nguema** was the principal and managing member of the LLC that owned the property (UMRO and Umansky's client) (*id.* ¶¶ 29–30, 36); Mauricio **Oberfeld** offered Umansky an opportunity to invest in the property, which Umansky accepted without timely disclosure to his client, and ultimately bought the property (*id.* ¶¶ 62–65); Oberfeld then resold the property less than one year later, along with the other investors (including Umansky), for a profit of over $30 million, with Umansky serving as the listing agent (*id.* ¶¶ 66–67); Sam **Hakim** had offered first to buy the property, then to buy for $8 million an assignment of Oberfeld's right to purchase the property, which UMRO and Umansky did not disclose to the seller (*id.* ¶¶ 43–45); and **Western World**

15

Insurance Company issued a liability-insurance policy to UMRO that was implicated in the underlying lawsuits, leading to Western World's own lawsuit against UMRO and Umansky (*id.* ¶¶ 17, 75–76).

At a minimum, the requested documents speak directly to the credibility and potential motives of key witnesses in this case and are therefore discoverable. *See, e.g., Davis v. Kelly Servs., Inc.*, No. CV 17-1699-GW (PLAX), 2017 WL 11633478, at *7 (C.D. Cal. Oct. 23, 2017) (denying a motion to quash a third-party subpoena in part because "documents that tend to implicate credibility, such as disciplinary records and performance evaluations, are discoverable" (citation omitted)). This is especially so here, where the alleged wrongful conduct—Umansky and UMRO withholding information from their client about the true value of the property in their own self-interest—implicates the NAR rule at issue in the instant litigation. NAR's Clear Cooperation Policy ensures that information about homes for sale in a particular area is broadly publicized through the local Multiple Listing Service, thereby upholding NAR's commitment to provide equal opportunity to all and transparency in the housing market. Umansky's and UMRO's alleged fraudulent conduct, if true, could speak to their motivations for a lawsuit challenging the Clear Cooperation Policy. Request No. 7 therefore concerns highly relevant documents.

UMRO said it would reconsider its position on Request No. 7 if NAR sent proposed search terms. NAR has heard no updates from UMRO since doing so, and UMRO has no valid basis for refusing to comply with this Request. NAR therefore requests that the Court order UMRO to comply with the search terms that NAR proposed. In the alternative, although NAR maintains that its search terms are reasonable, it remains willing to work with UMRO to reach a mutually agreeable solution.

### 2.    *UMRO's Position*

.

### CONCLUSION

NAR and UMRO request a motion hearing date of Friday, August 7, 2026, at 9:30 A.M., before the Honorable Charles F. Eick to resolve these issues.

17

LOCAL RULE 37 JOINT STIPULATION FOR SUBPOENA FROM DEFENDANT THE NATIONAL ASSOCIATION OF REALTORS TO THIRD PARTY UMRO REALTY CORP. D/B/A THE AGENCY

Dated: []

**National Association of REALTORS®**

By: /s/ *William K. French*

Leonard A. Gail
lgail@masseygail.com
Suyash Agrawal
sagrawal@masseygail.com
Peter M. Stasiewicz
pstasiewicz@masseygail.com
William K. French
wfrench@masseygail.com
**MASSEY & GAIL LLP**
50 East Washington Street, Suite 400
Chicago, IL 60602
Tel: (312) 283-1590

Matthew M. Collette
mcollette@masseygail.com
Kylie C. Kim
kkim@masseygail.com
**MASSEY & GAIL LLP**
The Wharf
1000 Main Avenue SW, Suite 450
Washington, D.C. 20024
Tel: (202) 652-4511

Daniel H. Handman
dhandman@hkemploymentlaw.com
**HIRSCHFELD KRAEMER LLP**
1299 Ocean Avenue, Suite 750
Santa Monica, CA 90401
Telephone: (310) 255-0705

*Attorneys for Defendant National Association of REALTORS®*

**UMRO Realty Corp. d/b/a The Agency**

By: /s/ *[Signature]*

Brandon K. Braga
brandon.braga@theagencyre.com
Kristin A. Regan
kregan@theagencyre.com
UMRO Realty Corp. d/b/a The Agency
331 Foothill Road, Suite 100
Beverly Hills, California 90210

*Attorneys for Third Party UMRO Realty Corp. d/b/a The Agency*

18

## CERTIFICATE OF SERVICE

I hereby certify that on [DATE], I caused a true and correct copy of the foregoing to be served by electronic mail on the following counsel of record for PLS and counsel for UMRO.

Christopher G. Renner
cgrenner@dhillonlaw.com
Jonathan M. Shaw
jshaw@dhillonlaw.com
Andrew K. Mann
akmann@dhillonlaw.com
Domenic Aulisi
daulisi@dhillonlaw.com
Dhillon Law Group Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

Brandon Q. Tran
btran@dhillonlaw.com
4675 MacArthur Court, Suite 1410
Newport Beach, CA 92660

*Attorneys for Plaintiff The PLS.com, LLC*

Brandon K. Braga
brandon.braga@theagencyre.com
Kristin A. Regan
kregan@theagencyre.com
UMRO Realty Corp. d/b/a The Agency
331 Foothill Road, Suite 100
Beverly Hills, California 90210

*Attorneys for Third Party UMRO Realty Corp. d/b/a The Agency*

Dated: [DATE]                    /s/ William K. French
                                 William K. French

# Exhibit 6



## July 9, 2026

**VIA EMAIL**

Constance Grieves
Massey & Gail
50 E. Washington Street, Suite 400
Chicago, IL 60602

      Re: *PLS. v. NAR – Subpoena to UMRO*

Dear Counsel,

This email is response to your Meet and Confer email dated June 3, 2026, and the continuing the dialogue concerning the Subpoena you served upon UMRO on November 12, 2025.

**Scope of the Current Dispute**

Your draft Joint Stipulation address only Requests 1, 2, 4 and 7. Accordingly, this response is directed to those Requests only. UMRO does not understand NAR to have withdrawn the remaining requests and expressly reserves all objections to those requests should NAR later seek to pursue them.

In an effort to narrow the scope of the dispute, NAR also proposed limiting any electronic search to certain search terms and a January 1, 2017 to present date range. UMRO addresses those proposed limitations below. Although those proposals reduce the scope of the original Subpoena, they do not resolve the fundamental defects discussed in this response.

**UMRO's Position Regarding Request Nos. 1, 2 and 4**

    **A.**    **The Requests Seek Duplicative Discovery That Has Already Been Searched for and Produced to NAR**

The principal defect in Request Nos. 1, 2 and 4 is not the proposed search methodology, but that NAR continues to seek broad discovery from UMRO, a nonparty without demonstrating that UMRO possesses unique responsive information unavailable from PLS or the individual custodians from whom NAR has already obtained discovery. Although NAR has narrowed the requests at issue and proposed search terms in an effort to reduce burden, those modifications do not cure the fundamental defects in the requests or justify imposing another broad search on a non-party.

UMRO is a separate legal entity from PLS and has no managerial control, operational authority, or governance over PLS. The principal nexus upon which NAR apparently relies is that four individuals affiliated with PLS (Mauricio Umansky, Chris Dyson, James Harris, and David Parnes) are or were also affiliated with UMRO. That overlap does not eliminate the separate corporate identities of UMRO and PLS, nor does it establish that UMRO possesses unique information unavailable from PLS itself.

Our understanding is that those four individuals have already conducted extensive searches of their email accounts in response to discovery requests served in the prior action and again in this action. Because those email accounts are maintained on UMRO's systems, the prior searches necessarily encompassed the same accounts and systems that NAR now seeks to require UMRO to search yet again.

NAR's suggestion that additional discovery from UMRO is necessary because James Harris and David Parnes purportedly no longer have access to their former UMRO email accounts is without merit. The relevant issue is not whether Harris or Parnes presently have access to those accounts, but whether those accounts have already been searched and the responsive documents produced. Our understanding is that they have. Those UMRO-hosted email accounts were searched in connection with discovery in the prior action and/or this action, and the resulting documents were produced to NAR. Requiring UMRO to conduct another search would not provide NAR access to a previously unavailable source of information; it would merely require a nonparty to repeat searches of the same accounts without any showing that the prior searches were incomplete or that additional responsive information exists.

UMRO understands that these prior searches resulted in the production of hundreds of thousands of documents to NAR. Thus, NAR has already received extensive discovery from the very custodians and email accounts implicated by the present Subpoena—and has received such discovery on at least two separate occasions. Nevertheless, NAR continues to require UMRO to conduct another search of those same systems and accounts. NAR has not demonstrated that the prior searches were inadequate, identified any specific category of responsive documents missing from the prior productions, or established that a third search is reasonably likely to yield material information not already in NAR's possession.

Rule 45(d)(1) requires the party issuing and serving a subpoena to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." While NAR has narrowed the requests presently at issue, it has not demonstrated why requiring a non-party to repeat broad searches of accounts that have already been searched is necessary or proportional. Rule 26 likewise limits discovery to information proportional to the needs of the case, considering, among other things, the parties' relative access to the relevant information and whether the burden or expense of the proposed discovery outweighs its likely benefit. Those considerations weigh strongly against compelling UMRO to repeat searches already conducted by parties to the litigation.

Requiring UMRO to conduct yet another search of the same systems for the same custodians is cumulative and duplicative. The burden is particularly unjustified because NAR has not identified any category of unique responsive information that UMRO possesses or shown that

the discovery it seeks from UMRO is materially different from the documents previously obtained from the parties themselves.

### B.    Repeating Nine Years of Electronic Discovery Would Impose a Substantial and Disproportionate Burden on UMRO

The burden NAR seeks to impose is not theoretical. The Requests seek documents extending back approximately nine years, to 2017. During that period, substantial quantities of email and electronically stored information have been archived, and UMRO's technology platforms and software systems have changed multiple times.

Responding to the Subpoena would therefore require UMRO to devote substantial internal and external resources to identifying potentially responsive custodians and data sources; locating and restoring archived information; addressing legacy platforms and software systems; collecting and processing electronically stored information; reviewing potentially massive quantities of documents for responsiveness; conducting attorney review for privilege, confidentiality, and other protections; preparing privilege logs where required; and producing responsive documents.

These burdens would be imposed on a nonparty with no direct interest in the outcome of this litigation. More importantly, UMRO would incur these substantial burdens and expenses to repeat searches of custodians and email accounts that, based on information available to UMRO, have already been searched in connection with party discovery.

The likely benefit of this discovery is therefore minimal, while the burden and expense to UMRO are substantial. NAR has not identified any category of unique responsive information that is available only from UMRO and unavailable from PLS or the overlapping custodians. Under Rules 26(b)(1), 45(d)(1), and 45(d)(3)(A)(iv), that imbalance weighs heavily against compelling production.

### C.    NAR Is Improperly Seeking to Use UMRO as a Proxy to Obtain Discovery Concerning PLS

The Subpoena effectively seeks to use UMRO as a discovery proxy for PLS and its principals. UMRO and PLS are separate and distinct legal entities. Aside from a partial ownership interest held by Mauricio Umansky in each entity, UMRO and PLS operate independently. Neither entity exercises managerial control, oversight, governance, or operational authority over the other. UMRO does not participate, direct, or supervise in the business operations of PLS, and PLS does not participate, direct, or supervise in UMRO's business operations. Common ownership does not eliminate those separate corporate identities or transform UMRO into a repository for PLS's discovery. NAR cannot disregard these separate corporate identities merely because certain individuals affiliated with PLS maintained email accounts on UMRO's systems.

To the extent NAR seeks discovery concerning the conduct of PLS, its principals, or the claims and defenses asserted in this litigation, NAR should obtain that discovery from the parties

themselves. Indeed, our understanding is that NAR has already done so, obtaining hundreds of thousands of documents from the relevant individuals. The fact that UMRO's systems hosted certain email accounts does not justify requiring UMRO to repeat searches already undertaken in connection with party discovery or transform UMRO into a substitute discovery source whenever NAR wishes to conduct additional searches concerning PLS. Rule 45 does not permit a party to shift the substantial burden and expense of duplicative discovery to a nonparty without demonstrating that the nonparty possesses unique responsive information unavailable from the parties themselves.

**D.**     **NAR's Narrowing Does Not Cure the Subpoena's Overbreadth and Undue Burden**

NAR's reduction of the number of requests and proposed search terms does not cure their extraordinary breadth. The remaining Requests continue to seek sweeping categories of "all" documents and information. They encompass a period extending back to 2017 and potentially implicate numerous UMRO personnel.

Although NAR has proposed search terms in an effort to narrow the scope of the Requests, those search terms do not cure the underlying burden imposed by the Subpoena. They would still require UMRO to conduct extensive searches across years of electronically stored information and archived systems without demonstrating that UMRO possesses unique responsive information unavailable from PLS or the overlapping custodians. Narrowing the search methodology does not, by itself, justify imposing another broad search on a non-party.

Even as narrowed, the Requests continue to require extensive searches across approximately nine years of electronically stored information. Such sweeping discovery is especially inappropriate when directed to a nonparty. Rule 45(d)(1) requires NAR to take affirmative and reasonable steps to minimize the burden and expense imposed on UMRO. NAR's decision to withdraw or narrow certain Requests does not satisfy that obligation where the Requests continue to require extensive, resource-intensive searches of electronic and archived information comparable to the searches that previously resulted in the production of hundreds of thousands of documents.

Nor is UMRO required to recreate or produce documents that no longer exist because of the passage of time, ordinary document retention practices, technological changes, or migration between software platforms.

NAR has failed to demonstrate that the broad discovery it seeks is proportional to the needs of the case, particularly where the relevant party custodians have already searched the same email accounts and produced hundreds of thousands of documents. NAR has not identified any category of responsive information uniquely within UMRO's possession, custody, or control that would justify requiring a separate, non-party search.

**E.**     **NAR Has Not Demonstrated That Additional Discovery from UMRO Is Warranted**

UMRO is not a party to this litigation. Its connection to the dispute is limited, and UMRO and PLS are separate legal entities. Nevertheless, NAR continues to seek to require UMRO to incur substantial costs to conduct searches that, as we understand it, have already been conducted by parties to the action.

NAR has not identified any specific category of responsive documents omitted from the prior productions, demonstrated that the prior searches were inadequate, or shown that UMRO possesses unique, material information unavailable from PLS or the overlapping custodians. Nor has NAR explained why another search of the same systems and accounts is reasonably likely to produce meaningful new information.

NAR's approach also underscores the disproportionality of the requested discovery. UMRO is unaware of any comparable subpoenas served on other brokerages or industry participants who may have communicated with PLS or the overlapping custodians regarding the same subject matter. Instead, NAR seeks to impose the burden of years of electronic discovery on UMRO based principally on the fact that Mauricio Umansky holds an ownership interest in both UMRO and PLS. Common ownership, without more, does not justify imposing discovery obligations on a separate non-party that have not been imposed on similarly situated entities.

Against that backdrop, requiring UMRO to undertake another broad search is inconsistent with the proportionality principles embodied in Rules 26 and 45. NAR has not shown that the likely benefit of compelling additional discovery from a non-party outweighs the substantial burden and expense such discovery would impose.

Requests 1, 2 and 4 would still require UMRO to incur substantial expense to repeat discovery efforts undertaken in connection with party discovery, without any showing that those efforts are reasonably likely to produce unique responsive information. Under these circumstances, compelling further discovery from UMRO would impose an unwarranted burden on a non-party.

F.      UMRO's Offer to NAR

Without waiving any of the foregoing objections, and in an effort to resolve this dispute without Court intervention, UMRO is willing to conduct a limited search of the email accounts of custodians in its marketing and finance departments who, to UMRO's knowledge, were not among the overlapping custodians whose email accounts were previously searched in connection with party discovery. UMRO is willing to search the emails for the custodians below using the following search terms proposed by NAR for the period January 1, 2017 to the present, with the understanding that UMRO is not required to restore, recreate, or produce information from accounts that no longer exist or are no longer reasonably accessible.

Custodians:
- Laura Corrigan, Marketing
- Laura Stace, Marketing
- Sandy Knell, Finance

Search Terms:
- "PLS" or "pocket listing service"
- "pocket" w/2 "listing"
- PLS OR "PLS.com" OR "ThePLS.com" OR "pocket listing service*" OR "Private Listing service*"
- "Clear Cooperation" OR "cooperation policy" OR CCP

## II.    UMRO's Position Regarding Request No. 7

### A.    Request No. 7 Seeks Documents Protected by the Attorney-Client Privilege, Work-Product Doctrine and Protective Orders

Request No. 7 is fundamentally different from the other Requests because it seeks documents relating to separate litigation involving UMRO and Mauricio Umansky. Litigation files are unlike ordinary business records. By their nature, they contain substantial amounts of attorney-client communications, attorney work product, litigation strategy, confidential discovery, and documents subject to protective orders. To the extent Request No. 7 seeks communications with counsel, attorney work product, attorney mental impressions, litigation strategy, investigations conducted in anticipation of litigation, or other protected materials, those documents are not subject to compelled disclosure. Rule 45(d)(3)(A)(iii) requires the Court to quash or modify a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies."

This Request is particularly burdensome because its breadth would require UMRO to collect and review substantial quantities of documents solely to identify, segregate, redact and log privileged and protected materials. This task has already been performed in connection with the underlying litigation, and it is our understanding that PLS has already produced Privilege Logs to NAR. Any privilege log prepared by UMRO would almost certainly be duplicative of the privileges asserted by PLS and the/or the overlapping custodians. Likewise, many of the documents in that case were subject to a Protective Order, which would require additional review, and substantial culling and redacting. Requiring UMRO to undertake those efforts would impose a substantial burden on a non-party while providing little, if any, additional benefit to NAR.

To the extent Request No. 7 seeks pleadings, motions, orders, or other publicly filed court documents, those materials are equally available to NAR through the public court dockets and should not be the subject of compelled production by UMRO.

### B.    Request No. 7 Fails to Demonstrate the Need for Wholesale Discovery of Separate Litigation Files

Request No. 7 also improperly seeks discovery concerning matters that should be directed to the parties to the underlying litigation. Simply referencing allegations made in other proceedings does not establish that the underlying litigation files contain discoverable, non-privileged information relevant here.

To the extent NAR seeks documents relating to the underlying litigations, it should identify the specific categories of non-privileged documents it contends are relevant to this action rather than broadly seeking entire litigation files. NAR may not shift the burden of reviewing years of privileged, work-product, confidential, and publicly available litigation materials to a separate nonparty entity simply because certain individuals associated with a party were also affiliated with UMRO. NAR has not demonstrated that UMRO possesses unique, non-privileged information unavailable from the underlying litigation or other sources. The Request therefore imposes an undue burden on UMRO and is inconsistent with Rules 26(b)(1), 45(d)(1), and 45(d)(3)(A).

Sincerely,

*Brandon Braga*

Brandon Braga

# Exhibit 7



July 17, 2026

**VIA EMAIL**

Constance Grieves
Will French
Massey & Gail
50 E. Washington Street, Suite 400
Chicago, IL 60602

   Re: *PLS. v. NAR – Subpoena to UMRO*

Dear Counsel,

Your summary of our follow-up meet-and-confer conversation yesterday, July 16, 2026, omits several important facts concerning the documents sought by NAR's November 12, 2025 subpoena.

As UMRO has repeatedly explained, NAR has already received hundreds of thousands of documents from PLS, Mauricio Umansky, Chris Dyson, James Harris, and David Parnes, produced on two separate occasions. With the possible exception of a few discrete categories discussed below, UMRO has no reason to believe that the additional searches demanded by NAR are reasonably likely to yield material relevant to the antitrust issues in this action. Nor has NAR explained why these searches are sufficiently relevant to justify the burden.

**Meet-And-Confer Issues Regarding Subpoena Request Nos. 1, 2, 4, And 7**

Throughout the meet-and-confer process, UMRO has repeatedly asked NAR to identify specifically what it believes is "missing" from the hundreds of thousands of documents already produced by PLS. UMRO has also asked NAR to formulate narrowly tailored requests directed to any genuinely "missing" categories of documents and relevant custodians. Given UMRO's status as a non-party, and not a real party in interest, NAR should make reasonable efforts to avoid imposing unnecessary burden and expense on UMRO, particularly where substantially similar discovery has already been obtained from the parties.

NAR has consistently failed to meaningfully narrow the scope of the documents it seeks. Although NAR contends that it has narrowed certain search terms, it has not reduced either the universe of email accounts to be searched, or the nine-year time period covered by its requests. As they currently stand, the requests remain substantially as broad and burdensome as those contained in the original subpoena.

NAR continues to insist that UMRO search potentially hundreds of internal email accounts spanning approximately nine years, including archived data maintained on systems that have migrated across multiple platforms and, in some instances, are stored off-site. Such a search would impose a substantial burden and expense on UMRO, particularly given the extensive discovery NAR has already obtained from the very same accounts. Despite UMRO's repeated efforts to explain this distinction during the meet-and-confer process, NAR has not proposed any reasonable limitation that addresses these concerns. (The one exception is that NAR withdrew its demand for non-email documents after learning that UMRO was not aware of the existence of any such documents.)

Moreover, in its July 14, 2026 email, NAR proposed adding as custodians "UMRO agents who used PLS." This is not a narrowing of the subpoena; it is a significant expansion. Such a request could potentially implicate more than one thousand email accounts belonging to current and former agents, all of whom are independent contractors and are the owners of these email accounts. Searching such an expansive universe of accounts would substantially increase the burden and expense imposed on UMRO.

UMRO, by contrast, has made meaningful efforts to identify reasonable and appropriately targeted categories of documents that could potentially provide NAR with information not already included in the prior productions.

NAR has not responded to these proposals.

### 1. UMRO Offered to Search Emails of Marketing and Finance Custodians

In UMRO's July 9, 2026 response to NAR's June 3, 2026 meet-and-confer letter, UMRO proposed a reasonable narrowing of the subpoena. Specifically, UMRO offered to search the email accounts of three custodians whose emails may not have been included in PLS's prior productions. However, NAR should already possess responsive emails from these three custodians if emails were sent by, sent to, or copied to these accounts Mauricio Umansky, Chris Dyson, James Harris, or David Parnes.

Accordingly, and in light of NAR's requests for documents relating to marketing and finance, UMRO offered to conduct targeted searches of the following custodians' accounts:

Custodians:
- Laura Corrigan, Marketing
- Laura Stace, Marketing
- Sandy Knell, Finance

Search Terms:
- "PLS" or "pocket listing service"
- "pocket" w/2 "listing"
- PLS OR "PLS.com" OR "ThePLS.com" OR "pocket listing service*" OR "Private Listing service*"

- "Clear Cooperation" OR "cooperation policy" OR CCP

NAR has not responded to this offer.

### 2. UMRO Offered to Produce Documents from the Email Accounts of Harris and Parnes

The subpoena sought all documents relating to "Office Exclusive Listings" and "Pocket Listings" marketed or sold from June 1, 2018, to the present with respect to Harris and Parnes. In NAR's June 3, 2026 email following the parties' meet and confer, NAR narrowed the request to emails only, but at the same time expanded the relevant time period from June 1, 2018–present to January 1, 2017–present.

UMRO explained its understanding that NAR already possesses the responsive documents from the Harris and Parnes accounts. Nevertheless, on July 16, 2026, UMRO stated that, if there is a discrete date range for which NAR does not already possess responsive documents—and they are not available from Harris or Parnes—NAR should identify that specific date range in writing.

NAR speculated that the last documents produced from these accounts were dated October 2022, but that would need to be confirm by reviewing PLS's prior productions. UMRO specifically asked requested NAR to provide the allegedly missing date range by email. NAR has not yet done so.

NAR's insistence that UMRO explain its understanding of precisely which documents have already been produced from the Harris and Parnes accounts is misplaced. NAR is in possession of the prior productions and is therefore in the best position to identify any alleged gap in those productions. If NAR contends that responsive documents are missing, NAR should identify the specific dates for which it believes documents have not already been produced.

Nonetheless, UMRO's understanding is that, to the extent any gap exists, it may encompass a period of months—not years—between the date of the last production and the departure of Harris and Parnes from UMRO. Limiting any supplemental search to that discrete period would constitute a reasonable and appropriate narrowing of NAR's request.

UMRO remains willing to produce this limited category of documents if NAR identifies the specific dates that are allegedly missing from the prior productions.

### NAR's Purported Narrowing Has Not Cured the Subpoena's Overbreadth and Undue Burden

In its June 3, 2026 email, NAR purported to narrow its subpoena by proposing a "list" of search terms to be run across email accounts rather than requiring UMRO to respond separately to each subpoena request. That proposal, however, does not meaningfully

narrow the discovery sought. Critically, NAR did not limit the number of custodians, the number of email accounts to be searched, or the relevant date ranges. NAR's proposal would therefore still require UMRO to search potentially hundreds of internal email accounts spanning approximately nine years.

Nor did NAR meaningfully reduce the number of search terms. To the contrary, it expanded them. As reflected in the attached Comparison of Requests chart, the original subpoena contains approximately 16 search terms to be applied across potentially hundreds of accounts over an eight- to nine-year period. NAR's purported "narrowing" in its June 3, 2026 email increases the number of search terms to approximately 27, again to be applied across potentially hundreds of accounts over a nine-year period.

With the exception of NAR's July 14, 2026 proposal to exclude the internal accounts of Umansky and UMRO's counsel from Subpoena Request No. 7, NAR has not meaningfully narrowed its requests. Instead, NAR continues to pursue extraordinarily broad discovery from a non-party.

Moreover, in its July 14, 2026 email, NAR proposed adding the email accounts of "UMRO agents who used PLS," potentially encompassing over a thousand current and former UMRO agents. Far from narrowing the subpoena, this proposal represents a significant expansion of the universe of accounts potentially subject to search.

**The Minimal Potential Benefit Does Not Justify the Undue Burden**

Despite UMRO's repeated explanations concerning the substantial and disproportionate burden associated with NAR's requests, NAR continues to press for sweeping discovery. As UMRO explained in its July 9, 2026 email, responding to the subpoena as presently framed would require UMRO to devote substantial internal and external resources to, among other things: identifying potentially responsive custodians and accounts; locating and restoring archived information, including information maintained off-site; accessing or restoring data from older platforms and software systems that are no longer in regular use; reviewing potentially massive quantities of documents for responsiveness; conducting attorney review for privilege, confidentiality, and other protections; preparing privilege logs where required; and preparing responsive documents for production.

This process would impose a tremendous burden on UMRO's technology department, which consists of only a handful of personnel, as well as substantial legal and financial costs. Such sweeping discovery is particularly inappropriate when directed to a non-party. Rule 45(d)(1) requires NAR, as the party responsible for issuing and serving the subpoena, to take reasonable steps to avoid imposing undue burden or expense.

The likely benefit of the sweeping searches NAR proposes is minimal, particularly when weighed against this substantial burden. For example, if UMRO were required to search hundreds of internal accounts (except the accounts of Umansky, Dyson, Harris, and Parnes) for generic terms such as "MLS," "multiple listing service," "pocket listing,"

"Clear Cooperation," or "PLS," the search could generate a volume of documents equal to or exceeding the hundreds of thousands of documents already produced.

UMRO is a real estate brokerage company. Its personnel necessarily send and receive substantial volumes of emails concerning real estate listings and related matters. Generic terms such as "MLS", "listing" and "pocket listing" appear routinely in ordinary business communications concerning matters wholly unrelated to the issues in this litigation. For example, responsive hits could include communications about marketing a property, preparing listing forms, drafting social media posts, answering routine compliance questions, assisting an agent with entering a listing into the MLS, announcing that a new listing will soon be placed on the MLS, or requesting information concerning a property identified by an MLS number.

The sheer volume of such routine and irrelevant communications illustrates why NAR's proposed search methodology is neither targeted nor proportional to the information it purports to seek. NAR has not identified sufficiently focused search terms, custodians, or date limitations reasonably calculated to isolate potentially relevant documents from UMRO personnel— almost all of whom probably had no involvement with PLS and may have no knowledge of PLS whatsoever.

NAR's approach also underscores the disproportionality of the requested discovery. UMRO is unaware of any comparable subpoenas served on other brokerages or industry participants who may have communicated with PLS or the overlapping custodians regarding the same subject matter. It appears that NAR seeks years of electronic discovery on UMRO based principally on the fact that Mauricio Umansky holds an ownership interest in both UMRO and PLS. Common ownership, without more, does not justify imposing discovery obligations on a separate non-party that have not been imposed on similarly situated entities

Under these circumstances, requiring UMRO to undertake a massive search and review of hundreds of accounts spanning approximately nine years, at substantial expense to a non-party, in the hope of locating potentially relevant documents that have not already been produced is not justified by the minimal likelihood of obtaining new, relevant information. UMRO has proposed reasonable, targeted alternatives designed to identify any genuinely missing documents while minimizing unnecessary burden and duplication.

NAR has not responded to those proposals.

Best,

Kristin A. Regan

**Comparison of Requests**

| Subpoena (Nov. 12, 2025) | Subpoena Search Terms | NAR Email "Narrowed" (June 3, 2026) | NAR "Narrowed" Search Terms | NAR Proposal to Add Agents (July 14, 2026) | NAR Proposal to Add Agents Search Terms |
|---|---|---|---|---|---|
| No. 1 | PLS | No. 1 | PLS | No. 4 | |
| | | No. 1, 3 | Pocket Listing Service | | |
| No. 10, 12, 14 and 16 | Pocket Listings | No. 2 | Pocket listing | | |
| | | No. 3 | PLS.com | | |
| | | No. 3 | ThePLS.com | | |
| No. 2 | Action | | | | |
| No. 2 | Prior action | | | | |
| No. 2 | Complaint | | | | |
| No. 3 | Listing Service | No. 3 | Private Listing service | | |
| | | No. 3 | MLS | | |
| | | Mo. 3 | Multiple Listing | | |
| No. 4 | Clear Cooperation Policy | No. 4 | Clear Cooperation | | |
| | | No. 4 | Cooperation Policy | | |
| | | No. 4 | CCP | | |
| No. 5 | Listing Network Services | No. 5 | Private Listing Network, | | |
| No. 5 | Listing Network | No. 5 | Private Network | | |
| | | No. 5 | PLN | | |
| No. 6 | Withholding | | | | |
| No. 6 | Concealing | | | | |
| No. 6 | Misrepresenting | | | | |
| No. 7 | Umansky Fraud Litigations | No. 8 | 3620 | | |
| | | No. 8 | Sweetwater | | |
| | | No. 9 | Nguema | | |
| | | No. 9 | Oberfeld | | |
| | | No. 9 | Hakim | | |
| | | No. 10 | Western World | | |
| No. 8 | Third Party Marketing Services | | | | |

| No. 9 | Violation of Law, ethics, etc | | | | |
|---|---|---|---|---|---|
| No. 11, 13, 15, 17 | Office Exclusive Listings | | | | |
| | | No. 6 | Benefit | | |
| | | No. 6 | Advantage | | |
| | | No. 6 | Value | | |
| | | No. 6 | Non-Member | | |
| | | No. 6 | Without membership | | |
| | | No. 6 | Member | | |
| | | No. 7 | Nation database listing | | |
| | | | | No. 4 | Add UMRO Agents who used PLS |
| **Totals (Approx)** | **16 search terms from hundreds of accounts over 8-9 years** | | **27 search terms from hundreds of accounts over 9 years** | | **1 search term from thousands of accounts of Independent Contractor Accounts over 9 years** |

# Exhibit 8

James L. Wraith, State Bar No. 112234
E-mail:    jwraith@selvinwraith.com
John A. Chatowski, State Bar No.174471
E-mail:    jchatowski@selvinwraith.com
SELVIN WRAITH HALMAN LLP
505 14th Street, Suite 1200
Oakland, CA 94612
Telephone:  (510) 874-1811
Facsimile:   (510) 465-8976

Attorneys for Plaintiff
WESTERN WORLD INSURANCE COMPANY

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WESTERN WORLD INSURANCE COMPANY,<br><br>          Plaintiff,<br><br>     v.<br><br>UMRO REALTY CORPORATION, a California corporation, and MAURICIO UMANSKY, an individual,<br><br>          Defendants. | CASE NO. 2:18-cv-05594-GW (MRWx)<br><br>**WESTERN WORLD INSURANCE COMPANY'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY** |

Plaintiff Western World Insurance Company complains and alleges against Defendants UMRO Realty Corporation and Mauricio Umansky as follows:

## I.    JURISDICTION AND VENUE

1.       Jurisdiction of this action is founded upon 28 U.S.C. § 1332, as there is complete diversity of citizenship between Plaintiff and Defendants in this matter and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs, as more fully explained below.  This court also has jurisdiction over these claims under 28 U.S.C. § 2201, the Declaratory Judgment Act.

1

2.      Venue is proper in the Central District of California pursuant to 28 U.S.C. §§ 1391(a)(1) and (c) in that the Defendants reside in this district and because they are subject to personal jurisdiction at the time the action is commenced. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(a)(2) as a substantial part of the events giving rise to the claim occurred in this district, including the execution of the application for insurance and an underlying professional liability claim involving Defendants' business located in Beverly Hills, California. In addition, the contract of insurance that is the subject of this complaint identifies a location within this district – 33 Foothill Road, Suite 100, Beverly Hills, CA 90210 – as the location of the insured's business.

## II.   PARTIES

3.      Plaintiff Western World Insurance Company ("Western World") is a New Hampshire corporation with its principal place of business in Parsippany, New Jersey, which is duly authorized to conduct business in California.

4.      Defendant UMRO Realty Corporation ("UMRO") is a California corporation with its principal place of business in Beverly Hills, California.

5.      Defendant Mauricio Umansky ("Umansky") is an individual who resides in the State of California.  Western World is informed and believes, and on that basis alleges, that Umansky is the Chief Executive Officer and co-owner of UMRO, and Umansky resides in Beverly Hills, California.

## III.  THE INSURANCE APPLICATION

6.      In June 2017, UMRO applied to Western World for an Errors & Omissions Liability Insurance Policy by submitting a Great American-branded application form entitled Real Estate Related Services Errors And Omissions Application which was accepted by Western World ("Application") as UMRO's insurance application for a real estate agent's errors and omissions liability policy for issuance by Western World.  A true and correct copy of the Application is attached hereto as **Exhibit A**, and is incorporated herein by reference.

2

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**               **CASE NO. 2:18-cv-05594-GW (MRWx)**

7.  On page 3 of the Application, the Application states: "Value of the largest transaction completed during the past 12 months: $30,000,000."

8.  On page 5 of the Application, the Application states: "Is the Applicant (after proper inquiry of each director, officer or partner of the Applicant) aware of any circumstances, incidents, situation, or accidents … that may result in a claim being made against: (a) the Applicant; … or (e) any past or present partners, directors, officers, or employees of the Applicant …?  NO."

9.  On page 6 of the Application, the Application states: "F. CLAIMS EXPERIENCE: (2). Is the Applicant (or any director, officer, partner or employee of the Applicant, or any other proposed insured) aware of any actual or alleged deficiencies, errors or omissions and work performed by the Applicant or by others for whom the Applicant is legally responsible?  NO."

10.  On page 6 of the Application, the Application states: "It is agreed that any claim or lawsuit against the Applicant, any director, officer, partner or employee of the Applicant, or any other proposed insured, arising from any facts, circumstances, acts, errors or omissions disclosed or required to be disclosed in response to questions F.1, F.2, F.3, F.4 and F.5, above, is hereby expressly excluded from coverage under the proposed insurance policy."

11.  On page 6 of the Application, the Application states: "NOTICE TO APPLICANT-PLEAD READ CAREFULLY: Warranty: It is hereby Understood and Agreed, after proper inquiry of each director, officer, partner, or employee of the Applicant or any other proposed insured, that this application and its representations and warranties shall be deemed to be submitted by or on behalf of and be binding upon the Applicant and each and every proposed insured under the policy.  It is further agreed that any misrepresentations, non-disclosure, concealment, or breach of warranty in this application shall be binding upon the Applicant and each and every proposed insured under the policy whether or not the proposed insured knew of, committed, or was responsible for such misrepresentation, non-disclosure, concealment, or breach of

3

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**          **CASE NO. 2:18-cv-05594-GW (MRWx)**

warranty."

12. On page 6 of the Application, the Application states: "We understand and accept … that the insurer will rely upon the truth of the information and statements in this application in deciding whether to issue a policy to the Applicant.

13. On page 6 of the Application, the Application states: "The Applicant agrees that if the information supplied on or attached to this application changes between the time this application is executed and the time that the proposed insurance policy is bound or coverage commenced, the Applicant will immediately notify the Insurer in writing of such changes; and the Insurer fully reserves its rights with respect to the underwriting acceptance or denial of such changes."

14. On page 6 of the Application, the Application states: " … this application shall be basis of the insurance should a policy be bound and issued, and shall become part of the policy."

15. The Application included a Real Estate Related Services Risk Management Supplement Application form ("Supplement Application") and on page 1 of the Supplement Application, the Supplement Application states: "Does the Applicant have written Quality Assurance/Risk Management procedures to avoid or mitigate their exposure to errors & omissions claims arising out of their performing of professional services?  YES."  If "YES", do the procedures ensure:

(c) The conflicts of interest of the Applicant and the Applicant's principles, partners, directors, officers, professional employees or independent contractors are fully disclosed and understood by all parties to "dual agency" transactions?  YES."

16. The Supplemental Application, on page 3, states, " It is hereby understood and agreed that the information provided above is true and correct and is material to the Insurer in deciding whether to issue its policy to the Applicant.  Further, if such information is false or incomplete, it may constitute a misrepresentation that will: (a) permit the Insurer to modify the terms and conditions of the policy issued to the

4

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**      **CASE NO. 2:18-cv-05594-GW (MRWx)**

Applicant (including without limitation to excluding any claim arising from or relating to the false information or non-disclosure): or (b) void the policy."

## IV. THE INSURANCE POLICY

17. Based upon the representations made by UMRO and its agents and representatives, Western World issued an "Errors And Omissions" liability insurance policy to UMRO for the policy period from August 2, 2017 to August 2, 2018, under policy number BRL 0015249 ("Policy"). A true and correct copy of the Western World Policy is attached hereto as **Exhibit B** and is incorporated herein by reference.

18. The Policy is subject to all of the terms, conditions, limitations, exclusions, and endorsements contained therein, including the following Limits of Liability: $3 million limit (each claim and annual aggregate), with a $50,000 each claim retention, and throughout the Policy the words "you" and "your" refer to the Named Insured shown in the Common Policy Declarations (which is UMRO Realty Corporation d/b/a The Agency, 33 Foothill Road, Suite 100, Beverly Hills, CA 90210").

19. The Policy provides: "In consideration of the payment of the premium and reliance upon the statements made and information furnished to us as part of the 'application', and subject to all the provisions of this policy, we agree to provide the insurance described in this Coverage Form and its applicable endorsements."

20. The Insuring Agreement for the Errors and Omissions Liability of the Policy provides: "For this insurance to apply, all of the following conditions must be met: (b) The "insured" had no knowledge prior to the effective date of this policy of the "wrongful act" or circumstance likely to give rise to a "claim";"

21. The Policy defines "Application" to mean, in pertinent part, "An application, whether it is ours or another's and any material submitted for this coverage."

22. The Policy defines "claim" to mean, in pertinent part, "A written demand for monetary relief received by an insured seeking to hold the insured responsible for a

5

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY** CASE NO. 2:18-cv-05594-GW (MRWx)

"wrongful act", including, but not limited to, the service of suit or the institution of arbitration or mediation proceedings against the insured;

23. The Policy defines "Insured" to mean, "You and any person acting within the scope of his or her duties as a past or present partner, principal, officer, director or employee of yours … independent contractors who are natural persons, but only with respect to professional services performed on your behalf…"

24. The Policy defines "Loss" to mean, "damages and settlements that an "insured" is legally obligated to pay as a result of a "claim" for "wrongful act."… However, "loss" does not include fines, penalties, taxes, damages owed based on an express obligation by written or oral agreement, disgorgement of profits by an "insured"; cost of an "insured's" correction; fees, commissions, expenses or costs paid to or charged by an "insured," … or any agreement to provide such relief or amounts owed under any contract or agreement."

25. The Policy defines "Wrongful act" to mean, "any actual or alleged negligent acts or errors or omissions, arising solely out of the "insured's" professional services rendered for others as stated in Item 1 of the Coverage Part Declarations.

26. The Policy contains exclusions under which the Policy does not apply to any "loss" or "defense costs" in connection with any "claim" made against an insured, arising out of, directly or indirectly resulting from, or in consequence of, or in any way involving the following, among others:

   4. **Contractual Liability:** Liability under any contract or agreement, except liability that would exist even in the absence of the contract or agreement.

   7. **Prior Knowledge:** "Wrongful act" or circumstance that an "insured": (a) Had knowledge of prior to the effective date of the policy; and (b) Had a reasonable belief could result in a claim.

   22. **Fee and Other Compensation Disputes:** Return of fees, commissions, premiums or other compensation charged by the

6

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY          CASE NO. 2:18-cv-05594-GW (MRWx)**

"insured".

**28.** **Illegal Profit:** The gaining in fact of any profit or advantage to which the "insured" is not legally entitled.

27. The Policy contains General Conditions under which it is provided that:

"**7.** **Application**. By acceptance of this policy, you agree that the statements in the "application" are true representations, this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between the "insured" and us, or any of our Agents, relating to this insurance.

In the event the "application", including materials submitted or required to be submitted, contains any misrepresentation or omission made with the intent to deceive or which materially affects either the acceptance of the risk or hazard assumed by us under this policy, this policy will be void ab initio as to any "insured" who knew the facts misrepresented or the omissions, whether or not such person knew of the "application" or this policy.

For purposes of this clause, only the knowledge of your Chief Executive Officer, chief financial officers, risk manager and general counsel (or the functional equivalent of such positions) will be imputed to all "insured's" who are natural persons. The knowledge of an "insured", other than the above officers or employees, will not be imputed to any other "insureds" who are natural persons. The knowledge of any "insured" may be imputed to you."

28. The Policy contains a "Real Estate Agent, Broker And Related Services Endorsement" which adds the following exclusions to the Policy: "This insurance does not apply to any "loss", in connection with, arising out of, or in any way involving:

**I.** Sums received by any "insured" or credited to any "insured's" account;

7

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY** CASE NO. 2:18-cv-05594-GW (MRWx)

## V.  SETTLEMENT WITH UNITED STATES DEPARTMENT OF JUSTICE ASSET FORFEITURE DEPARTMENT

29.  Sweetwater Malibu LLC ("Sweetwater") was the owner of a parcel of residential property located at 3620 Sweetwater Mesa, Malibu, California ("Property").

30.  Sweetwater's principal and managing member is Teodoro Nguema Obiang Mangue ("Nguema") who is also the Vice President of Equatorial Guiana and the son of the President of Equatorial Guiana (Teodoro Obiang Nguema Mbasogo).

31.  Western World alleges on information and belief that on April 28, 2011, the United States (through the Department of Justice) filed an action against Sweetwater and Nguema seeking forfeiture of the Property, and in keeping with the practice of using forfeited assets where practicable and consistent with law to protect the rights of innocent persons in the interests of justice, the United States intended to utilize the forfeiture of the Property for the benefit and social welfare of the people of Equatorial Guiana.

32.  Western World alleges on information and belief that on October 10, 2014, the United States entered into a Stipulation And Settlement Agreement ("Settlement Agreement") with Sweetwater and Nguema by which Sweetwater and Nguema agreed to liquidate the Property in a manner consistent with the Settlement Agreement.  A true and correct copy of the Settlement Agreement is attached hereto as **Exhibit C**, and is incorporated herein by reference.

33.  Western World alleges on information and belief that the Settlement Agreement specified in pertinent part as follows:

(a)  For the United States and Nguema to jointly select a licensed real estate agent to sell the property at a fair market value established by a jointly selected real estate appraiser (unless the United States and Nguema agreed to a different price in writing), with the sale, sale terms, escrow and buyer to be approved by the United States;

///

8

WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY          CASE NO. 2:18-cv-05594-GW (MRWx)

(b)  For the United States to have the right to assume control over the liquidation and sale of the Property if the Sale was not completed within 25 months of the Settlement Agreement;

(c)  For the Property's sale proceeds to be distributed in the following manner: First, sale proceeds will be paid to expenses incurred for the maintenance and sale of the Property; Second, sale proceeds of $10,300,000 will be forfeited to the United States; Third, any and all remaining funds shall be paid to a Charity jointly selected by the United States and Nguema with the funds to be used for the benefit of the people of the Republic of Equatorial Guiana;

34.  Western World alleges on information and belief that the United States and Sweetwater and Nguema jointly selected a real estate appraiser that on November 11, 2014, placed a fair market valuation of the Property of $32 million.

35.  Western World alleges on information and belief that the United States and Sweetwater and Nguema jointly selected UMRO as their licensed real estate agent for the liquidation sale of the Property in late-May 2015.

## VI.  THE PROPERTY SALE

36.  Western World alleges on information and belief that a Residential Listing Agreement was entered into between UMRO and Sweetwater that designated UMRO as the listing agent for the Property from April 18, 2015 through October 18, 2016 ("Listing Period") and provides the Listing Price of the Property shall be determined in accordance with the Settlement Agreement, and provides a 6% brokerage commission for the sale of the Property, that UMRO agrees to cooperate with all the terms set forth in the Settlement Agreement, that the Settlement Agreement provisions will prevail in the event of any conflict with the terms of the Listing Agreement, and that the sale of the Property shall be an all cash transaction at closing.

37.  Western World alleges on information and belief that on or around August 10, 2015, Sweetwater executed a Residential Purchase Agreement And Joint Escrow Instructions ("Purchase Agreement") that specified that the Buyer's purchase

9

WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND
RESCISSION OF INSURANCE POLICY          CASE NO. 2:18-cv-05594-GW (MRWx)

contingencies begin to run on the date the United States approves the Buyer as the purchaser of the Property.

38. Western World alleges on information and belief that UMRO and Umansky procured five (5) purchase offers from prospective buyers ranging in price from $32 million to $33.5 million.

39. Western World alleges on information and belief that on or about December 14, 2015, Sweetwater issued a Seller's Counter Offer to the prospective buyers to sell the Property for $33.5 million, and that the Seller's Counter Offer specified that the Buyer's purchase contingencies begin to run on the date the United States approves the Buyer as the purchaser of the Property.

40. Western World alleges on information and belief that prospective buyer Mauricio Oberfeld ("Oberfeld") was the first prospective buyer to accept the Seller's Counter Offer of $33.5 million, on or soon after December 14, 2015.

41. Western World alleges on information and belief that pursuant to the Settlement Agreement the United States had to approve Oberfeld as the Buyer, and the United States approved Oberfeld as the Buyer on February 8, 2016.

42. Western World alleges on information and belief that all of the Buyer's contingency periods pursuant to the Purchase Contract (August 10, 2015) and Seller's Counter Offer (December 14, 2015) began to run on February 8, 2016, which is the date of the United States' approval of Oberfeld as the Buyer, and the contingencies periods were set to expire on or about February 29, 2016, and close of escrow for the sale of the Property was to be on or before March 24, 2016.

43. Western World alleges on information and belief that on February 20, 2016, another prospective purchaser Sam Hakim ("Hakim") issued a letter of intent ("LOI") offering to pay to Oberfeld the sum of $8 million to purchase an assignment of Oberfeld's first-place buyer-position to purchase the Property, and Hakim sent the LOI to UMRO and Umansky.

///

10

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**      **CASE NO. 2:18-cv-05594-GW (MRWx)**

44. Western World alleges on information and belief that UMRO and Umansky responded by email on February 22, 2016, to Hakim's LOI, making a counteroffer on behalf of Oberfeld, demanding the assignment fee be increased from $8 million to a nonrefundable, binding $15 million amount, with UMRO and Umansky sharing a 4% brokerage fee for the $15 million assignment fee with Hakim's broker (Berkshire Hathaway/Aitan Segal).

45. Western World alleges on information and belief that UMRO and Umansky did not disclose to Sweetwater or the United States that Hakim was offering to pay $8 million to Oberfeld for an assignment of Oberfeld's right to purchase the Property from Sweetwater for $33.5 million, or that Oberfeld was demanding payment of $15 million from Hakim for an assignment of Oberfeld's right to purchase the Property from Sweetwater for $33.5 million.

46. Western World alleges on information and belief that the $8 million offer by Hakim to purchase an assignment of the right to purchase the Property for $33.5 million, and the $15 million counter-demand by Oberfeld to sell an assignment of the right to purchase the property for $33.5 million, was material evidence that the fair market value of the Property in February 2016 was more than $33.5 million, and that UMRO or Umansky had a fiduciary duty as the real estate broker for the Seller (Sweetwater) to disclose to Sweetwater the negotiations to sell an assignment of Oberfeld's right to purchase the Property for $33.5 million, which was evidence or potential evidence that the Property had a fair market value exceeding $33.5 million.

47. Western World alleges on information and belief that the Beverly Hills based residential real estate brokerage firm UMRO is one of the largest and most prestigious real estate brokerage firms in Los Angeles.

48. Western World alleges on information and belief that as co-founder of UMRO in 2011, Umansky has been recognized as having created a real estate agency (UMRO) which has grown to 18 offices worldwide employing 350 agents in more than $6 billion in annual sales since its inception.

11

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**        **CASE NO. 2:18-cv-05594-GW (MRWx)**

49. Western World alleges on information and belief that Umansky has routinely been recognized since 2012 as one of the most powerful and influential real estate brokers in Los Angeles, that Umansky has sold more homes in the USA priced over $20 million than any other real estate broker, and has handled some of the largest sales in Los Angeles, including the sale of the Playboy mansion in 2016 for $100 million which, at the time of sale, represented the greatest sale price of any residential property in Los Angeles history, and since 2012 Umansky has routinely been ranked as one of the top real estate agents in Los Angeles, and has been ranked by the *The Wall Street Journal* for the past seven consecutive years as being within the Top 10 real estate agents in the United States.

50. Western World alleges on information and belief that UMRO or Umansky were aware of their fiduciary duties as real estate broker to the Seller (Sweetwater) of the Property to disclose all information regarding the Property's fair market value in March 2016, including the negotiation between Oberfeld and Hakim to sell an assignment of Oberfeld's right to purchase the Property for $33.5 million to Hakim for a price between $8 million and $15 million, and that the negotiation between Oberfeld and Hakim in which UMRO and Umansky participated, was information that UMRO and Umansky had a fiduciary duty to disclose to Sweetwater.

51. Western World alleges on information and belief that as the deadline approached for the expiration of the Buyer's contingencies for performance of the purchase under the Purchase Agreement and Seller's Counter Offer, that on or about March 15, 2016, Oberfeld requested an extension of the Buyer's contingencies through March 21, 2016, and Sweetwater agreed to the extension, and Sweetwater's agreement to the extension was made without knowledge of the recent negotiation between Hakim and Oberfeld to sell an assignment for price between $8 million and $15 million of Oberfeld's right to purchase the Property for $33.5 million, and that the Seller (Sweetwater) did not have to extend the contingencies for Oberfeld's purchase of the Property for a price of $33.5 million that might be below fair market value.

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**      **CASE NO. 2:18-cv-05594-GW (MRWx)**

52. Western World alleges on information and belief that on or around March 18, 2016, Oberfeld requested a second extension of the Buyer's contingencies, and Sweetwater granted a second extension of the Buyer's contingencies through March 31, 2016.

53. Western World alleges on information and belief that Sweetwater agreed to the second extension without knowledge of the negotiation between Hakim and Oberfeld, or that the negotiation suggested a purchase price of $33.5 million for the Property was below its fair market value in March 2016.

54. Western World alleges on information and belief that when Sweetwater granted the two (2) extensions of the Buyer's contingencies to Oberfeld, that Sweetwater was ignorant of the negotiation between Oberfeld and Hakim to sell an assignment of Oberfeld's right to purchase the Property for $33.5 million to Hakim for a price from $8 million-$15 million, or that UMRO and Umansky participated in those negotiations, and did not disclose those negotiations to Sweetwater.

55. Western World alleges on information and belief that on March 31, 2016, that Oberfeld identified repair items at the Property in the sum of $1.3 million, and demanded a $1 million credit to make those repairs against the $33.5 million purchase price, effectively reducing the purchase price to $32.5 million, and Oberfeld asserted Oberfeld would waive all the Buyer's contingencies if the Seller (Sweetwater) granted his demand for a $1 million repair credit.

56. Western World alleges on information and belief that on April 7, 2016, UMRO and Umansky notified Sweetwater that Oberfeld would remove all contingencies to complete the purchase of the Property if Oberfeld received a $1 million repair credit.

57. Western World alleges on information and belief that Sweetwater was in a position to reject Oberfeld's request for a $1 million repair credit and demand that Oberfeld immediately pay the full $33.5 million purchase price for the Property, or that Sweetwater could cancel the Purchase Agreement with Oberfeld if Oberfeld did not

13

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**          CASE NO. 2:18-cv-05594-GW (MRWx)

waive the contingencies, and that Sweetwater could thereafter sell the Property to another Buyer including Hakim, for more than $33.5 million.

58. Western World alleges on information and belief that on April 15, 2016, that UMRO and Umansky recommended to Sweetwater and the United States that Sweetwater and the United States agree to the $1 million repair credit to conclude the sale to Oberfeld for a net price of $32.5 million.

59. Western World alleges on information and belief that at the time that Sweetwater agreed to extend the Buyer's time period for performing the Buyer's contingencies under the Purchase Agreement and Seller's Counter Offer, and at the time that UMRO and Umansky recommended to Sweetwater and the United States that Sweetwater and the United States agree to the $1 million repair credit to conclude the sale to Oberfeld for a net price of $32.5 million, that UMRO and Umansky had not disclosed and were concealing from Sweetwater and the United States that in the prior month (February 20-22, 2016), an $8 million offer had been made by Hakim to purchase an assignment from Oberfeld of Oberfeld's right to purchase the Property for $33.5 million, or that Oberfeld had counter-demanded a payment price of $15 million for an assignment, and that this undisclosed and concealed information was material to whether the property's fair market value exceeded $33.5 million in March 2016, which was material to whether Sweetwater should extend the Buyer's period of time to waive the Buyer's contingencies, or to whether Sweetwater should grant a $1 million repair credit to Oberfeld to conclude the sale of the Property for a net reduced price of $32.5 million.

60. Western World alleges on information and belief that the failure of UMRO and Umansky to disclose the negotiation between Oberfeld and Hakim to sell an assignment of Oberfeld's right to purchase the Property for $33.5 million to Hakim for a price from $8 million-$15 million was an obvious violation of fiduciary duties of disclosure owed by a real estate broker to Sweetwater as the seller of the Property.

///

<div align="center">14</div>

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**          **CASE NO. 2:18-cv-05594-GW (MRWx)**

61. Western World alleges on information and belief that Sweetwater and the United States, acting without knowledge of the negotiation between Oberfeld and Hakim to sell an assignment of Oberfeld's right to purchase the Property for $33.5 million to Hakim for a price from $8 million-$15 million, agreed to extend the Buyer's period of time to perform the Buyer's contingencies to purchase the Property, and acting upon the recommendation of UMRO and Umansky to grant the $1 million repair credit to Oberfeld, agreed to a $1 million repair credit to Oberfeld on May 11, 2016, thereby reducing the net sales price of the Property to $32.5 million.

62. Western World alleges on information and belief that on or before May 11, 2016, Oberfeld invited Umansky to participate as an investor in the purchase of the Property from Sweetwater, and to participate as an investor in the subsequent renovation and resale of the Property as an investment, and that Umansky agreed to become an investor in the purchase, renovation and resale of the Property.

63. Western World alleges on information and belief that UMRO and Umansky were aware that the real estate market was rapidly appreciating in value in mid-2016, that the November 2014 real estate appraisal of the Property at $33.5 million was outdated, that the undisclosed negotiation between Oberfeld and Hakim for the right to purchase the Property for $33.5 million, as well as other information regarding the real estate market, all provided information that the fair market value of the Property was more than $32.5 million, at the time that Sweetwater granted to Oberfeld two extensions of the buyer's contingencies, and at the time that UMRO and Umansky recommended to Sweetwater and the United States that a $1 million repair credit be granted to Oberfeld to conclude the sale of the Property for a net price of $32.5 million, and that none of this information was disclosed by UMRO or Umansky to Sweetwater or the United States, and the nondisclosure and concealment was an obvious violation of the fiduciary duties of disclosure owed by UMRO and Umansky to Sweetwater as the seller of the Property.

///

15

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**      **CASE NO. 2:18-cv-05594-GW (MRWx)**

64. Western World alleges on information and belief that Umansky did not notify the United States until June 13, 2016, or notify Sweetwater until June 16, 2016, that Umansky was an investor with Oberfeld in the purchase, renovation and resale of the Property.

65. Western World alleges on information and belief that at the time Umansky notified Sweetwater that Umansky was investing with Oberfeld in the purchase, renovation and resale of the Property, that it was too late for Sweetwater to withdraw from the sale of the Property to Oberfeld or reject Oberfeld's request for a $1 million repair credit, or reject Oberfeld's prior two (2) requests to extend the time period for the Buyer's contingencies, which would have enabled Sweetwater to ascertain the Property's full market value in mid-2016, or sell the Property to a different buyer for the Property's full market value, or compel Oberfeld to pay the original $33.5 million purchase price set forth in the Seller's Counter Offer, and that Umansky's participation with Oberfeld as a co-purchaser of the Property and co-investor in the renovation and resale of the Property, were all material facts showing the property had a greater fair market value than $32.5 million, whose nondisclosure was an obvious breach of fiduciary duties to Sweetwater.

## VII. THE RESALE OF THE PROPERTY

66. Western World alleges on information and belief, that less than one year later, that Oberfeld and other investors in the Property, including Umansky, subsequently resold the Property on or around April 1, 2017, for $69.9 million.

67. Western World alleges on information and belief, that in the resale of the Property, UMRO and Umansky were the listing agent.

## VIII. SWEETWATER CLAIM

68. On or about August 15, 2017, Sweetwater sent a written demand letter to UMRO and Umansky asserting a real estate brokers' professional liability claim against UMRO and Umansky for breach of fiduciary duties, breach of statutory duties, negligence and other claims arising from UMRO and Umansky actions as

16

WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND
RESCISSION OF INSURANCE POLICY            CASE NO. 2:18-cv-05594-GW (MRWx)

Sweetwater's real estate broker in the sale of the Property to Oberfeld including, but not limited to, a failure to fully disclose to Sweetwater the business relationship between UMRO and Umansky and Oberfeld in the sale of the Property and the resale of the Property, the financial benefits received by UMRO and Umansky, the conflict of interest of UMRO and Umansky, the recommendation to provide Oberfeld with a $1 million repair credit, the failure to disclose material information to Sweetwater regarding the value of the Property, the failure to disclose the negotiations between Oberfeld and Hakim regarding Hakim's $8 million offer to purchase an assignment of Oberfeld's purchase offer to Sweetwater and the United States to buy the Property for $33.5 million or Oberfeld's counterdemand for a $15 million assignment fee from Hakim, the profits derived by UMRO and Umansky from the investment with Oberfeld in renovating and reselling the Property, and other related claims ("Sweetwater Claim"). A copy of the Sweetwater demand letter and UMRO tender of defense to Western World is attached as **Exhibit D**.

69. Western World alleges on information and belief that the Sweetwater Claim alleges that UMRO and Umansky breached their real estate broker fiduciary duties to Sweetwater (or the United States or both) in failing to disclose the $8 million offer by backup purchaser Hakim to buy an assignment of Oberfeld's purchase offer for the Property, or Oberfeld's $15 million counterdemand to Hakim to sell the assignment of Oberfeld's purchase offer for the Property, that UMRO and Umansky failed to accurately establish or communicate to Sweetwater the fair market value of the Property prior to the completion of the sale to Oberfeld, and that these breaches of fiduciary duties of disclosure to Sweetwater as the Seller of the Property caused the Property to be sold for a lower purchase price than would have been realized if the foregoing was communicated to Sweetwater.

70. Western World alleges on information and belief that Sweetwater has demanded payment from UMRO and Umansky for their failure to disclose their business relationship with Oberfeld in the sale, renovation and resale of the Property,

17

the financial benefits received by UMRO and Umansky, the conflict of interest of UMRO and Umansky, the recommendation to provide a $1 million repair credit to Oberfeld, the failure to disclose material information regarding the fair market value of the Property, the failure to disclose the assignment negotiations between Oberfeld and Hakim, the failure to disclose Umansky's profits from investing with Oberfeld in renovating and reselling the Property.

### IX. UMRO PROPERTY SALES

71. Western World alleges on information and belief that in the 12 months predating UMRO's submission of the Application to Western World, that UMRO and Umansky was the Listing Agent for the $100 million sale in August 2016, of the Playboy Mansion at 10236 Charing Cross Road, Los Angeles, which UMRO and Umansky has advertised and promoted as the largest sales price for any residence in Los Angeles.

72. Western World alleges on information and belief that in the 12 months predating UMRO's submission of the Application to Western World, that UMRO was the Listing Agent for the $100 million sale in October 2016 of the Mansion at 301 North Carolwood Drive, Los Angeles, which UMRO has also advertised and promoted as the largest sales price for any residence in Los Angeles.

73. Western World alleges on information and belief that in the 12 months predating UMRO's submission of the Application to Western World, that UMRO was the Listing Agent for the Tom Cruise Mansion in Beverly Hills that sold in June 2016 for $38 million.

74. Western World alleges on information and belief that in the 12 months predating UMRO's submission of the Application to Western World, that UMRO was a real estate broker in the sale of other properties that sold for values exceeding the $30 million amount that UMRO misrepresented and concealed in the Application to Western World was the value of the largest transaction completed during the past 12 months including, but not limited to, UMRO's undisclosed resale of the Property in

18

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**      **CASE NO. 2:18-cv-05594-GW (MRWx)**

April 2017, for $69.9 million, which is part of the Sweetwater Claim against UMRO.

## X. INSURANCE CLAIM

75. September 27, 2017, UMRO and Umansky tendered the Sweetwater Claim to Western World for defense and indemnity under the Policy, and through the present, are demanding that Western World defend and settle the Sweetwater Claim for the policy's $3 million limit. A copy of the Sweetwater demand letter and UMRO tender of defense to Western World is attached as **Exhibit D**.

76. Western World is defending UMRO and Umansky in the Sweetwater Claim, through defense counsel selected by UMRO and Umansky, pursuant to a comprehensive reservation of rights to disclaim coverage for claims that are uninsured or not covered by the Policy.

## FIRST CAUSE OF ACTION

### (Rescission Of Policy – UMRO Property Sales)

77. Western World refers to paragraphs 1 through 28 and 71 through 74, inclusive, and by reference makes them a part hereof.

78. UMRO and Umansky submitted the Application to Western World for the Policy.

79. The questions asked by the Application were important and material to Western World in determining whether UMRO and Umansky were a risk that Western World was willing to undertake for the Policy at issue and what premium would be appropriate to charge for the coverage provided.

80. Western World is informed and believes, and on that basis, alleges, that UMRO and Umansky failed to disclose, misrepresented, or concealed material information in the Application, including but not limited to, the following questions:

(a) Question 2E: Value of the largest transaction completed during the past twelve months: Answer: "$30,000,000."

81. Western World is informed and believes that UMRO or Umansky failed to disclose, misrepresented, or concealed material information in the Application,

19

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**      **CASE NO. 2:18-cv-05594-GW (MRWx)**

including but not limited to, the question of the value of the largest transaction completed during the past 12 months (i.e., June 2016-2017), which UMRO and Umansky misrepresented as being a real estate transaction with a value of $30 million. Western World is presently without knowledge as to whether UMRO or Umansky may have also failed to disclose, misrepresented, or concealed other material information in the Application regarding its sales in the 12 months preceding the submission of the Application.

82.     Western World is informed and believes that UMRO or Umansky were the real estate broker within 12 months preceding the submission of the Application to Western World for the two (2) largest sales of residential property in Los Angeles history consisting of the $100 million sale of the Playboy Mansion at 10236 Charing Cross Road, Los Angeles, in August 2016,  and the $100 million sale of the Mansion at 301 North Carolwood Drive, Los Angeles, in October 2016, which UMRO has advertised and promoted as the two (2) largest sales prices in history for any residence in Los Angeles.

83.     Western World is informed and believes UMRO or Umansky were the real estate broker within 12 months preceding the submission of the Application to Western World for the sale of the Tom Cruise Mansion for $38 million.

84.     Western World is unaware of all the of real estate transactions involving UMRO or Umansky as real estate brokers, during the 12 months preceding UMRO's submission of the Application to Western World, that had a transaction value exceeding $30 million, but Western World is aware that in April 2017, only two months before UMRO submitted the Application to Western World, that UMRO and Umansky were the real estate broker listing agent for the resale of the Property by Oberfeld for a value of $69.9 million, because that sale is a part of the Sweetwater Claim.

85.     Although the total number of transactions completed by UMRO or Umansky in the 12 months preceding the submission of the Application to Western

20

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**          **CASE NO. 2:18-cv-05594-GW (MRWx)**

World that had a value exceeding $30 million is unknown to Western World, there is no question that UMRO or Umansky were involved in multiple transactions exceeding $30 million which UMRO misrepresented to Western World as being the value of the single largest transaction completed by UMRO during the previous 12 months.

86. Western World is informed and believes that UMRO or Umansky's responses to the questions in the Application were false or materially incomplete. With respect to the questions referenced in Paragraph 80 of this complaint, the response was false or materially incomplete in that the responses failed to disclose, misrepresent, or concealed the following information:

(a) Within the past twelve months of the Application's submission to Western World in June 2017, UMRO and Umansky completed the resale of the Property on behalf of Oberfeld for $69.9 million, that UMRO and Umansky sold the Playboy Mansion for $100 million, that UMRO sold the Holmby Hills Mansion for $100 million, that UMRO sold the Tom Cruise Mansion for $38 million, or that UMRO or Umansky sold other properties as yet unknown to Western World, all for values exceeding $30 million which UMRO and Umansky misrepresented to Western World in the Application was the largest single transaction made by UMRO or Umansky in the prior 12 months.

87. Western World is informed and believes that UMRO or Umansky knew that the responses provided to Western World in the Application, including the misrepresentation or concealment of the information in Paragraph 80 of this Complaint was incorrect or incomplete.

88. The key California Insurance Code Provisions that permit an Insurance Company to rescind the Policy where its policyholder, either intentionally or unintentionally, fails to disclose a material fact in its Application for the Policy, include but are not limited to, the following:

(i) Section 330. Concealment Defined. Neglect to communicate that which a party knows, and not to communicate, is concealment.

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY          CASE NO. 2:18-cv-05594-GW (MRWx)**

(ii) Section 331.  Effect of Concealment.  Concealment, whether intentional or unintentional, entitles the injured party to rescind the insurance.

(iii) Section 332.  Required Disclosure.  Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, in which the other has not the means of ascertaining.

(iv) Section 334.  Materiality.  Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries.

(v) Section 356.  Time of Reference.  The completion of the contract of insurance is the time to which a representation must be presumed to refer.

(vi) Section 358.  Falsity.  A representation is false when the facts fail to correspond with its assertions or stipulations.

(vii) Section 359.  Effect of Material False Representation.  If a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time the representation becomes false.

(viii) Section 360.  Materiality.  The materiality of the representation is determined by the same rule as the materiality of a concealment.

89.     UMRO or Umansky's misrepresentations and concealments in the Application are material to Western World's decision to issue the Policy because had Western World known that UMRO or Umansky's responses to the Application concealed facts and included misrepresentations, Western World would not have issued the Policy, or would have issued the Policy subject to materially different terms and conditions.

90.     Western World hereby notifies UMRO and Umansky, pursuant to California Insurance Code §1691, of Western World's intent to rescind the Policy, and

<div align="center">22</div>

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**          **CASE NO. 2:18-cv-05594-GW (MRWx)**

that Western World intends the service of the Summons and Complaint in this action to serve as formal notice of rescission of the Policy. Western World also hereby notifies UMRO that Western World hereby offers to restore to UMRO any insurance premiums paid for the Policy by UMRO, and that Western World intends this pleading to be deemed to constitute Western World's offer to repay to UMRO the Insurance premiums received by Western World for the Policy, subject to offset for sums paid by Western World to defend UMRO or Umansky (or any other insured under the Policy) against the claims asserted in the Sweetwater Claim, or any other claim that might be asserted against UMRO or any other insured in the future, according to proof, as will return the parties to a position *status quo ante*.

91.	Western World seeks an order rescinding the Policy issued to UMRO, based upon UMRO or Umansky's material misrepresentations in the Application submitted to Western World for the Policy, and for the parties to be returned to a position *status quo ante* through reimbursement to Western World from UMRO or Umansky of policy benefits paid on behalf of UMRO or Umansky, offset by the amounts paid by UMRO for insurance premium under the rescinded Policy, so that the Policy is null and void ab initio.

92.	Western World seeks an order rescinding the Policy because Western World has no other adequate remedy at law. Western World will suffer substantial harm and injury under the Policy if the Policy is not rescinded because Western World has expended, and will continue to expand, substantial sums in the defense of UMRO or Umansky, and may be found liable to indemnify UMRO or Umansky for a risk materially different from the risk disclosed to Western World or the risk that Western World bargained to cover, and all in an amount which exceeds the jurisdictional minimum.

///

///

///

23

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY	CASE NO. 2:18-cv-05594-GW (MRWx)**

## SECOND CAUSE OF ACTION

### (Rescission Of Policy – The Sweetwater Claim)

93.     Western World refers to paragraphs 1 through 70, 75 and 76, inclusive, and by reference makes them a part hereof.

94.     UMRO and Umansky submitted the Application to Western World for the Policy.

95.     The questions asked by the Application were important and material to Western World in determining whether UMRO and Umansky were a risk that Western World was willing to undertake for the Policy at issue and what premium would be appropriate to charge for the coverage provided.

96.     Western World is informed and believes, and on that basis, alleges, that UMRO and Umansky failed to disclose, misrepresented, or concealed material information in the Application, including but not limited to, the following questions:

(a)     Question F2: Is the Applicant (after proper inquiry of each director, officer or partner of the Applicant) aware of any circumstances, incidents, situation or accidents … that may result in a claim being made against: (a) Applicant; … or any past or present partners, directors, officers, or employees of the Applicant … ? Answer: "NO."

(b)     Question F4: Is the Applicant (or any director, officer, partner or employee of the Applicant, or any other proposed insured) aware of any actual or alleged deficiencies, errors or omissions in work performed by the Applicant or by others for whom the Applicant is legally responsible?  Answer: "NO.".

97.     Western World is informed and believes that UMRO or Umansky failed to disclose, misrepresented, or concealed material information in the Application, including but not limited to, the question of whether  the Applicant (after proper inquiry) was aware of any circumstances, incidents, situation or accidents that may result in a claim being made against Applicant and the question of (c) whether the Applicant or any director, officer, partner or employee was aware of any actual or

24

WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY          CASE NO. 2:18-cv-05594-GW (MRWx)

alleged deficiencies, errors or omissions in work performed by the Applicant.

98. Western World is informed and believes that at the time UMRO submitted the Application to Western World, that UMRO or Umansky were aware of the breaches of their fiduciary duties, and statutory duties, and acts of negligence toward Sweetwater in the sale of the Property as previously identified herein, and committed in the course of the sale of the Property to Oberfeld, and thereafter, and were aware that these breaches of their fiduciary duties, and statutory duties, and acts of negligence toward to Sweetwater could give rise to the Sweetwater Claim against UMRO or Umansky.

99. Western World alleges on information and belief that the breaches of fiduciary duties, breach of statutory duties, negligence and other claims arising from UMRO and Umansky actions as Sweetwater's real estate broker in the sale of the Property to Oberfeld are alleged by Sweetwater to include, but are not limited to, a failure to fully disclose to Sweetwater the business relationship between UMRO and Umansky and Oberfeld in the sale of the Property and the resale of the Property, the financial benefits to be received by UMRO and Umansky from the purchase and resale of the Property, the conflict of interest of UMRO and Umansky due to their business venture with Oberfeld in the purchase and resale of the Property, their recommendation to Sweetwater that Sweetwater provide Oberfeld with a $1 million repair credit at a time when undisclosed evidence suggested the fair market value of the Property was greater than $33.5 million or (after a $1 million repair credit) $32.5 million, the failure to disclose material information regarding the value of the Property, the failure to disclose the negotiations between Oberfeld and Hakim regarding Hakim's $8 million offer to purchase an assignment of Oberfeld's purchase offer to Sweetwater and the United States to buy the Property for $33.5 million or Oberfeld's counter-demand for a $15 million assignment fee from Hakim, the failure to provide the foregoing information to Oberfeld so that Oberfeld could consider whether to grant extensions of Buyer's contingencies to Oberfeld or cancel the sale to Oberfeld if Oberfeld did not

25

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**      **CASE NO. 2:18-cv-05594-GW (MRWx)**

timely perform for the full $33.5 million purchase price, or the profits derived by UMRO and Umansky from the investment with Oberfeld in renovating and reselling the Property, and other related claims ("Sweetwater Claim").

100. Western World is informed and believes that UMRO or Umansky's responses to the questions in the Application were false or materially incomplete. With respect to the questions referenced in Paragraph 96 of this complaint, the responses were false or materially incomplete in that the responses failed to disclose, misrepresent, or concealed the following information:

(a) UMRO and Umansky failed to fully disclose to Sweetwater the business relationship between UMRO and Umansky and Oberfeld in the sale of the Property and the resale of the Property, the financial benefits to be received by UMRO and Umansky from the purchase and resale of the Property, the conflict of interest of UMRO and Umansky due to their business venture with Oberfeld in the purchase and resale of the Property, their recommendation to Sweetwater that Sweetwater provide Oberfeld with a $1 million repair credit at a time when undisclosed evidence suggested the fair market value of the Property was greater than $33.5 million or (after a $1 million repair credit) $32.5 million, the failure to disclose material information regarding the value of the Property, the failure to disclose the negotiations between Oberfeld and Hakim regarding Hakim's $8 million offer to purchase an assignment of Oberfeld's purchase offer to Sweetwater and the United States to buy the Property for $33.5 million or Oberfeld's counter-demand for a $15 million assignment fee from Hakim, the failure to provide the foregoing information to Oberfeld so that Oberfeld could consider whether to grant extensions of Buyer's contingencies to Oberfeld or cancel the sale to Oberfeld if Oberfeld did not timely perform for the full $33.5 million purchase price, or the profits derived by UMRO and Umansky from the investment with Oberfeld in renovating and reselling the Property, and other related claims ("Sweetwater Claim").

///

26

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY** CASE NO. 2:18-cv-05594-GW (MRWx)

101. Western World alleges on information and belief that UMRO and Umansky were aware, or should have been aware, that the failure to disclose the preceding information to Sweetwater was an actual or alleged breach of UMRO and Umansky's real estate brokers' fiduciary duties to Sweetwater that may result in a claim being made against UMRO or Umansky.

102. Western World alleges on information and belief that UMRO and Umansky were aware, or should have been aware, that the failure to disclose the preceding information to Sweetwater constituted actual or alleged deficiencies, errors or omissions in work performed by UMRO or Umansky to Sweetwater in the sale of the Property to Oberfeld.

103. Western World is informed and believes that UMRO or Umansky knew that the responses provided to Western World in the Application, including the misrepresentation or concealment of the information in the preceding paragraphs was incorrect or incomplete.

104. The key California Insurance Code Provisions that permit an Insurance Company to rescind the Policy where its policyholder, either intentionally or unintentionally, fails to disclose a material fact in its Application for the Policy, include but are not limited to, the following:

(i) Section 330. Concealment Defined. Neglect to communicate that which a party knows, and not to communicate, is concealment.

(ii) Section 331. Effect of Concealment. Concealment, whether intentional or unintentional, entitles the injured party to rescind the insurance.

(iii) Section 332. Required Disclosure. Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, in which the other has not the means of ascertaining.

(iv) Section 334. Materiality. Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party

27

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**      **CASE NO. 2:18-cv-05594-GW (MRWx)**

to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries.

(v) Section 356. Time of Reference. The completion of the contract of insurance is the time to which a representation must be presumed to refer.

(vi) Section 358. Falsity. A representation is false when the facts fail to correspond with its assertions or stipulations.

(vii) Section 359. Effect of Material False Representation. If a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time the representation becomes false.

(viii) Section 360. Materiality. The materiality of the representation is determined by the same rule as the materiality of a concealment.

105. UMRO or Umansky's failure to disclose the preceding information in the Application to Western World concealed from Western World that UMRO or Umansky had significant liability to Sweetwater for breaches of real estate brokers' fiduciary duties, statutory duties and negligence toward the seller of the Property, including exposure to actual damages, penalties, punitive damages, litigation costs and attorneys' fees.

106. UMRO or Umansky's misrepresentations and concealments in the Application are material to Western World's decision to issue the Policy because had Western World known that UMRO or Umansky's responses to the Application concealed facts and included misrepresentations, including UMRO or Umansky's exposure to significant civil liability, Western World would not have issued the Policy, or would have issued the Policy subject to materially different terms and conditions including, but not limited to, issuing the Policy with an endorsement deleting coverage for liabilities arising from the sale of the Property to Oberfeld, or the resale of the Property by Oberfeld.

///

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**      **CASE NO. 2:18-cv-05594-GW (MRWx)**

107.   Western World hereby notifies UMRO and Umansky, pursuant to California Insurance Code §1691, of Western World's intent to rescind the Policy, and that Western World intends the service of the Summons and Complaint in this action to serve as formal notice of rescission of the Policy.  Western World also hereby notifies UMRO that Western World hereby offers to restore to UMRO any insurance premiums paid for the Policy by UMRO, and that Western World intends this pleading to be deemed to constitute Western World's offer to repay to UMRO the Insurance premiums received by Western World for the Policy, subject to offset for sums paid by Western World to defend UMRO or Umansky (or any other insured under the Policy) against the claims asserted in the Sweetwater Claim, or any other claim that might be asserted against UMRO or any other insured in the future, according to proof, as will return the parties to a position *status quo ante*.

108.   Western World seeks an order rescinding the Policy issued to UMRO, based upon UMRO or Umansky's material misrepresentations in the Application submitted to Western World for the Policy, and for the parties to be returned to a position *status quo ante* through reimbursement to Western World from UMRO or Umansky of policy benefits paid on behalf of UMRO or Umansky, offset by the amounts paid by UMRO for insurance premium under the rescinded Policy, so that the Policy is null and void ab initio.

109.   Western World seeks an order rescinding the Policy because Western World has no other adequate remedy at law.  Western World will suffer substantial harm and injury under the Policy if the Policy is not rescinded because Western World has expended, and will continue to expand, substantial sums in the defense of UMRO or Umansky, and may be found liable to indemnify UMRO or Umansky for a risk materially different from the risk disclosed to Western World or the risk that Western World bargained to cover, and all in an amount which exceeds the jurisdictional minimum.

///

29

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY            CASE NO. 2:18-cv-05594-GW (MRWx)**

## THIRD CAUSE OF ACTION

### (Declaratory Judgment – Duty to Defend)

110. Western World refers to Paragraphs 1 through 70, 75 and 76, and 93 through 109, inclusive, and by reference makes them a part hereof.

111. There is at present a controversy between Western World and UMRO or Umansky in that Western World contends that there is no coverage under the Policy for the claims asserted by Sweetwater, and therefore no duty to defend UMRO or Umansky. Western World is informed and believes and thereon alleges that UMRO or Umansky contends otherwise.

112. Western World requests that this Court declare that there is no potential for coverage and, therefore, no duty to defend UMRO or Umansky under the Policy with respect to the Sweetwater Claim for the reasons set forth below.

113. Western World is informed and believes that the Sweetwater Claim against UMRO or Umansky includes claims seeking recovery for actions by UMRO or Umansky that do not constitute under the Policy's Insuring Clause a "wrongful act" which is defined as an "actual or alleged negligent act or error or omission in the rendering of real estate brokers' professional services," or, in the alternative, constitute or are alleged to constitute the "wrongful act" or "circumstance" that was likely to give rise to the Sweetwater Claim, and was within the knowledge of UMRO or Umansky, prior to the effective date of the Policy on August 2, 2017. See; **Exhibit B**, Errors And Omissions Insurance Coverage Form, Section I-Insuring Agreements, Errors and Omissions Liability; and, Section II- Definitions.

114. Accordingly, Western World requests that this Court declare there is no coverage under the Policy for the Sweetwater Claim that does not seek recovery from UMRO or Umansky for an actual or alleged negligent act or error or omission in the rendering of real estate brokers' professional services, and therefore that Western World has no duty to defend UMRO or Umansky for such uninsured claims.

///

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**          CASE NO. 2:18-cv-05594-GW (MRWx)

115. Accordingly, Western World requests that this Court declare there is no coverage under the Policy for the Sweetwater Claim that arises from an alleged "wrongful act" or "circumstance" that was likely to give rise to the Sweetwater Claim, and was within the knowledge of UMRO or Umansky, prior to the effective date of the Policy on August 2, 2017.

116. Western World is informed and believes that the Sweetwater Claim against UMRO or Umansky includes claims seeking recovery that or excluded from coverage by the Policy's exclusions including, but not limited to, those exclusions set forth below in this paragraph, which state that the Policy's "insurance does not apply to any "loss", in connection with, arising out of, or in any way involving the following:

**4.** **Contractual Liability:** Liability under any contract or agreement, except liability that would exist even in the absence of the contract or agreement.

**7.** **Prior Knowledge:** "Wrongful act" or circumstance that an "insured": (a) Had knowledge of prior to the effective date of the policy; and (b) Had a reasonable belief could result in a claim.

**22.** **Fee and Other Compensation Disputes:** Return of fees, commissions, premiums or other compensation charged by the "insured".

**28.** **Illegal Profit:** The gaining in fact of any profit or advantage to which the "insured" is not legally entitled.

**Real Estate Agent, Broker And Related Services Endorsement**

**I.** Sums received by any "insured" or credited to any "insured's" account;

117. Western World is informed and believes that the Sweetwater Claim against UMRO or Umansky are excluded by the Policy's "Prior Knowledge" Exclusion because prior to the inception of the Policy on August 2, 2017, UMRO or Umansky knew that UMRO or Umansky had knowledge that the failure to disclose the

31

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**      **CASE NO. 2:18-cv-05594-GW (MRWx)**

negotiation between Oberfeld and Hakim for the sale of an assignment of Oberfeld's acceptance of Sweetwater's $33.5 million offer to sell the Property, with an assignment price between $8 million to $15 million, was a breach of fiduciary duties to Sweetwater, and UMRO or Umansky had a reasonable belief there breach of fiduciary duties to Sweetwater could result in a claim by Sweetwater against UMRO or Umansky for those breach of fiduciary duties.

118. Western World is informed and believes that the Sweetwater Claim against UMRO or Umansky are excluded by the Policy's "Prior Knowledge" Exclusion because prior to the inception of the Policy on August 2, 2017, UMRO or Umansky knew that UMRO or Umansky had knowledge that the failure to disclose Umansky's business relationship with Oberfeld including, but not limited to, the purchase of the Property and the subsequent renovation and resale of the Property, was a breach of fiduciary duties to Sweetwater, and UMRO or Umansky had a reasonable belief there breach of fiduciary duties to Sweetwater could result in a claim by Sweetwater against UMRO or Umansky for those breach of fiduciary duties.

119. Western World is informed and believes that the Sweetwater Claim against UMRO or Umansky are excluded by the Policy's "Prior Knowledge" Exclusion because prior to the inception of the Policy on August 2, 2017, UMRO or Umansky knew that UMRO or Umansky had knowledge that the fair market value of the Property exceeded the $33.5 million purchase price that Oberfeld initially agreed to pay by accepting the Seller's Counter Offer, and that this information was not disclosed to Sweetwater by UMRO or Umansky at the time UMRO or Umansky recommended to Sweetwater that the Seller's Counter Offer be made, and was not disclosed when Oberfeld subsequently requested to extensions on the Buyer's contingencies, and was not disclosed when Oberfeld demanded a $1 million repair credit, that reduced the net sale price of the Property to $32.5 million, which was even further below the Property's fair market value at that time, and that UMRO or Umansky's failure to disclose these facts to Sweetwater at each of the foregoing stages of the sale

32

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**          **CASE NO. 2:18-cv-05594-GW (MRWx)**

transaction, was a breach of fiduciary duties to Sweetwater, and UMRO or Umansky had a reasonable belief there breach of fiduciary duties to Sweetwater could result in a claim by Sweetwater against UMRO or Umansky for those breach of fiduciary duties.

120. Accordingly, Western World requests that this Court declare in connection with the Prior Knowledge Exclusion that there is no coverage under the Policy for the Sweetwater Claim, and that Western World therefore has no duty to defend UMRO or Umansky against the Sweetwater Claim.

121. Western World is informed and believes that the Sweetwater Claim seeks recovery from UMRO or Umansky of fees, commissions, compensation, profits, and other sums paid to or received by UMRO or Umansky in connection with the sale of the Property to Oberfeld, or the resale of the Property by Oberfeld, which are claims for monetary relief excluded from coverage by the Contractual Liability Exclusion, Fee And Other Compensation Disputes Exclusion, Illegal Profit Exclusion, and Sums Received By Any Insured For Credited To Any Insured's Account Exclusion.

122. Accordingly, Western World requests that this Court declare in connection with the Contractual Liability Exclusion, Fee And Other Compensation Disputes Exclusion, Illegal Profit Exclusion, and Sums Received By Any Insured For Credited To Any Insured's Account Exclusion, that there is no coverage under the Policy for the Sweetwater Claim that seeks recovery for these excluded monetary relief claims.

123. The Policy's Errors And Omissions Insurance Coverage Form EO01 (10/16) states under Section V- Conditions, ¶ B, General Conditions, subpart 7, "Application," that UMRO and Umansky agreed by accepting the Policy that the statements in the "application" are true representations and that this Policy is issued in reliance upon the truth of such representations, and in the event the "application," including material submitted a required to be submitted, contains any misrepresentation or omission made with the intent to deceive or which materially affects either the acceptance of the risk or hazard assumed by Western World under the

33

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**      **CASE NO. 2:18-cv-05594-GW (MRWx)**

Policy, the Policy will be *void ab initio* as to any "insured" who knew the facts misrepresented or the omissions, whether or not such person knew of the "application" or this Policy.  For purposes of this clause, only the knowledge of your Chief Executive Officer (Umansky) will be imputed to all "insureds" who are natural persons, and the knowledge of any "insured" including CEO Umansky, may be imputed to the named insured UMRO.

124.   Western World is informed and believes that the Application" submitted to Western World for the Policy by UMRO contains misrepresentations or omissions which materially affects either the acceptance of the risk or hazard assumed by Western World under the Policy, and that under the Policy's General Conditions, the Policy is *void ab initio* as to UMRO because UMRO knew the misrepresented facts or omissions, and as to Umansky because Umansky knew the misrepresented facts or omissions, and as to any other "insureds" who are natural persons because Umansky is the CEO and his knowledge is imputed to any other "insureds" who are natural persons, and is also imputed to the named insured UMRO.

## **FOURTH CAUSE OF ACTION**

### **(Declaratory Judgment – Duty to Indemnify)**

125.   Western World refers to paragraphs 1 through 70, 75 and 76, and 93 through 124, inclusive, and by reference makes them a part hereof.

126.   There is at present a controversy between Western World and UMRO or Umansky in that Western World contends that there is no coverage under the Policy for the claims asserted by Sweetwater, and therefore no duty to indemnify UMRO or Umansky.  Western World is informed and believes and thereon alleges that UMRO or Umansky contends otherwise.

127.   Western World requests that this Court declare that there is no potential for coverage and, therefore, no duty to indemnify UMRO or Umansky under the Policy with respect to the Sweetwater Claim for the reasons set forth in Paragraphs No. 1-70, 75, 76, and 93 through 124, as set forth herein.

34

**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**          **CASE NO. 2:18-cv-05594-GW (MRWx)**

128. Accordingly, Western World requests that this Court declare that there is no coverage under the Policy for the Sweetwater Claim, and that Western World therefore has no duty to indemnify UMRO or Umansky against the Sweetwater Claim.

### FIFTH CAUSE OF ACTION

### Reimbursement Against UMRO or Umansky

129. Western World refers to paragraphs 1 through 128, inclusive, and by reference makes them a part hereof.

130. Western World contends that it is entitled to reimbursement from UMRO or Umansky for all sums paid to defend or indemnify UMRO or Umansky against the Sweetwater Claim because Western World has had no duty to defend or indemnify UMRO or Umansky against the Sweetwater Claim, and/or because the Policy is subject to rescission.

131. Western World is defending UMRO and Umansky against the Sweetwater Claim, and has incurred and continues to incur attorneys' fees and costs on behalf of UMRO or Umansky. Western World is providing the defense for UMRO or Umansky under a reservation of rights, including the right to seek reimbursement from UMRO or Umansky of attorneys' fees, or indemnity payments for settlement or satisfaction of judgment against them, and costs and litigation expenses paid by Western World to defend uninsured or uncovered claims, or payment of settlement or satisfaction of judgment paid by Western World to indemnify uninsured or uncovered claims, are recoverable from UMRO or Umansky, pursuant to *Buss v. Superior Court,* 16 Cal.4th 35 (1997), and *Scottsdale Ins. Co. v. MV Transportation,* 36 Cal.4th 643 (2005).

132. As a further alternative, Western World is entitled to reimbursement from UMRO or Umansky for all sums it has paid for defense and indemnity as to any and all claims arising under the Policy because the Policy is subject to rescission and *void ab inito* because of UMRO's or Umansky's failure to disclose, misrepresentation, or concealment of material information in the Application regarding its sales in the 12 months preceding the submission of the Application as set forth in paragraphs 1

35

WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY          CASE NO. 2:18-cv-05594-GW (MRWx)

through 28, 71 through 74, and 77 through 92 of this complaint, and the parties are therefore entitled to be returned to *status quo ante*.

133. As a further alternative, Western World is entitled to reimbursement from UMRO or Umansky for all sums it has paid for defense and indemnity as to any and all claims arising under the Policy because the Policy is subject to rescission and *void ab inito* because of UMRO's or Umansky's failure to disclose, misrepresentation, or concealment of material information in the Application regarding the Sweetwater Claim as set forth in paragraphs 1 through 70, 75, 76, and 93 through 109 of this complaint, and the parties are therefore entitled to be returned to *status quo ante*.

## PRAYER

WHEREFORE, Plaintiff Western World Insurance Company prays for judgment against UMRO or Umansky as follows:

1. For entry of judgment rescinding the Policy and returning the parties to a position *status quo ante*, through UMRO or Umansky's reimbursement to Western World of all policy benefits paid on behalf of UMRO or Umansky or any other "insured" under the Policy, offset by the amounts paid by UMRO four insurance premiums for the rescinded Policy, according to proof;

2. For a judicial declaration by the Court that Western World has no duty to defend UMRO or Umansky in the Sweetwater Claim under the Policy;

3. For a judicial declaration by the Court that Western World has no duty to indemnify UMRO or Umansky in the Sweetwater Claim under the Policy;

4. For entry of judgment against UMRO or Umansky requiring UMRO or Umansky to reimburse Western World for all sums paid by Western World to investigate and defend and indemnify UMRO or Umansky against the Sweetwater Claim, or in the alternative, to reimburse Western World for all sums paid to investigate and defend against uninsured claims, according to proof, or in the further alternative, to reimburse Western World all sums expended under the Policy less insurance premium paid, pursuant to a Judgment of Rescission.

36

5.      For such other and further relief as the court deems just and proper.

Dated:  September 17, 2018          SELVIN WRAITH HALMAN LLP


                                    By:     /s/ *James L. Wraith*
                                    James L. Wraith
                                    John A. Chatowski
                                    Attorneys for Plaintiff
                                    WESTERN WORLD INSURANCE
                                    COMPANY

268169.doc

37
**WESTERN WORLD'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY          CASE NO. 2:18-cv-05594-GW (MRWx)**

| Re: | **Western World Insurance Company v. UMRO Realty Corporation, et al.** |
|---|---|
| **Court:** | **United States District Court, Central District of California - Western Division** |
| **Action No.** | **2:18-cv-05594-GW (MRWx)** |

## PROOF OF SERVICE

I declare that I am over the age of 18, am not a party to the above-entitled action, and am an employee of Selvin Wraith Halman LLP whose business address is 505 14th Street, Suite 1200, Oakland, Alameda County, California 94612.

On September 17, 2018, I served the following document(s):

**WESTERN WORLD INSURANCE COMPANY'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RESCISSION OF INSURANCE POLICY**

**By ELECTRONIC FILE TRANSFER TO ECF FILE & SERVE:** By transmitting a true copy the document(s) listed above for service on all parties in this case pursuant to applicable statutes, local rules and/or order of this Court.

Ms. Andrea S. Warren
Barnes & Thornburg LLP
11 S. Meridian Street
Indianapolis, Indiana 46204

Attorneys for Defendants:
UMRO REALTY CORPORATION
and MAURICIO UMANSKY

Telephone No.: (317) 236-1313
Fax No.: (317) 231-7433
Email: andrea.warren@btlaw.com

Mr. David P. Schack
Barnes & Thornburg LLP
2029 Century Park East Suite 300
Los Angeles, CA 90067

Attorneys for Defendants:
UMRO REALTY CORPORATION
and MAURICIO UMANSKY

Telephone No.: (310) 284-3880
Fax No.: (310) 284-3894
Email: david.schack@btlaw.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: September 17, 2018

/s/ Kristen Garcia
Kristen Garcia

1

Case No.: 2:18-cv-05594-GW (MRWx)

# Exhibit 9

## Will French

| | |
|---|---|
| **From:** | Will French |
| **Sent:** | Friday, June 26, 2026 5:01 PM |
| **To:** | 'Kristin Regan' |
| **Cc:** | Bill Balachowski; Morgan Meyer; Peter Stasiewicz; Constance Grieves; Brigid Carmichael |
| **Subject:** | RE: PLS v. NAR - UMRO Subpoena Response |

Hi Kristin,

Just checking in to confirm that you'll be sending a written response today.

Thank you,

Will

Will French
Associate
Massey & Gail LLP
Office: 312-981-0314
Cell: 414-426-9097

*This email may contain privileged or confidential information.*

**From:** Kristin Regan <kregan@theagencyre.com>
**Sent:** Friday, June 19, 2026 12:13 PM
**To:** Will French <wfrench@masseygail.com>
**Cc:** Bill Balachowski <BBalachowski@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>; Peter Stasiewicz <pstasiewicz@masseygail.com>; Constance Grieves <cgrieves@masseygail.com>; Brigid Carmichael <bcarmichael@masseygail.com>
**Subject:** Re: PLS v. NAR - UMRO Subpoena Response

**[EXTERNAL EMAIL]**

Hi Will,

I am preparing a written response for you which will be sent next week.

Kristin

THE**AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

On Tue, Jun 16, 2026 at 11:08 AM Will French <wfrench@masseygail.com> wrote:

Thank you, Kristin. Can we please schedule a call for next Monday following your update? I'll throw out 11:00 PT, but we have flexibility.

Also, do you anticipate producing documents responsive to proposed search terms 8, 9, and 10 below? Those terms correspond to document request number 7. ("All Documents and communications relating to the Umansky Fraud Litigations.") If you anticipate that UMRO will stand on its objection and refuse to produce such documents, we can prepare a narrow joint stipulation accordingly.

Thank you,

Will

Will French

Associate

Massey & Gail LLP

Office: 312-981-0314

Cell: 414-426-9097

*This email may contain privileged or confidential information.*

**From:** Kristin Regan <kregan@theagencyre.com>
**Sent:** Monday, June 15, 2026 4:23 PM
**To:** Will French <wfrench@masseygail.com>
**Cc:** Bill Balachowski <BBalachowski@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>; Peter Stasiewicz <pstasiewicz@masseygail.com>; Constance Grieves <cgrieves@masseygail.com>; Brigid Carmichael <bcarmichael@masseygail.com>
**Subject:** Re: PLS v. NAR - UMRO Subpoena Response

2

[EXTERNAL EMAIL]

Hi Will,

I am still waiting to hear back from staff regarding some of the documents. I will have an update by the end of the week.

Kristin

THE **AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

On Mon, Jun 15, 2026 at 1:24 PM Will French <wfrench@masseygail.com> wrote:

Hi Kristin,

I just left you another voicemail asking for an update on the issues raised in my June 3 email.

We're in the process of preparing a joint stipulation pursuant to the Local Rules, which we plan to send to you for your review shortly. We would of course prefer to resolve these issues without court intervention and remain willing to work with you to reach a mutually agreeable solution. To that end, please let us know if a call would be helpful.

Thank you,

3

Will

Will French

Associate

Massey & Gail LLP

Office: 312-981-0314

Cell: 414-426-9097

*This email may contain privileged or confidential information.*

**From:** Will French
**Sent:** Friday, June 12, 2026 5:36 PM
**To:** 'Kristin Regan' <kregan@theagencyre.com>
**Cc:** Bill Balachowski <BBalachowski@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>; Peter Stasiewicz <pstasiewicz@masseygail.com>; Constance Grieves <cgrieves@masseygail.com>; Brigid Carmichael <bcarmichael@masseygail.com>
**Subject:** RE: PLS v. NAR - UMRO Subpoena Response

Hi Kristin,

By next Monday, June 15, please let us know your positions on the issues raised in my June 3 email. If we do not hear from you, we will be forced to seek relief from the Court.

Thank you,

Will

Will French

4

Associate

Massey & Gail LLP

Office: 312-981-0314

Cell: 414-426-9097

*This email may contain privileged or confidential information.*

---

**From:** Will French
**Sent:** Tuesday, June 9, 2026 11:22 PM
**To:** Kristin Regan <kregan@theagencyre.com>
**Cc:** Bill Balachowski <BBalachowski@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>; Peter Stasiewicz <pstasiewicz@masseygail.com>; Constance Grieves <cgrieves@masseygail.com>
**Subject:** RE: PLS v. NAR - UMRO Subpoena Response

Hi Kristin,

Just following up on the below.

Thank you,

Will

Will French

Associate

Massey & Gail LLP

Office: 312-981-0314

Cell: 414-426-9097

*This email may contain privileged or confidential information.*

---

**From:** Will French
**Sent:** Wednesday, June 3, 2026 6:03 PM
**To:** 'Kristin Regan' <kregan@theagencyre.com>
**Cc:** Bill Balachowski <BBalachowski@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>; Peter Stasiewicz <pstasiewicz@masseygail.com>; Constance Grieves <cgrieves@masseygail.com>
**Subject:** RE: PLS v. NAR - UMRO Subpoena Response

Hi Kristin,

Hope you're doing well. Below, please see our proposed search terms for certain of NAR's requests to UMRO, with a date range of January 1, 2017, to the present:

1.  "PLS" or "pocket listing service"
2.  "pocket" w/2 "listing"
3.  PLS OR "PLS.com" OR "ThePLS.com" OR "pocket listing service*" OR "Private Listing service*"
4.  "Clear Cooperation" OR "cooperation policy" OR CCP
5.  (MLS* OR "multiple listing") AND ("private listing network" OR "private network" OR PLN OR (private* w/4 network))
6.  (benefit* OR advantag* OR value*) w/10 ((non-member* OR nonmember* OR "without membership" OR member*) w/10 (MLS* OR "multiple listing"))
7.  nation* w/10 database w/10 listing*
8.  3620 OR Sweetwater
9.  Nguema OR Oberfeld OR Hakim
10. "Western World"

That we are not currently sending search terms for each of NAR's requests should not be treated as a waiver of NAR's ability to send such search terms in the future. We send these terms now for the sake of efficiency. We reserve our right to send additional search terms, including about NAR's other requests, in the future.

Please let us know as soon as possible whether these search terms are agreeable to you. We propose a call on Friday, June 12, to discuss your progress reviewing the search terms and the universe of responsive documents.

In addition, please let us know by Monday, June 8, if UMRO continues to maintain that it will not produce documents related to the alleged fraud involving Mr. Umansky. Those include the documents responsive to request no. 7; as discussed, we have suggested search terms for that request. (See items 8-10, above.) Based on our prior meet-and-confer, we understand that UMRO likewise refuses to produce documents responsive to requests nos. 6 and 9. Please let us know by June 8 if UMRO continues to maintain that position as well.

Thank you,

Will

Will French

Associate

Massey & Gail LLP

Office: 312-981-0314

Cell: 414-426-9097

*This email may contain privileged or confidential information.*

---

**From:** Will French
**Sent:** Wednesday, May 27, 2026 6:42 PM
**To:** 'Kristin Regan' <kregan@theagencyre.com>; Constance Grieves <cgrieves@masseygail.com>
**Cc:** Bill Balachowski <BBalachowski@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>; Peter Stasiewicz <pstasiewicz@masseygail.com>
**Subject:** RE: PLS v. NAR - UMRO Subpoena Response

Hi Kristin,

Thank you for the call today. As discussed, we will send you proposed search terms with the understanding that both parties have reserved their rights for each of the document requests.

Best,

Will

Will French

Associate

Massey & Gail LLP

Office: 312-981-0314

Cell: 414-426-9097

*This email may contain privileged or confidential information.*

**From:** Kristin Regan <kregan@theagencyre.com>
**Sent:** Thursday, May 21, 2026 5:57 PM
**To:** Constance Grieves <cgrieves@masseygail.com>
**Cc:** Bill Balachowski <BBalachowski@masseygail.com>; Will French <wfrench@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>; Peter Stasiewicz <pstasiewicz@masseygail.com>
**Subject:** Re: PLS v. NAR - UMRO Subpoena Response

**[EXTERNAL EMAIL]**

Hi Constance,

How is 3:00 on Wednesday, May 27?

THE **AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

On Wed, May 20, 2026 at 3:42 PM Kristin Regan <kregan@theagencyre.com> wrote:

I am waiting to hear back on the timing of a conference call on Tuesday. I will let you know.

THE **AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

On Wed, May 20, 2026 at 1:39 PM Constance Grieves <cgrieves@masseygail.com> wrote:

Sure. I can meet any time between 10 am and 3 pm CT.

Constance Grieves

Partner

Massey & Gail LLP

50 E. Washington St., Suite 400, Chicago, IL 60602

P: 312-809-0183 | M: 615-473-3131

cgrieves@masseygail.com

(*she/her/hers*)

9

Check out www.masseygail.com

*This e-mail may contain privileged & confidential information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.*

---

**From:** Kristin Regan <kregan@theagencyre.com>
**Sent:** Wednesday, May 20, 2026 3:36 PM
**To:** Constance Grieves <cgrieves@masseygail.com>
**Cc:** Bill Balachowski <BBalachowski@masseygail.com>; Will French <wfrench@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>; Peter Stasiewicz <pstasiewicz@masseygail.com>
**Subject:** Re: PLS v. NAR - UMRO Subpoena Response

**[EXTERNAL EMAIL]**

Hi Constance,

I am not. Are you available on Tuesday?

THE**AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

On Wed, May 20, 2026 at 6:56 AM Constance Grieves <cgrieves@masseygail.com> wrote:

Circling back here, Kristin. Are you available today or Friday before 2 pm CT?

Constance Grieves

Partner

Massey & Gail LLP

10

50 E. Washington St., Suite 400, Chicago, IL 60602

P: 312-809-0183 | M: 615-473-3131

cgrieves@masseygail.com

(*she/her/hers*)

Check out www.masseygail.com

*This e-mail may contain privileged & confidential information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.*

---

**From:** Constance Grieves
**Sent:** Monday, May 18, 2026 6:57 PM
**To:** Kristin Regan <kregan@theagencyre.com>
**Cc:** Bill Balachowski <BBalachowski@masseygail.com>; Will French <wfrench@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>; Peter Stasiewicz <pstasiewicz@masseygail.com>
**Subject:** Re: PLS v. NAR - UMRO Subpoena Response

Thanks, Kristin. I'm tied up all day Thursday. I could do any time Wednesday or Friday before 2pm CT.

Constance Grieves

Partner

Massey & Gail LLP

50 E. Washington St., Suite 400, Chicago, IL 60602

cgrieves@masseygail.com

M: 615-473-3131

*This e-mail may contain privileged and confidential information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.*

On May 18, 2026, at 6:42 PM, Kristin Regan <kregan@theagencyre.com> wrote:

**[EXTERNAL EMAIL]**

Hi Constance,

I am working through your responses. How about we set up a call for Thursday afternoon to discuss?

Kristin

THE**AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

On Mon, May 18, 2026 at 1:35 PM Constance Grieves <cgrieves@masseygail.com> wrote:

Kristin,

Following up on a voicemail I left you this morning—I need to know whether/when you will meet and confer. We are far beyond the 10 days allowed for in L.R. 37-1. Please promptly let me know when you are available to meet. Otherwise I will start preparing a declaration in accordance with L.R. 37-2.4 and seek relief from the Court.

Thanks,

Constance Grieves

Partner

Massey & Gail LLP

50 E. Washington St., Suite 400, Chicago, IL 60602

P: 312-809-0183 | M: 615-473-3131

cgrieves@masseygail.com

(*she/her/hers*)

Check out www.masseygail.com

*This e-mail may contain privileged & confidential information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.*

**From:** Kristin Regan <kregan@theagencyre.com>
**Sent:** Tuesday, May 5, 2026 4:58 PM
**To:** Constance Grieves <cgrieves@masseygail.com>
**Cc:** Bill Balachowski <BBalachowski@masseygail.com>; Will French <wfrench@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>; Peter Stasiewicz <pstasiewicz@masseygail.com>
**Subject:** Re: PLS v. NAR - UMRO Subpoena Response

**[EXTERNAL EMAIL]**

Hi Constance,

I will review and get back to you with a few dates.

Kristin

**THE AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

13

On Mon, May 4, 2026 at 11:54 AM Constance Grieves <cgrieves@masseygail.com> wrote:

Hi Kristin,

Checking in on this.

Thanks,

Constance Grieves

Partner

Massey & Gail LLP

50 E. Washington St., Suite 400, Chicago, IL 60602

P: 312-809-0183 | M: 615-473-3131

cgrieves@masseygail.com

(*she/her/hers*)

**Check out** www.masseygail.com

*This e-mail may contain privileged & confidential information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.*

**From:** Kristin Regan <kregan@theagencyre.com>
**Sent:** Monday, April 27, 2026 12:58 PM
**To:** Constance Grieves <cgrieves@masseygail.com>
**Cc:** Bill Balachowski <BBalachowski@masseygail.com>; Will French <wfrench@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>; Peter Stasiewicz <pstasiewicz@masseygail.com>
**Subject:** Re: PLS v. NAR - UMRO Subpoena Response

[EXTERNAL EMAIL]

Hi Constance,

Receipt confirmed. I will review and get back to you.

Thank you,

Kristin

**THE AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
t: +1 (310) 283-3884

On Thu, Apr 23, 2026 at 11:11 AM Constance Grieves <cgrieves@masseygail.com> wrote:

Dear Counsel:

Please confirm receipt of my April 9, 2026, letter and advise when you are able to meet and confer regarding the issues raised therein.

Best regards,

Constance Grieves

Partner

Massey & Gail LLP

50 E. Washington St., Suite 400, Chicago, IL 60602

P: 312-809-0183 | M: 615-473-3131

cgrieves@masseygail.com

(*she/her/hers*)

**Check out** www.masseygail.com

*This e-mail may contain privileged & confidential information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.*

---

**From:** Constance Grieves
**Sent:** Thursday, April 9, 2026 4:22 PM
**To:** 'Kristin Regan' <kregan@theagencyre.com>
**Cc:** Bill Balachowski <BBalachowski@masseygail.com>; Will French <wfrench@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>; Peter Stasiewicz <pstasiewicz@masseygail.com>
**Subject:** PLS v. NAR - UMRO Subpoena Response

Dear Counsel:

Please see attached.

Best regards,

Constance Grieves

Partner

Massey & Gail LLP

50 E. Washington St., Suite 400, Chicago, IL 60602

P: 312-809-0183 | M: 615-473-3131

16

cgrieves@masseygail.com

(*she/her/hers*)

Check out www.masseygail.com

*This e-mail may contain privileged & confidential information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.*

cgrieves@masseygail.com

# Exhibit 10

# Will French

| | |
|---|---|
| **From:** | Kristin Regan <kregan@theagencyre.com> |
| **Sent:** | Wednesday, July 29, 2026 2:57 PM |
| **To:** | Will French |
| **Cc:** | brandon.braga@theagencyre.com; Peter Stasiewicz; Constance Grieves; Brigid Carmichael; Morgan Meyer |
| **Subject:** | Re: PLS v. NAR_Draft Joint Stipulation re NAR Subpoena to UMRO |

**[EXTERNAL EMAIL]**

Hi Will,

You are welcome for prioritizing the Harris and Parnes documents responsive to Requests Nos. 1, 2, and 4.

With respect to Request No. 7, by your own admission, you acknowledge that you have not requested documents concerning the "Umansky Fraud Litigation" from Mr. Umansky himself, a party to this litigation. Those documents, which relate to Mr. Umansky's prior unrelated litigation, should be sought from the Plaintiff in the first instance, not a non-party.

Moreover, you have made requests for production from Plaintiffs and Mr. Umansky on two separate occasions. If you believed those productions were incomplete, it was incumbent upon you to address any perceived deficiencies with Plaintiffs at that time. Your decision not to do so does not justify imposing the burden of a third round of discovery on a non-party. Nor does the fact that you have now chosen to pursue a new theory of relevance through additional search terms entitle you to require UMRO to re-collect, re-search, and re-review nearly a decade of litigation files that should have been sought from Plaintiff directly.

The sweeping production you seek imposes an undue and disproportionate burden on UMRO and is inconsistent with Rules 45 and 26 of the Federal Rules of Civil Procedure. Compliance would require UMRO to search hundreds of employee email accounts and the accounts of thousands of current and former real estate agents over a nine-year period, followed by an extensive review for responsiveness, privilege, confidentiality, and protective-order issues. That extraordinary burden is particularly unwarranted where the requested documents are available from a party to this litigation through significantly less burdensome means. The publicly filed litigation record also provides you with substantial information regarding the underlying claims and proceedings.

Rule 45 requires that "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena," and further provides that the court must quash or modify a subpoena that "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(1), (3)(A)(iv). Likewise, Rule 26 requires the court to limit discovery that is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i). Request No. 7 disregards both principles by attempting to obtain from a non-party documents that should first be sought from the Plaintiff.

Finally, please provide us with the Joint Stipulation papers so that we may prepare our response. We have engaged in extensive meet-and-confer efforts since you sent the papers over two weeks ago. The issues have changed and they warrant sufficient briefing and argument. We will need time the time set out in Local Rule 37-2 to properly brief these issues.

1

Kristin

THE **AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

On Tue, Jul 28, 2026 at 11:14 AM Will French <wfrench@masseygail.com> wrote:

Hi Kristin,

Thank you for the update. We appreciate your prioritization of Harris's and Parnes's documents as well as your offer to do rolling productions.

We wanted to follow up regarding Request No. 7. We've emailed counsel for PLS and confirmed our understanding that the search terms we proposed for this request ***were not used as search terms in PLS I or PLS II***. Although a limited number of the documents that PLS did produce happen to contain the search terms we proposed, those documents were produced because of different search terms.

As a result, we suspect that there are many documents responsive to the proposed search terms that were never produced (or logged) in this action. For example, a search for "Western World" produces zero hits in PLS's documents. We believe that each of the search terms we proposed constitutes a category of documents that we have not yet received.

We wanted to see if the above changes your position on Request No. 7, including your position reflected in the joint stipulation and the accompanying declaration. Paragraph One of the declaration in particular suggests that these search terms were used in the PLS productions. Now that we have confirmed otherwise, we wanted to see if you'd continue to stand on that objection.

If we do need to seek court intervention on this issue, we would like to file the stipulation by this Thursday. So please send us any revised drafts for your portion of the joint stipulation by 2:00 PM (PT) tomorrow, July 29.

We also remain willing to negotiate in good faith the search terms and custodians for Request No. 7 to limit the scope of potential overlap (which we think is minimal) and to reduce the burden on UMRO.

2

We further maintain our offer to exclude communications with counsel for Umansky and UMRO in the underlying litigations, which we believe should resolve your privilege concerns. And we do not understand UMRO's position that a protective order entered in another case limits UMRO's ability to produce its own documents here. *See, e.g.*, *Anderson v. Domino's Pizza, Inc.*, No. 11-CV-902 RBL, 2012 WL 1076261, at *3 (W.D. Wash. Mar. 30, 2012) (explaining that, although a protective order might govern a party's use of ***another*** party's materials in a later case, it "obviously does not" allow a party to refuse to produce its "own materials" because "otherwise, a party could immunize its own documents from discovery in later litigation").

Please let us know whether you'll stand on your objections to Request No. 7 by 2:00 PM (PT) tomorrow, July 29, so that we can finalize the joint stipulation if necessary. If you'd like to revise your portion of the joint stipulation, please send us your materials by then too.

Thank you,

Will

Will French

Associate

Massey & Gail LLP

Office: 312-981-0314

Cell: 414-426-9097

*This email may contain privileged or confidential information.*

---

**From:** Kristin Regan <kregan@theagencyre.com>
**Sent:** Monday, July 27, 2026 4:17 PM
**To:** Will French <wfrench@masseygail.com>
**Cc:** brandon.braga@theagencyre.com; Peter Stasiewicz <pstasiewicz@masseygail.com>; Constance Grieves <cgrieves@masseygail.com>; Brigid Carmichael <bcarmichael@masseygail.com>; Morgan Meyer

<mmeyer@masseygail.com>

**Subject:** Re: PLS v. NAR_Draft Joint Stipulation re NAR Subpoena to UMRO

**[EXTERNAL EMAIL]**

Dear Counsel,

I am writing to provide an update on our document production.

Our IT department has successfully downloaded and searched the email accounts for James Harris (from September 15, 2022, to the present) and David Parnes (from October 17, 2022, to the present). I am currently reviewing these materials and will produce these two initial sets of documents by Tuesday, August 4, 2026.

We will continue to search and review the remaining accounts, and I will produce responsive documents on a rolling basis. I will notify you if we encounter any issues accessing the accounts. We expect to complete the production by August 18, 2026.

Kristin

**THE AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

On Thu, Jul 23, 2026 at 6:41 PM Kristin Regan <kregan@theagencyre.com> wrote:

Counsel,

### Requests 1, 2 and 4

Thank you for agreeing to simplify the searches by applying the same search terms to the searches for Corrigan, Stace and Knell. We agree to the date range of January 1, 2017 to the present for these three accounts.

We also agree to the date ranges of September 15, 2022 to the present for James Harris and October 17, 2022 to the present for David Parnes.

Completing the requested searches will take considerable time. The requests impose a substantial task on our small in-house IT department. The requests require downloading each mailbox, opening or converting the mbox file into a usable format, conducting the search, collecting the results, and then completing legal review before production. Given the size and format of the mailboxes and the resources available to our in-house IT department, the searches must proceed sequentially rather than simultaneously. Each mailbox is in a single mbox file on Google drive and is inaccessible in its current format. We will have to download each account, which will take time since they are about 170GB, and we have limited software to open mbox files.

We can give you a better estimate on the date the production will begin and the date of the final production after our IT department has completed an initial assessment of the accounts. They started downloading one account today. We want to preserve some flexibility in case the downloads, file integrity, search software, or volume of results create unexpected issues.

We will hold off from addressing the litigation hold questions until next week. By then, we should know whether we have any access issues.

**Request No. 7**

NAR already requested these prior unrelated litigation materials directly from the parties, and the same body of documents has already been the subject of party discovery, twice. Compliance would require UMRO to reconstruct and re-review a body of litigation documents that has already been collected and reviewed in party discovery, including for privilege, work product, confidentiality, and compliance with the applicable protective orders.

Complicating the issue, these documents are not presently maintained in a single, readily searchable repository available to us. The consolidated litigation database was maintained by outside counsel or a litigation-support vendor, our native files are in several different locations. To conduct the requested search internally, we would have to determine where the underlying documents remain and collect or reconstruct documents from multiple sources or re-engage former outside counsel or the vendor to access any archived database, assuming it still exists. That collection and reconstruction process would itself involve significant time and expense before any search or substantive review could begin. We would then have to conduct a new review for responsiveness, privilege, work product, confidentiality, and protective-order restrictions. This would be extraordinarily expensive and redundant.

In addition, the courts in the prior unrelated litigation imposed protective orders on confidential information as to all parties on each side of the actions. Some documents were further limited to, "for attorney's eyes only". The responses NAR already received from PLS would have addressed those prior protective orders and privilege issues. Any response by UMRO would mirror the responses NAR has already received from PLS. The documents searched by PLS were: (1) from the same prior litigation cases; (2) they involved the same pool of files; (3) in which Mr. Umansky and UMRO were

defendants and had the same counsel; and (4) the files were protected by the same protective orders that applied equally to Mr. Umansky and UMRO.

Finally, NAR has not identified any category of responsive, non-privileged documents that it believes exists but was not already produced during party discovery. Without identifying what it believes is missing, NAR is asking us, a non-party, to incur substantial expense reconstructing and re-reviewing an existing litigation collection without demonstrating that the process is likely to yield materially different documents.

I will provide you with an update on Monday.

Kristin

THE **AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

On Wed, Jul 22, 2026 at 2:35 PM Will French <wfrench@masseygail.com> wrote:

Hi Kristin,

We've received confirmation from PLS's counsel that our understanding of the productions from James Harris's and David Parnes's UMRO accounts is correct. It is true that PLS produced documents in March 2023, but those did not include documents from Harris's and Parnes's accounts, which were last searched in September and October 2022, respectively.

We therefore stand on our request that you produce documents from their accounts using the dates we've proposed: September 15, 2022, through the present for Harris and October 17, 2022, through the present for Parnes. Please let us know if you accept our proposal as to Harris and Parnes as well as the other custodians relevant to Requests 1, 2, and 4, as detailed in our previous email, by the close of business tomorrow.

6

As stated in our communication from yesterday, please also let us know if (i) you'll agree to produce documents regarding Request 7 having considered our points in the email below; (ii) if you'll describe the applicable litigation holds for the relevant custodians, including dates, recipients, and acknowledgements; and (iii) if you'll make a production in two weeks (or explain why your systems require three weeks to identify documents). Please let us know your position on each of these three points by the close of business Friday so that we know whether we will need to address them in our joint stipulation.

Thank you,

Will

Will French

Associate

Massey & Gail LLP

Office: 312-981-0314

Cell: 414-426-9097

*This email may contain privileged or confidential information.*

**From:** Peter Stasiewicz <pstasiewicz@masseygail.com>
**Sent:** Tuesday, July 21, 2026 5:50 PM
**To:** Kristin Regan <kregan@theagencyre.com>
**Cc:** Will French <wfrench@masseygail.com>; brandon.braga@theagencyre.com; Constance Grieves <cgrieves@masseygail.com>; Brigid Carmichael <bcarmichael@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>
**Subject:** RE: PLS v. NAR_Draft Joint Stipulation re NAR Subpoena to UMRO

Kristin,

We received your joint stipulation. We are not yet in agreement on Requests 1, 2, and 4. Please review our positions on these requests below. Since we have not yet resolved that disagreement, please also review our clarification on our position on Request 7 below.

**Regarding Requests 1, 2, and 4:**

We do not agree to limit the dates for Laura Corrigan, Laura Stace, and Sandy Knell to March, 1, 2020. The March 1, 2020, limitation for the 5 UMRO agents is tied directly to specific PLS listing data before that date and has no relationship to the finance and marketing functions performed for PLS in the years since 2020. We therefore stand on our request for Corrigan, Stace, and Knell to be searched from January 1, 2017, to present. Although you offered broader search terms in your prior letters, we agree to your request to limit the to the same search terms as for the other custodians responsive to Requests 1, 2, and 4 in a good faith effort to expedite your review.

For the time being, we also stand on our request that the start date for Harris and Parnes be September 15, 2022, and October 17, 2022, respectively.  No documents reflecting Harris or Parnes as custodians were produced after that time in PLS I (i.e., the prior filing of the case, when discovery occurred before Harris and Parnes left UMRO). And our records do not indicate that Harris and Parnes' UMRO accounts were searched through March 24, 2023. However, in light of your last communication, we have reached out to PLS counsel for clarification as to what was actually searched.

Regarding your claim that responsive emails may not be preserved beyond four years, please describe the litigation hold that was put in place when the PLS litigation was initiated by UMRO's founder and employees – including the date of the litigation hold, the recipients of that hold, and whether signed acknowledgments of the hold by those recipients exist.

**Regarding Request 7:**

We do not believe our search requests overlap with prior PLS productions – for example, our requested search term "Western World" does not appear in any documents produced to date by PLS. We also do not understand how a protective order in another case can prevent UMRO's production of UMRO documents. NAR does not request production or review of documents designated confidential by another party pursuant to a protective order in any other matter. Nor does NAR seek public records from UMRO, communications with UMRO or Umansky's counsel, or a privilege log. Thus, we ask that you run our requested search terms. To the extent that your objection is based on the broad number of custodians, we are open to limiting the search to an appropriate subset of custodians. Alternatively, in an effort to relieve burden, we would be willing to accept copies of productions made by UMRO in the referenced litigations.

**Regarding Timeline:**

Finally, your suggestion that a search of the accounts even for requests 1, 2, and 4 will take three weeks appears facially unreasonable. The search terms are relatively simple, and IT should be able to pull these documents from any typical email server in a matter of hours. If there is a technical reason that these searches require so much time to identify, we would need specific insight into those reasons. *See A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 188 (C.D. Cal. 2006) (objections like overly burdensome or harassing are improper without evidentiary declarations or support); *Apple, Inc. v. Samsung Elecs. Co.,* No. 12-CV-0630-LHK PSG, 2013 WL 1942163, at *2-3 (N.D. Cal. May 9, 2013)  (status as a third party "does not confer a right to obfuscation or obstinacy" and does not permit the producing party to just tell the requesting party to "figure out what documents are missing or what terms it thinks would generate more responsive hits"). We think it should be feasible for a search and attorney review of at least the Harris and Parnes documents resulting in at least an initial production within two weeks.

**Proposed Next Steps:**

1.  Please confirm agreement to the search Corrigan, Stace, and Knell from January 1, 2017, to present, with the same search terms as the other custodians responsive to Requests 1, 2, and 4.
2.  Please describe applicable litigation holds, including dates, recipients, and acknowledgements for all relevant custodians.
3.  Please confirm that you will make an initial production within two weeks, or explain with specificity why your systems require three weeks to identify documents.
4.  If our proposals regarding Request 7 make any difference to your position as stated in the joint stipulation, let us know if further discussion may be warranted on that request. If not, we have your portion of the joint stip but will hold off filing until we resolve or exhaust these other disputes.

In the meantime, we will hold off creating the final stipulation and advise you as soon as we get clarity into the Harris and Parnes date ranges.

Regards,

Pete

**Peter Stasiewicz**

*Counsel*

Massey & Gail LLP

pstasiewicz@masseygail.com

312.379.0801

9

*This email may contain privileged or confidential information.*

---

**From:** Kristin Regan <kregan@theagencyre.com>
**Sent:** Monday, July 20, 2026 6:29 PM
**To:** Peter Stasiewicz <pstasiewicz@masseygail.com>
**Cc:** Will French <wfrench@masseygail.com>; brandon.braga@theagencyre.com; Constance Grieves <cgrieves@masseygail.com>; Brigid Carmichael <bcarmichael@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>
**Subject:** Re: PLS v. NAR_Draft Joint Stipulation re NAR Subpoena to UMRO

[EXTERNAL EMAIL]

Hi Pete,

Thank you for your response. With a few adjustments, I believe we can reach an agreement on Requests 1, 2 and 4. We disagree with your understanding of our position on Request No. 7 and we do not plan to produce documents as you propose.

## Requests 1, 2 and 4

To simplify the searches, I suggest applying the same search terms and date ranges you requested for Nagy, White, Mazzone, Dragos, and Tescher to the searches for Corrigan, Stace and Knell.

My understanding is that PLS searched the accounts of Harris and Parnes through March 24, 2023 (and not through September 15, 2022 and October 17, 2022, respectively). Please confirm the date range that needs to be searched.

Laura Corrigan, Laura Stace, and Sandy Knell

- April 17, 2017, and March 1, 2020

- search terms: PLS OR "PLS.com" OR "ThePLS.com" OR "pocket listing service\*" OR "Private Listing service\*"

10

James Harris and David Parnes

- March 24, 2023 to the present

- search terms: PLS OR "PLS.com" OR "ThePLS.com" OR "pocket listing service" OR "Private Listing service*"

Andrej Nagy, Keri White, Mike Mazzone, Chad Dragos, and Lynn Tescher

- April 17, 2017, and March 1, 2020

- search terms: PLS OR "PLS.com" OR "ThePLS.com" OR "pocket listing service*" OR "Private Listing service*"

Please keep in mind that I cannot guarantee that all emails in the above date ranges are still available. Some of the older emails may no longer exist. Our policy is to retain emails for four years. Our technology department will know the status of each account when they perform the searches.

**Request No. 7**

Request No. 7 asks UMRO, a non-party, to repeat discovery on the same privileged, protected, or confidential materials that have already been the subject of discovery with the parties to the litigation. UMRO understands that PLS has already searched the same systems and provided privilege logs to NAR. Any privilege log prepared by UMRO would almost certainly be duplicative of the privileges asserted by PLS and the overlapping custodians since Mr. Umansky and UMRO were sued together in the same cases alleging the same claims and defenses. In each case, they were represented by the same counsel.

Additionally, many documents in those cases were subject to Protective Orders, requiring further review to determine whether they may be disclosed and whether redaction or other protections are necessary.

To the extent Request No. 7 seeks pleadings, motions, orders, or other publicly filed documents, those materials are equally available to NAR through public court dockets and should not be the subject of compelled production by UMRO.

11

If you have categories of non-privileged/protected responsive documents, which have not already been produced and which you believe UMRO is in possession of, we will consider those documents.

**Dates of Production**

I expect our technology department will need about three weeks to search the accounts. Depending on how many documents are found, I will need 7-10 days to review them.

Kristin

THE**AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

On Mon, Jul 20, 2026 at 12:09 PM Peter Stasiewicz <pstasiewicz@masseygail.com> wrote:

Hi Kristin,

Will is out today; I write in response to your letter of July 17.

We accept and appreciate your offer to search the email accounts of Laura Corrigan, Laura Stace, and Sandy Knell using the search terms you propose in the letter.

With respect to James Harris and David Parnes, we have searched for the respective latest date of a document produced by each of these custodians.  For Harris, that date is September 15, 2022, and for Parnes, that date is October 17, 2022. We agree to limit the search of these custodians from those respective dates, through the present. We further propose to narrow the search terms for both Harris and Parnes to just the following:

12

PLS OR "PLS.com" OR "ThePLS.com" OR "pocket listing service*" OR "Private Listing service*"

These search terms are meant to target communications Harris and Parnes may have had about PLS and reflect our good-faith efforts to reduce the burden on UMRO while ensuring that we are not missing documents from Harris and Parnes.

We disagree that our requests concerning UMRO agents who used PLS expand the scope of requested documents. These documents are a narrow subset of the documents responsive to (at least) Request No. 1 from the subpoena ("All documents relating to PLS"). In the interest of narrowing the documents at issue, we propose limiting the search to accounts for five UMRO agents who used PLS between April 17, 2017, and running through March 1, 2020: Andrej Nagy, Keri White, Mike Mazzone, Chad Dragos, Lynn Tescher.

With respect to Request No. 7, our understanding from your letter is that our proposal to exclude documents with Umansky's and UMRO's counsel in the underlying litigations has addressed your concerns over reviewing litigation files.

In light of the foregoing, please confirm by <u>close of business (PT) today</u> that UMRO will take the following actions:

1. UMRO will search email accounts of Laura Corrigan, Laura Stace, and Sandy Knell with the search terms laid out in pages 2-3 of your letter.
2. Regarding Harris and Parnes, UMRO will produce documents as follows (time periods based on last available document produced by respective custodian in this litigation):

   a. UMRO will search the email of James Harris from September 15, 2022 to the present.
   b. UMRO will search the emails of David Parnes from October 17, 2022 to the present.
   c. UMRO will use the search terms PLS OR "PLS.com" OR "ThePLS.com" OR "pocket listing service*" OR "Private Listing service*" for the Harris and Parnes searches.

3. UMRO will produce documents from Andrej Nagy, Keri White, Mike Mazzone, Chad Dragos, and Lynn Tescher responsive to the terms PLS OR "PLS.com" OR "ThePLS.com" OR "pocket listing service*" OR "Private Listing service*" between April 17, 2017, and March 1, 2020.
4. UMRO will produce documents responsive to Request 7, other than communications with Umansky or UMRO's counsel in the underlying litigation.

In addition to confirming these points, please provide (a) the date by which you anticipate making your first production and (b) the date by which all responsive documents will be produced.

To the extent that UMRO does not agree to any of the 4 points above, please provide your portion of the joint stipulation as to the remaining disputed points by <u>noon (PT) tomorrow</u>, <u>Tuesday July 21, 2026</u>. If we do not receive your response to any remaining disputed points, we will file the stipulation with the court ex parte.

13

Regards,

Pete



**Peter Stasiewicz**

*Counsel*

Massey & Gail LLP

pstasiewicz@masseygail.com

312.379.0801



*This email may contain privileged or confidential information.*

---

**From:** Kristin Regan <kregan@theagencyre.com>
**Sent:** Saturday, July 18, 2026 1:50 AM
**To:** Will French <wfrench@masseygail.com>
**Cc:** brandon.braga@theagencyre.com; Peter Stasiewicz <pstasiewicz@masseygail.com>; Constance Grieves <cgrieves@masseygail.com>; Brigid Carmichael <bcarmichael@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>
**Subject:** Re: PLS v. NAR_Draft Joint Stipulation re NAR Subpoena to UMRO


**[EXTERNAL EMAIL]**


Hi Will,


Please find my response to your email attached.


Kristin

14

**THE AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

On Fri, Jul 17, 2026 at 2:20 PM Will French <wfrench@masseygail.com> wrote:

Hi Kristin,

We dispute your characterization that we drafted your portion of the joint stipulation. You sent your letter on July 9, the final day to respond to the draft joint stipulation under Local Rule 37-2.2. We never agreed to your offer to extend this deadline; even if we had, your proposed deadline was July 16. We received no written materials from you following the letter. So, consistent with Local Rule 37-2.2, we copied the sections of your letter to the corresponding sections of the joint stipulation.

If your position is that the letter does not constitute your portion of the joint stipulation, we will agree to one more extension for your submission. If we have not received your materials by next Monday, July 20, at 2:00 PT, we will file an *ex parte* motion under Local Rule 37-2.4. If you do submit your materials by then, please update the requested hearing date in the drafts to Friday, August 14, pursuant to Local Rule 37-3. To be clear, this is the final extension we will agree to.

Separately, we disagree with your claim that we added new categories of documents to our requests. To the contrary, in response to your letter, we proposed ***narrowing*** the documents at issue based on factors like the custodians, time periods, and search terms—the sort of good-faith negotiations that are typical in discovery disputes. None of the documents we requested are "new."

We will look for your email later today and your portion of the joint stipulation by next Monday, July 20, at 2:00 PT.

Thank you, and have a nice weekend,

15

Will

Will French

Associate

Massey & Gail LLP

Office: 312-981-0314

Cell: 414-426-9097

*This email may contain privileged or confidential information.*

---

**From:** Kristin Regan <kregan@theagencyre.com>
**Sent:** Friday, July 17, 2026 11:46 AM
**To:** Will French <wfrench@masseygail.com>
**Cc:** brandon.braga@theagencyre.com; Peter Stasiewicz <pstasiewicz@masseygail.com>; Constance Grieves <cgrieves@masseygail.com>; Brigid Carmichael <bcarmichael@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>
**Subject:** Re: PLS v. NAR_Draft Joint Stipulation re NAR Subpoena to UMRO

**[EXTERNAL EMAIL]**

Hi Will,

I will respond to the issues raised in your email this afternoon. Until then, you do not have my authority to draft UMRO's section of the Joint Stipulation; I will provide you with our portion directly. Because you continue to add new categories of documents to your requests, it will be necessary to address those matters in UMRO's response.

Kristin

THE **AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

16

On Thu, Jul 16, 2026 at 4:40 PM Will French <wfrench@masseygail.com> wrote:

Hi Kristin,

We went into the call today hoping to find common ground to avoid the necessity of court intervention. To that end, we sent you our proposed discussion topics on Tuesday, July 14, so that the parties could come to the meeting prepared for a productive conversation. We were therefore surprised and disappointed by your immediately contentious approach and unwillingness to discuss any point of substance or answer any of our questions.

For example, although we described the missing documents for James Harris and David Parnes as early as our April 9 letter, you continued to refuse to commit one way or the other on whether you would produce their documents, instead requesting another round of written correspondence that would only further prolong resolution of the dispute. Indeed, you did not answer how many documents might be at issue even for the proposed search terms we sent you on June 3, which makes it difficult to understand the basis for your assertion of undue burden. Also, when we raised our proposal to exclude communications with external counsel for Request No. 7, you did not answer whether that would alleviate the concerns in your letter regarding the burden of reviewing litigation files. You simply reiterated throughout the call that you stood on your assertions in the letter, repeatedly refusing to answer our questions. As we explained multiple times, that we have received documents from PLS and that UMRO is not a plaintiff do not mean that you have no obligation to respond to our subpoena requests.

We've described the need for progress on these issues. Based on your combative and unprofessional behavior throughout the meeting today—punctuated by your prompt, unexpected termination of the call—we do not believe that further written correspondence or meetings would be productive.

We sent you a draft joint stipulation on July 2. On July 7, you represented that you would prepare your portion of the stipulation by July 16. We have thus added the points from your letter to their corresponding sections in the draft joint stipulation, attached. There are two minor redlines to our portions of the draft, reflecting only that you responded to the joint stipulation. We are also re-attaching the other draft filings supporting the joint stipulation.

17

Pursuant to Local Rule 37-2.2, please sign the attached materials by the close of business tomorrow. We will then file them with the Court. Otherwise, we will proceed consistent with Local Rule 37-2.4.

Thank you,

Will

Will French

Associate

Massey & Gail LLP

Office: 312-981-0314

Cell: 414-426-9097

*This email may contain privileged or confidential information.*

---

**From:** Will French
**Sent:** Tuesday, July 14, 2026 5:15 PM
**To:** 'Kristin Regan' <kregan@theagencyre.com>
**Cc:** brandon.braga@theagencyre.com; Peter Stasiewicz <pstasiewicz@masseygail.com>; Constance Grieves <cgrieves@masseygail.com>; Brigid Carmichael <bcarmichael@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>
**Subject:** RE: PLS v. NAR_Draft Joint Stipulation re NAR Subpoena to UMRO

Hi Kristin,

In advance of our call this Thursday, please see the below points that we would like to discuss.

18

- Can you please describe how you identified Laura Corrigan, Laura Stace, and Sandy Knell as potential custodians?

- We'd like to clarify your understanding of the documents that have already been produced from the UMRO email accounts for James Harris and David Parnes.

- With respect to Request No. 7, we'd propose excluding communications with Mauricio Umansky's and UMRO's counsel for the underlying litigations.

- We'd like to discuss adding UMRO agents who used PLS as custodians, with appropriate limitations on the scope of potentially responsive documents.

Please let us know if you have any questions about these topics before our call.

Thank you,

Will

Will French

Associate

Massey & Gail LLP

Office: 312-981-0314

Cell: 414-426-9097

*This email may contain privileged or confidential information.*

19

**From:** Kristin Regan <kregan@theagencyre.com>
**Sent:** Monday, July 13, 2026 12:48 PM
**To:** Will French <wfrench@masseygail.com>
**Cc:** brandon.braga@theagencyre.com; Peter Stasiewicz <pstasiewicz@masseygail.com>; Constance Grieves <cgrieves@masseygail.com>; Brigid Carmichael <bcarmichael@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>
**Subject:** Re: PLS v. NAR_Draft Joint Stipulation re NAR Subpoena to UMRO

[EXTERNAL EMAIL]

Hi Will,

I am available for a call on Thursday at 1:30 PT. Please let me know if that works for you.

Kristin

THE**AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

On Fri, Jul 10, 2026 at 4:50 PM Kristin Regan <kregan@theagencyre.com> wrote:

You too.

THE**AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

20

On Fri, Jul 10, 2026 at 4:36 PM Will French <wfrench@masseygail.com> wrote:

Understood, thank you. Hope you have a nice weekend.

Best,

Will

Will French

Associate

Massey & Gail LLP

Office: 312-981-0314

Cell: 414-426-9097

*This email may contain privileged or confidential information.*

---

**From:** Kristin Regan <kregan@theagencyre.com>
**Sent:** Friday, July 10, 2026 6:34 PM
**To:** Will French <wfrench@masseygail.com>
**Cc:** brandon.braga@theagencyre.com; Peter Stasiewicz <pstasiewicz@masseygail.com>; Constance Grieves <cgrieves@masseygail.com>; Brigid Carmichael <bcarmichael@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>
**Subject:** Re: PLS v. NAR_Draft Joint Stipulation re NAR Subpoena to UMRO

**[EXTERNAL EMAIL]**

21

Hi Will,

Brandon is not available at this very moment. We will get back to you with a proposed time for next week.

Kristin

THE **AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

On Fri, Jul 10, 2026 at 4:21 PM Will French <wfrench@masseygail.com> wrote:

Thank you, Kristin. Please see below for a Zoom link for 4:30 PT today if that still works.

Will French is inviting you to a scheduled Zoom meeting.

Topic: Will French's Personal Meeting Room

Join Zoom Meeting

https://zoom.us/j/2202280811?pwd=aEY4Vmczcm5rZGpXZ0ZncHZtamZaUT09

Meeting ID: 220 228 0811

Passcode: 7HHZaA

22

---

One tap mobile

+13126266799,,2202280811#,,,,*845523# US (Chicago)

+13092053325,,2202280811#,,,,*845523# US

---

Join by SIP

• 2202280811@zoomcrc.com

Join instructions

https://zoom.us/meetings/2202280811/invitations?signature=7QVOkzN15gUb7iuUWKDG4BrnF_92oun9WO340-OzTtk

_____
**From:** Kristin Regan <kregan@theagencyre.com>
**Sent:** Friday, July 10, 2026 5:56 PM
**To:** Will French <wfrench@masseygail.com>
**Cc:** brandon.braga@theagencyre.com; Peter Stasiewicz <pstasiewicz@masseygail.com>; Constance Grieves <cgrieves@masseygail.com>; Brigid Carmichael <bcarmichael@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>
**Subject:** Re: PLS v. NAR_Draft Joint Stipulation re NAR Subpoena to UMRO

**[EXTERNAL EMAIL]**

23

Hi Will,

We are available now if that works for you. Otherwise, the best time would be Monday, July 17 at 1:00 PT/3:00 CT. Brandon is on vacation next week.

Kristin

THE **AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

On Fri, Jul 10, 2026 at 2:44 PM Will French <wfrench@masseygail.com> wrote:

Hi Kristin,

Thank you for the letter. We think a call would be helpful to discuss some of these points. I'll throw out next Tuesday at 4:00 CT/2:00 PT. Does that work for you? If so, I'm happy to send an invite.

Thank you,

Will

Will French

Associate

Massey & Gail LLP

24

Office: 312-981-0314

Cell: 414-426-9097

*This email may contain privileged or confidential information.*

---

**From:** Kristin Regan <kregan@theagencyre.com>
**Sent:** Thursday, July 9, 2026 6:40 PM
**To:** Will French <wfrench@masseygail.com>
**Cc:** brandon.braga@theagencyre.com; Peter Stasiewicz <pstasiewicz@masseygail.com>; Constance Grieves <cgrieves@masseygail.com>; Brigid Carmichael <bcarmichael@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>
**Subject:** Re: PLS v. NAR_Draft Joint Stipulation re NAR Subpoena to UMRO

**[EXTERNAL EMAIL]**

Hi Will,

Attached please find UMRO's response to your Meet & Confer.

Kristin

THE **AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

On Thu, Jul 9, 2026 at 1:13 PM Will French <wfrench@masseygail.com> wrote:

25

Hi Kristin,

Thank you for the call. We will look for your written response later today and will follow up as soon as possible.

Best,

Will

Will French

Associate

Massey & Gail LLP

Office: 312-981-0314

Cell: 414-426-9097

*This email may contain privileged or confidential information.*

---

**From:** Will French
**Sent:** Thursday, July 9, 2026 10:58 AM
**To:** 'Kristin Regan' <kregan@theagencyre.com>
**Cc:** 'brandon.braga@theagencyre.com' <brandon.braga@theagencyre.com>; Peter Stasiewicz <pstasiewicz@masseygail.com>; Constance Grieves <cgrieves@masseygail.com>; Brigid Carmichael <bcarmichael@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>
**Subject:** RE: PLS v. NAR_Draft Joint Stipulation re NAR Subpoena to UMRO

Hi Kristin,

Just following up on the below.

Thank you,

Will

Will French

Associate

Massey & Gail LLP

Office: 312-981-0314

Cell: 414-426-9097

*This email may contain privileged or confidential information.*

---

**From:** Will French
**Sent:** Wednesday, July 8, 2026 11:14 AM
**To:** 'Kristin Regan' <kregan@theagencyre.com>
**Cc:** brandon.braga@theagencyre.com; Peter Stasiewicz <pstasiewicz@masseygail.com>; Constance Grieves <cgrieves@masseygail.com>; Brigid Carmichael <bcarmichael@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>
**Subject:** RE: PLS v. NAR_Draft Joint Stipulation re NAR Subpoena to UMRO

Hi Kristin,

Thank you for your email. Given the amount of time that has elapsed since our April 9 meet-and-confer letter, we think a more modest extension is appropriate. We're also concerned that waiting until next Thursday would risk us being unable to file the joint stipulation in time to secure our requested hearing date of Friday, August 7. With depositions approaching, timing has become a critical factor.

We therefore would agree to extend your deadline to exchange the joint-stipulation materials until Tuesday, July 14. This offer, however, is contingent on you agreeing to another meet-and-confer later this week so that we can try again to resolve any disagreements without court intervention.

For example, we'd like some clarity on your position regarding the documents that have already been produced in this case. As discussed in our prior meet-and-confer, we understand that James Harris and David Parnes no longer have access to their UMRO email accounts, meaning they cannot produce responsive documents themselves. We suspect that another meet-and-confer could help us reach common ground on this and other issues.

Please let us know if that proposal is agreeable and, if so, when you are available for a call this week.

Thank you,

Will

Will French

Associate

Massey & Gail LLP

Office: 312-981-0314

Cell: 414-426-9097

*This email may contain privileged or confidential information.*

---

**From:** Kristin Regan <kregan@theagencyre.com>
**Sent:** Tuesday, July 7, 2026 10:27 PM
**To:** Will French <wfrench@masseygail.com>
**Cc:** brandon.braga@theagencyre.com; Peter Stasiewicz <pstasiewicz@masseygail.com>; Constance Grieves <cgrieves@masseygail.com>; Brigid Carmichael <bcarmichael@masseygail.com>; Morgan Meyer

28

&lt;mmeyer@masseygail.com&gt;
**Subject:** Re: PLS v. NAR_Draft Joint Stipulation re NAR Subpoena to UMRO

**[EXTERNAL EMAIL]**

Hi Will,

Hi Will,

I received your proposed Stipulation and Motion late Thursday afternoon, immediately before the July 4th holiday weekend. Our offices closed at 3:00 p.m. on Thursday and did not reopen until Monday. Given the timing of your correspondence, I am just now in a position to review the materials and respond.

I will send a response to your Meet and Confer in a separate email. After we met and conferred, I learned that you had already received more than 100,000 documents responsive to the same search terms on two prior occasions. I needed time to understand these productions.

I will prepare our portion of the Stipulation. However, given the issues raised and the time necessary to adequately prepare our position, I will need a reasonable amount of time to do so. Because the Magistrate hears motions on Fridays, providing our sections of the Stipulation by Thursday, July 16, 2026, should not delay the hearing of the Motion by much. Accordingly, I request a courtesy extension to provide our sections to you by that date.

Thank you,

Kristin

THE**AGENCY**
Redefining real estate
KRISTIN REGAN
Associate General Counsel
**t:** +1 (310) 283-3884

29

On Tue, Jul 7, 2026 at 1:23 PM Will French <wfrench@masseygail.com> wrote:

Counsel,

We wanted to let you know that, pursuant to Local Rule 79-5.2.2(b), we have conferred with counsel for PLS regarding our proposed redaction to Exhibit 4 of the draft declaration (attached below). PLS has consented to the proposed redaction, so we're set to proceed with the filing.

Please let us know as soon as possible whether you will be participating in the joint stipulation. As mentioned below, we plan to file a motion under Local Rule 37-2.4 if do not receive your materials by this Thursday, July 9.

Thank you,

Will

Will French

Associate

Massey & Gail LLP

Office: 312-981-0314

Cell: 414-426-9097

*This email may contain privileged or confidential information.*

**From:** Will French
**Sent:** Thursday, July 2, 2026 5:33 PM

**To:** 'brandon.braga@theagencyre.com' <brandon.braga@theagencyre.com>; Kristin Regan <kregan@theagencyre.com>
**Cc:** Peter Stasiewicz <pstasiewicz@masseygail.com>; Constance Grieves <cgrieves@masseygail.com>; Brigid Carmichael <bcarmichael@masseygail.com>; Morgan Meyer <mmeyer@masseygail.com>
**Subject:** PLS v. NAR_Draft Joint Stipulation re NAR Subpoena to UMRO

Counsel,

Attached, please find drafts of (a) a joint stipulation, (b) a supporting declaration, (c) corresponding exhibits, and (d) a notice of motion, all concerning NAR's subpoena to UMRO and UMRO's responses and objections thereto.

Pursuant to Local Rule 37-2.2 of the Local Civil Rules for the Central District of California, please send us any proposed edits as well as your portion of the stipulation by next Thursday, July 9. If we don't receive your materials by then, we plan to file the stipulation with the Court under Local Rule 37-2.4.

Thank you,

Will

Will French

Associate

Massey & Gail LLP

Office: 312-981-0314

Cell: 414-426-9097

*This email may contain privileged or confidential information.*

31

# Exhibit 11





Search for ...

HOME » ThePLS.com Launches First Private, National, Off-Market Listing Platform

# ThePLS.com Launches First Private, National, Off-Market Listing Platform

**by The Agency Team** | Aug 15, 2017



**ThePLS.com**, The Pocket Listing Service, has launched the first private, national off-market listing forum created exclusively by agents, for agents.

Pocket listings, or properties not listed on the MLS, have long been a staple in the industry and a valuable tool for listing and buying agents alike. The new membership-based service provides a secure, searchable online platform where listing agents can streamline and share valuable off-market information, and buying agents can search for properties that cannot be sourced through the MLS or other public, searchable entities.

The service was created by entrepreneur and top producing real estate agent, Christopher Dyson, and launched in partnership with co-founders, Mauricio Umansky, CEO and founder of The Agency, who is ranked as the fifth top agent in the U.S by Real Trends, and James Harris and David Parnes of Bravo's *Million Dollar Listing Los Angeles*. ThePLS.com provides a place where agents across the U.S. can consolidate off-market listings in one easy-to-use space and collaborate with fellow members on behalf of their clients.

Strictly for licensed real estate agents and not available for public access, ThePLS.com allows agents to market pocket listings without compromising a seller's privacy, sharing as much or as little information as they wish. Agents may also give sellers the option to test price points without accruing precious days on the market. Sellers can either sell their property "off market" or list to the MLS using compelling information and feedback gathered from ThePLS.com. The service allows buying agents to offer opportunities and inventory not currently available in the public domain.

"Pocket listings are a significant part of our business, and ThePLS.com fills an obvious void in the market for a national platform where agents can share and collaborate amongst themselves," said Dyson. "Having this tool will help strengthen the agent community and allow us to offer our clients a competitive edge in the marketplace."

ThePLS.com made its debut at last week's Inman Connect event in San Francisco, where 4,000 top-producing agents, brokers, tech entrepreneurs and marketing executives came together to learn, explore the newest technology and embrace changes in the real estate industry.

"It was beyond exciting to debut ThePLS.com at Inman Connect, one of the largest and most significant gatherings of real estate professionals nationwide," said Umansky. "The service allows us to share information beyond our regular spheres of influence to give our clients a broader reach, whether selling or purchasing a home."

Joining ThePLS.com is simple and only available to licensed real estate agents. Those who join before September 30, 2017 receive a free one-year membership. A valid BRE number is required. Join here →

## READY TO MAKE A MOVE?
### Let's *get started.*

EXPLORE LISTINGS →

## YOU MIGHT ALSO LIKE...

Case 2:25-cv-05971-JWH-E    Document 60-3    Filed 08/07/26    Page 276 of 284    Page ID #:739



PROPERTIES  |  NEWS & INSIGHTS  |  NEW YORK CITY  |  DALLAS

|  GREATER LOS ANGELES  |  BUY

# Notable Closings from Orange County to Midtown Manhattan

by Michele Vidarte  |  Jun 23, 2026



## NEWS & INSIGHTS

# Introducing The Agency's 2026 Red Paper Mid-Year Report

**by The Agency Team** | Jun 22, 2026

## CHECK US OUT @THEAGENCYRE



Case 2:25-cv-05971-JWH-E     Document 60-3     Filed 08/07/26     Page 278 of 284   Page ID #:741







Case 2:25-cv-05971-JWH-E     Document 60-3     Filed 08/07/26     Page 279 of 284     Page ID #:742







# Real estate isn't just business.

## *It's personal.*

# LET'S CONNECT.

First Name (Required)

Last Name (Required)

Email Address (Required)

Case 2:25-cv-05971-JWH-E     Document 60-3     Filed 08/07/26     Page 281 of 284   Page ID #:744

## Phone Number (Optional)

## Best Time to Call (Optional)

Best Time to Call (Optional)

## Preferred Agent (Optional)

## Address (Optional)

## Message

Message

Let's Connect



## The Agency

ABOUT US

AGENTS

PRESS

MAGAZINE

BLOG

PHILANTHROPY

GLOBAL OFFICES

CAREERS

SHOP THE AGENCY

## Resources

BUY

SELL

RENT

GLOBAL REGIONS

CORE SERVICES

DEVELOPMENT GROUP

INTERNATIONAL AFFILIATE

## Get In Touch

CONTACT FORM $\longrightarrow$

866.371.6468

HELLO@THEAGENCYRE.COM

THE MOST FOLLOWED REAL ESTATE BRAND

## Join The Club

ALWAYS BE THE FIRST TO KNOW, SIGN UP FOR OUR WEEKLY NEWSLETTER

ENTER YOUR EMAIL ADDRESS

TERMS OF USE

PRIVACY POLICY

CCPA

DMCA

ACCESSIBILITY

NEW YORK STATE FAIR HOUSING NOTICE
NEW YORK STATE STANDARD OPERATING PROCEDURES
NEW YORK STATE NOTICE OF REASONABLE ACCOMMODATIONS FOR PERSONS WITH DISABILITIES

TEXAS REAL ESTATE COMMISSION INFORMATION ABOUT BROKERAGE SERVICES
TEXAS REAL ESTATE COMMISSION CONSUMER PROTECTION NOTICE

Search by: LOCATIONIQ.COM

© 2026 The Agency IP Holdco, LLC. The Agency and The Agency logo are registered trademarks of The Agency IP Holdco, LLC under license to its parents and affiliates. All rights in such marks are reserved by The Agency IP Holdco, LLC.

The Agency fully supports the Equal Housing Opportunity laws. The Agency IP Holdco, LLC and its parents, affiliates, subsidiaries, franchisees of its affiliates, and network partners make no representations, warranties, or guaranties as to the accuracy of the information contained herein, including square footage, lot size or other information concerning the condition, suitability or features of the property. All material is intended for informational purposes only and has been obtained from public records, MLS, or other sources believed to be reliable, but not verified. All prospective buyers should conduct a careful, independent investigation of the information and property, and consult with appropriate professionals, such as appraisers, architects, civil engineers, etc. CalDRE #01904054