Chahira Solh (State Bar No. 248985)
CSolh@crowell.com
Eric Fanchiang (State Bar No. 317989)
EFanchiang@crowell.com
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614
Telephone: 949.263.8400
Facsimile: 949.263.8414

*Attorneys for Non-Parties Tracy Tutor, Josh Flagg, and Chris Cortazzo*

*[Additional counsel on next page]*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| The PLS.com, LLC,<br>Plaintiff,<br>v.<br>The National Association of Realtors,<br>Defendant. | Case No: 2:25-cv-05971-JWH-E<br><br>**[DISCOVERY MATTER] JOINT STIPULATION RE NON-PARTIES TRACY TUTOR, JOSH FLAGG, AND CHRISTOPER CORTAZZO'S MOTION TO QUASH SUBPOENAS AND REQUEST FOR SANCTIONS AGAINST NAR**<br><br>Hon. Charles F. Eick<br><br>Courtroom: 750, 7th Floor<br>Hearing Date: November 20, 2026<br>Hearing Time: 9:30 am<br><br>Discovery Cutoff: November 20, 2026[1]<br>Pretrial Conference Date: September 10, 2027<br>Trial Date: September 27, 2027 |

[1] Pursuant to Local Rule 37-2.1, the initial case schedule and the subsequent amendment to the case scheduling order have been attached to the Declaration of Eric Fanchiang in Support of the Compass-Affiliated Agents' Motion to Quash and Request for Sanctions as Exhibits U and V.

Leonard A. Gail
lgail@masseygail.com
Suyash Agrawal
sagrawal@masseygail.com
Constance Grieves
cgrieves@masseygail.com
Peter M. Stasiewicz
pstasiewicz@masseygail.com
William K. French
wfrench@masseygail.com
MASSEY & GAIL LLP
50 East Washington Street, Suite 400
Chicago, IL 60602
Tel: (312) 283-1590

Matthew M. Collette
mcollette@masseygail.com
MASSEY & GAIL LLP
1000 Main Avenue SW, Suite 450
Washington, D.C. 20024
Tel: (202) 652-4511

Joshua C. Stokes (State Bar No. 220214)
jstokes@sklarkirsh.com
Lilian M. Loh (State Bar No. 296196)
lloh@sklarkirsh.com
Sklar Kirsh, LLP
1850 Sawtelle Boulevard, Suite 300
Los Angeles, CA 90025
Tel: (310) 845-6416

*Attorneys for the National Association of REALTORS®*

## TABLE OF CONTENTS


INTRODUCTION ........ 1

I. COMPASS-AFFILIATED AGENTS' PRELIMINARY STATEMENT ........ 1

II. COMPASS-AFFILIATED AGENTS' STATEMENT OF THE RELEVANT BACKGROUND ........ 3

III. COMPASS-AFFILIATED AGENTS' LEGAL STANDARD ........ 6

IV. COMPASS-AFFILIATED AGENTS' ARGUMENT ........ 7

- A. The Subpoenas Are Unduly Burdensome, Overbroad, and Duplicative ........ 7
  - 1. The Subpoenas Seek Sweeping Information of Little Relevance. ........ 7
  - 2. The Subpoenas Seek Information That Could Have Been Obtained From a More Convenient Source or Are Duplicative. ........ 10
  - 3. The Subpoenas Are Retaliatory and Sanctions Should Be Imposed. ........ 11

V. COMPASS-AFFILIATED AGENTS' CONCLUSION AND REQUEST FOR RELIEF ........ 13

VI. NAR'S INTRODUCTORY STATEMENT ........ 14

VII. NAR'S STATEMENT OF THE RELEVANT BACKGROUND ........ 17

- A. Compass has an obvious interest in the outcome of the underlying dispute. ........ 17
- B. Compass shifted its positions throughout negotiations in a way that helps PLS and hurts NAR. ........ 20
- C. Compass initiated parallel proceedings in the Southern District of New York. ........ 23

VIII. NAR'S ARGUMENT ........ 24

- A. Compass's Motion to Quash Should Be Denied. ........ 24
  - 1. NAR Requests Relevant Information Given Alexander's Agreement to Testify. ........ 25
    - a) The deposition of Alexander implicates the Compass-Affiliated Agents' boots-on-the-ground knowledge. ........ 25
    - b) NAR seeks narrowly tailored documents and limited corresponding depositions. ........ 27
  - 2. Compass Has Not Shown Undue Burden. ........ 29
    - a) Boilerplate objections are flatly improper. ........ 30
    - b) The documents NAR seeks are not available from other sources. ........ 31
    - c) Compass's threadbare production in the prior phase of this case does not address NAR's requests. ........ 32

d) NAR has further narrowed its requests in light of the Alexander deposition. ....32

B. Compass's Request for Sanctions Should Be Denied. ....33

IX. NAR'S CONCLUSION ....34

## INTRODUCTION

Pursuant to Fed. R. Civ. P. 45 and Local Rule 37-2.1, Non-Parties Tracy Tutor ("Ms. Tutor"), Josh Flagg ("Mr. Flagg"), and Chris Cortazzo ("Mr. Cortazzo, and with Ms. Tutor and Mr. Flagg, the "Compass-Affiliated Agents") and Defendant National Association of Realtors ("NAR") submit the following joint stipulation regarding the Compass-Affiliated Agents' Motion to Quash NAR's Subpoenas and Request for Sanctions. Pursuant to Local Rule 37-1, the parties have conducted several pre-filing conferences and exchanged several pre-conference letters which are attached in the accompanying Declaration of Eric Fanchiang in Support of the Compass-Affiliated Agents' Motion to Quash and Request for Sanctions ("Fanchiang Decl.").

## I. COMPASS-AFFILIATED AGENTS' PRELIMINARY STATEMENT

Despite the fact that Compass, Inc. ("Compass"), the Compass-Affiliated Agents, and Compass's executives are not parties to and have no direct interest in this Action, NAR has served subpoenas on the Compass-Affiliated Agents and three high-ranking Compass executives seeking both deposition testimony and documents. The executives who received subpoenas are Compass's CEO Robert Reffkin ("Mr. Reffkin"); Compass's Chief Strategy Officer Ashton Alexander ("Ms. Alexander"); and Compass's President of Integrated Services Cory Perkins ("Mr. Perkins", and together with Mr. Reffkin and Ms. Alexander, the "Compass Executives"). Subpoenaing six non-party witnesses, including the Compass-Affiliated Agents and the Compass Executives, is unduly burdensome on its face. NAR further added to that burden by including with each subpoena between nine and sixteen enormously broad document requests. These requests demanded "[a]ll documents" relating to a wide swath of topics such as the agents' and executives' communications with clients and how those clients want to list their homes for sale; documents about membership in real estate trade associations; and indeed even communications with *NAR itself*—communications NAR could easily obtain from a

more convenient source: its own records. NAR served these requests even though Compass had already produced more than 250 documents (totaling more than 1300 pages) in the previous action that PLS brought against NAR but then dismissed ("Previous Action")—documents that NAR has access to in this Action.

Further, the breadth of the subpoenas—and indeed NAR's own representations—demonstrate that NAR has no interest in any information the Compass-Affiliated Agents, the Compass's Executives, and Compass may possess. Rather, NAR's motive behind the subpoenas seems to be retaliation against Compass for agreeing to put up even one executive for deposition testimony—even though both parties would have the opportunity to question that executive. NAR has essentially admitted that it only issued its subpoenas because PLS had issued a subpoena seeking deposition testimony from Mr. Reffkin. When Compass raised that it might move to quash PLS's subpoena to Mr. Reffkin, NAR seemed more than happy to drop all of the subpoenas it had issued. But when Compass proposed as a compromise position to provide Ms. Alexander as a deponent to both PLS and NAR, NAR decided that it again would try to enforce *all* of its subpoenas as to all six individuals, including the Compass-Affiliated Agents, unless Compass refused to put up *anyone* for deposition.

In short, the Compass-Affiliated Agents, the Compass Executives, and Compass are caught in the middle of a fight that they are not a part of and have no direct interest in. Even though they have no direct interest in the case and are non-parties to this Action, the Compass-Affiliated Agents, the Compass Executives, and Compass nonetheless tried to fulfill their obligations without being subject to undue burden. In the spirit of compromise, Compass has offered Ms. Alexander to sit for deposition for five hours, to be split equally between PLS and NAR. PLS, despite its continuing desire to depose Mr. Reffkin, has reasonably agreed to the compromise. NAR has not. NAR instead seeks to enforce all of its subpoenas as to all six witnesses, including the three Compass-Affiliated Agents, and continues to

seek both deposition testimony and documents relating to dozens of topics. NAR's behavior is plainly at odds with Fed. R. Civ. P. 45(d), which states that a party issuing a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena, *particularly* when the subpoenaed party is a non-party. NAR's behavior and discovery tactics against Compass-Affiliated Agents, the Compass Executives, and Compass fly directly in the face of how Fed. R. Civ. P. 45(d) and case law interpreting Fed. R. Civ. P. 45 demand that non-parties be treated. The Compass-Affiliated Agents thus ask this Court to quash the subpoenas NAR has issued to them[2] and that the Court impose sanctions in the form of reasonable attorney's fees and expenses against NAR for violating Fed. R. Civ. P. 45(d).

## II. COMPASS-AFFILIATED AGENTS' STATEMENT OF THE RELEVANT BACKGROUND

Compass is a real estate brokerage and is a customer of both PLS and NAR-affiliated multiple listing services ("MLSs"). Fanchiang Decl. at ¶ 3. Ms. Tutor, Mr. Flagg, and Mr. Cortazzo are all real estate agents affiliated with Compass and are all residents of Los Angeles, California. Fanchiang Decl. at ¶ 4. Mr. Reffkin is Compass's Chief Executive Officer and a resident of New York City, New York. Fanchiang Decl. at ¶ 5. Ms. Alexander is Compass's Chief Strategy Officer and is also a resident of New York City, New York. Fanchiang Decl. at ¶ 6. Mr. Perkins is Compass's President of Integrated Services and is also a resident of New York City, New York. Fanchiang Decl. at ¶ 7.

According to PLS's complaint filed on July 1, 2025, PLS is suing NAR in this Court alleging that NAR had violated the antitrust laws of the United States. Complaint at 1, *ThePLS .com, LLC. v. The National Association of Realtors*, Case

[2] The Compass Executives are all residents of New York City and therefore will be bringing their own motion to quash in the United States District Court for the Southern District of New York.

No. 2:25-cv-05971 (July 1, 2025) (ECF No. 1). This Action appears to center around NAR's market share, control over the MLSs, and a policy promulgated by NAR called the Clear Cooperation Policy, which requires NAR members who use MLSs to submit any property that is publicly marketed to an MLS within one business day of that public marketing. *Id.* at 4. The Compass-Affiliated Agents understand that this Action is essentially a refiling of a previous action that PLS brought against NAR but then dismissed (the "Previous Action"). *Id.* at 28-29. The Compass-Affiliated Agents, the Compass Executives, and Compass are *not* parties to this Action, *see id.* at 1, and Compass is not mentioned a single time in the Complaint, *see generally id.*

Compass produced over 250 documents totaling more than 1300 pages in the Previous Action. Fanchiang Decl. at ¶ 8. The Compass-Affiliated Agents understand that those documents were made available to the parties for use in this Action. Fanchiang Decl. at ¶ 8.

While several Compass executives and agents were listed on PLS's Fed. R. Civ. P. 26 initial disclosures in this Action, PLS amended those initial disclosures to remove them all. Fanchiang Decl. at ¶ 9. On June 9, 2026, PLS issued a subpoena seeking the deposition of Mr. Reffkin. Fanchiang Decl. at ¶ 10. In late July 2026, NAR served five subpoenas to each of Ms. Tutor, Mr. Flagg, Mr. Cortazzo, Ms. Alexander, and Mr. Perkins. Fanchiang Decl., Exs. A-C, F and G. All five subpoenas sought deposition testimony. Fanchiang Decl., Exs. A-C, F and G. In addition to seeking deposition testimony, the subpoenas to the Compass-Affiliated Agents included sixteen document requests, and the subpoenas to Ms. Alexander and Mr. Perkins included eleven document requests. Fanchiang Decl., Exs. A at 5-6; B at 5-6; C at 5-6; F at 5-6; and G at 5-6.

On August 12, 2026, Ms. Alexander and Mr. Perkins served objections to the subpoenas; on August 14, 2026, the Compass-Affiliated Agents served objections to the subpoenas. Fanchiang Decl. at ¶ 11. On August 18, 2026, counsel for NAR

and counsel for Compass met and conferred regarding the subpoenas. Fanchiang Decl. at ¶ 12. At that time, NAR agreed that the deposition dates and response dates for the subpoenas would be taken off calendar while further discussions about the NAR subpoenas were in progress. Fanchiang Decl. at ¶ 12.

On August 21, 2026, NAR served Mr. Reffkin with two subpoenas—one for deposition testimony and one for nine categories of documents. Fanchiang Decl. at ¶ 13. On September 4, 2026, counsel for Compass informed NAR that Mr. Reffkin would not testify at a deposition for *either* PLS or NAR. Fanchiang Decl. at ¶ 14. NAR seemed content to drop all of its subpoenas if Mr. Reffkin was not going to testify at a deposition. Fanchiang Decl. at ¶ 14. On September 22, 2026, counsel for Compass met and conferred with NAR and informed NAR that Compass was considering offering Ms. Alexander for deposition as a compromise solution that would satisfy both PLS and NAR. Fanchiang Decl. at ¶ 15. NAR responded, "if [Compass] intend[s] to make Ms. Alexander available for a deposition, we [will] pursue NAR's document subpoena to Ms. Alexander and the other NAR subpoenas sent to Compass representatives." Fanchiang Decl., Ex. O at 1.

On October 5, 2026, Compass sent NAR a letter reminding NAR of its obligation under Fed. R. Civ. P. 45 to avoid undue burden. Fanchiang Decl. at ¶ 16. Compass also informed NAR that it was clear that NAR's only intent behind the subpoenas was to retaliate against Compass to ensure that no one from Compass would testify. Fanchiang Decl., Ex. Q at 1. On October 9, 2026, Compass sent both NAR and PLS a letter with a final offer that they were willing to have Ms. Alexander testify at a five-hour deposition with both NAR and PLS getting equal time, but would not be producing any additional documents and would not be agreeing to any other depositions because of the extreme burden. Fanchiang Decl. at ¶ 17. PLS accepted that offer. Fanchiang Decl. at ¶ 18. NAR refused. Fanchiang Decl. at ¶ 18.

## III. COMPASS-AFFILIATED AGENTS' LEGAL STANDARD

Fed. R. Civ. P. 45(d)(1) states that a party issuing and serving a subpoena "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). A court must enforce that duty and impose appropriate sanctions, including lost earnings and reasonable attorney's fees, on a party who fails to take such reasonable steps. *Id.*; *Mattel, Inc. v. Walking Mountain Productions*, 353 F.3d 792, 814 (9th Cir. 2003) (affirming an award of attorneys' fees because the subpoena was overly burdensome and served for an improper purpose). The protections of Fed. R. Civ. P. 45(d)(1) apply particularly strongly to non-parties—courts have stated that "special weight" is given to the burden on non-parties. *See Amini Innovation Corp. v. McFerran Home Furnishings Inc.*, 300 F.R.D. 406, 409 (C.D. Cal. 2014) (explaining that concern for the unwanted burden thrust upon non-parties is a factor entitled to "special weight" in a Rule 45 inquire).

A determination of whether a subpoena imposes an undue burden "requires the court to weigh the burden to the subpoenaed party against the value of the information to the serving party." *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005). Factors to be considered in evaluating undue burden include the relevance of the requested discovery, the need of the party for the documents, the breadth of the document request, the time period covered, and the particularity with which the documents are described. *Id.* Courts must also consider whether the discovery sought is unreasonably cumulative or duplicative or obtainable from a more convenient source. *See Amini*, 300 F.R.D. at 409, 409. Though the party seeking to quash the subpoena bears the burden of persuasion on the motion to quash, the party issuing the subpoena still must demonstrate that the discovery sought is relevant. *See Moon*, 232 F.R.D. at 637; *see also Corbett v. eHome Credit Corp.*, No. 10-cv-26 (JG) (RLM), 2010 WL 3023870, at *2-3 (Aug. 2, 2010 E.D.N.Y.).

## IV. COMPASS-AFFILIATED AGENTS' ARGUMENT

The subpoenas issued to the Compass-Affiliated Agents should be quashed and sanctions issued against NAR. These subpoenas are facially unduly burdensome, overbroad, and duplicative, particularly in light of the Compass-Affiliated Agents' status as non-parties. Sanctions are further appropriate here because the Subpoenas are retaliatory in nature and because NAR has not complied with its obligations to reduce the burden on the non-party Compass-Affiliated Agents.[3]

### A. The Subpoenas Are Unduly Burdensome, Overbroad, and Duplicative

#### 1. The Subpoenas Seek Sweeping Information of Little Relevance.

The Subpoenas are unduly burdensome and overbroad because they seek huge amounts of information that is of little relevance to this Action. The subpoenas therefore should be quashed. It is a well-established principle that under Fed. R. Civ. P. 45, a party issuing a subpoena "must" take reasonable steps to avoid undue burden. Fed. R. Civ. P. 45(d). When weighing whether a subpoena is unduly burdensome, courts weigh the burden on the subpoenaed party against the value of the information sought and consider: the relevance of the information; the need of the party for the information; the breadth of the requests; the time period; and the particularity with which the information sought is described. *Moon*, 232 F.R.D. at 637. Sweeping requests that are "very broad" and seek "all documents" are particularly improper. *See Mattel Inc.*, 353 F.3d at 813-14; *see also Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 50 (S.D.N.Y. 1996) (stating that to the extent a subpoena "sweepingly pursues material with little apparent or likely relevance to the subject matter it runs the greater risk of 'being found overbroad

[3] The Compass-Affiliated Agents explicitly preserve their rights regarding documents and information protected by the attorney-client privilege, the work product privilege, or any other applicable privilege.

and unreasonable'" (quoting *United States v. Int'l Bus. Mach. Corp.*, 83 F.R.D. 97, 106-07 (S.D.N.Y. 1979)). Courts regularly hold that seeking documents over a period of ten years is unduly burdensome. *See Concord Boat*, 169 F.R.D. at 52-53 (finding that requests were overbroad on their face because they sought a huge swath of documents over a ten-year period). A party's status as a non-party must also be given "special weight" when considering the burden. *See Amini*, 300 F.R.D. at 409-10.

Here, the overbreadth of the subpoenas issued by NAR is clear on their face. The subpoenas seek documents for a period spanning nearly ten years. Fanchiang Decl., Exs. A-C at 3 (instruction stating that the requests seek responsive documents for the period of January 1, 2017 to the present). The subpoenas also included sixteen document requests to each agent—with every one of the requests seeking "all" documents or communications relating to a topic. Fanchiang Decl., Exs. A at 5-6; B at 5-6; C at 5-6. The requests cover expansive topics, from documents about *every single* listing that the Compass-Affiliated Agents put on an MLS or marketed outside of the MLSs; the Compass-Affiliated Agents' communications with their clients; communications with PLS; and communications with NAR. Fanchiang Decl., Exs. A at 5-6; B at 5-6; C at 5-6.

The document requests have little, if any, relevance to this Action. For example, the fourth and fifth requests seek "[a]ll Documents relating to or constituting all real estate listings" that the agents posted to an MLS or marketed outside of the MLSs. Fanchiang Decl., Exs. A at 5; B at 5; C at 5. This means these are seeking correspondence with clients with no relevance to NAR or PLS, such as discussions about how to stage a home, referrals to title and insurance companies, or a huge manner of other routine communications that agents have with their clients that have nothing to do with NAR or PLS. Fanchiang Decl., Exs. A at 5; B at 5; C at 5. Similarly, the tenth request to the Compass-Affiliated Agents seeks "All Communications with the NAR including any NAR employee or

Representative." Fanchiang Decl., Exs. A at 5; B at 5; C at 5. Setting aside that NAR should *already have their own documents* (discussed further below), there is simply no reason that NAR needs *all* communications with NAR—including communications that have nothing to do with the Clear Cooperation Policy, the MLSs, or PLS. These are just some of the most egregious examples from NAR's subpoenas—all of the document requests are repeatedly overbroad and of questionable relevance.

The request for depositions contained in the subpoenas are even worse—they seek unbound depositions with no restrictions whatsoever as to time period or subject matter. Such unbound depositions of Compass's agents are plainly improper and invite serious abuse and harassment. Nor would the depositions produce any relevant information. The Compass-Affiliated Agents are real estate agents. They are not Compass or NAR executives who would be setting any organizational strategies or policies relating to MLS usage, off-MLS marketing, Clear Cooperation, or NAR. Further, as discussed above, the document requests seek irrelevant information—NAR presumably would be seeking information about those same irrelevant topics at the deposition.

Despite the extreme breadth and the lack of relevance of the information sought, and despite the fact that Compass and the Compass-Affiliated Agents are non-parties to this Action, Compass has generously agreed to have one of its senior-most executives, Ms. Alexander, testify at a five-hour deposition. Fanchiang Decl. at ¶ 17. PLS has reasonably accepted this offer—NAR has not. Fanchiang Decl. at ¶ 18. And, as NAR knows, Compass previously produced hundreds of documents to the parties. Fanchiang Decl. at ¶ 16. There is simply no reason why NAR needs additional testimony from the Compass-Affiliated Agents here. In light of the overbreadth and the lack of relevance of the information sought by NAR, Compass and the Compass-Affiliated Agents' status as non-parties, the documents Compass has already produced, and Compass's offer to have Ms. Alexander testify, the

Subpoenas should be quashed. Sanctions should also be imposed, as NAR should have tried to reduce the burden on the Compass-Affiliated Agents by narrowing its discovery requests significantly before serving them or by simply accepting the fact that Compass had already produced hundreds of documents and was offering Ms. Alexander's deposition.

**2. The Subpoenas Seek Information That Could Have Been Obtained From a More Convenient Source or Are Duplicative.**

NAR's subpoenas also seek duplicative information and information that could have been obtained by a party to this Action—in some instances, NAR seeks *its own records*. The subpoenas should therefore be quashed. Courts have regularly held that the burden on a non-party must be given special weight. *See Amini*, 300 F.R.D. at 409-10. Indeed, "[c]ourts are particularly reluctant to require a non-party to provide discovery that can be produced by a party." *Id.* at 410. Further, discovery requests that are "unreasonably cumulative or duplicative" are improper and should be quashed. *See id.* at 409.

Here, the subpoenas are clearly duplicative. Each of the subpoenas, including the document requests contained in the subpoenas, are substantively identical except for the person to which they are served on. *Cf.* Fanchiang Decl., Exs. A, B, and C. They are also identical to the subpoenas and document requests served on Ms. Alexander and Mr. Perkins except the requests that the Compass-Affiliated Agents received about their individual listings. *Cf.* Fanchiang Decl., Exs. A at 1-6; B at 1-6; C at 1-6; F at 1-5; and G at 1-5. Again, Compass has already offered Ms. Alexander for deposition—there is simply no need for the Compass-Affiliated Agents to be asked to provide the exact same information.

Additionally, the subpoenas seek information that should have been sought from the parties in this Action. Perhaps most egregiously, NAR seeks from the Compass-Affiliated Agents documents *that NAR already has in its possession*. In its tenth document request to the Compass-Affiliated Agents, NAR seeks "All

Communications" that they had "*with NAR including any NAR employee or representative*." Fanchiang Decl., Exs. A, B, and C at 5 (emphasis added). NAR would of course already have any communications that the Compass-Affiliated Agents had with NAR. Similarly, the first two document requests to the Compass-Affiliated Agents seek documents related to their membership in any MLS—NAR, being the parent organization of the MLSs, would also have this information in its own records or in the records of entities that it has an affiliation with. Fanchiang Decl., Exs. A, B, and C at 5.

NAR also seeks documents that should instead be sought from PLS, the plaintiff in this Action. For example, the thirteenth requests to the Compass-Affiliated Agents seek "[a]ll Communications" with a number of PLS executives. Fanchiang Decl., Exs. A, B, and C at 6. All of these documents should have been sought from PLS.

Because the subpoenas are duplicates not only of each other but also of the subpoenas the Compass Executives received, there is simply no reason NAR should have issued all three subpoenas, especially where it already had hundreds of documents and where it was seeking documents that it already had or could have obtained from PLS. Fanchiang Decl. at ¶ 8. There is also no reason that NAR needs deposition testimony from three of Compass's agents and three of Compass's senior-most executives, particularly where Compass has already offered to provide deposition testimony from Ms. Alexander. Sanctions should therefore be imposed, as at minimum NAR should have tried to get *its own documents from itself* and get PLS's documents from the plaintiff.

### 3. The Subpoenas Are Retaliatory and Sanctions Should Be Imposed.

The history of the meet and confers demonstrates that the subpoenas are retaliatory and oppressive and were served for the purpose of intimidating Compass's witnesses to not comply with PLS's subpoenas. Therefore, sanctions

are appropriate. Where subpoenas are overbroad and targeted at a particular party, a court can reasonably conclude that the purpose of the subpoenas is oppressive and designed to "exert pressure on the witnesses not to testify." *Mattel*, 353 F.3d at 814 (affirming lower court's granting of motion to quash and sanctions because the court reasonably concluded that the subpoenas were served for the purpose of annoying and harassment and not really for the purpose of getting information.) In such a situation, sanctions in the form of attorney's fees are appropriate. *See id.* at 814.

As discussed above, the subpoenas are plainly overbroad, which supports the conclusion that the subpoenas were issued to intimidate and harass rather than for the legitimate information-seeking purposes. But this is not the only fact that supports that conclusion. During the meet and confer process, NAR made it clear that if Compass were to comply with PLS's subpoenas and put up *any* witness for deposition, NAR would make Compass suffer sixfold by enforcing *all* of its subpoenas. Fanchiang Decl. at ¶ 15. Then, when Compass suggested it might fight PLS's subpoena to Mr. Reffkin, NAR seemed perfectly happy to drop all of its subpoenas. Fanchiang Decl. at ¶ 14. When Compass informed NAR that it was considering offering up Ms. Alexander for deposition as a compromise to *both* PLS and NAR, NAR immediately decided it again wanted to enforce *all* of its subpoenas, including its subpoenas against the Compass-Affiliated Agents. Fanchiang Decl. at ¶ 15. To this day, NAR seeks to enforce all of its subpoenas, even though Compass has reasonably offered to put up Ms. Alexander for a five-hour deposition. Fanchiang Decl. at ¶ 18.

Indeed, NAR's own words demonstrate its retaliatory intent. On September 22, 2026, NAR's counsel e-mailed counsel for the Compass-Affiliated Agents and directly stated "if Ms. Alexander is deposed, NAR reserves the right to pursue depositions and documents for the other Compass representatives" and further asked that "you keep us updated about PLS's plans." Fanchiang Decl., Ex. O at 1.

Then, on September 28, 2026, NAR sent a letter to Compass directly stating its retaliatory intent that "if you intend to make Ms. Alexander available for a deposition, we [will] pursue NAR's document subpoena to Ms. Alexander and the other NAR subpoenas sent to Compass representatives." Fanchiang Decl., Ex. P at 2. NAR has never suggested that it will drop any of its duplicative subpoenas, and indeed, continues to firmly state that if Compass provides even *one* witness for a deposition, NAR will enforce *all* of its subpoenas. Fanchiang Decl, Ex. S at 1 (October 16, 2026 letter from NAR stating that "NAR will move to compel the documents and depositions it seeks if Compass stands on its unfounded, wholesale objections to NAR's discovery requests *while simultaneously making a Compass witness available to PLS for a deposition*." (emphasis added)).

Again, Compass has generously offered one of its senior-most executives, Ms. Alexander, as a compromise to *both* PLS and NAR. But just one deposition of Compass's senior executives is not enough for NAR. NAR's conditions are clear—either Compass refuses to put up any witnesses at all, or NAR will inflict six times the burden on Compass. This is simply not how a non-party is to be treated under the Federal Rules. *See Arminak v. Arminak & Associates, LLC*, No. CV 16-3382 JAK (SSx), 2017 WL 10402987 at 3 (discussing the special status that a non-party has when it comes to burden); *see also Concord Boat*, 169 F.R.D. at 52 (same); *Corbett*, 2010 WL 3023870, at 3 (same). Compass thus seeks an order quashing the subpoenas issued for an improper retaliatory purpose and imposing sanctions against NAR for failing to meet its obligations of avoiding undue burden under Fed. R. Civ. P. 45(d).

## V. COMPASS-AFFILIATED AGENTS' CONCLUSION AND REQUEST FOR RELIEF

As discussed above, NAR issued exceptionally broad and unduly burdensome requests, making essentially no effort to reduce the burden despite the Compass-Affiliated Agents' status as non-parties. NAR also is engaging in

retaliatory discovery in order to intimidate and stop Compass from complying with PLS's subpoenas. Compass thus asks that the Court quash all subpoenas issued by NAR to the Compass-Affiliated Agents, including because that to the extent PLS moves forward with the deposition of Ms. Alexander, during which PLS and NAR will each be entitled to equal time at that deposition for no more than a combined five hours. Compass also asks that because of NAR's failure to comply with Fed. R. Civ. P. 45(d) and because of NAR's retaliatory behavior, the Court impose sanctions on NAR in the form of reasonable attorneys' fees and any other relief or sanctions that the Court deems appropriate.

## VI. NAR'S INTRODUCTORY STATEMENT

Compass wants to supply PLS with the testimony of a friendly, handpicked Compass executive while refusing NAR any discovery to scrutinize her claims. That witness is Compass's Chief Strategy Officer, Ashton Alexander. Here, Compass attempts to clear the runway for Alexander's testimony by moving to quash NAR's subpoenas to the Compass-Affiliated Agents who used (or had agents who used) the PLS platform: Tracy Tutor, Josh Flagg, and Christopher Cortazzo. The Court should deny such gamesmanship.

The country's largest residential real estate brokerage with over $200 billion in annual sales volume, Compass is absolutely not a disinterested non-party "caught in the middle." It wants to help PLS because both PLS and Compass seek to invalidate policies like NAR's Clear Cooperation Policy (CCP) for their own benefit, at the expense of a transparent and competitive marketplace. Compass has campaigned vigorously to challenge the CCP from the time it was first proposed about seven years ago. In fact, PLS's emails show that Compass CEO Robert Reffkin and Alexander coordinated with PLS co-founder Mauricio Umansky in their shared "quest" against the CCP—Alexander circulated commentary about "***how important PLS.com v. NAR, the Ninth Circuit decision, is to Compass***."

A1018;[4] A7.

Compass has also publicly threatened MLSs that it would "spend millions of dollars to sue" them if they enforced rules related or similar to the CCP. A20–25; A1150–55; A1167–72. Those are not mere idle threats; Compass is actively litigating with several MLSs in this Court and in the Southern District of New York (S.D.N.Y.). *See, e.g.*, *Compass, Inc., et al. v. Cal. Reg'l Multiple Listing Serv. Inc.*, No. 26-cv-06121 (C.D. Cal. Oct. 16, 2026), ECF No. 1; *Ariz. Reg'l Multiple Listing Serv., Inc., et al. v. Compass Inc.*, No. 26-cv-09253 (S.D.N.Y. Oct. 22, 2026), ECF No. 1. Compass's public actions confirm its motive to help PLS and oppose NAR.

PLS first injected Compass witnesses, including the Compass-Affiliated Agents, into this case with its Rule 26(a)(1) disclosures. Compass asserts that PLS "amended those initial disclosures to remove [the Compass witnesses]." That is false. PLS confirmed as much. Grieves Decl. ¶ 55; A1050. NAR issued subpoenas to the disclosed witnesses. A29–31; A39–166; A168–296; A298–426; A428–555; A557–685. Compass served blanket, boilerplate objections, refusing to produce anything. A687–709; A711–37; A739–65; A767–89; A791–817. Despite NAR's many efforts to negotiate the scope of its requests, Compass's position never changed. A829–30; A826–27. It steadfastly refused to discuss the scope.

PLS then said it would depose Compass's CEO Robert Reffkin, whom PLS had not previously disclosed. So, NAR issued an even narrower set of document requests to Reffkin. A837–38; A840–968. Compass answered with the same boilerplate objections. A970–75; A977–94. It then confirmed that it would "***stand on all of its objections***." A996. After months of failed negotiation, Compass

---

[4] Citations to NAR's appendix of exhibits are denoted "A ___" to reference the page number of the appendix upon which the cited materials are located. All emphasis in such citations is added. Because this case tracks the parties' parallel proceedings in the Southern District of New York (discussed below), NAR has used its declaration and appendix from that matter as the template for its filings in this Court. NAR has excluded inapplicable exhibits from the declaration and used slipsheets in their place to ensure that the appendix numbering remains consistent.

issued a "final offer" under which Alexander would sit for a five-hour deposition yet would "***not be producing any documents.***" A1000. NAR offered again on October 13 to narrow its requests and address any burden Compass might identify. A1005–06. Compass never responded to that offer. Six days later, it announced that PLS had accepted Compass's offer of Alexander's deposition but that Compass would move to quash every subpoena NAR had served. A1008–9.

Compass's position is not reasonable. It insists that producing documents would be unduly burdensome, but it has offered no evidence of burden as to any specific request. Yet Compass finds the capacity to present a senior executive at PLS's request. And it now brazenly asks the Court to sanction NAR for ensuring it has the necessary tools to scrutinize Alexander's anti-CCP testimony.

This dispute is proceeding on two fronts. NAR's subpoena to Alexander is the subject of parallel proceedings—initiated Friday, October 23—in the S.D.N.Y., *Alexander, et al. v. The National Association of Realtors*, No. 26-mc-00525 (S.D.N.Y.). Compass has moved to quash, and NAR moves to compel. NAR maintains that Compass cannot offer Alexander for a deposition while refusing to produce any of her documents. *Id.*, A1196–1229. NAR has asked the S.D.N.Y. to transfer that action here for efficiency and because it would not prejudice Compass. Compass refused NAR's proposal to have this Court adjudicate both disputes.

The dispute before this Court now concerns NAR's document and deposition subpoenas to the Compass-Affiliated Agents. After rebuffing every one of NAR's overtures to discuss and negotiate a reasonable scope, Compass moves to quash every request based on boilerplate objections. And it does so before NAR has obtained any discovery from Compass pursuant to its subpoenas. Since Alexander is a high-level executive, her testimony may well refer to facts sourced from the Compass-Affiliated Agents. Alexander does not act as a day-to-day real estate agent; the Compass-Affiliated Agents do—***and*** they or their agents have used PLS. NAR needs this discovery to scrutinize Alexander's anticipated testimony, and

Compass's boilerplate objections do not show undue burden.

Timing matters. ***For weeks***, Compass insisted it would produce no witnesses if NAR sought any documents. A833–34. But on October 19—a month before the close of fact discovery—Compass said that it would present Alexander while moving to quash NAR's subpoenas. This last-minute about-face further reveals Compass's gamesmanship. It cannot clear the runway for its chosen witness's testimony by categorically refusing any related discovery requests.

## VII. NAR'S STATEMENT OF THE RELEVANT BACKGROUND

NAR did not inject Compass into this lawsuit. PLS did by listing five Compass witnesses (including the Compass-Affiliated Agents and Alexander) on its Rule 26(a)(1) disclosures. A29–31. Those disclosures were never amended to remove the Compass witnesses. Grieves Decl. ¶ 55; A1050. Given PLS's disclosures—and given Compass's willingness to present a senior executive for oral testimony—NAR is reasonably entitled to the discovery it needs to challenge that executive's anti-CCP testimony. Compass is well-heeled and motivated to help PLS. It cannot agree to selectively help PLS while stonewalling NAR.

### A. Compass has an obvious interest in the outcome of the underlying dispute.

PLS brought this antitrust lawsuit against NAR in this Court over the CCP. A1057–92. Broadly speaking, NAR—a national trade association of real estate professionals of all stripes—passed the CCP in November 2019 by an overwhelming vote of NAR's Board of Directors. A1190–94. In its most general sense,[5] the CCP promotes "clear cooperation" among its members. The policy states, in relevant part, that listing brokers who are MLS members must submit exclusive listings to that MLS for cooperation with other MLS participants within

[5] For the avoidance of doubt (and lest any party attempt to take these descriptions out of context), there are many details about the CCP, how it works, its relationship with other rules and structures, and other industry aspects that are simplified here.

one (1) business day of marketing a property to the public.[6] It promotes access to residential properties that are available for sale and that are publicly marketed for ***all*** NAR-member brokers and agents. Notably, the NAR-affiliated MLSs adopt, implement, and enforce the CCP—not NAR.

PLS contends that it was "formed as the 'Pocket Listing Service.'" A1059 ¶ 8. By joining its network, "licensed real estate professionals could ***privately share*** pocket listings with other licensed real estate professionals while avoiding the exposure of those listings through the NAR-affiliated MLSs." *Id.* PLS claims that the CCP "eliminates the viability of the private network of pocket listings," like its own. *Id.* ¶ 14. PLS records show that the Compass-Affiliated Agents, or their agents, used the PLS platform.

Compass and PLS have aligned interests regarding the CCP. According to its press release, Compass is "the largest residential real estate brokerage in the United States" with over "$262 billion in sales volume . . . in 2025." A1011–16. The company—and its CEO, Reffkin—have been vocal, public opponents of the CCP. Compass contends that the CCP is directly at odds with Compass's marketing plan, called Phased Marketing Strategy. A1131. This strategy includes a "Private Exclusive" phase in which listed properties are made available to "340,000 top agents across [***Compass's***] network of brokerages" but ***not*** to non-Compass real estate professionals who otherwise cooperate and compete with each other via the MLS. A1132.

[6] A Multiple Listing Service (MLS) is a collaborative broker network and database used to share comprehensive property listings and facilitate cooperation among real estate professionals. There are hundreds of MLSs around the country, some (but not all) of which are affiliated with NAR. Prior to the CCP's passage, most MLSs required mandatory submission by agents of all exclusive listings in a set time period following the execution of the listing agreement between the agent and their client, the home seller. The CCP was enacted in part to combat the problem of agents who were shirking their obligations under those "mandatory submission" principles through systematic abuse of an exemption, or purposeful non-compliance. The CCP only applies to those listings that were already subject to mandatory submission.

Compass has opposed the CCP for years.[7] Its CEO has publicly noted that Compass voted against the policy in 2019 and that it "has consistently lobbied NAR and the local MLSs for the removal of the policy."[8] A1174. Recently, Compass's campaign against the CCP has become even more aggressive. In July 2025, Compass announced that its agents would purposely violate the CCP by withholding listings from MLSs.[9] A1095. Compass's senior-most executives, including Alexander, have been in contact with a PLS co-founder, Mauricio Umansky, in their "quest" to challenge the CCP. For example:

- On September 7, 2024, Umansky sent Reffkin an email titled "Introduction CCP," introducing him to a reporter and asking how Umansky could "help and continue with the quest." Reffkin responded by adding "[Alexander] our head of strategy" to the email and proposed a meeting. A1018.
- Then, on September 15, 2024, Reffkin emailed Umansky an advance copy of a writing criticizing the CCP. A1020 ("While the Clear Cooperation Policy may appear to serve a noble purpose of transparency, it imposes restrictions that must be questioned…" and "it is an ethical imperative to challenge such policies"). *Id.*
- On January 16, 2025, Alexander sent Umansky a detailed "summary of our perspective" on the CCP. A1024. It included "stats from several surveys of homeowners, which demonstrate consumer demand for the option to list off-MLS…", asserts that the CCP "poses immediate and serious legal risk," that "[t]he DOJ has opened two

---

[7] *See*, *e.g.*, A1157–60 (urging NAR and MLSs to "remove 'mandatory' rules like Clear Cooperation"); A1162–66 (calling support for the CCP "all financially motivated"); A1180–89 (urging MLSs to stop enforcing the CCP and warning of litigation risk).

[8] A1174–78.

[9] A1094–98.

anti-trust investigations into Clear Cooperation," and that the CCP "has led to Private Listing Service (PLS) . . . suing NAR," A1024-25; and points homeowners to Compass's website, www.compass-homeowners.com, A1028. Reffkin replied, "I hope you find this helpful Mauricio." A1024.

- On July 30, 2025, Alexander sent Umansky an email forwarding an industry article which referenced "***how important PLS.com v. NAR, the Ninth Circuit decision, is to Compass***" in connection with Compass's litigation against an MLS. A7.

Escalating its challenge to the CCP, Compass has threatened multiple MLSs around the country with "potential antitrust litigation" for having "a rule requiring real estate professionals to submit listings to the MLS and consequently market their clients' homes only as allowed" by the rules of the respective MLS. A22; A1152; A1169. Compass concluded these letters with a clear threat: "***we will spend millions of dollars to sue [you] and other MLSs to accomplish those goals***." A24; A1154; A1171. And Compass is in active litigation with at least six separate MLSs over their cooperation rules that track the CCP. A1144. Two of those cases are in the S.D.N.Y.,[10] and one—which Compass brought—is in the Central District of California (C.D. Cal.),[11] the jurisdiction where Compass is asking to transfer ***all*** of the MLS-related litigation. A1100.

### B. Compass shifted its positions throughout negotiations in a way that helps PLS and hurts NAR.

PLS—not NAR—involved Compass in this case. PLS identified five Compass witnesses, including the Compass-Affiliated Agents and Alexander, in its

[10] *Cal. Reg'l Multiple Listing Serv. Inc. v. Compass, Inc.*, No. 26-cv-08796 (S.D.N.Y. Oct. 5, 2026); *Ariz. Reg'l Multiple Listing Serv., Inc., et al. v. Compass Inc.*, No. 26-cv-09253 (S.D.N.Y. Oct. 22, 2026).

[11] *Compass Inc. v. Cal. Reg'l Multiple Listing Serv. Inc.,* No. 5:26-cv-06121 (C.D. Cal. Oct. 16, 2026).

initial disclosures. A29–31. PLS described these five individuals identically as witnesses who may testify about "[c]onsumer demand for off-MLS listing services, the Clear Cooperation Policy and its anticompetitive effects." *Id.* Compass's false accusation of retaliation is refuted by what actually happened.

- **July 20** – NAR served subpoenas for depositions and documents on Alexander, Cortazzo, Flagg, Perkins, and Tutor—the only Compass witnesses on PLS's initial disclosures.[12] A39–166; A168–296; A298–426; A428–555; A557–685. At the same time, NAR served subpoenas on all other non-Compass brokers in PLS's disclosures as part of routine discovery to avoid surprise should any testify at trial.
- **July 23** – PLS circulated to NAR a friendly Notice of Deposition—not a subpoena—it had apparently served on Reffkin. A1030–33. NAR did not learn that PLS had served a *subpoena* on Reffkin until Compass filed its motion to quash. Grieves Decl. ¶ 56.
- **August 12** – For the original five witnesses, Compass served boilerplate objections to virtually every aspect of the subpoenas—from the instructions, to the definitions, to the requests themselves. A687–709; A711–37; A739–65; A767–89; A791–817. It declared that it would "not be producing any documents and will not be appearing for any depositions." A833–34.
- **August 18** – NAR attempted the first meet-and-confer with Compass to discuss its objections. A1036. Compass insisted that, as a third party, it had no duty to comply with the subpoenas whatsoever but indicated a willingness to reach a compromise in good faith. *Id.*
- **August 21** – Given Compass's apparent agreement to present Reffkin for deposition on October 13, NAR logically issued its own cross-subpoena,

[12] Compass asserts that PLS has since dropped these witnesses from its Rule 26(a)(1) disclosures, but this is incorrect. PLS has *not* amended its disclosures. Grieves Decl. ¶ 55; A1050.

including document requests. A837–38; A840–968. Consistent with NAR's earlier willingness to narrow its requests, NAR's subpoena targeted nine precise requests for documents, the bare minimum to adequately prepare for cross-examination. A846–47.

- **August 26** – In NAR's effort to confer with Compass over the scope of its earlier document requests, and following days of silence, Compass summarily announced that NAR's new, narrow subpoena on Reffkin presented a "significant shift" in Compass's willingness to provide discovery. A826–27.
- **September 4** – Compass served boilerplate objections to NAR's subpoena on Reffkin. When NAR directly asked Compass to "confirm your position that Compass's CEO is agreeing to testify but … unwilling to produce any documents," Compass responded that Reffkin "does not agree to testify." A823.
- **September 22** – Compass told NAR that it was considering offering Alexander for a deposition in the place of Reffkin. A1036.
- **September 28** – NAR replied:

> ***We remain open to further meeting and conferring*** to address any concerns you have with NAR's subpoenas to Compass witnesses. But we will not allow Compass to unfairly assist PLS in this litigation by making PLS's chosen witness or witnesses available for depositions while simultaneously refusing to produce other documents or witnesses in response to NAR's subpoenas. A1037.

- **October 5 –** Compass stated that it would "stand on all of its objections." A996.
- **October 9** – Compass proposed what it called its "final offer":

> Compass will put up Alexander, who is the individual at Compass most likely to have information potentially relevant to this case, for one deposition of five hours. No other Compass or

> Compass-affiliated witnesses will be appearing for a deposition. ***Compass will not be producing any documents***, as it has already previously produced hundreds of documents. ***If the parties do not accept,*** Compass will have no choice but to ***move to quash all of the subpoenas*** under Fed. R. Civ. P. 45. A1000 (emphasis added).

- **October 10 –** PLS announced that it would not accept these terms, stating its continued desire for Reffkin's testimony. A1002.
- **October 13 –** NAR said that it would "not agree to allow Compass's CEO or any other executive to sit for a limited deposition in which NAR cannot effectively cross-examine because Compass refused to comply with validly served subpoenas." A1005. And NAR proposed ***once again*** to negotiate with Compass to narrow its "document requests and address any burden concerns [Compass] may have." *Id.*
- **October 15** – With the fact-discovery deadline a month away, PLS suddenly suggested that it may agree to Compass's proposal for only Alexander's testimony. A1039-40. NAR promptly replied that it would not sit idly by observing PLS's and Compass's deal-making and would enforce its own subpoenas. A1043-44.
- **October 19** – Compass sent a letter announcing that it would effectively give PLS what it wanted—Alexander's deposition—while contesting all of NAR's subpoenas: "Compass will be moving to quash all subpoenas that NAR has issued to Compass executives and Compass affiliated agents, with the exception that Compass continues to offer NAR its fair share of Alexander's five-hour deposition." A1008. Compass agreed with NAR that the parties have exhausted their meet-and-confer efforts on this matter. *Id.*; *see also id.* at 2.

### C. Compass initiated parallel proceedings in the Southern District of New York.

On October 23, Compass filed a motion to quash in the S.D.N.Y. with

respect to the subpoenas that NAR had served on the three Compass Executives—Reffkin, Alexander, and Perkins—who all live in New York. A1231–50. On October 27, NAR cross-moved to compel Alexander's production of the last, ***narrowest*** set of document requests that NAR served on a Compass Executive (Reffkin). A1196–1229. These documents represent the bare minimum that NAR would require to effectively cross-examine Alexander, now that Compass and PLS have agreed to depose her.

NAR had asked Compass before the S.D.N.Y. filings if Compass would consent to litigating all the subpoenas in the C.D. Cal. The parties at the time knew that they would be filing the instant dispute, concerning the Compass-Affiliated Agents, in this Court, so NAR proposed combining the litigations for the sake of efficiency and consistency. Compass refused. NAR has asked the S.D.N.Y. to transfer the cross-motions here under Federal Rule of Civil Procedure 45(f); that request remains pending, as do the parties' cross-motions to quash and compel as to the Compass Executives.

## VIII. NAR'S ARGUMENT

***First,*** this Court should deny Compass's motion to quash the document and deposition subpoenas to the Compass-Affiliated Agents. The subpoenas request relevant information given Alexander's deposition and do not pose an undue burden. ***Second,*** the Court should deny Compass's sanctions request. PLS, not NAR, injected Compass witnesses into this case, and NAR has attempted to reduce Compass's purported (and unsupported) burden throughout the process.

### A. Compass's Motion to Quash Should Be Denied.

"The scope of discovery allowed by a subpoena is identical to the scope of discovery under Rule 26." *Poe v. Nw. Mut. Life Ins. Co.*, No. SA CV 21-2065-PA(EX), 2022 WL 22228503, at *1 (C.D. Cal. June 14, 2022) (quotation marks, citation, and alteration omitted); *see also* Fed. R. Civ. P. 26(b)(1) ("Parties may

obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ."). "The burden of persuasion on a motion to quash is on the moving party." *Fauceglia v. Univ. of S. Cal.*, No. CV1904738FMOJEMX, 2021 WL 6752008, at *1 (C.D. Cal. Sept. 7, 2021). Third parties "are not immune" from discovery; they may not "simply invoke generalized objections" to avoid their obligations. *Blagman v. Apple Inc.*, No. CV138496PSGPLAX, 2014 WL 12607841, at *3 (C.D. Cal. Jan. 6, 2014).

**1. NAR Requests Relevant Information Given Alexander's Agreement to Testify.**

First, NAR's requests seek relevant information in light of Compass's agreement to offer Alexander for a deposition. The Federal Rules of Civil Procedure accommodate a "broad scope of discovery." *D'Agostino v. Circle K Stores Inc.*, No. CV-26-01225-PHX-JAT, 2026 WL 1660344, at *2 (D. Ariz. June 9, 2026). This includes complementary—not substitute—forms of discovery, like depositions and document production. *See, e.g.*, *Tennison v. City & County of San Francisco*, 226 F.R.D. 615, 622 (N.D. Cal. 2005) (explaining that "documentary evidence is often necessary to assist in the examination of a witness, either to show inconsistencies or to refresh the witness' recollection").

**a) The deposition of Alexander implicates the Compass-Affiliated Agents' boots-on-the-ground knowledge.**

Alexander's forthcoming deposition—and the documents NAR has requested in its S.D.N.Y. motion to compel—may well implicate the testimony or documents of the Compass-Affiliated Agents. The stakes are high. Because Alexander is outside the subpoena power of the C.D. Cal., her deposition testimony will likely serve as trial testimony for PLS. NAR therefore needs discovery from the Compass-Affiliated Agents to scrutinize her anti-CCP testimony.

***The Compass-Affiliated Agents serve a different role than Alexander.*** PLS identified the Compass-Affiliated Agents as individuals who may have relevant

information when it named each in its initial disclosures. A30–31. Compass asserts that PLS "amended those initial disclosures to remove" the Compass-Affiliated Agents, but that is false, as PLS confirmed. Grieves Decl. ¶ 55; A1050. PLS thus injected Compass into this dispute and has not changed its position, including as to the Compass-Affiliated Agents. The reason for PLS's position may well be that its records indicate that the Compass-Affiliated Agents or their agents ***all used PLS's platform***.[13]

The Compass-Affiliated Agents' use of PLS demonstrates the distinction between them and Alexander, Compass's Chief Strategy Officer. Alexander does not act as a day-to-day real estate agent interfacing with home buyers and sellers; the Compass-Affiliated Agents do, and in that role, they have used PLS's services. In fact, in its S.D.N.Y. brief (concerning the Compass executives like Alexander), Compass cites the apex doctrine for the proposition that "[c]ourts generally refuse to allow the deposition of a high-level executive before the testimony of lower-level employees with closer knowledge of the case has been secured." A1246. This all but admits that the Compass-Affiliated Agents are better suited to testify based on personal knowledge than an executive like Alexander. Compass cannot simultaneously argue in the S.D.N.Y. that NAR should have pursued discovery from individuals with boots on the ground and then tell this Court that it should quash NAR's subpoenas to such individuals. It cannot have its cake and eat it, too.

***Alexander's deposition testimony will likely implicate the boots-on-the-ground knowledge of the Compass-Affiliated Agents.*** PLS has refused to detail the testimony it expects to elicit from Alexander. Its Rule 26(a)(1) disclosures vaguely describe her potential subjects of testimony as: "Consumer demand for off-MLS listing services, the Clear Cooperation Policy and its anticompetitive effects."

[13] PLS listing records indicate that Tutor and Flagg were PLS users and listed properties with PLS; those records also show a listing involving an agent using a chriscortazzo.com email, likely associated with Cortazzo's brokerage. Grieves Decl. ¶ 61.

A29-31. PLS identified the same subjects for all Compass witnesses, executives and agents alike. When NAR asked PLS for more information on this point, PLS once more referenced this general disclosure and added that Alexander has "interacted with NAR directly on Clear Cooperation issues."[14] PLS in no way ties Alexander's anticipated testimony to any precise subject. Nor has it promised to limit its questioning to matters supported by documents that have already been produced. A1047–48.

This vagueness makes it hard to see how Alexander, Compass's Chief Strategy Officer, could even testify from personal knowledge on PLS's proffered subjects. For example, testimony about "[c]onsumer demand for off-MLS listing services," A29–31, would seem to be based on hearsay and likely inadmissible expert testimony drawn to some degree from the boots-on-the-ground perspective that the Compass-Affiliated Agents provide. For example, the agents are the ones who ***actually use listing networks, including PLS,*** or implement Compass's Three-Phased Marketing Strategy with their clients. They are the witnesses able to speak to client demand for off-MLS listings or the relative use of MLS and off-MLS listings in their practice. Again, Compass effectively concedes Alexander's limited personal knowledge in the S.D.N.Y. by arguing that NAR and PLS should not have even subpoenaed any Compass executives under the apex doctrine.

If Compass is willing to put up a senior executive for a deposition in which she will provide anti-CCP testimony, NAR is entitled to the information that purportedly supports her claims.

**b) NAR seeks narrowly tailored documents and limited corresponding depositions.**

In light of Alexander's agreement to testify and the vague topics of the testimony that PLS plans to elicit, NAR has identified the narrow documents to

[14] In connection with Alexander's interactions with NAR, PLS points—still with no specific citations—to documents that NAR has produced. A1047.

which it is entitled to ensure that it can scrutinize Alexander's claims during her deposition. These topics relate to PLS's indication that it will ask Alexander about the "[c]onsumer demand for off-MLS listing services." A29–31. And they are all encompassed in NAR's original document requests to the Compass-Affiliated Agents—including for "[a]ll Documents relating to or constituting all real estate listings You posted to thePLS.com from January 2017 through the Present," "[a]ll Documents and Communications related to consumer and/or client demand for off-MLS listing services," and "[a]ll Documents and Communications related to Agent demand for off-MLS listing services." A174–75, A304–05, A563–64.

Specifically, NAR needs the following documents from the Compass-Affiliated Agents before Alexander's deposition (which has not been scheduled):

1. Documents about the Compass-Affiliated Agents' use of PLS or any other private listing service, including but not limited to member confirmation and payments.
2. Documents about the listings the Compass-Affiliated Agents posted on PLS's platform, including but not limited to listing agreements, sale agreements, closing statements, and client files.
3. Documents about how, pursuant to any iteration of Compass's Three-Phased Marketing Strategy, Compass directs its affiliated agents to use disclosure agreements when entering into listing agreements.

These documents all speak to the purported demand for off-MLS listing services. PLS—which, again, the Compass-Affiliated Agents or their agents have used—is an example of an off-MLS listing service. NAR is entitled to documents about how they actually used PLS so it can test Alexander's testimony, which will ostensibly support PLS's position that there is in fact demand for these services. And as mentioned above, Compass's Three-Phased Marketing Strategy includes a "Private Exclusive" phase in which listed properties are made available to "340,000

top agents across [***Compass's***] network of brokerages" but ***not*** to non-Compass real estate professionals who otherwise cooperate and compete with each other via the MLS. A1132. NAR is entitled to the documents about how Compass discloses this arrangement to sellers as that too speaks to the purported demand for off-MLS listing services and whether it is indeed driven by sellers' preference—or rather by agents' business interests.

Because NAR needs these documents to scrutinize Alexander's claims during her deposition, the Compass-Affiliated Agents must produce them in a timely fashion sufficiently before the deposition. In addition, NAR reserves the right ***at its option*** to depose the Compass-Affiliated Agents—the ones with firsthand knowledge given their use of PLS—following Alexander's deposition. If NAR pursues such depositions, it will agree to depose only two of the three Compass-Affiliated Agents, to be determined after a review of their documents. And consistent with Compass's offer as to Alexander, NAR will agree to depose the two witnesses for five hours each (2.5 hours for NAR, 2.5 hours for PLS).

This circumscribed set of discovery identifies the pinpoint documents, and depositions, NAR needs to challenge Alexander's anticipated, anti-CCP testimony.

**2. Compass Has Not Shown Undue Burden.**

Second, Compass fails to carry its burden of showing that the requests pose an undue burden, *Fauceglia*, 2021 WL 6752008, at *1, its sole basis for moving to quash. The test for undue burden weighs "the burden to the subpoenaed party against the value of the information to the serving party." *Aleman v. Riverside Cnty. Sheriff's Dep't*, No. EDCV 22-269-CJC (KK), 2023 WL 4680925, at *2 (C.D. Cal. June 9, 2023). Courts consider "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Id.* (citation omitted).

**a) Boilerplate objections are flatly improper.**

It is well established that boilerplate objections, including ones for burden, fail. *See, e.g.*, *Nguyen v. Lotus By Johnny Dung Inc.*, No. SACV1701317JVSJDEX, 2019 WL 4570032, at *4 (C.D. Cal. Apr. 12, 2019) ("General or boilerplate objections are improper - especially when, as here, she has failed to submit any evidentiary declarations supporting most of her objections."). To the contrary, "[f]or a burdensomeness argument to be sufficiently specific to prevail, it must be based on affidavits or other evidence showing the exact nature of the burden." *Blagman*, 2014 WL 12607841, at *3. So Compass may not assert objections based on a purported burden without explaining the precise burden compliance imposes.

Yet that is exactly what Compass has done. Its responses to every subpoena served by NAR on the Compass-Affiliated Agents assert these improper generic, copied-and-pasted burden objections. *See, e.g.*, A714 ("Cortazzo objects to the entire Subpoena, the request for deposition testimony, and the Document Requests as requiring Cortazzo to search for information that is not reasonably accessible because of undue burden or cost."); A742 (same for Flagg); A794 (same for Tutor). These are the quintessential boilerplate objections that should be rejected. That means that Compass has not carried its burden of refuting NAR's requests.

Compass repeatedly notes that it is a third party. So Compass is willing to present its second-most senior executive for deposition, yet when convenient, it invokes its third-party status to evade the corresponding, necessary discovery to scrutinize her claims. This is improper. Third parties are "not immune" from "the burdens of discovery" and may not "simply invoke generalized objections" to avoid their obligations. *Blagman*, 2014 WL 12607841, at *3. This is especially true for third parties like Compass and Alexander, who have a strong interest in the outcome of the case given Compass's demonstrated antagonism towards the CCP, as detailed above. *Cf. Balfour Beatty Infrastructure, Inc. v. PB & A, Inc.*, 319

F.R.D. 277, 281–82 (N.D. Cal. 2017) (declining to shift costs based on the subpoenaed party's practical "interest in the outcome of the underlying case").

Compass's absolute refusal to negotiate further undermines its claim of undue burden. NAR proposed narrower requests and repeatedly attempted to negotiate in good faith. A818–35. Compass never reciprocated. "[G]iven [NAR's] willingness to address [Compass's] concerns so as to make the subpoena less burdensome to respond to, the subpoena does not place an undue burden on [Compass]." *In re Ex Parte Application of Kleimar N.V.*, 220 F. Supp. 3d 517, 522 (S.D.N.Y. 2016); *see also, e.g.*, *Balfour Beatty Infrastructure, Inc*, 319 F.R.D. at 283 (concluding that the issuing party had "engaged in discussions . . . to narrow the subpoena, resulting in a" narrower scope that "was not unduly burdensome.

Simply put, Compass has agreed to put up a high-level executive as a friendly deponent for PLS but categorically refused to allow NAR the discovery that it needs to refute her anti-CCP testimony. Compass's boilerplate burden objections do not allow it to clear the runway for Alexander to give PLS favorable testimony without relevant and proportionate cross-examination material.

**b) The documents NAR seeks are not available from other sources.**

Only the Compass-Affiliated Agents and Compass can provide the documents responsive to NAR's targeted requests. The documents the parties themselves have produced that involve Compass employees are limited in scope. For example, they do not entail the Compass-Affiliated Agents' listing agreements, which would reflect seller opt-outs of the MLS, or show whether off-MLS marketing was driven by seller preference or the agent's business objectives. The bare listing information that PLS produced does not absolve Compass of its duties; PLS, for example, never tracked sales data. A1254. Indeed, the documents of the Compass-Affiliated Agents have never been searched. And PLS has indicated that it expects to question Alexander beyond the scope of already-produced materials.

So it is eminently unfair to deny NAR the documents (and depositions) it needs to properly scrutinize her testimony.

**c) Compass's threadbare production in the prior phase of this case does not address NAR's requests.**

Finally, Compass argues that it may flatly refuse document production because it produced about 250 documents in a prior phase of this litigation (*PLS I*).[15] This is a red herring. ***Those few documents were produced in response to a subpoena from PLS, not NAR***. A1037. The production came from a single executive, non-agent custodian—not any of the Compass-Affiliated Agents. *Id.* It contained two documents from 2021 and no documents dated beyond July of that year. Much has happened since involving Compass and the CCP. For example, from September 2024 through at least July 2025, Compass's CEO and Alexander communicated with Umansky about their "quest" against the CCP. A1018; A4–A19. None of these issues is (or could be) reflected in the small *PLS I* production. So the documents do not, for example, reflect Compass's recent policies on its off-MLS business strategy. Nor do the documents contain information about how the agents used PLS and the types of properties they listed there.

**d) NAR has further narrowed its requests in light of the Alexander deposition.**

As explained above, NAR has been willing throughout the negotiations—and remains willing now—to narrow its requests to the Compass-Affiliated Agents. The pinpoint documents that NAR requests in Section VIII.A.1(b), above, are narrowly tailored to this dispute. They therefore further address Compass's (unsubstantiated) claims of undue burden. *See, e.g.*, *Balfour Beatty Infrastructure, Inc.*, 319 F.R.D. at 283 (concluding that the issuing party had "engaged in

[15] PLS first sued NAR and three MLSs over the CCP in May 2020 in *PLS.com, LLC v. Nat'l Ass'n of Realtors et al.*, 2:20-cv-04790 (C.D. Cal.) (*PLS I*). PLS voluntarily dismissed *PLS I* in early 2024. In July 2025, it refiled the current underlying case, *PLS II,* 2:25-cv-05971 (C.D. Cal.). A1057–92.

discussions . . . to narrow the subpoena, resulting in a" narrower scope that "was not unduly burdensome"); *see also Cooper v. County of San Luis Obispo*, 350 F.R.D. 625, 635–36 (C.D. Cal. 2025) (noting that the plaintiff had offered "specifically identified categories" of her original document requests and granting her motion to compel as to the narrower categories. This Court should deny Compass's motion to quash the subpoenas to the Compass-Affiliated Agents.

### B. Compass's Request for Sanctions Should Be Denied.

Finally, this Court should deny the Compass-Affiliated Agents' request for sanctions. As a preliminary matter, Compass's authority for this point is a Ninth Circuit opinion that concerns sanctions under then-Rule 45(c)(1), which is now Rule 45(d)(1). *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 814 (9th Cir. 2003); *see also* Fed. R. Civ. P. 45(d)(1) (authorizing sanctions). In the Ninth Circuit, "courts have interpreted Rule 45 (d)(1) sanctions as applying primarily to reimburse a non-party's costs incurred in ***complying*** with a subpoena, not merely litigating a motion to quash." *Cox v. Summit at Turtle Ridge Cmty. Ass'n*, No. 24-CV-03270-VC, 2025 WL 404595, at *1 (N.D. Cal. Feb. 5, 2025) (quotation marks and citation omitted). Compass has never complied with NAR's subpoenas, so sanctions under Rule 45(d)(1) should be denied on that basis.

Either way, Compass's request is predicated on the unfounded accusation—including material misstatements of facts—that NAR issued the subpoenas in bad faith as an oppressive tactic to discourage Compass's witnesses from testifying. This claim is baseless and completely false. NAR pursued proportionate discovery against only those Compass witnesses PLS specifically injected into the case. PLS first brought Compass into this case through its Rule 26(a)(1) disclosures, prompting NAR's routine subpoenas to understand the testimony they might offer at trial and the documents supporting or contradicting it. Contrary to Compass's assertion, those disclosures were never amended and to this day include the

Compass witnesses, including the Compass-Affiliated Agents. Days after NAR issued those subpoenas, PLS circulated a notice of deposition for an undisclosed witness who also happened to be Compass's CEO (with Compass's apparent consent). A1030–33. Only then did NAR serve its narrowly tailored subpoena to Reffkin. A840–968. The retaliation accusation thus falls flat; NAR did not issue the subpoenas "for an improper purpose." *Mattel, Inc.*, 353 F.3d at 814.

Also, Compass has provided no facts demonstrating that NAR's subpoenas impose an undue burden. *E.g.*, *Nguyen*, 2019 WL 4570032, at *4. Nor can Compass credibly claim undue burden. Throughout the process, ***NAR*** was the party trying to negotiate with Compass to reach a mutually agreeable solution that would avoid motion practice and would allow NAR to get the documents needed to adequately approach the ever-changing potential Compass deponent or deponents. Had Compass engaged in good faith instead of resting on boilerplate objections, shifting positions, and refusing to negotiate, this discovery dispute could have been avoided.

NAR does not deny that it would withdraw its document subpoenas if no Compass witness testified. That is the entire point. If Compass agrees with PLS to put up a hand-selected witness for testimony, NAR must insist that it have a fair chance to scrutinize her claims through related discovery. Compass cannot use this motion to clear the runway for its handpicked witness to provide anti-CCP testimony that will be played at trial. A holding to the contrary would severely prejudice NAR and endorse the gamesmanship Compass has deployed throughout negotiations.

## IX. NAR'S CONCLUSION

This Court should deny Compass's motion to quash the subpoenas to the Compass-Affiliated Agents and for sanctions. It should order Compass to produce to NAR the documents requested in Section VIII.A.1(b) sufficiently before Alexander's deposition. And NAR reserves the right to, at its option, depose two of

the Compass-Affiliated Agents consistent with the parameters discussed in Section VIII.A.1(b).

Dated: October 30, 2026

CROWELL & MORING LLP

By: */s/ Chahira Solh*
Chahira Solh

*Attorney for Non-Parties Tracy Tutor, Josh Flagg, and Chris Cortazzo*

Dated: October 30, 2026

MASSEY & GAIL LLP

By: */s/ Suyash Agrawal*
Suyash Agrawal

*Attorney for the National Association of REALTORS®*

## FILER'S ATTESTATION

I, Chahira Solh, pursuant to Civil Local Rule 5-4.3.4(a)(2)(i), attest that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated: October 30, 2026

*/s/ Chahira Solh*
Chahira Solh